## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**WILLIAM H. STEINBRINK, M.D. and** )
**PATRICIA M. STEINBRINK, his wife,** )
    **and** )
                )
**BAYSIDE OBSTETRICS** )
**GYNECOLOGY INFERTILITY, INC.** )
**401(k) PROFIT SHARING PLAN,** )
                )
    **Plaintiffs,** )
                )
    **v.** )    **Civil No. 01-382 Erie**
                )    **(FILED UNDER SEAL)**
**ROTHSTEIN, KASS & COMPANY,** )
**P.C.; STUART BENDER, partner;** )
**B. HAUPTMAN & ASSOCIATES, LLC;** )
**and BRUCE A. HAUPTMAN,** )
                )
    **Defendants.** )
                )

## Opinion

Plaintiffs William H. Steinbrink, M.D., his wife Patricia M. Steinbrink, and Bayside

Obstetrics Gynecology Infertility, Inc. 401(k) Profit Sharing Plan commenced this action setting

forth fifteen counts against eight Defendants involved in managing or auditing investment

partnerships in which the Plaintiffs invested and subsequently lost their investment. Following the

filing of motions to dismiss by the Defendants, Plaintiffs have voluntarily dismissed four of the

Defendants (Genesis Capital Fund, LP, Gamelan Capital Fund, LP, William Hurlin, and Susan

Silvers) and have withdrawn two counts (Count XII alleging RICO Conspiracy, and Count XIII

alleging violations of the Commodity Exchange Act of 1974). Therefore, there are thirteen Counts

remaining asserted against four Defendants: B. Hauptman & Associates, LLC ("BHA"), an

investment management consulting firm; Bruce A. Hauptman, the President of BHA; Rothstein,

Kass & Company, P.C. ("RKC"), a professional corporation that provides, among other things,

auditing services to investment companies; and Stuart Bender, a partner in RKC.

Plaintiffs allege self-dealing, fraud, conversion, breach of contract, conspiracy, violations of RICO, and securities violations concerning, in general, the conduct and management of the investment partnerships against BHA and Mr. Hauptman. Against RKC and Mr. Bender Plaintiffs allege negligence, negligent and intentional misrepresentation, fraud, breach of contract, and securities violations for, in general, the failure to disclose the activities of BHA, Mr. Hauptman and related entities uncovered in the audits. Finally, Plaintiffs assert one count of conspiracy against BHA, Mr. Hauptman, and RKC.

Presently before the Court are BHA and Mr. Hauptman's Motion to Dismiss (Doc. 13) and RKC and Mr. Bender's Motion to Dismiss (Doc. 9). Plaintiffs have filed a Response to the motions to dismiss and each Defendant group has filed a Reply to Plaintiffs' Response, to which Plaintiffs have also filed a Response. For the reasons stated below, we will grant in part, and deny in part the motions to dismiss. In addition, this entire case is presently under seal. Because it appears that the protection of sealing is no longer necessary, we will also order the parties to show cause why this case should not be unsealed.

## I. Background

We will set forth an overview of the factual background necessary to resolve the instant motions to dismiss, supplemented in the Discussion section by additional relevant information as necessary.

### A. Allegations from the Complaint

William H. Steinbrink, M.D. is a board-certified obstetrician/gynecologist in Erie, Pennsylvania, and Patricia M. Steinbrink is his wife. Plaintiff Bayside Obstetrics Gynecology Infertility, Inc. 401(k) Profit Sharing Plan is Dr. Steinbrink's qualified 401(k) profit sharing plan under the Employees Retirement Income Security Act.

Defendant Bruce A. Hauptman is a citizen and resident of the State of Iowa and is president of Defendant BHA, an investment management consulting firm.

2

The two investment partnerships at issue in this litigation are the Genesis Capital Fund, L.P. ("Genesis"), and the Gamelan Capital Fund, L.P. ("Gamelan"), both of which are limited liability partnerships formed under the laws of the State of Delaware. Genesis came into existence on December 6, 1989, and lasted until sometime in 2000. Gamelan came into existence on April 4, 1997, and remains active.

The Steinbrinks first invested in the Genesis fund in 1990. The Steinbrink 401(k) Plan first invested in Genesis in 1992. The Steinbrinks were limited partners in Genesis. An entity called Genesis Management was the general partner of Genesis. An entity called Georgica Pond, Ltd. was the general partner of Genesis Management, and Mr. Hauptman was the president of Georgica Pond.

Because of the lack of performance of the Genesis fund, the Steinbrinks informed Mr. Hauptman in 1999 that they wanted to withdraw from the Genesis fund. Mr. Hauptman suggested that the Plaintiffs transfer their Genesis funds into his new fund named Gamelan.

The Steinbrinks stated to Mr. Hauptman that they would only consider transferring their Genesis funds to Gamelan if the withdrawal provisions of Gamelan permitted them to withdraw funds from Gamelan on a quarterly basis. The Steinbrinks insisted on a written amendment to the Gamelan Partnership Agreement. Mr. Hauptman preferred that they rely upon his oral representations regarding a quarterly right to withdraw funds from Gamelan. The parties negotiated this issue from October 1999 through December 1999. Eventually, Mr. Hauptman did provide the Steinbrinks with a letter dated December 13, 1999, in which stated he agreed that the Steinbrinks would have the right to withdraw funds from Gamelan on a quarterly basis, so long as 30 days written notice was provided.

From the time Mr. Hauptman first suggested that the Steinbrinks transfer their funds from Genesis to Gamelan, until the Steinbrinks executed the Partnership Agreement, Mr. Hauptman undertook various actions and omissions designed to convince the Steinbrinks to transfer their funds. He provided them with the 1998 annual audit reports of both Genesis and Gamelan, performed by the auditing firm of Rothstein, Kass & Company ("RKC"). According to the

3

Steinbrinks, Mr. Hauptman knew that these reports contained significant misrepresentations and material omissions, but that Mr. Hauptman provided them in order to induce the Steinbrinks to invest in Gamelan. In a letter from Mr. Hauptman to the Steinbrinks, dated October 9, 1999, Mr. Hauptman notified the Steinbrinks that the Genesis fund would be terminated on December 31, 1999, and that Mr. Hauptman planned to use the Gamelan fund for managing investments. Mr. Hauptman also represented that the Gamelan fund would be operated as a hedge fund with Mr. Hauptman acting as a Commodity Pool Operator and as a Commodity Trading Advisor as defined in the Commodity and Exchange Act (7 U.S.C. § 1, *et seq.*) and by regulations.

The Steinbrinks executed the Subscription Agreements for the Gamelan fund sometime after December 13, 1999. As a result, the Steinbrinks invested $6,654,908.00 into the Gamelan fund, while the Steinbrink 401(k) Plan invested $1,292,379.00 into the fund. The Steinbrinks also became limited partners in the Gamelan fund. The managing general partner of the Gamelan fund is BHA, and Mr. Hauptman is the president of BHA.

Mr. Hauptman requested that the Plaintiffs backdate the Gamelan Subscription Agreements to October 1, 1999, which the Plaintiffs did. However, unbeknownst to the Plaintiffs, Mr. Hauptman had already converted the Plaintiffs' investments in the Genesis fund into the Gamelan fund on October 1, 1999, without Plaintiffs' knowledge or permission.

Despite being told that the Gamelan fund was to be run as a hedge fund, Mr. Hauptman, through BHA, caused the Gamelan fund to cease its activities in investing in futures and derivative instruments. Mr. Hauptman also terminated his registration as a Commodity Pool Operator and Commodity Trading Advisor. In part, this was accomplished through Mr. Hauptman and BHA's material misrepresentation and omissions to the Commodity Futures Trading Commission ("CFTC"). For example, Mr. Hauptman avoided having to divulge audited financial statements to the CFTC or the National Futures Association ("NFA") by intentionally waiting until after the CFTC approved Mr. Hauptman's de-registration as a Commodity Pool Operator and Commodity Trading Advisor. In fact, Mr. Hauptman knew that RKC's audit had found that 101% of the

4

Gamelan fund partners' capital was unreasonably valued and that the procedures used to determine the valuations were unreasonable.

Beginning in 2001, Plaintiffs sought to discover the entities in which the Gamelan fund had invested their funds, but Mr. Hauptman refused to divulge this information. Plaintiffs allege that Mr. Hauptman refused to provide Plaintiffs with this information in order to prevent them from finding out the true nature of the Gamelan fund's investments, as well as Plaintiffs' proportional share of these investments. By letter dated February 26, 2001, Dr. Steinbrink notified Mr. Hauptman that he would be withdrawing $5,000,000.00 of his investment in the Gamelan fund on March 31, 2001. The Gamelan fund did not remit the requested funds to Dr. Steinbrink. By letter dated May 25, 2001, Dr. Steinbrink notified Mr. Hauptman that he and his wife, and the 401(k) Plan, would be withdrawing $7,000,000.00 of their investment in the Gamelan fund on June 30, 2001. Again, the Gamelan fund did not remit the requested funds to the Plaintiffs.

Because of Mr. Hauptman's failure to remit the requested funds and his unwillingness to divulge the specifics of the Gamelan fund's investments, the Plaintiffs retained attorney to assist them. From May 2001 through September 2001, Plaintiffs' attorneys sought through requests and negotiations the release of information regarding the Gamelan fund's investments, which they eventually did receive.

Mr. Hauptman wrote a letter to Plaintiffs, dated September 7, 2001, in which he informed them that it was not possible to remit funds from the Gamelan fund before December 31, 2001, because the assets were invested in private securities. In order to have funds necessary to remit to the Plaintiffs, one of the companies in the Gamelan fund's portfolio would have to be acquired or go public, an unlikely event in 2001, but possible in 2002. In this letter, Mr. Hauptman also explained that it was likely that the Gamelan fund would write down the value of its investment in USA Global Link, Inc. ("USA Global") before the end of the third quarter, and that any losses from this divestment would be offset by the performance of the Gamelan fund's remaining investments.

In an October 12, 2001 letter to Plaintiffs, Mr. Hauptman stated that following a review of

5

the Gamelan fund's investment in USA Global it was decided that the value of the USA Global investment would be reduced to zero as of June 30, 2001, and that second quarter financial statements are being revised to reflect the change. Mr. Hauptman further explained that the ultimate decision to divest from USA Global was based on USA Global's inability to arrange for appropriate financing.

The Gamelan fund had invested as much as 56% of its assets into USA Global. USA Global, in concert with Mr. Hauptman, engaged in a scheme of buying and selling shares of a wholly owned subsidiary of USA Global, named Online India, Inc., for the purpose of artificially inflating the value of the Gamelan fund's investment in USA Global. This scheme was concealed from Plaintiffs and allowed Mr. Hauptman to report to the Gamelan fund's investors an inflated value in the Gamelan fund's quarterly and year-end statements.

Defendants also allege that the financial statements issued by both the Genesis fund and the Gamelan fund from 1996 through 2000 were false and misleading by overstating the values of investments and omitting material disclosures. Underlying these financial statements was Mr. Hauptman's self-dealing, fraud, and mismanagement, perpetrated for his own benefit. RKC and Mr. Bender, as auditors of the Genesis and Gamelan funds failed to disclose this self-dealing, fraud, and mismanagement in the audit reports and statements from these two entities in the years 1996 through 2000. Therefore, RKC and Mr. Bender aided and assisted the scheme to defraud the Plaintiffs, and unlawfully deprived the Plaintiffs of information necessary to make a proper evaluation of the Genesis and Gamelan funds.

Although RKC did conclude that the Genesis and Gamelan funds valuations were unreasonable, RKC failed to disclose the basis for this conclusion, failed to sufficiently disclose and identify the unreasonable procedures used by Mr. Hauptman, and failed to cause the entities to provide a schedule of investments. In sum, RKC knew or recklessly disregarded numerous indicators of self-dealing, fraud, and mismanagement. RKC was required to make such disclosures pursuant to the Generally Accepted Accounting Principles ("GAAP") and Generally Accepted

6

Accounting Standards ("GAAS"). Because the material information was not disclosed, the

Plaintiffs were prevented from uncovering the self-dealing, fraud, and mismanagement, and were

otherwise deprived of information critical to the Plaintiffs protecting their investments.

**B. Claims**

Plaintiffs assert the following claims:

Against the auditor RKC:

> Negligence (Count I);
>
> Negligent Misrepresentation (Count II);
>
> Intentional Misrepresentation (Count III);
>
> Fraud and Deceit (Count IV);
>
> Breach of Contract (Count V); and
>
> violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count XV).

Against Mr. Hauptman:

> Fraud and Deceit (Count VI);
>
> Self-Dealing (Count VII);
>
> Breach of Contract (Count IX); and
>
> violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count XIV).

Against Mr. Hauptman and his investment company BHA:

> Conversion (Count VIII); and
>
> violations of RICO – 18 U.S.C. §§ 1962(c), 1964(c) (Count XI).

Against Mr. Hauptman, BHA, and RKC, Plaintiffs allege:

> Conspiracy (Count X).

None of the Counts name Defendant Stuart Bender. Accordingly, we will dismiss Stuart

Bender as a Defendant in this action.

In response to these claims Defendants have filed motions to dismiss. BHA and

7

Mr. Hauptman argue as follows. First, Mr. Hauptman argues pursuant to Federal Rule of Civil Procedure 12(b)(2) that this Court lacks personal jurisdiction over him as he is a citizen of Iowa with limited if any contacts with Pennsylvania. Next, BHA and Mr. Hauptman argue pursuant to Federal Rule of Civil Procedure 12(b)(6) that Plaintiffs have failed to state claims of Conversion (Count VIII); RICO violations (Count XI); and § 10(b) Exchange Act vioaltions (Count XIV). BHA and Mr. Hauptman also argue that Plaintiffs have failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b) in Counts VI, XI, and XIV. They also argue that Plaintiffs' claim of a violation of § 10(b) of the Exchange Act (Count XIV) is barred by the statute of limitations. Finally, in the event that any claims survive the motion to dismiss, BHA and Mr. Hauptman seek a more definite statement of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(e).

RKC argues in its motion that Plaintiffs' claim of a violation of § 10(b) of the Exchange Act (Count XV) is barred by the statute of limitations. Next, RKC argues pursuant to Federal Rule of Civil Procedure 12(b)(6) that Plaintiffs have failed to state a claim under § 10(b) of the Exchange Act of 1934 and Rule 10(b)-5 (Count XV). Finally, RKC argues that Plaintiffs have failed to plead fraud as required by Federal Rule of Civil Procedure 9(b) in Count IV and XV.

## II. Standard of Review

Defendants bring their motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) or 12(b)(6). The applicable law regarding Defendants' 12(b)(2) motion is set forth in the section discussing the personal jurisdiction issue.

A motion to dismiss pursuant to Federal Rule 12(b)(6), tests the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A court must determine whether the party making the claim would be entitled to relief under any set of facts that could be established in support of the claim. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing *Conley*, 355 U.S. at 45-46); see also Wisniewski v. Johns- Manville Corp., 759 F.2d 271, 273 (3d Cir. 1985). "A motion to dismiss pursuant to 12(b)(6) may be granted only if, accepting all well-pleaded

8

allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n.2 (1977).

## III. Discussion

As noted, two separate motions to dismiss have been filed; however, there is overlap in the arguments. We will begin by addressing Mr. Hauptman's argument that this court lacks personal jurisdiction over him, followed by the Defendants' remaining arguments.

### A. Personal Jurisdiction

#### 1. Applicable Law

A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant to the extent permissible under the law of the forum state. Fed. R. Civ. P. 4(e); Pennzoil Prod. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 200 (3d Cir. 1998) (citation omitted). "Pennsylvania's long-arm statute, 42 Pa. Cons.Stat. Ann. § 5322(b), authorizes Pennsylvania courts 'to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment.'" Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001) (citing Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992)). (4). The statute's reach is coextensive with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Grand Entertainment Group, Ltd. v. Star Media Sales, 988 F.2d 476, 481 (3d Cir. 1993) (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984)).

Courts must resolve the question of personal jurisdiction "based on the circumstances that the particular case presents." Brooks v. Bacardi Rum Corp., 943 F.Supp. 559, 562 (E.D.Pa. 1996) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 485 (1985). Due process, then, is an

9

individualized inquiry. Mellon Bank, 960 F.2d at 1224-25. Consistent with the requirements of due process, we must ensure that a defendant is subjected to personal jurisdiction only where its activities have been purposefully directed at residents of the forum, or otherwise availed herself of the privilege of conducting activities there. Burger King, 471 U.S. at 472; Hanson v. Denckla, 357 U.S. 235, 253 (1958).

The due process inquiry turns on the defendant's contacts with the forum state. Personal jurisdiction may be either general or specific, and both the quality and quantity of the necessary contacts differs according to which sort of jurisdiction applies. General personal jurisdiction arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. Due process for general personal jurisdiction requires a showing that the defendant has had continuous and systematic contacts with the forum state. Helicopteros Nacionales de Colombia, N.A. v. Hall, 466 U.S. 408, 412-13, 414 nn. 8 & 9 (1984). Plaintiffs do not contend that there is any basis for general jurisdiction in this case.

Specific jurisdiction exists "when the plaintiff's claim is related to or arises out of the defendant's contacts with the forum." Mellon Bank, 960 F.2d at 1221. Specific personal jurisdiction comports with due process as long as the defendant has sufficient minimum contacts with the forum state. The due process inquiry must focus on "the relationship among the defendant, the forum, and the litigation." Rush v. Savchuk, 444 U.S. 320, 327 (1980) (*quoting* Shaffer v. Heitner, 433 U.S. 186 (1977)). It has long been recognized that minimum contacts exist where the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. at 253. In other words, when a defendant's conduct is such that she reasonably should have foreseen being haled into court in the forum, the necessary minimum contacts have been shown. World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Even a single act can support specific jurisdiction, so long as it creates a "substantial connection" with the forum. Burger King, 471 U.S. at 476.

10

It is the plaintiff's burden to demonstrate that the defendant has minimum contacts with the forum. Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984) (*quoting* Compagnie des Bauxites de Guinee v. L'Union, 723 F.2d 357 (3d Cir. 1983)). To meet this burden, plaintiffs "must come forward with sufficient jurisdictional facts by affidavit, depositions or other competent evidence to establish the court's jurisdiction over the defendant." National Precast Crypt Co. v. Dy-Core of Pennsylvania, Inc., 785 F. Supp. 1186, 1189 (W.D.Pa. 1992). "[F]actual discrepancies created by affidavits are generally resolved in favor of the non-moving party." Elbeco Inc. v. Estrella de Plato, Corp., 989 F.Supp. 669, 674 n. 3 (E.D.Pa. 1997).

If a defendant has sufficient minimum contacts with the forum state, the court may further consider "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting International Shoe v. Washington, 326 U.S. 310, 320 (1945)). Although this determination is discretionary, courts in this circuit "have generally chosen to engage in this second tier of analysis in determining questions of personal jurisdiction." Pennzoil Prods. Co. v. Copelli & Assoc., 149 F.3d 197, 201 (3d Cir. 1998). Factors to be considered include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King, 471 U.S. at 477 (quoting World-Wide Volkswagen, 444 U.S. at 292).

At this point it becomes the defendant's burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Grand Entertainment, 988 F.2d at 483 (quoting Burger King, 471 U.S. at 477).

**2. Analysis**

### a. Minimum Contacts and Purposeful Availment

Mr. Hauptman argues that both general and specific personal jurisdiction are lacking in this case. In addition, he argues that he is protected by the corporate shield jurisdiction, which limits

11

jurisdiction over an individual for contacts within the forum state taken in his corporate capacity. Finally, he argues that to assert personal jurisdiction over him would violate notions of fair play and substantial justice.

Plaintiffs concede that general jurisdiction is inapplicable and instead argue that specific personal jurisdiction over Mr. Hauptman is proper and set forth the following in support of personal jurisdiction.

Dr. Steinbrink contacted Mr. Hauptman in 1990 to inquire about investing in the Genesis Capital Fund. Dr. Steinbrink did invest in the Genesis fund in 1990, as a limited partner. Thereafter, Dr. Steinbrink received numerous mailings regarding the Genesis fund, which were mailed to Dr. Steinbrink's Erie residence by Mr. Hauptman. In addition, Mr. Hauptman and Dr. Steinbrink had numerous telephone conversations regarding the Genesis fund. During these telephone calls, Mr. Hauptman represented to Dr. Steinbrink that he visited Pennsylvania on a regular basis to meet with Genesis fund limited partners, and to make sales presentations to prospective investors.

Dr. Steinbrink initially expressed his concern about the performance of the Genesis fund to Mr. Hauptman in the fall of 1997. In response, Mr. Hauptman telephoned Dr. Steinbrink and requested to meet with him to discuss the Genesis fund investment and to also make a sales presentation for a new fund, the Gamelan Capital Fund.

Mr. Hauptman met with Dr. Steinbrink on October 15, 1997 at the Bel Aire Hotel in Erie, Pennsylvania. At that meeting, Mr. Hauptman discussed Dr. Steinbrink's investment in the Genesis fund and made a sales presentation regarding the Gamelan fund, soliciting Dr. Steinbrink's investment.

Following the meeting, Mr. Hauptman made several more telephone calls to Dr. Steinbrink in Pennsylvania to extol the Gamelan fund. In addition, Mr. Hauptman sent mail to Dr. Steinbrink regarding the Gamelan fund, including a private placement memorandum for the Gamelan fund offered to Dr. Steinbrink in February 1998; a March 1998 letter stating that the Gamelan fund was

12

now accepting new subscriptions, which included an enclosure showing the Gamelan fund's performance; and, a September 1998 letter summarizing the Gamelan fund's recent eight-month performance. The telephone conversations and letters continued through the fall of 1999.

In addition, due to Dr. Steinbrink conveying his continued concern about the lack of performance of his investment in the Genesis fund, Mr. Hauptman again encouraged Dr. Steinbrink to invest in the Gamelan fund. In August or September 1999, Mr. Hauptman mailed to Dr. Steinbrink a copy of RKC's unqualified 1998 audit of the Gamelan fund. Mr. Hauptman followed-up that letter with a telephone call to Dr. Steinbrink, in which he explained to Dr. Steinbrink that if he was to become a limited partner he had to do so by October 1, 1999.

Dr. Steinbrink responded to Mr. Hauptman by stating that he required a special withdrawal provision in writing before he would consider investing in the Gamelan fund. In a letter from Mr. Hauptman to the Plaintiffs, dated October 9, 1999, Mr. Hauptman notified the Plaintiffs that the Genesis fund would be terminated on December 31, 1999, and that Mr. Hauptman planned to use the Gamelan fund for managing investments. Thereafter, the two parties negotiated by mail and telephone over the issue of a written special withdrawal provision. Ultimately, Plaintiffs executed the Subscription Agreements for the Gamelan fund sometime after December 13, 1999, the date of a letter sent by Mr. Hauptman to Dr. Steinbrink in Erie that included the written withdrawal provision and Subscription Agreements.

Mr. Hauptman continued to send mail to Dr. Steinbrink over the ensuing years regarding his investments, and the two continued to engage in telephone conversations about the investments.

We conclude that Mr. Hauptman's contacts with Pennsylvania are sufficient minimum contacts for specific jurisdiction. Minimum contacts comport with due process as long as the plaintiff shows "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum state." Burger King, 471 U.S. at 475. The purposeful availment requirement assures that personal jurisdiction will result from the actions of the defendant itself. Id. It "ensures that a defendant will not be haled into a jurisdiction solely as a result of

13

'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or third person." Id. (internal citations omitted).

The affidavits in the case before us show that Mr. Hauptman's conduct was not unilateral, 'random,' 'fortuitous,' or 'attenuated,' and that he had significant contacts with Pennsylvania by presenting sales proposals, performing customer service, managing investments, and negotiating for the Steinbrinks' investment in the Gamelan fund, Mr. Hauptman's investment fund.

We find that Mr. Hauptman engaged in business with residents of the Commonwealth when he solicited Dr. Steinbrink's investment in the Gamelan fund in Pennsylvania, facilitated that transaction through numerous telephone calls and letters and his personal appearance in Pennsylvania, and ensured the consummation of the investment by notifying Dr. Steinbrink that he agreed to the written special withdrawal provision. We find that by these actions Mr. Hauptman purposefully availed himself of the privilege of doing business in the Commonwealth, and therefore, should not be surprised to be haled into court here.

Mr. Hauptman's arguments against asserting specific personal jurisdiction are weak. Mr. Hauptman claims, somewhat disingenuously, that he "did not solicit or initiate any client relationships in Pennsylvania." (BHA and Hauptman's Brief, at 26; see also BHA and Hauptman's Reply, at 13.) Mr. Hauptman refers to the fact that Dr. Steinbrink initiated his initial investment in the Genesis fund by contacting Mr. Hauptman in 1990. However, Mr. Hauptman completely ignores his later conduct soliciting Dr. Steinbrink's investment in the Gamelan fund, including a personal visit to Pennsylvania, several mailings, and a negotiation that resulted in Mr. Hauptman purposefully mailing a written agreement to Dr. Steinbrink that was the final hurdle to Dr. Steinbrink's investing in the Gamelan fund.

Mr. Hauptman also disputes that his meeting at the Bel Aire hotel was to solicit investments for the Gamelan fund as asserted by Plaintiffs. (BHA and Hauptman's Reply, at 14.) To the extent Mr. Hauptman is presenting "factual discrepancies created by affidavits," such discrepancies "are generally resolved in favor of the non-moving party." Elbeco Inc., 989 F.Supp. at 674 n.3.

14

Tellingly, however, Mr. Hauptman does not provide a citation to either his first or second affidavits to support his assertion that the meeting in Erie was not not to solicit Dr. Steinbrink's investment in the Gamelan fund. Instead, Mr. Hauptman asserts that the "purpose of this visit was to discuss the existing Genesis Capital fund, not to solicit investments for Gamelan Capital as Plaintiffs allege." (BHA and Hauptman's Reply, at 14.) Mr. Hauptman asserts this as a fact but he fails to support the assertion with record evidence, despite his having provided two affidavits.

Instead, Mr. Hauptman describes his meeting in Erie in very limited terms stating only "I had dinner with Dr. Steinbrink." (Affidavit of Bruce A. Hauptman, at ¶¶ 17, 20.) In contrast, Dr. Steinbrink describes in his affidavit that during the meeting "Hauptman besides discussing my investment in Genesis made a presentation regarding the benefits of investing in Gamelan." (Affidavit of William H. Steinbrink, M.D., at ¶ 9.) Dr. Steinbrink continues to describe Mr. Hauptman's presentation at the Erie meeting in great detail in his affidavit. If there were a dispute here, we would resolve it in favor of Dr. Steinbrink. However, we see no dispute as it appears that Mr. Hauptman is unwilling, or unable, to support his assertion that the meeting in Erie was not to solicit investments in the Gamelan fund by repeating the assertion in his affidavit, or in his second affidavit filed along with his reply to Plaintiffs' brief in opposition.

In addition, at the time Mr. Hauptman sent the written inducement into Pennsylvania on December 13, 1999, he had already transferred Plaintiffs' funds into the Gamelan fund without their knowledge or consent. Mr. Hauptman's incentive in mailing the written special withdrawal provision was motivated in part by a need to cover his tracks. He truly needed Dr. Steinbrink's agreement to roll his Genesis funds into the Gamelan fund, for Mr. Hauptman had already done it.

Mr. Hauptman, again disingenuously, also argues that "[m]ost of Hauptman's contacts with Pennsylvania are based on Plaintiffs' unilateral activity (*e.g.,* Plaintiffs' solicitation of the investment fund, telephone calls to Hauptman from Plaintiffs, etc.) . . . ." (BHA and Hauptman's Brief, at 26.) Mr. Hauptman simply ignores his solicitation of Dr. Steinbrink's investment in the Gamelan fund, as well as his own telephone calls and mailings directed into Pennsylvania.

15

Mr. Hauptman's use of the term "most" to describe the nature of the contacts is likewise unavailing. Our inquiry concerns sufficient minimum contacts, not a weighing of the number of contacts initiated by each side (though of course such facts are included in the inquiry). Mr. Hauptman also notes that in the general course of his business he sent mailings regarding the Genesis fund or the Gamelan fund to all investors, regardless of where they lived, and he sent specific responses to investors who asked specific questions. Again, Mr. Hauptman does not firmly address the contacts he had in Pennsylvania regarding his solicitation of an investment by Dr. Steinbrink into the Gamelan fund. Mr. Hauptman's argument against assertion of specific personal jurisdiction is in reality an argument against assertion of general personal jurisdiction, a point conceded by Plaintiffs.

### b. Fair Play and Substantial Justice

We conclude that Plaintiffs have established that Mr. Hauptman has sufficient minimum contacts with Pennsylvania to support our assertion of personal jurisdiction over him. It remains for us to determine whether this jurisdiction comports with fair play and substantial justice under the factors enumerated in Burger King and World Wide Volkswagen. These include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King, 471 U.S. at 477 (quoting World-Wide Volkswagen, 444 U.S. at 292). This determination is made at the Court's discretion. Pennzoil, 149 F.3d at 201.

At this stage in the jurisdictional inquiry it becomes the defendant's burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Grand Entertainment 988 F.2d at 483 (quoting Burger King, 471 U.S. at 477).

Mr. Hauptman has not met this heavy burden.

We find that the burden of defending this action in the Western District of Pennsylvania is slight and that Plaintiffs have a significant interest in pursuing its claims where they reside. Mr. Hauptman must defend this action in any event as it relates to BHA, who does not contest

16

jurisdiction. In addition, Plaintiffs allege that Mr. Hauptman purposefully sent documents to Dr. Steinbrink in Pennsylvania that were the result of fraud, self-dealing, and misrepresentation in order to ensure that Dr. Steinbrink remained ignorant of the true nature of his investment and that Mr. Hauptman was benefitting at Plaintiffs' expense. Pennsylvania has a strong interest in protecting her citizens from this kind of conduct as alleged in the complaint. Accordingly, we hold that it does not offend traditional notions of fair play and substantial justice to require that Mr. Hauptman defend this action in Pennsylvania.

### c. Corporate Shield

Mr. Hauptman also argues that any contacts he may have had with Pennsylvania were made solely in his corporate capacity. He argues that under the "corporate shield" doctrine such contacts may not count toward the contacts necessary for personal jurisdiction over him as an individual.

As a general rule, '[i]ndividuals performing acts in a state in their corporate capacity are not subject to the personal jurisdiction of the courts for that state for those acts." Elbeco, 989 F.Supp. at 676 (citing National Precast Crypt Co. v. Dy-Core of Pennsylvania, Inc., 785 F.Supp 1186, 1181 (M.D.Pa. 1992); Maleski v. DP Realty Trust, 653 A.2d 54, 62 (Pa. Commw. Ct. 1994).

However, many courts recognize an exception to this general rule, and hold that a "corporate agent may be held personally liable for torts committed in their corporate capacity." Elbeco, 989 F.Supp. at 676; Beistle Co. v. Party U.S.A., Inc., 914 F.Supp. 92, 96 (M.D.Pa. 1996); Maleski, 653 A.2d at 63 (and cases cited therein).

District court decisions in this jurisdiction show a split of authority on this question, thus enabling both sides here to cite to cases supporting their respective positions. The issue has not been decided by the Court of Appeals for the Third Circuit. Cases imposing the corporate shield do so to protect officers and directors from being haled into court based solely upon their status within a corporation. See, e.g. Simkins Corp. v. Gourmet Resources Int'l, 601 F.Supp. 1136 (E.D.Pa. 1985). Other courts, however, have balanced this concern with "the principle that, in Pennsylvania, corporate officers and directors are liable for the tortious acts the corporation commits under their

17

direction or with their participation." Maleski, 653 A.2d at 63 (citing Al-Khazraji v. St. Francis College, 784 F.2d 505 (3d Cir. 1986), *aff'd* 481 U.S. 604 (1987). Using a case-by-case approach to determine whether corporate contacts should be considered for personal jurisdiction over an officer, these courts analyze the following factors: (1) the officer's role in the corporate structure; (2) the quality of the officer's contacts; and (3) the extent and nature of the officer's participation in the alleged tortious conduct. Elbeco, 989 F.Supp. at 676 (citing Maleski, 653 A.2d at 63); Moran v. Metropolitan District Council of Philadelphia, 640 F.Supp. 430 (E.D.Pa. 1986).

We conclude that the latter is the better-reasoned approach and will use it to determine whether the corporate shield protects Mr. Hauptman as an individual from personal jurisdiction. Applying the first prong of the test, it is clear that Mr. Hauptman is the president of BHA and its principal shareholder.

We find that the nature and quality of Mr. Hauptman's corporate contacts with Pennsylvania weigh in favor of using them to assess individual jurisdiction. Mr. Hauptman was personally involved with Dr. Steinbrink regarding his investments and the solicitation to invest in the Gamelan fund. He had numerous mail and telephone contacts with Dr. Steinbrink, as well as a personal visit to Erie to meet with Dr. Steinbrink. Applying the final prong of the analysis, we find that Mr. Hauptman directly participated in the alleged tortious conduct central to the lawsuit, the fraudulent activity as it relates to the investments managed by Mr. Hauptman.

Therefore, having evaluated the appropriate criteria, we conclude that, although all of Mr. Hauptman's contacts with the forum were made in his corporate capacity, he is not entitled to the protection of the corporate shield.

## B. Statute of Limitations

Next, RKC, BHA, and Hauptman argue that Plaintiffs' claims of a violation of § 10(b) of the Exchange Act (Counts XIV & XV) are barred by the statute of limitations.

18

## 1. Applicable Law

"In Lampf v. Gilbertson, 501 U.S. 350, 364 [] (1991), the Court determined that claims arising under § 10(b) of the Exchange Act are governed by the limitations rule set forth in § 9(e) of the Exchange Act: 'No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.' 15 U.S.C. § 78i(e)." In re NAHC, Inc., 306 F.3d 1314, 1324 (3d Cir. 2002). "'To the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations.'" Benak v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006) (quoting NAHC, 306 F.3d at 1325). "The one-year period begins to run when the plaintiffs discovered or in the exercise of reasonable diligence should have discovered the basis for their claim against the defendant." Benak, 435 F.3d at 400 (internal quotations and citations omitted).

"Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had 'sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity.'" NAHC, 306 F.3d at 1325 (quoting Gruber v. Price Waterhouse, 697 F. Supp. 859, 864 (E.D. Pa. 1988)).

> The test for "storm warnings" is an objective one, based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." Mathews [v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 252 [3d Cir. 2001)]. Plaintiffs need not know all of the details or "narrow aspects" of the alleged fraud to trigger the limitations period; instead, the period begins to run from "the time at which plaintiff should have discovered the general fraudulent scheme." In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 599 (D.N.J. 1997) (quoting McCoy v. Goldberg, 748 F. Supp. 146, 158 (S.D.N.Y. 1990)).

NAHC, 306 F.3d at 1325-1326. "'Storm warnings may take numerous forms, . . . [which] may include, . . . substantial conflicts between oral representations of the brokers and the text of the prospectus, . . . the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or

significant omissions had been made.'" NAHC, 306 F.3d at n.5 (quoting Mathews, 260 F.3d at 252). "Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." NAHC, 306 F.3d at 1326 (quoting Gruber, 697 F. Supp. at 864) (other citations omitted).

"Once defendants establish "storm warnings" in pressing their affirmative defense, 'the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries.'" Benak, 435 F.3d at 400 (quoting Mathews, 260 F.3d at 252). "If plaintiffs do not investigate the storm warnings, they are 'deemed . . . on inquiry notice of their claims.'" NAHC, 306 F.3d at 1327 (quoting Mathews, 260 F.3d at n.16).

## 2. Analysis

In their Complaint, Plaintiffs explain that due to the fraudulent scheme of Defendants, Gamelan's investment in USA Global was carried at an inflated price on the books of Gamelan. The scheme alleged by Plaintiffs is alleged to have occurred from March 1999 through May 11, 2001, and involved manipulation of the price of the stock of Online India in order to boost the stock of USA Global (Online India's parent company) so that the value of USA Global would appear at an inflated price on Gamelan's books. (Compl. at ¶¶ 244-250 (Hauptman and BHA); 255-261, 265-267 (RKC).) Defendants argue that RKC's March 10, 2000 report on Gamelan's 1999 financial statement put Plaintiffs on "inquiry notice" of the alleged fraudulent scheme. RKC's March 10, 2000 report stated the opinion, according to Plaintiffs' Complaint,

the procedures regarding certain investments in special situations valued at $11,079,710 at December 31, 1999 are not reasonable and the documentation is not appropriate to determine the value of such investments in conformity with GAAP.

(Compl. at ¶ 101.) Defendants argue that this express warning that some of Gamelan's investments had an unreasonable value and insufficient documentation to determine the correct value, should have put Plaintiffs on inquiry notice of at least a portion of the fraud on March 10, 2000. Thus, Defendants argue that since the Complaint in this matter was not filed until November 30, 2001,

20

over one year after the March 10, 2000 report, Plaintiffs' claims are barred by the limitations period.

Plaintiffs' respond by arguing that RKC's qualified warning in the March 10, 2000 report was "materially inadequate" to trigger "inquiry notice" because RKC's opinion "did not state whether the values were unreasonably high or low or identify what procedures were unreasonable." (Plaintiffs' Brief, at 22.) Plaintiffs also argue as a separate point, but one we see as related, that their Complaint contains a vast body of allegations of fraud, misrepresentations, omissions, and other allegations of specific negative conduct, all of which were not mentioned in RKC's March 10, 2000 report. (Plaintiffs' Brief, at 23.)

The above-cited case law shows that "Plaintiffs need not know all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period; instead, the period begins to run from 'the time at which plaintiff should have discovered the general fraudulent scheme.'" NAHC, 306 F.3d at 1326 (citation omitted). "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." In re Allied Investment Corp. v. KPMG Peat Marwick, 872 F.Supp. 1076, 1081 (D.Me. 1995). "The issue, therefore, is not whether the disclosed facts alerted plaintiffs to the existence of the entire fraudulent scheme they allege occurred, but rather whether plaintiffs had notice of facts sufficient to impose upon them a duty to inquire further into the matter." Ardini/Messina Partnership v. National Med. Fin. Services, 74 F.Supp.2d 352, 359 (S.D.N.Y. 1999) (citing Dodds v. Cigna Sec., Inc., 12 F.3d 346, 352 (2d Cir. 1993); Siemens Solar Indus. v. Atlantic Richfield Co., 1994 WL 86368, *3 (S.D.N.Y. Mar. 16, 1994)).

We find that Plaintiffs were put on "inquiry notice" as of March 10, 2000, as they had sufficient information of possible wrongdoing that would "'alert a reasonable person to the probability that misleading statements or significant omissions had been made.'" NAHC, 306 F.3d at 1326 (quoting Mathews, 260 F.3d at 252). Indeed, Plaintiffs admit in their Complaint that "RKC's own audit reports provide evidence" of a "serial pattern of accounting violations and omissions of disclosures in the financial statements of Genesis and Gamelan." (Complaint, at ¶ 52.) Specifically, Plaintiffs describe that "RKC qualified its audit reports on the 1996 and 1997 financial

21

statements of Genesis and the 1999 and 2000 financial statements of Gamelan because [RKC] concluded that the procedures used by the general partner to value investments without a ready market were unreasonable and the documentation was inappropriate." (Complaint, at ¶ 52 (emphasis added).) Thus, Plaintiffs admit that RKC's warnings in their reports are the kinds of warnings that "excite 'storm warnings' of culpable activity." NAHC, at 1325. In addition, we fail to see how RKC's opinion that the investments were unreasonably valued and the documentation is not appropriate to determine the value of such investments in conformity with GAAP is insufficient to trigger "inquiry notice," but if RKC had added to its report a statement that the values were unreasonably high (or low), or added a statement identifying the unreasonable procedures, (or both) would be a sufficient warning to Plaintiffs of "storm warnings" of "culpable activity."

Moreover, Mr. Steinbrink admits that after he read the March 10, 2000 report he was concerned enough about the warning that "[s]ometime in the spring of 2000, [he] had a conversation with Hauptman regarding RKC's qualification in the 1999 Gamelan report." (Affidavit of Steinbrink, at ¶ 26.) However, Plaintiffs did not commence an investigation until no earlier than April 2001, when Dr. Steinbrink became concerned about Hauptman's representations regarding his financial condition and the financial condition of Genesis and Gamelan. (Affidavit of Steinbrink, at ¶ 29.) The cause for this concern arose after Dr. Steinbrink learned in April 2001, that Mr. Hauptman had tax liens for failure to pay approximately $6,500,000 in personal income tax. (Affidavit of Steinbrink, at ¶ 29.) Plaintiffs claim that they actually did not commence an investigation until May 2001. (Compl., at 41-43; Affidavit of Steinbrink, at ¶ 36-37.) Thus, Plaintiffs failed to show that they exercised reasonable due diligence to investigate their claim by waiting for more than one year after they were put on "inquiry notice" on March 10, 2000 to begin an investigation. Mathews, 260 F.3d at 252. Since Plaintiffs did not investigate the storm warnings, they are "deemed . . . on inquiry notice of their claims." Id. at n.16; see also NAHC, 306 F.3d at 1326 ("plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent

investigation during the limitations period.") Therefore, because Plaintiffs' Securities Exchange Act claims regarding the alleged fraudulent scheme to overinflate the value of USA Global were not asserted until November 19, 2001, Plaintiffs' action was not commenced within the one-year limitations period. Accordingly, we will dismiss Plaintiffs' Securities Exchange Act claims as time-barred.

Finally, we address Plaintiffs' assertion that "inquiry notice" did not begin with the March 10, 2000 report because when Dr. Steinbrink expressed his concern about the warning in the report "Hauptman represented to Dr. Steinbrink that RKC did not have adequate understanding of the special situation investments and in reality the investments were properly valued." (Plaintiffs' Brief, at 23, citing Affidavit of Steinbrink, at ¶ 26.) We emphasize that this is an *assertion* by Plaintiffs without an argument. We conclude that Mr. Hauptman's oral representation to Dr. Steinbrink that he could ignore the warning in the RKC report has no effect on whether Plaintiffs were put on "inquiry notice" and does not negate Plaintiffs' duty to exercise reasonable due diligence to discover their claims. Certainly, Mr. Hauptman's assurances did not act to *prevent* Plaintiffs from investigating the fraud in spite of their due diligence. Butala v. Agashiwalka, 916 F.Supp. 314, 319 (S.D.N.Y. 1996). Finally, since Plaintiffs did not even begin to investigate the warnings in the March 10, 2000 report until after one year had passed Plaintiffs have failed to show that they exercised due diligence. Incidentally, we note that if Plaintiffs believed Mr. Hauptman's "assurances" then it appears to follow that Hauptman's statement also notified Plantiffs that (i) RKC's auditing abilities were deficient if it truly did not have adequate understanding of the investments, (ii) Hauptman's judgment in retaining an inferior auditing firm is suspect, and (iii) Hauptman appears to be unable to effectively communicate the special nature of the investments to RKC.

## C. Failure to State A Claim Upon Which Relief Can Be Granted

Defendants also argue that Plaintiffs RICO claim, Securities Exchange Act claims, and conversion claim all fail to state claims upon which relief can be granted.

### 1. RICO Claim Asserted Against Hauptman and BHA

Mr. Hauptman and BHA argue that Plaintiffs have failed to state a RICO claim upon which relief can be granted because private parties may not use RICO to sue for securities violations. (Hauptman and BHA's Brief, at 7 (citing the Private Securities Litigation Reform Act, Pub. L. No. 104-67, 109 Stat. 737 (1995)).) We agree.

#### a. Applicable Law

"The Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA") amends 18 U.S.C. § 1964(c) to eliminate, as a predicate act for a private cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), any conduct actionable as fraud in the purchase or sale of securities." Mathews v. Kidder, Peabody & Co., 161 F.3d 156, 157 (3d Cir. 1998) (citing Pub. L. No. 104-67, § 107, 109 Stat. 737, 758 (1995) (amending 18 U.S.C. § 1964(c) (1994)). "The Conference Committee Report accompanying § 107 states that the amendment was intended not simply 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.'" Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999)(quoting H. R. Conf. Rep. No. 104-369, at 47 (1995)).

#### b. Analysis

BHA and Mr. Hauptman argue that a plain reading of Plaintiffs' Complaint reveals that their claims are grounded in securities violations and are actionable as fraud in the purchase or sale of securities, and are therefore barred by the Reform Act. In response, Plaintiffs state they "do not allege nor will they prove fraudulent conduct relative to the purchase or sale of securities to establish their RICO claim." (Plaintiffs' Response, at 40.) In this regard, Plaintiffs aver that their RICO

24

claim is based on conduct occurring subsequent to the sale of the securities. This post-sale conduct, Plaintiffs argue, is separate and discreet from conduct related to the sale of the securities, and is not predicated on securities fraud. (Id. at 40-41.) Plaintiffs direct the Court to paragraphs 117 through 139 of their Complaint to support their argument. (Id. at 41.)

In Reply to Plaintiffs' argument, BHA and Hauptman point out that this kind of recasting of a securities claim as a RICO claim is precisely barred by the Reform Act. (BHA and Hauptman's Reply Brief, at 2-5.)

Plaintiffs "cannot avoid the RICO Amendment's bar by pleading mail fraud [and] wire fraud . . . as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 330 (3d Cir. 1999). "Allowing such surgical presentation of the cause of action here would undermine the congressional intent behind the RICO Amendment." Id.

The "predicate acts alleged by plaintiff[s] were undeniably undertaken in connection with the alleged securities fraud." In re Ikon Office Solutions, Inc. Sec. Litig., 86 F. Supp. 2d 481, 486 (D. Pa. 2000), aff'd, 277 F.3d 658 (3d Cir. 2002). Plaintiffs rely on the same underlying facts to support both their RICO claim and their securities violation claims.

In its RICO claim asserted against BHA and Hauptman Plaintiffs state that "Hauptman conducted or participated direct[ly] or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering consisting of multiple instances of mail fraud and wire fraud as set forth in **paragraphs 116 through 139**." (Compl., ¶ 218 (emphasis added).)

In their section 10(b) securities violation claim Plaintiffs state that they "justifiably relied upon the correspondence and unaudited monthly statements sent by Hauptman (**see paragraphs 116-139**) as well as the yearly audit reports and financial statements prepared by RKC for Gamelan for 1999 and 2000." (Compl., ¶ 251 (emphasis added).) Thus, it is clear from the Complaint itself that Plaintiffs RICO claims are based on securities violations.

25

As noted, Plaintiffs support their "bases for the civil RICO complaint" by citing to

paragraphs 117 through 139, carefully omitting paragraph 116. (Plaintiffs' Response, at 41.)

Paragraph 116, which Plaintiffs *do* cite in support of their RICO claim in the Complaint, states:

> Hauptman engaged in a pattern of misrepresentations to limited partners of Genesis and Gamelan through communications outside of the audited financial statements. Hauptman made material misrepresentations to limited partners **about the financial condition and performance of Genesis and Gamelan designed to induce them to invest or continue to invest in Genesis and/or Gamelan** while permitting Hauptman to benefit from a pattern of self-dealing and fraud.

(Compl., ¶ 116 (emphasis added).) Plaintiffs cannot avoid the bases for their claims merely by not

citing to paragraph 116.

Similarly, Plaintiffs cannot avoid the Reform Act bar by attempting to cite only post-sale

conduct, or by asserting that the bases for the RICO claim are not based on conduct in connection

with the purchase or sale of securities. Plaintiffs argue that the following "misrepresentations which

occurred in the form of telephone contacts and mailings are not predicated on securities fraud:"

> The misrepresentations and acts of concealment were made to inflate the value of funds so as to provide Hauptman with greater management fees than he was entitled to charge. The inflated values were also provided to the plaintiffs to preclude them from ascertaining the proper value of their investments and to discourage them from withdrawing their investments. Misrepresentations were also made to enable Hauptman and Hauptman-related entities to liquidate their various investments to the detriment of the plaintiffs.

(Plaintiffs' Response, at 41.) Contrary to Plaintiffs assertion, we find that such conduct is

predicated on securities fraud. "'[C]onduct undertaken to keep a securities fraud . . . scheme alive

is conduct undertaken in connection with the purchase and sale of securities.'" In re Ikon Office

Solutions, 86 F. Supp. 2d at 487 (quoting Bald Eagle, 189 F.3d at 330).

We conclude that Plaintiff's allegations of conduct giving rise to the predicate offenses in

Plaintiffs RICO claim amounts to securities fraud and is therefore barred by the PSLRA. Bald

Eagle, 189 F.3d at 330. Accordingly, we will dismiss Count XI for failure to state a claim upon

which relief can be granted.

## 2. Securities Exchange Act Claims Asserted Against RKC and Hauptman

Next, in addition to arguing for dismissal based on the statute of limitations, RKC and Hauptman also argue that Plaintiffs' Securities Fraud Claims must be dismissed because the claims do not comply with the requirement of Section 10(b) of the Securities Exchange Act that the fraud was committed "in connection with the purchase or sale of a security." (Hauptman and BHA's Brief, at 17 and RKC's Brief, at 12 (both quoting 15 U.S.C. § 78j(b).)

### a. "In Connection With"

It is undisputed that Plaintiffs' investment in Gamelan qualifies as a sale or purchase of a security as set forth in the Securities and Exchange Act. 15 U.S.C. § 78(c)(10). Defendants argue, however, that the alleged fraudulent scheme set forth in the Complaint occurred *after* the Plaintiffs initially invested in Gamelan on December 13, 1999, not "in connection with" the investment in Gamelan. In addition, the alleged fraudulent scheme involving Online India and USA Global was not "in connection with" the sale or purchase of any security in either of these entities.

The scheme alleged by Plaintiffs is alleged to have occurred from the summer of 2000 through May 11, 2001, and involved manipulation of the price of Online India in order to boost the stock of USA Global (Online India's parent company) so that the value of USA Global would appear at an inflated price on Gamelan's books. (Compl. at ¶¶ 244-250 (Hauptman and BHA); 255-261, 265-267 (RKC).) None of this fraudulent activity occurred in connection with Plaintiff's purchase of a limited partnership in Gamelan on December 13, 1999. Instead, Plaintiffs allege that the fraudulent scheme described in the Complaint "prevented the plaintiffs from taking any type of remedial action before it was too late," (BHA and Hauptman's Brief, at 17, citing Compl. at ¶ 249), and thus, the fraudulent scheme induced Plaintiffs to "continue to maintain their investment and not execute their right to withdraw their funds." (RKC's Brief, at 13 citing Compl. at ¶ 268). Therefore, Defendants argue that Plaintiffs' Securities claims must be dismissed since liability under 10(b) cannot be based on fraudulent activity that induces plaintiffs to retain their interest in a

27

security.  Walck v. American Stock Exchange, Inc., 687 F.2d 778, 790 (3d Cir. 1982); Metropolitan
Life Insurance Co. v. RJR Nabisco, Inc., 716 F.Supp. 1504, 1525 (S.D.N.Y. 1989).

In response, Plaintiffs abandon their claims as set forth in their Complaint as Securities
Fraud claims.  Plaintiffs' Securities Fraud claims are clearly based on the post-December 13, 1999
fraudulent scheme to artificially inflate and manipulate the price of Online India in order to boost the
stock of USA Global, which would ultimately have the effect of artificially inflating the value of
Gamelan.  Plaintiffs decision to abandon these claims in the face of Defendants' motion to dismiss
demonstrates that Plaintiffs concede that their securities violations claims must be dismissed
because they do not comply with the requirement of Section 10(b) of the Securities Exchange Act
that the fraud was committed "in connection with the purchase or sale of a security." Accordingly,
we will grant Defendants' motion to dismiss Plaintiffs' Securities Fraud claims as set forth in the
Complaint.

### b. Plaintiff's Alleged New Claim

Plaintiffs now claim that the fraudulent activity that their Securities Fraud claims are based
upon are material misrepresentations and omissions of fact by Hauptman, and RKC's 1998
unqualified audit reports of Gamelan and Genesis, which Plaintiffs claim induced them to make
their investment in the Gamelan fund.  (Plaintiffs' Brief, at 27, 32-33.)  Since Plaintiffs' investment
in Gamelan is a security as set forth in the Securities and Exchange Act, Plaintiffs argue that they
have satisfied section 10(b)'s requirement that the fraudulent activity was committed in connection
with the purchase or sale of a security.  This newly described claim, however, is significantly
different from the fraudulent scheme described in the Complaint involving USA Global and Online
India that occurred after Plaintiffs had invested in Gamelan.  (See Compl. at ¶¶ 244-250; 255-261; &
265-267.)

Plaintiffs decline to directly address their abandonment of their claims as clearly set forth in
their Complaint and instead merely state in a general way that "the post sale misrepresentations and
omissions via the U.S. Mails and the telephone . . . constitute the predicate acts for the RICO

28

allegation[s]" and are "separate and distinct from the misrepresentations and omissions made by Hauptman to induce the sale." (Plaintiffs' Brief, at 21, citing Affidavit of Steinbrink, at 8-23 & Compl. at ¶¶ 4, 8, and ¶¶ 29-35.) Rather than offering an explanation for this change of claims, Plaintiffs instead admonish Defendants for "conveniently" overlooking the incorporation clauses of Counts XIV and XV. (Plaintiffs' Brief, at 33, 27.)

In response, Defendants argue that Plaintiffs are improperly attempting to amend their Complaint to plead a new claim by relying on the incorporation clauses. In the alternative, Defendants argue that even if such an amendment were permitted, the new claims also must be dismissed for failure to adequately plead reliance and loss causation.

We agree that Plaintiffs are improperly attempting to amend their Complaint by relying on the incorporation clauses. Federal Rule of Procedure 10(c) provides that "[s]tatements in a pleading may be adopted by reference in a different part of the same pleading . . . ." Fed.R.Civ.P. 10(c). "While Rule 10(c) authorizes adoption by reference . . . such adoption must be done with a degree of specificity and clarity which would enable the responding party to easily determine the nature and extent of the incorporation." Wolfe v. Charter Forest Behavioral Health Sys., Inc., 185 F.R.D. 225, 228-229 (D. La. 1999) (discussing adoption by reference of prior pleadings). We find such specificity and clarity lacking in the present case.

Counts XIV and XV do have boilerplate incorporation clauses, but Plaintiffs are wrong to blame Defendants for arguing for dismissal of plainly stated claims. Plaintiffs have filed a 270-paragraph, 102-page Complaint asserting 15 claims against eight defendants. The Complaint is detailed and is hardly a model of a "short and plain statement of the claim showing that the pleader is entitled to relief" required by Federal Rule of Civil Procedure 8(a)(2). Moreover, the Complaint does not comply with the simple directives of Rule 10(b) that all averments be set forth in a paragraph "limited as far as practicable to a statement of a single set of circumstances." Notwithstanding these problems, the Complaint does set forth in detail the events and circumstances

29

underlying the claims, and sets forth in separate counts the claims Plaintiffs assert against Defendants.

Counts XIV and XV are both entitled "Violation of §10(b) of the Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5". (Compl., at ¶¶ 96 and 99.) Our review of these Counts shows the following.

Count XIV (asserted against Hauptman at ¶¶ 241-252):

Plaintiffs aver that Hauptman breached his duty to Plaintiffs to manage investments without engaging in fraudulent and illegal activities "as set forth herein." (Compl., at ¶¶ 242-243.) Plaintiffs then set forth the fraudulent activity of Hauptman as the scheme involving USA Global and Online India, which Plaintiffs allege occurred after they invested in Gamelan. (See Compl. at ¶¶ 244-250.) Plaintiffs specifically refer back to Paragraphs 116 through 139 of the Complaint in support of their allegation that Plaintiffs "justifiably relied upon the correspondence and unaudited monthly statements sent by Hauptman (see paragraphs 116-139) as well as the yearly audit reports and financial statements prepared by RKC for Gamelan **for 1999 and 2000**." (Compl., at ¶ 251 (emphasis added). ) Paragraphs 116 through 139 do not mention RKC's 1998 report and contain only one reference to a document dated prior to December 13, 1999 - - Hauptman's October, 1999 letter to Dr. Steinbrink. (Compl., at ¶¶ 116-139.) In their Claim Plaintiffs never mention fraud or misrepresentation by Hauptman to induce Plaintiffs to invest in Gamelan on December 13, 1999. There is no common sense reading of Count XIV that could conclude that Plaintiffs' securities violation claim against Hauptman is based on material misrepresentations and omissions of fact by Hauptman which induced Plaintiffs to invest in the Gamelan fund. We reiterate that Plaintiffs' Securities Fraud claims are based on the alleged fraudulent scheme involving Online India and USA Global, a scheme that is not "in connection with" the purchase or sale of Gamelan.

Count XV (asserted against RKC at ¶¶ 253-270):

Plaintiffs aver that RKC breached its duty to disclose to Plaintiffs "any illegal and/or improper activity by Hauptman in the management of Gamelan which affected the value of its

30

investments . . . ." (Compl., at ¶ 254.) Plaintiffs refer to pre-December 13, 1999 activity as follows.

First, paragraph 257 states:

> **257.** RKC never caused Genesis and Gamelan to disclose[] adequate information about a schedule of investments it its 1998 and 1999 annual audit report and accompany[ing] financial statements of Genesis and Gamelan. Therefore, the plaintiffs had no notice that USA Global accounted for approximately 56% of the total net assets of Gamelan.

Second, paragraph 268 states:

> **268.** By the time the plaintiffs received the 2000 audit report for Gamelan which disclosed the investment in USA Global, it was too late for plaintiffs to do anything or take an[y] remedial action. As a result the plaintiffs have lost at least 56% of the value of their investment in Gamelan as a result of RKC's failure to disclose information about investments in the previous audits of Genesis and Gamelan, i.e., 1998 and 1999, which in part induced the plaintiffs to roll their funds from Genesis into Gamelan and continue to maintain their investment and not execute their right to withdraw their funds.

Finally, paragraphs 269 and 270 state:

> **269.** The plaintiffs justifiably relied upon the annual audits and accompany[ing] financial statements prepared by RKC for Genesis and Gamelan for 1998, 1999 and 2000.
>
> **270.** As a direct and proximate result of RKC's failure to disclose material information in the annual audit reports of Genesis and Gamelan for 1998, 1999, and 2000, the plaintiffs have suffered substantial financial injury.

It's true that Plaintiffs' do claim that RKC's failure to disclose that USA Global accounted for

approximately 56% of the total net assets of Gamelan in part induced Plaintiffs to invest their funds

in Gamelan on or about December 13, 1999. (Compl., at ¶ 268.) However, Plaintiffs' claim is

primarily a description of the post-December 13, 1999 scheme involving Online India and USA

Global. (See Compl., at ¶¶ 255-256, 258-268.) Again, there is no common sense reading of Count

XV that could conclude that Plaintiffs' securities' violation claim against RKC is based on material

misrepresentations and omissions of fact by RKC in the 1998 unqualified audit reports of Gamelan

and Genesis, which induced Plaintiffs to invest in the Gamelan fund.

Plaintiffs attempt to incorporate by reference a new claim must fail. Plaintiffs' alleged new

claim is not presented "with a degree of clarity which enables the responding party to ascertain the

nature and extent of the incorporation." Heintz and Co., Inc. v. Provident Tradesmens Bank and

Trust Co., 29 F.R.D. 144, 145 (E.D.Pa. 1961). "Courts have historically been reluctant to allow an

incorporation by reference if it fails to provide adequate notice of the incorporating party's claims, defenses, or factual allegations." Cooper v. Nationwide Mut. Ins. Co., 2002 WL 31478874, *5 (E.D. Pa. 2002). Here, Plaintiffs alleged incorporation by reference of an entirely new claim fails to "frame [the] claim in terms sufficiently specific as to apprise . . . defendants of the nature of the claim they are being called upon to answer." Heintz, 29 F.R.D. at 145. "It would seem to be an almost impossible task to prepare an understandable answer to such a pleading." Aktiebolaget Stille-Werner v. Stille-Scanlan, Inc., 1 F.R.D. 395, 396 (D.N.Y. 1940).

Defendants argue that even if we were to accept Plaintiffs' newly asserted claims that such claims should be dismissed since (i) Plaintiffs' clearly allege that what induced them to invest in Gamelan was Mr. Hauptman's promise to allow quarterly payments, not information about the performance of the fund, and (ii) Plaintiffs cannot show loss causation. As a side note, Plaintiffs also fail to allege in their purported new claim that they would not have invested in Gamelan had they known that 56% of the assets were in USA Global. In any event, we are not able to decide these issues as the alleged new claim is not properly before us and Defendants' argument in response to the alleged new claim is made without benefit of actually responding to a properly plead claim. Therefore, Plaintiffs will be ordered to file an amended complaint to add the alleged new claim and to further refine the complaint in compliance with Rules 8(a) and 10(b) and in accord with this Opinion. We note that a new Securities Exchange Act claim, which will relate back to the filing of the original Complaint, may also be subject to dismissal as being barred by the limitations period, but again the state of the pleadings renders it impossible to make such a determination at this stage.

### 3. Conversion Claim Asserted Against Hauptman and BHA

Defendants Hauptman and BHA argue that Plaintiffs' conversion claim fails as a matter of law because Plaintiffs retroactively acquiesced in the Defendants' unauthorized act thereby ratifying said act. (Hauptman and BHA's Brief in Support, at 16 (citing IRS v. Gaster, 42 F.3d 787, 794 (3d Cir. 1994); Restatement (Second) of Agency §§ 83, 100 & cmt.a.).)

Defendants note that plaintiffs allege in their conversion count the following:

32

**189.** On October 1, 1999, Hauptman without the permission and consent of the plaintiffs withdrew \$7,947,287.00 which represented the total value of plaintiffs' investment in Genesis and contributed said funds to Gamelan.

**190.** This conduct by Hauptman was illegal and constituted a conversion without permission or consent of the plaintiffs. The plaintiffs refused to invest in Gamelan until Hauptman gave them a special withdrawal provision in writing which was finally agreed to by Hauptman on December 13, 1999. Prior to that time, plaintiffs had never returned to Hauptman an executed subscription agreement agreeing to invest in Gamelan by the withdrawal [of] their funds from Genesis.

(Compl. at ¶¶ 189, 190.) Defendants claim that in the next paragraph Plaintiffs allege that they

knowingly and explicitly ratified Hauptman's act of transferring the funds on December 13, 1999:

**192.** Sometime after December 13, 1999, the plaintiffs returned the executed subscription agreements to Hauptman and at his request backdated the subscription agreements to October 1, 1999.

(Compl. at ¶ 191.) Thus, Defendants contend that Plaintiffs ratified the prior transfer of funds.

In response, Plaintiffs argue that they were never told that their funds were actually

transferred on October 1, 1999. Thus, Plaintiffs argue that they could not ratify an event of which

they had no knowledge of all the material facts. (Plaintiffs' Response to Motions to Dismiss, at 17

(citing Villanueva v. Brown, 103 F.3d 1128, 1138 (3d Cir. 1997); and Restatement (Third) of

Agency, § 4.06 (T.D. no. 2, 2001)).) Rather, Plaintiff argues that we should rule as a matter of law

that there could not have been ratification because they were never made aware of the prior transfer

of funds. Plaintiffs' Response to Motions to Dismiss, at 18 (citing Merrill Lycnh v. Cheng, 901

F.2d 1124, 1129 (D.C. Cir. 1990).)

The parties go on to trade arguments on this issue in their respective Reply and Response to

Reply briefs. At this stage of the proceedings we are unable to conclude as a matter of law the issue

of ratification, though it appears that it will be difficult for Plaintiffs to prevail on this issue.

Dr. Steinbrink was informed by Hauptman that if he "was not a registered limited partner by

October 1, 1999 it would be too late to subscribe and become a limited partner in Gamelan."

(Steinbrink Affidavit, at ¶ 22.) Nonetheless, Dr. Steinbrink continued to negotiate with Hauptman

beyond October 1, 1999. (Id.) Dr. Steinbrink was also informed that if he "didn't back date the

subscription agreements to October 1, 1999 that it would not be possible for [him] to purchase an

33

interest in the fund since the fund had closed to new limited partners on October 1, 1999." (Id.) Thereafter, Dr. Steinbrink agreed to execute the subscriptions so that Plaintiffs' investment in Gamelan would have an effective date of October 1, 1999. (Id. at ¶ 23.)

Mr. Hauptman attaches several documents to his second affidavit that purport to show that Plaintiffs actually knew before the December 13, 1999 letter that their funds had been transferred into Gamelan as of October 1, 1999. (Second Affidavit of Hauptman, at ¶ 3 & Exs. B, C, and D.) In response, Plaintiffs claim they never received Exhibits B, C, and D. (Plaintiffs' Response, at 2.) Plaintiffs argument is that they could not have received these pre-December 13, 1999 documents because they had not yet invested in Gamelan yet. (Id. at 2-3.) Of course, whether they actually received the documents and actually knew that their Genesis funds had been transferred to Gamelan on October 1, 1999, is not contingent on whether they had executed their subscription agreements.

Mr. Hauptman also claims that Plaintiffs ratified any illegal conversion because they received benefits from the conversion in that overall their investment grew from October 1, 1999 through December, 1999. (BHA and Hauptman's Reply, at 4.) In response, Plaintiffs claim that the documents showing a positive growth are not correct and that Plaintiffs did not receive a benefit, but rather incurred a tax liability. (Plaintiffs' Response, at 2 & n.1.)

We cannot say for certain on this record what Dr. Steinbrink knew had happened or was going to happen to Plaintiffs' funds. It certainly appears that he had to have known some minimal information regarding the transfer of Plaintiffs' funds into Gamelan. When Dr. Steinbrink executed the subscription agreement he knew that the fund had closed, and yet, he also had to know that the funds must be transferred into Gamelan in order to give effect to the executed subscription agreement. Assuming that Dr. Steinbrink was informed or believed that his funds would be transferred after he executed the agreement, the record is in dispute as to whether Dr. Steinbrink was informed or believed that his late-transferred funds would be given an effective date of investment of October 1, 1999, or whether his investment in Gamelan would only be affected by events occurring after he executed the agreement. Dr. Steinbrink's Brief in Response suggests that at some

34

point he knew that his funds were being given an effective date of October 1, 1999. (See Plaintiffs' Response, at n.1.) In addition, given that the fund was closed to new limited partners on October 1, 1999, the record is silent as to how Dr. Steinbrink thought Hauptman was going to open the closed fund without in some manner having Dr. Steinbrink's investment be counted as being transferred before the fund closed, that is, on October 1, 1999. Even if Dr. Steinbrink did not know that the funds were actually transferred on October 1, 1999 without his permission, by backdating the subscription agreement it is difficult to see how Dr. Steinbrink did not give consent to Hauptman to give his investment in Gamelan an effective date as if it was transferred on October 1, 1999. Whether that constitutes legal ratification in support of Defendants affirmative defense is a question that we cannot answer at this stage on this record. Discovery should aid in resolving the issue; however, it is also possible that resolution of the issue will depend upon a disputed matter of fact based on a credibility determination that is committed to the fact finder. In addition, we note that the parties offered a bare minimum of legal argument in support of their positions, something that might need to be more fully developed should the issue resurface. Accordingly, we will deny the motion to dismiss the conversion claim without prejudice.

## D. Pleading Fraud with Particularity Pursuant to Rule 9(b)

Defendants also argue that Plaintiffs have failed to plead particularity with respect to their various claims of fraud pursuant to Rule 9(b). We conclude that it is unnecessary to address Defendants' Rule 9(b) argument at this time.

We have already determined that Plaintiffs RICO claim should be dismissed for failure to state a claim. In addition, Plaintiffs' Securities Exchange Act claims, as plead, are barred by the statute of limitations; and, in the alternative, Plaintiffs' Securities Exchange Act claims (again as plead) fail to state a claim upon which relief can be granted. The remaining claims that include fraud are state law claims. However, we are permitting Plaintiffs to file an amended Complaint to assert their apparent 10(b) claims described in their Brief in Response to Defendants' motions to dismiss. As noted, the claims described by Plaintiffs in their brief appear to be subject to dismissal

35

based on an inability to plead that Plaintiffs were induced to invest in Gamelan based on the 1998 audit report or other misrepresentations by Defendants, which contradicts Plaintiffs clearly stated allegations that they invested in Gamelan based on Mr. Hauptman's agreement to modify the withdrawal provisions. However, until an amended complaint is filed we cannot say that Plaintiff has no viable Securities Exchange Act claim.

As presently filed, dissecting Plaintiffs' complaint is no easy task. In addition, with respect to the parties' Rule 9(b) arguments we are told by BHA and Hauptman that Plaintiffs have "utterly failed to comply" with Rule 9(b) (BHA and Hauptman's Brief, at 33), while Plaintiffs respond that "[n]othing could be further from the truth," (Plaintiffs Brief, at 8). While one or the other might be correct, our review of the Complaint in light of the arguments presented show that there likely is a middle area. That is, Defendants present well-founded arguments that Plaintiffs have failed to set forth adequately the who, what, when, where, why, and how of their fraud claims, while Plaintiffs do point to some allegations that contain some specificity. It appears to the Court, however, that Plaintiff will be hard-pressed to set forth a viable claim of conspiracy against RKC, or to establish the necessary scienter against RKC in their fraud claims. We are not ruling on these arguments at this time because we find that such a task is unnecessary until an amended complaint is filed.

Defendants also request a more definite statement of Plaintiffs' claims pursuant to Rule 12(e). While we do not grant that request, Plaintiffs will no doubt prepare a complaint that will likely address Defendants' concerns. In filing an amended complaint, Plaintiffs will have the opportunity, which we strongly suggest they take, to streamline their claims in accordance with Rule 8(a)(2)'s requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief," and to adhere to the directives of Rule 10(b) that all averments be set forth in a paragraph "limited as far as practicable to a statement of a single set of circumstances."

36

## IV. Regarding the Sealing of the Case

The Complaint in this case was sealed upon motion of Plaintiffs approximately 30 days after it was filed and the entire case has remained under seal. Plaintiffs' explained in their motion to file the complaint under seal that Plaintiffs had entered into a Confidentiality Agreement with BHA and Hauptman that provided in part that "if a legal action was filed against B. Hauptman & Associates, LLC and Bruce A. Hauptman based in whole or in part upon information disclosed pursuant to the Confidentially Agreement that the Complaint would be filed under seal initially until the Court made the determination that the protection of sealing was no longer necessary." (Doc. 2., at ¶¶ 1 & 2.)

The Court now determines that the protection of sealing is no longer necessary. Therefore, we will order the parties to show cause why this case should not be unsealed no later than August 9, 2006.

The parties may argue that certain confidential documents or portions of certain documents be filed under seal. Assuming that the parties are unable to show cause why the entire case should not be kept under seal each party shall also designate the document or documents, if any, that the party argues should remain under seal. This information shall be included in the parties' response to the Court's show cause order.

As always each party must obtain prior leave of court for each document that is requested to be filed under seal. Thus, in addition to designating the documents to be filed under seal, each party shall also separately file a motion for leave to file the designated documents under seal (or in this case, to remain under seal) no later than August 16, 2006. Upon the unsealing of the case, the designated documents will remain under seal until the party's motion has been decided.

## V. Conclusion

As set forth in the Opinion, we will deny BHA and Hauptman's motion to dismiss pursuant to Rule 12(b)(2) arguing that this Court lacks personal jurisdiction over him. We will also deny

37

BHA and Hauptman's motion to dismiss Plaintiffs' conversion claims without prejudice to reasserting this argument.

We will grant Defendants' motions to dismiss Plaintiffs' claims of a violation of § 10(b) of the Exchange Act as barred by the statute of limitations. We will also grant Defendants' motion to dismiss Plaintiffs' RICO claim and Securities Exchange Act claims for failure to state a claim upon which relief can be granted. In addition, we will dismiss Stuart Bender as a Defendant since no claims have been asserted against him.

We will deny Defendants remaining arguments presented in their motions to dismiss without prejudice to reasserting them in response to Plaintiffs' Amended Complaint.

Finally, as explained in the opinion, the parties will be ordered to address the unsealing of this case.

An appropriate Order follows.

July 26, 2006
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.,
Senior District Judge

38