IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | | |
|---|---|---|
| WILLIAM H. STEINBRINK, M.D. and<br>PATRICIA M. STEINBRINK, his wife,<br><br>    and<br><br>BAYSIDE OBSTETRICS GYNECOLOGY<br>INFERTILITY, INC. 401(K) PROFIT<br>SHARING PLAN,<br><br>        Plaintiffs,<br><br>    v.<br><br>ROTHSTEIN, KASS & COMPANY, P.C.,<br>B. HAUPTMAN & ASSOCIATES, LLC, and<br>BRUCE A. HAUPTMAN,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 01-382 ERIE |

**AFFIDAVIT OF BRUCE A. HAUPTMAN
IN SUPPORT OF MOTION TO DISMISS**

| | |
|---|---|
| STATE OF IOWA | )<br>) ss: |
| COUNTY OF JEFFERSON | ) |

1.      My name is Bruce A. Hauptman.  I am a defendant in the above-referenced action

and I submit this affidavit in support of the Motion to Dismiss of Defendants B. Hauptman &

Associates LLC ("BHA") and Bruce A. Hauptman.

2.      I founded B. Hauptman & Associates in 1984, a start-up business offering

investment management consulting services to small and medium sized pension plans and high

net-worth individuals.  B. Hauptman & Associates was incorporated in or around 1987 and then

was converted to a limited liability company (i.e., BHA) in or around 1999.  I have been the President of BHA since 1984.

3.    In 1989, B. Hauptman & Associates decided to create an investment fund, Genesis Capital Fund, L.P. ("Genesis Capital"), which was formed as a limited partnership. Genesis Capital was structured as a "fund of funds" — a limited partnership that invested in a group of hedge funds

4.    In 1997, Gamelan Capital Fund, L.P. ("Gamelan Capital") was formed.  BHA is the General Partner of Gamelan Capital.  While Genesis Capital had been a fund of funds with limited opportunity to participate in private equity investments, Gamelan Capital was structured to enable it to participate in various investment opportunities, including private equity investments.  See Exhibit A (Amended and Restated Limited Partnership Agreement of the Gamelan Capital Fund, L.P. dated June 10, 1998).

5.    Effective as of October 1, 1999, William Steinbrink, Patricia Steinbrink and Bayside Obstetrics Gynecology Infertility, Inc.401(k) Profit Sharing Plan (collectively, "Plaintiffs") elected to transfer their entire investment in Genesis Capital to Gamelan Capital. See Exhibit B (Gamelan Capital Fund, L.P. Subscription Instructions and Subscriber Information Form, completed by William and Patricia Steinbrink; Gamelan Capital Fund, L.P. Subscription Agreement of William and Patricia Steinbrink, dated October 1, 1999) and Exhibit C (Gamelan Capital Fund, L.P. Subscription Instructions and Subscriber Information Form, completed by Bayside Obstetrics Gynecology Infertility, Inc.401(k) Profit Sharing Plan; Gamelan Capital Fund, L.P. Subscription Agreement of Bayside Obstetrics Gynecology Infertility, Inc.401(k) Profit Sharing Plan, dated October 1, 1999).

6.     Gamelan Capital currently has twenty-four limited partners.  Plaintiffs represent two of those twenty-four limited partners.

Bruce A. Hauptman

Sworn to and subscribed before
me this _18_ day of November, 2006.

Notary Public

WALTER J DEVASIER
Commission Number 707516
My Commission Expires
12-27-09

4

# Exhibit A

# GAMELAN CAPITAL FUND, L.P.

*A Delaware Limited Partnership*

**Amended and Restated
Limited Partnership Agreement**

**June 10, 1998**

031029.0006  New York  67195 v02

CONFIDENTIAL
G 001077

CONFIDENTIAL
G 001078

---

## NOTICE

---

NEITHER GAMELAN CAPITAL FUND, L.P. NOR THE LIMITED PARTNERSHIP INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES. THE OFFERING OF SUCH LIMITED PARTNERSHIP INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF INTERESTS IN GAMELAN CAPITAL FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT.

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001079

# TABLE OF CONTENTS

*Page*

NOTICE ......................................................................................................... i

Article I        Definitions...............................................................................1

Article II       Organization....................................................................8
  2.1            Formation of Limited Partnership....................................8
  2.2            Name of Partnership .......................................................8
  2.3            Principal Office; Registered Office................................8
  2.4            Term of Partnership ........................................................9
  2.5            Objects of Partnership ....................................................9
  2.6            Actions by Partnership ...................................................9

Article III      Capital ...........................................................................10
  3.1            Contributions to Capital.................................................10
  3.2            Rights of Partners in Capital ........................................10
  3.3            Capital Accounts ...........................................................11
  3.4            Allocation of Net Profit and Net Loss .........................11
  3.5            Allocation of Management Fees, Withholding Taxes and Certain
                 Other Expenditures .......................................................12
  3.6            Reserves; Adjustments for Certain Future Events .......12
  3.7            Performance Allocation .................................................13
  3.8            Allocation to Avoid Capital Account Deficits..............13
  3.9            Allocations for Income Tax Purposes...........................13
  3.10           Individual Partners' Tax Treatment..............................15

Article IV       Management....................................................................16
  4.1            Rights, Duties and Powers of the General Partner........16
  4.2            Management Fees ...........................................................16
  4.3            Expenses ........................................................................16
  4.4            Rights of Limited Partners ...........................................18
  4.5            Other Activities of Partners .........................................19
  4.6            Duty of Care; Indemnification .....................................20

Article V        Admissions, Transfers and Withdrawals ......................22
  5.1            Admission of Limited Partners......................................22
  5.2            Admission of Additional General Partners ...................22
  5.3            Transfer of Interests of Limited Partners ....................22
  5.4            Transfer of Interest of the General Partner ..................25
  5.5            Withdrawal of Interests of Partners ..............................25
  5.6            Withdrawal of Organizational Limited Partner ...........27

CONFIDENTIAL
G 001080

| | | |
|---|---|---|
| Article VI | Dissolution and Liquidation | 28 |
| 6.1 | Dissolution of Partnership | 28 |
| 6.2 | Liquidation of Assets | 29 |
| | | |
| Article VII | Accounting and Valuations;  Books and Records | 30 |
| 7.1 | Accounting and Reports | 30 |
| 7.2 | Valuation of Partnership Assets and Interests | 30 |
| 7.3 | Determinations by the General Partner | 32 |
| 7.4 | Books and Records | 32 |
| | | |
| Article VIII | General Provisions | 34 |
| 8.1 | Amendment of Partnership Agreement | 34 |
| 8.2 | Special Power of Attorney | 35 |
| 8.3 | Notices | 36 |
| 8.4 | Agreement Binding Upon Successors and Assigns | 37 |
| 8.5 | Governing Law | 37 |
| 8.6 | Not for Benefit of Creditors | 37 |
| 8.7 | Consents | 37 |
| 8.8 | Merger and Consolidation | 37 |
| 8.9 | Miscellaneous | 38 |

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001081

This Amended and Restated Limited Partnership of Gamelan Capital Fund, L.P. is made as of this 11th day of June, 1998 by and among the Partners (as defined herein).

The Partners agree that the Amended and Restated Limited Partnership Agreement of Gamelan Capital Fund, L.P. dated as of March 25, 1998 is hereby amended and restated in its entirety to read as follows:

## Article I
## Definitions

For purposes of this Agreement:

"*Act*" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

"*Agreement*" means this Amended and Restated Limited Partnership Agreement, as amended from time to time.

"*Capital Account*" means with respect to each Partner the capital account established and maintained on behalf of such Partner as described in Section 3.3.

"*Carryforward Account*" means a memorandum account to be recorded in the books and records of the Partnership with respect to each Limited Partner, which shall have an initial balance of zero and which shall be adjusted as follows:

(1)     As of the first day after the close of each Performance Period for such Limited Partner, the balance of the Carryforward Account (a) shall be increased by the amount, if any, of such Limited Partner's Negative Performance Change for such Performance Period and (b) shall be reduced (but not below zero) by the amount, if any, of such Limited Partner's Positive Performance Change for such Performance Period.

(2)     As of the close of each Performance Period for such Limited Partner, any positive balance of the Carryforward Account shall be further adjusted if the Capital Account balance of such Limited Partner has been reduced during such Performance Period as a result of a distribution or a partial withdrawal, by reducing such positive balance (but not below zero) by an amount determined by multiplying (a) such positive balance by (b) a fraction, of which (i) the numerator is equal to the amount so distributed or withdrawn, and (ii) the denominator is equal to the balance of such Limited Partner's Capital Account immediately before giving effect to

1

CONFIDENTIAL
G 001082

such distribution or withdrawal, and by multiplying the resulting amount by (c) a fraction, of which (i) the numerator is equal to the number of days remaining from the date of such distribution or withdrawal through the close of such Performance Period and (ii) the denominator is equal to the total number of days in such Performance Period. In the case of any adjustment which is made pursuant to the preceding sentence, a further adjustment shall be made to the Carryforward Account as of the first day of the subsequent Performance Period by reducing any positive balance therein (but not below zero) by an amount determined by multiplying the amount referred to in clause (a) of the preceding sentence by the fraction referred to in clause (b), and by multiplying the resulting amount by the difference between one (1) and the fraction referred to in clause (c) therein.

"*Certificate*" means the certificate of limited partnership referred to in Section 2.1.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"*Commencement Date*" means the first date on or as of which a Limited Partner other than the Organizational Limited Partner is admitted to the Partnership.

"*Fiscal Period*" means each period that starts on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends on the earliest of the following dates:

(1)    the last day of a calendar month;

(2)    any date as of which any withdrawal or distribution of capital is made by or to any Partner or as of which this Agreement provides for any amount to be credited to or debited against the Capital Account of any Partner, other than a withdrawal or distribution by or to, or an allocation to the Capital Accounts of, all Partners that does not result in any change of any Partner's Partnership Percentage;

(3)    the date which immediately precedes any day as of which a contribution to capital is accepted by the General Partner from any new or existing Partner; or

(4)    any other date which the General Partner selects in its reasonable sole discretion.

"*Fiscal Year*" means the period commencing on the Commencement Date and ending on December 31, 1997, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect

CONFIDENTIAL
G 001083

another fiscal year, provided that any such other fiscal year shall be permissible for federal income tax purposes.

"*General Partner*" means B. Hauptman & Associates, Inc, a Delaware corporation, any successor thereto, and any persons hereafter admitted as additional general partners.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

"*Limited Partner*" means any person admitted to the Partnership as a Limited Partner, until the entire limited partnership interest of such person has been withdrawn pursuant to Section 5.5 or a substitute Limited Partner or substitute Limited Partners are admitted with respect to such person's entire limited partnership interest. Except as the context otherwise requires in relation to Management Fees and Performance Allocations, the term includes any Special Limited Partner.

"*Majority of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than fifty percent (50%) of the aggregate Partnership Percentages of all Limited Partners.

"*Managed Account*" means any assets or investment of the General Partner, or any assets managed by the General Partner or any affiliate of the General Partner for the account of any party other than the Partnership, which are invested or available for investment in investment or trading activities, whether or not of the specific type being conducted by the Partnership.

"*Management Fee*" means, with respect to each Limited Partner, an amount determined as of the last day of each Fiscal Period by multiplying (1) onetwelfth of one percent of the value of the Capital Account of such Limited Partner as of the last day of such Fiscal Period, after taking into account any capital contributions and the allocation of Net Profit or Net Loss, but prior to taking into account the accrual of the current Management Fee, any withdrawals or distributions, or any other allocations to such Limited Partner's Capital Account as of such Fiscal Period end date, by (2) the quotient of (a) the number of days during such Fiscal Period, divided by (b) the number of days in the month that includes such Fiscal Period.

"*Net Assets*" means the total value, as determined by the General Partner in accordance with Section 7.2, of all Securities and other assets of the Partnership (including net unrealized appreciation or depreciation of Securities and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6). Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal

3

CONFIDENTIAL
G 001084

Period but after adding any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period, and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership which are effective as of the date on which such determination is made:

(1) any withdrawals by or distributions payable to any Partner which are effective as of the date on which such determination is made;

(2) any Management Fees payable to any Partner which are effective as of the date on which such determination is made; and

(3) withholding taxes, expenses of processing withdrawals and other items payable, and any increases or decreases in any reserves or other amounts recorded pursuant to Section 3.6, during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner in its sole discretion determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably to the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"*Organizational Limited Partner*" means William H. Hurlin in his capacity as organizational limited partner.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "Partners" means the General Partner and all of the Limited Partners.

"*Partnership*" means the limited partnership formed pursuant to this Agreement.

"*Partnership Percentage*" shall mean a percentage established for each Partner on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Partner for a Fiscal Period shall be determined by dividing the amount of the Partner's Capital Account as of the beginning of the Fiscal Period (after crediting all net contributions to the capital of the Partnership) by the sum of the Capital Accounts of all of the Partners as of the beginning of the Fiscal Period (after crediting all net contributions to the capital of the Partnership). The sum of the Partnership Percentages of all Partners for each Fiscal Period shall equal one hundred percent (100%).

CONFIDENTIAL
G 001085

"*Performance Allocation*" means with respect to any Limited Partner twenty percent (20%) of the amount, determined as of the close of each Performance Period with respect to each Limited Partner, by which (1) such Limited Partner's Positive Performance Change for such Performance Period, if any, exceeds (2) any positive balance in such Limited Partner's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto. The General Partner in its sole discretion may reduce or eliminate the Performance Allocation with respect to any Special Limited Partner.

"*Performance Change*" means, with respect to each Limited Partner for each Performance Period, the difference between:

(1)     the sum of (a) the balance of such Limited Partner's Capital Account as of the close of the Performance Period (after giving effect to all allocations to be made to such Limited Partner's Capital Account as of such date other than any Performance Allocation to be debited against such Limited Partner's Capital Account), plus (b) any debits to such Limited Partner's Capital Account during the Performance Period to reflect any actual or deemed distributions or withdrawals with respect to such Limited Partner's interest, plus (c) any debits to such Limited Partner's Capital Account during the Performance Period to reflect any items allocable to such Limited Partner's Capital Account pursuant to Section 3.5(b) and Section 3.5(c) hereof; and

(2)     the sum of (a) the balance of such Limited Partner's Capital Account as of the commencement of the Performance Period, plus (b) any credits to such Limited Partner's Capital Account during the Performance Period to reflect any contributions by such Limited Partner to the capital of the Partnership.

If the amount specified in clause (1) exceeds the amount specified in clause (2) such difference shall be a "Positive Performance Change," and if the amount specified in clause (2) exceeds the amount specified in clause (1), such difference shall be a "Negative Performance Change."

"*Performance Period*" means, with respect to each Limited Partner, the period commencing as of the date of admission of such Limited Partner to the Partnership (in the case of the initial Performance Period) and thereafter each period commencing as of the day following the last day of the preceding Performance Period with respect to such Limited Partner, and ending as of the close of business on the first to occur of the following after the relevant commencement date:

(1)     the last day of a Fiscal Year;

(2)     the withdrawal by such Limited Partner of his entire interest in the Partnership;

CONFIDENTIAL
G 001086

(3)     the admission as a substitute Partner of a person to whom the entire interest of such Limited Partner has been Transferred; or

(4)     the final distribution to such Limited Partner following the dissolution of the Partnership.

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount which such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Partnership interest at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any transfer or assignment of such interest, including by reason of death); and "Positive Basis Partner" shall mean any Partner who withdraws from the Partnership and who has Positive Basis as of the effective date of such withdrawal, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(c) equal to such Partner's Positive Basis as of the effective date of the withdrawal.

"*Principal*" means Bruce A. Hauptman, in his capacity as principal of the Partnership.

"*Securities*" means:

(1)     securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(1) of the Securities Act of 1933, as amended);

(2)     any contracts for future or forward delivery of any security, commodity or currency;

(3)     any contracts based on any securities or group of securities or currencies;

(4)     any options on any contracts referred to in clauses (2) or (3); and

(5)     any evidences of indebtedness (including participations in or assignments of bank loans, trade credit claims or any other claims).

"*Special Limited Partner*" means a Limited Partner with respect to which the General Partner has agreed to a variation or elimination of the Management Fee, the Performance Allocation or both. The General Partner shall have the absolute discretion to designate any Limited Partner as a Special Limited Partner and, subject to any agreement between the General Partner and a Special Limited Partner, to rescind any of the terms that distinguish a Special Limited Partner from a Limited Partner that is not a Special Limited Partner.

"*Transfer*" means any sale, exchange, transfer, assignment or other disposition by a Partner of his interest in the Partnership to another party, whether voluntary or involuntary.

CONFIDENTIAL
G 001087

"*Treasury Bill Rate*" means, with respect to any calendar month, a rate of interest, determined and adjusted monthly by the General Partner as of the fifth business day of each month, equal to the annual coupon equivalent yield on 13week U.S. Treasury bills resulting from the most recent auction of such instruments prior to the monthly determination                                                                    date.

CONFIDENTIAL
G 001088

## Article II
## Organization

### 2.1    Formation of Limited Partnership.

(a)    The parties hereto hereby agree to form a limited partnership under and pursuant to the Act.

(b)    The General Partner shall execute, acknowledge and file with the Secretary of State of the State of Delaware a Certificate, any amendments thereto as may be required by the Act and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership shall determine to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.  The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring said amendment.  All amendments may be signed by any one or more of the General Partners (as required by the Act) and may be signed either personally or by an attorneyinfact.

### 2.2    Name of Partnership.

The name of the Partnership shall be Gamelan Capital Fund, L.P. or such other name as the General Partner may hereafter adopt upon (i) causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware and (ii) sending notice thereof to the Limited Partners.  The Partnership shall have the exclusive ownership and right to use the Partnership name so long as any affiliate of the Principal is a general partner of the Partnership. If no general partner of the Partnership is an affiliate of the Principal, then upon the request of the Principal, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

### 2.3    Principal Office; Registered Office.

(a)    The Partnership shall have its principal office at 1661 Highway One, Fairfield, Iowa 525568947, or at such other location as the General Partner shall designate from time to time.

(b)    The Partnership shall have its registered office in Delaware at 1013 Centre Road, County of New Castle, and shall have The PrenticeHall Corporation System, Inc.

CONFIDENTIAL
G 001089

as its registered agent for service of process in Delaware, unless a different registered office or agent is designated from time to time by the General Partner.

**2.4    Term of Partnership.**

The term of the Partnership shall commence on the date on which the Certificate is filed with the Secretary of State of the State of Delaware and shall continue until dissolved pursuant to Section 6.1 hereof.  The legal existence of the Partnership as a separate legal entity shall continue until the cancellation of the Partnership's certificate of limited partnership.

**2.5    Objects of Partnership.**

The object of the Partnership shall be to purchase, sell (including short sales), invest and trade in Securities, and to engage in financial transactions relating thereto.

**2.6    Actions by Partnership.**

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects.

031029.0006 New York  67195 v02

CONFIDENTIAL
G 001090

### Article III
### Capital

**3.1    Contributions to Capital.**

(a)    The required initial contribution of each Partner to the capital of the Partnership shall be $500,000, or such lesser amount as the General Partner in its sole discretion may permit.  The General Partner in its sole discretion may increase the required initial minimum investment at any time.

(b)    The Partnership may accept, in the sole discretion of the General Partner, additional contributions by the Partners to the capital of the Partnership in such amounts and as of the first business day of any fiscal month or at such other times as the General Partner in its sole discretion may permit, but no Limited Partner shall be obligated to make any additional contribution to the capital of the Partnership, subject to the provisions of Sections 3.5 and 3.6 and any contrary provision of the Act.

(c)    The General Partner shall make an initial contribution to the capital of the Partnership on the Commencement Date in the amount set forth in the Partnership's records and the General Partner in its sole discretion shall have the right at any time to make additional contributions to the capital of the Partnership as a Limited Partner or General Partner.  Except as provided in the Act, the General Partner shall not be required or obligated to make any additional contributions to the capital of the Partnership.

(d)    Except as otherwise permitted by the General Partner in its sole discretion, (i) initial or additional contributions to the capital of the Partnership by each Partner shall be payable in cash and in one installment, and (ii) initial contributions shall be due as of the date of admission of such person as a Limited Partner of the Partnership.

**3.2    Rights of Partners in Capital.**

(a)    No Partner shall be entitled to interest on his contributions to the capital of the Partnership.

(b)    No Partner shall have the right to the return of any contribution to the capital of the Partnership except (i) upon withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1.  The entitlement to any such return at such time shall be limited to the value of the Capital Account of the Partner.  The General Partner shall not be liable for the return of any such amounts.

10

CONFIDENTIAL
G 001091

**3.3    Capital Accounts.**

(a)    The Partnership shall maintain a separate Capital Account for each Partner.

(b)    Each Partner's Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting such Partner's initial contribution to the capital of the Partnership.

(c)    Each Partner's Capital Account shall be increased by the sum of (i) the amount of any cash and the net value of any property constituting additional contributions by such Partner to the capital of the Partnership permitted pursuant to Section 3.1, (ii) the portion of any Net Profit allocated to such Partner's Capital Account pursuant to Section 3.4, (iii) a ratable portion of any amounts deducted from any withdrawal payment pursuant to Section 5.5(e), net of the actual costs and expenses of processing such withdrawal payable by the Partnership, and (iv) any decreases in any reserves recorded by the Partnership pursuant to Section 3.6(a), and any receipts determined to be applicable to a prior Fiscal Period pursuant to Section 3.6(b), to the extent the General Partner determines that, pursuant to any provision of this Agreement, such receipt is to be credited to such Partner's Capital Account on a basis which is not in accordance with the current respective Partnership Percentages of all Partners.

(d)    Each Partner's Capital Account shall be reduced by the sum of (i) the amount of any cash and the net value of any property withdrawn by or distributed to such Partner pursuant to Section 5.5 or 6.2, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(e), (ii) the portion of any Net Loss allocated to such Partner's Capital Account pursuant to Section 3.4, (iii) any Management Fees, withholding taxes or other expense items charged to such Partner's Capital Account pursuant to Section 3.5, (iv) any Performance Allocation charged to such Partner's Capital Account pursuant to Section 3.7, and (v) any increases in any reserves recorded by the Partnership pursuant to Section 3.6(a), and any payments determined to be applicable to a prior Fiscal Period pursuant to Section 3.6(b), to the extent the General Partner determines that, pursuant to any provision of this Agreement, such payment is to be charged to such Partner's Capital Account on a basis which is not in accordance with the current respective Partnership Percentages of all Partners.

**3.4    Allocation of Net Profit and Net Loss.**

Subject to Section 3.8, as of the last day of each Fiscal Period, any Net Profit or Net Loss for the Fiscal Period shall be allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for the Fiscal Period.

CONFIDENTIAL
G 001092

**3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures.**

(a)    Subject to any special arrangements with Special Limited Partners, as of the last day of each calendar month, each Limited Partner's Management Fees for each Fiscal Period during such calendar month shall be debited against the Capital Account of such Limited Partner.

(b)    If the Partnership incurs a withholding tax or other tax obligation with respect to the share of Partnership income allocable to any Partner, then the General Partner, without limitation of any other rights of the Partnership or the General Partner, shall cause the amount of such obligation to be debited against the Capital Account of such Partner as of the close of the Fiscal Period during which the Partnership pays such obligation. If the amount of such taxes is greater than such Capital Account balance, then such Partner and any successor to such Partner's interest shall pay to the Partnership as a contribution to the capital of the Partnership, within 5 business days after notification and demand by the General Partner, the amount of such excess. The General Partner shall not be obligated to apply for or obtain a reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such reduction or exemption.

(c)    Except as otherwise provided for in the Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner in its sole discretion to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be charged to only those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such charges shall be debited from the Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

**3.6    Reserves; Adjustments for Certain Future Events.**

(a)    Appropriate reserves may be created, accrued and charged against Net Assets and proportionately against the Capital Accounts for contingent liabilities, such reserves to be in the amounts which the General Partner in its sole discretion deems necessary or appropriate. The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner in its sole discretion deems necessary or appropriate. At the sole discretion of the General Partner, the amount of any such reserve, or any increase or decrease therein, may be charged or credited, as appropriate, to the Capital Accounts of those parties who are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties who were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

(b)    If the General Partner in its sole discretion determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods,

CONFIDENTIAL
G 001093

then such amount may be proportionately charged or credited, as appropriate, to those parties who were Partners during such prior period or periods.

(c)    If any amount is to be charged or credited to a party who is no longer a Partner, such amount shall be paid by or to such party, as the case may be, in cash, with interest at the Treasury Bill Rate in effect at that time from the date on which the General Partner, in its sole discretion, determines that such charge or credit is required. In the case of a charge, the former Partner shall be obligated to pay the amount of the charge, plus interest as provided above, to the Partnership on demand; provided that (i) in no event shall a former Partner be obligated to make a payment exceeding the amount of its Capital Account at the time to which the charge relates, and (ii) no such demand shall be made to the extent prohibited by applicable law. To the extent the Partnership fails to collect, in full, any amount required to be charged to such former Partner pursuant to paragraph (a) or (b) of this Section 3.6, whether due to the expiration of the applicable limitation period or for any other reason whatsoever, the deficiency may be charged proportionately to the Capital Accounts of the current Partners.

**3.7    Performance Allocation.**

The Performance Allocation shall be debited against the Capital Account of each Limited Partner as of the last day of each Performance Period with respect to such Limited Partner, and the amount so debited shall simultaneously be credited to the Capital Account of the General Partner. The General Partner in its sole discretion may waive or alter the Performance Allocation with respect to Limited Partners that are affiliated with the General Partner and others.

**3.8    Allocation to Avoid Capital Account Deficits.**

To the extent that any debits pursuant to Sections 3.4 through 3.7 hereof would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to Section 3.4 through 3.7 hereof to the Capital Account of any Limited Partner previously affected by the application of this Section 3.8 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.8 not previously recovered.

**3.9    Allocations for Income Tax Purposes.**

(a)    Income Tax Allocations. Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year shall be allocated among the Partners, General and Limited, in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To

CONFIDENTIAL
G 001094

this end, the Partnership shall establish and maintain records which shall show the extent to which the Capital Account of each Partner shall, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner. To the extent deemed by the General Partner, in its sole discretion, to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts.

(b)    Basis Adjustments.    To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required under Treasury Regulation Section 1.7041(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations; provided, in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, shall be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution which caused such adjustment.

(c)    Positive Basis Allocations.    If the Partnership realizes net gains from the sale of Partnership assets for federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner in its sole discretion may elect: (i) to allocate such net gains among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such net gains shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any net gains not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes net gains from a sale of a property investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner, there shall be allocated to such Positive Basis Partner an amount of such net gains equal to the amount, if any, by which his or its Positive Basis as of the effective date of its withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence.

CONFIDENTIAL
G 001095

**3.10    Individual Partners' Tax Treatment.**

Each Partner agrees not to treat, on any personal income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

CONFIDENTIAL
G 001096

**Article IV**
**Management**

**4.1    Rights, Duties and Powers of the General Partner.**

(a)    Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, (i) for all investment and investment management decisions to be undertaken on behalf of the Partnership and (ii) for managing and administering the affairs of the Partnership, and shall have the power and authority to do all things which the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)    Without limiting the generality of the General Partner's power and authority hereunder, the General Partner shall have full power and authority to execute, deliver and perform such contracts, agreements and other undertakings, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business and affairs of the Partnership, including, without in any manner limiting the generality of the foregoing, contracts, agreements, undertakings and transactions with any Partner or with any other person, firm or corporation having any business, financial or other relationship with any Partner or Partners.

**4.2    Management Fees.**

(a)    The General Partner shall be entitled to receive from the Partnership as compensation for its services hereunder a monthly amount equal to the aggregate Management Fees of all Limited Partners for each Fiscal Period during such calendar month.

(b)    Management Fees shall be payable by the Partnership to the General Partner in cash immediately following the close of each calendar month.

**4.3    Expenses.**

(a)    The General Partner will pay all of its own operating and overhead costs (except liability insurance) without reimbursement by the Partnership, including their expenses related to providing investment management, bookkeeping and other services to the Partnership. The Partnership will not have its own separate employees or office, and it will not reimburse the General Partner for salaries, office rent and other general overhead costs of the General Partner.

CONFIDENTIAL
G 001097

(b)    The Partnership, and not the General Partner, will pay all other costs and expenses arising in connection with its operations.    Such expenses payable by the Partnership include, without limitation, the following:

(i)    all costs and expenses directly related to portfolio investments or prospective investments of the Partnership, including brokerage commissions and other transaction costs, interest and commitment fees on debit balances or borrowings, borrowing charges on Securities sold short, custody fees and fees of professional advisors and consultants relating to investments or prospective investments;

(ii)    any withholding or transfer taxes imposed on the Partnership or any of its Partners;

(iii)    any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any selfregulatory organization or any Federal, state or local laws;

(iv)    any interest due to Partners in connection with capital withdrawals;

(v)    any legal fees and costs (including settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Partnership or the General Partner in its capacity as such;

(vi)    the cost of the audit of the Partnership's financial statements and the preparation of its tax returns;

(vii)    the fees and expenses of the Partnership's accountants in connection with accounting advice relating to the Partnership's affairs;

(viii)    the fees and expenses of the Partnership's counsel in connection with advice directly relating to the Partnership's legal affairs;

(ix)    the costs of any outside appraisers, accountants, attorneys or other experts engaged by the General Partner as well as other expenses directly related to the Partnership's investment program;

(x)    specific expenses incurred in obtaining systems, research and other information utilized for portfolio management purposes that facilitate valuations and accounting, including the costs of statistics and pricing services, service contracts for quotation equipment and related hardware and software;

(xi)    all costs and expenses associated with the organization of the Partnership, including ordinary legal and accounting fees, printing costs, travel

CONFIDENTIAL
G 001098

and outofpocket expenses (which shall be amortized over a period of sixty months) and compliance with any applicable federal and state laws;

(xii)    all costs and expenses associated with the offering of interests in the Partnership, provided that the Partnership will not bear or be charged any placement or solicitation fees;

(xiii)    the costs and expenses of holding any meetings of partners which are held;

(xiv)    the costs of any liability insurance obtained on behalf of the Partnership, the General Partner or the Principal; and

(xv)    all costs and expenses associated with reporting and providing information to existing and prospective Partners.

Any such expenses may be specially allocated among the Partners as provided elsewhere in this Agreement, including without limitation, Sections 3.5, 3.6 and 5.5. The General Partner shall be entitled to reimbursement from the Partnership for any of the above expenses paid by it on behalf of the Partnership; provided that, the General Partner in its sole discretion may absorb any or all of such expenses incurred on behalf of the Partnership. If the General Partner shall incur any of the expenses mentioned in Section 4.3(b) above for the account of the Partnership and any Managed Account, the General Partner will allocate such expense among the Partnership and each such Managed Account in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner in its sole discretion considers fair and reasonable.

(c)    The General Partner shall be entitled to use "soft dollars" generated by the Partnership to pay for certain of its own operating and overhead costs, including payment of all or a portion of the General Partner's costs and expenses of operation such as supplies, salaries, employee benefits, telephone, postage, transportation, travel, meals and entertainment, office equipment, news wire and data processing charges, legal and accounting fees, office rent and electricity, quotation services and periodical subscription fees and all other trading related expenses. Use of "soft dollars" by the General Partner as described herein shall not constitute a breach by the General Partner of any fiduciary or other duty which the General Partner may be deemed to owe to the Partnership or its Partners.

## 4.4    Rights of Limited Partners.

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by

CONFIDENTIAL
G 001099

applicable law. Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

**4.5     Other Activities of Partners.**

(a)     The General Partner shall not be required to devote its full time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine, in its discretion exercised in good faith, to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)     Each Partner agrees that any other Partner and any partner, director, officer, shareholder, affiliate or employee of any other Partner, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, whether or not any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Limited Partners or their respective partners, directors, officers, shareholders, affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this paragraph (b) of Section 4.5 to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Limited Partners and the General Partner and their respective partners, directors, officers, shareholders, affiliates and employees are hereby authorized to engage in activities contemplated by this paragraph (b) of Section 4.5 with, or to purchase, sell or otherwise deal or invest in Securities issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner.

(c)     When the General Partner in its sole discretion determines that it would be appropriate for the Partnership and any Managed Account to participate in an investment opportunity, the General Partner will seek to execute orders on a basis which is fair, reasonable and equitable to the Partnership and each such Managed Account. In such situations, the General Partner may place orders for the Partnership and each such Managed Account simultaneously and if all such orders are not filled at the same price, the General Partner may cause the Partnership and each such Managed Account to pay or receive the average of the prices at which the orders were filled for the Partnership and each such Managed Account. If all such orders cannot be fully executed under prevailing market conditions, the General Partner in its sole discretion may allocate the Securities or other assets traded among the Partnership and any Managed Account on a basis which it considers equitable, taking into account the size of the order placed for the Partnership

CONFIDENTIAL
G 001100

and each such Managed Account as well as any other factors which the General Partner in its sole discretion deems relevant.

(d)    The parties hereto hereby waive, and covenant not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.5.

**4.6    Duty of Care; Indemnification.**

(a)    The General Partner (which term shall include for this purpose each director, officer, employee or agent of, or any person who controls, the General Partner and its respective executors, heirs, assigns, successors or other legal representatives) shall not be liable to the Partnership or to any of its Limited Partners for any loss or damage occasioned by any acts or omissions in the performance of its services under this Agreement, unless such loss or damage is due to the gross negligence, wilful misconduct or bad faith of the General Partner, or as otherwise required by law.

(b)    The General Partner (which term shall include for purposes of this Section 4.6(b) each director, officer, employee or agent of, or any person who controls, the General Partner and its executors, heirs, assigns, successors or other legal representatives) shall be indemnified to the fullest extent permitted by law by the Partnership (but not the Partners individually) against any cost, expense (including attorneys' fees), judgment or liability incurred by or imposed upon it in connection with any action, suit or proceeding (including any proceeding before any judicial, administrative or legislative body or agency) to which it may be made a party or otherwise be involved or with which it shall be threatened by reason of being or having been General Partner; provided, however, that no General Partner shall be so indemnified to the extent such cost, expense, judgment or liability shall have been finally determined in a decision on the merits in any such action, suit or proceeding to have been incurred or suffered by the General Partner by reason of gross negligence, wilful misconduct or bad faith of the General Partner. The right to indemnification granted by this Section 4.6 shall be in addition to any rights to which the General Partner may otherwise be entitled and shall inure to the benefit of the successors or assigns of such General Partner. The Partnership shall pay the expenses incurred by the General Partner in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by such General Partner to repay such payment if there shall be an adjudication or determination that it is not entitled to indemnification as provided herein. In (i) any suit brought by the General Partner to enforce a right to indemnification hereunder, it shall be a defense that, and (ii) in any suit in the name of the Partnership to recover expenses advanced pursuant to the terms of an undertaking, the Partnership shall be entitled to recover such expenses upon a final adjudication that, the General Partner or other person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in Section 4.6(a). In any such suit brought to enforce a right to indemnification or to recover an advancement of expenses pursuant to the terms of an

CONFIDENTIAL
G 001101

undertaking, the burden of proving that the General Partner or other person claiming a right to indemnification is not entitled to be indemnified, or to an advancement of expenses, hereunder shall be on the Partnership (or any Limited Partner acting derivatively or otherwise on behalf cf the Partnership or the Limited Partners). No General Partner may satisfy any right of indemnity or reimbursement granted in this Section 4.6 or to which it may be otherwise entitled except out of the assets of the Partnership, and no Partner shall be personally liable with respect to any such claim for indemnity or reimbursement. The General Partner in its sole discretion may obtain appropriate insurance on behalf of the Partnership to secure the Partnership's obligations hereunder.

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001102

**Article V**
**Admissions, Transfers and Withdrawals**

**5.1    Admission of Limited Partners.**

The General Partner may, at the beginning of each month or at such other times as the General Partner may determine in its sole discretion, and without advance notice to or consent from the Limited Partners, admit any person who shall execute this Agreement or any other writing evidencing the intent of such person to become a Limited Partner, unless the investment by such Limited Partner in the Partnership would have any of the effects described in clauses (i) through (iv) of Section 5.3(c) herein. The General Partner shall have the absolute discretion to reject subscriptions for limited partnership interests in the Partnership.

**5.2    Admission of Additional General Partners.**

(a)    Except as provided in Section 5.2(b), the General Partner may admit one or more additional general partners, who may be natural persons, partnerships, companies (including limited liability companies) or other persons, to the Partnership only if such action is approved by a Majority of Limited Partners. No additional general partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement or if adding such additional general partner would have any of the effects described in clauses (i) through (iv) of Section 5.3(c) herein.

(b)    Notwithstanding Section 5.2(a), any person to whom the General Partner has transferred its general partnership interest in accordance with Section 5.4 shall be admitted to the partnership as a substitute General Partner without the consent of the Limited Partners.

**5.3    Transfer of Interests of Limited Partners.**

(a)    Each Limited Partner agrees with all other Partners that he will not make or attempt to make any Transfer of his interest in the Partnership which will violate this Section 5.3. In the event of any attempted Transfer of any Limited Partner's interest in the Partnership in violation of the provisions of this Section 5.3, without limiting any other rights of the Partnership, the General Partner in its sole discretion shall have the right to require the withdrawal of such Limited Partner's interest from the Partnership as provided by Section 5.5(h).

(b)    No Transfer of any Limited Partner's interest in the Partnership, whether voluntary or involuntary, shall be valid or effective, and no transferee shall become a

CONFIDENTIAL
G 001103

substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be denied in the General Partner's sole discretion. In the event of any Transfer, all of the conditions of the remainder of this Section 5.3 must also be satisfied.

(c)    No Transfer of any Limited Partner's interest in the Partnership, whether voluntary or involuntary, shall be valid or effective unless the General Partner in its sole discretion determines, after consultation with legal counsel acting for the Partnership, that such Transfer will not:

(i)    require registration of any interest in the Partnership under any securities laws of the United States of America, any state thereof or any other jurisdiction;

(ii)    subject the Partnership or the General Partner to a requirement to register under any securities or commodities laws of the United States of America, any state thereof or any other jurisdiction;

(iii)    result in a termination of the Partnership for U.S. federal income tax purposes under Section 708(b)(1)(B) of the Code, or cause the Partnership to be treated as a "publicly traded partnership" for U.S. federal income tax purposes under Section 7704(b) of the Code, or result in a subdivision of the Limited Partner's interest in the Partnership if the initial offering price of any such subdivided interest would have been less than $20,000;

(iv)    result in the Partnership being considered an investment company within the meaning of the Investment Company Act; or

(v)    violate or be inconsistent with any representation or warranty made by the transferring Limited Partner at the time the Limited Partner subscribed to purchase an interest in the Partnership.

The transferring Limited Partner, or his legal representative, shall give the General Partner written notice before making any voluntary Transfer and after any involuntary Transfer and shall provide sufficient information to allow legal counsel acting for the Partnership to make the determination that the proposed Transfer will not result in any of the consequences referred to in clauses (i) through (v) above. If an assignment, transfer or disposition occurs by reason of the death of a Limited Partner or assignee, the notice may be given by the duly authorized representative of the estate of the Limited Partner or assignee. The notice must be supported by proof of legal authority and valid assignment acceptable to the General Partner in its sole discretion.

(d)    In the event any Transfer permitted by this Section 5.3 shall result in multiple ownership of any Limited Partner's interest in the Partnership, the General Partner in its sole discretion may require one or more trustees or nominees to be

CONFIDENTIAL
G 001104

designated to represent a portion of or the entire interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement, and for the purpose of exercising the rights which the transferor as a Limited Partner had pursuant to the provisions of this Agreement.

(e)    Subsequent to receipt of the consent of the General Partner (which consent may be withheld by the General Partner in its sole discretion), an authorized transferee shall be entitled to the allocations and distributions attributable to the interest in the Partnership transferred to such transferee and to transfer such interest in accordance with the terms of this Agreement; provided, however, that such transferee shall not be entitled to the other rights of a Limited Partner as a result of such transfer until he becomes a substituted Limited Partner.  No transferee may become a substituted Limited Partner without the consent of the General Partner (which consent may be withheld by the General Partner in its sole discretion).  If the General Partner withholds consent to such substitution, a transferee will not have any of the rights of a Limited Partner, except that the transferee will be entitled to receive that share of capital or profits and to have the right of withdrawal to which his transferor would have been entitled and will remain subject to the other terms of this Agreement.  A transferring Limited Partner will remain liable to the Partnership as provided under applicable law and this Agreement regardless of whether his transferee becomes a substituted Limited Partner.  Notwithstanding the above, the Partnership and the General Partner shall incur no liability for allocations and distributions made in good faith to the transferring Limited Partner until a written instrument of transfer has been received by the Partnership and recorded on its books and the effective date of the Transfer has passed.

(f)    Any other provision of this Agreement to the contrary notwithstanding, a transferee shall be bound by the provisions hereof.  Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner in its sole discretion may require the transferring Limited Partner to execute and acknowledge an instrument of transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.  A transferee shall become a substituted Limited Partner and shall succeed to the portion of the transferor's Capital Account relating to the interest transferred effective upon the satisfaction of all of the conditions for such Transfer contained in this Section 5.3.

(g)    In the event of a Transfer or in the event of a distribution of assets of the Partnership to any Partner, the Partnership, in the sole discretion of the General Partner, may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable U.S. Treasury regulations, to cause the basis of the Partnership's assets to be adjusted for federal income tax purposes as provided by Sections 734 or 743 of the Code.

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001105

**5.4    Transfer of Interest of the General Partner.**

(a)    The General Partner may not transfer its interest as a General Partner in the Partnership other than (i) pursuant to Section 5.4(b), (ii) pursuant to a transaction not deemed to involve an assignment of its investment management obligations within the meaning of the United States Investment Advisers Act of 1940, as amended, or (iii) with the approval of a Majority of Limited Partners.  By executing this Agreement, each Limited Partner shall be deemed to have consented to any such transfer permitted by the preceding sentence.  Any successor to the General Partner shall succeed to the portion of the General Partner's Capital Account relating to the interest transferred.

(b)    Notwithstanding Section 5.4(a), B. Hauptman & Associates, Inc. may transfer its interest as the General Partner to any entity managed and controlled by it without the consent of the Limited Partners, and the transferee shall be admitted to the Partnership as a substitute General Partner in accordance with Section 5.2(b).  The General Partner will notify the Limited Partners of any transfer pursuant to this Section 5.4(b).

**5.5    Withdrawal of Interests of Partners.**

(a)    The interest of a Partner in the Partnership may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

(b)    Except as provided in Sections 5.5(f), 5.5(g), 5.5(j), and this Section 5.5(b), a Limited Partner may voluntarily withdraw all or part of his interest in the Partnership as of the close of business on the last business day of each Fiscal Year (or such shorter period as the General Partner in its sole discretion may determine), by giving irrevocable written notice to the General Partner at the principal office of the Partnership by November 1st of the relevant year (or within such other time as the General Partner in its sole discretion determines) indicating the amount to be withdrawn from such Partner's Capital Account in such notice.

(c)    The General Partner may not make any withdrawal of capital from the Partnership if, after giving effect thereto, the value of the General Partner's Capital Account would be less than the minimum balance required to be maintained pursuant to Section 3.1(c).  Subject to the foregoing, the General Partner and the Principal may voluntarily withdraw part of their respective interests in the Partnership at any time pursuant to this Section 5.5 without giving notice to the Limited Partners.

(d)    Except as provided in Section 5.5(f) and 5.5(g), payment of at least ninety percent (90%) due to a withdrawing Partner shall be made as soon as practicable (but not more than fifteen (15) days) after the effective date of withdrawal and any remaining balance shall be paid promptly following completion of the audit of the Partnership's financial statements for the Fiscal Year which includes the effective date of withdrawal (with interest on any unpaid balance from the 15th day after the withdrawal date to the

CONFIDENTIAL
G 001106

date or dates of payment at the money market fund rate of the Partnership's primary commercial bank applicable during such period).

(e)     The General Partner in its sole discretion may deduct from any withdrawal payments or otherwise charge to the withdrawing Limited Partner (i) a withdrawal charge reflecting (i) actual or estimated costs to the Partnership of complying with and processing such withdrawal plus (ii) in connection with any withdrawal occurring prior to amortization in full of the Partnership's organizational expenses, a ratable portion of the Partnership's organization expenses which have not yet been fully amortized.    The amount of any such charges deducted by the Partnership, net of any actual costs and expenses of processing the withdrawal, shall be allocated among and credited to the Capital Accounts of the remaining Partners on the commencement of the Fiscal Period immediately following the effective date of the withdrawal in accordance with their respective Partnership Percentages at such time.

(f)     Upon receipt by the General Partner of a Limited Partner's notice of intention to withdraw assets from the Partnership, the General Partner shall have the absolute discretion to manage the Partnership's assets in a manner which would provide for cash being available to satisfy such Limited Partner's request for withdrawal, but the General Partner shall be under no obligation to effect sales of Partnership assets if the General Partner in its sole discretion determines that such transactions might be detrimental to the interest of the other Partners or that such transactions are not reasonably practicable. The General Partner in its sole discretion may effect withdrawal payments (i) in cash, (ii) by transfer of certain Securities to the Limited Partner, the value of which, as determined in accordance with Section 7.2, would satisfy the Limited Partner's request for withdrawal or (iii) in any combination of the foregoing.. If the Partnership holds assets that were not marketable or redeemable as of the date of a withdrawal by a Partner, the General Partner in its sole discretion may (but is not required to) suspend payment of the withdrawal proceeds attributable to the withdrawing Partner's pro rata share of such illiquid holdings. In these circumstances, the General Partner will seek to dispose of a sufficient portion of such illiquid holdings in an orderly manner at the earliest practicable date to permit the withdrawal to be completed. The amount payable to the withdrawing Limited Partner with respect to such illiquid holdings will be based on the actual proceeds derived by the Partnership (without reference to the value of the illiquid holdings as of the original withdrawal date). In such event, payment will be made to the withdrawing Limited Partner as soon as is practicable after the disposition of the illiquid holdings. Any amount not immediately paid to a withdrawing Limited Partner will, to the extent practicable after the liquidation of positions, be held in an interestbearing account for the benefit of the withdrawing Partner until the actual payment of the balance due to the withdrawing Limited Partner.

(g)     In addition to the foregoing, the General Partner in its sole discretion may suspend any payments to a withdrawing Limited Partner if the effect of such withdrawal would impair the Partnership's ability to pursue its investment objectives. The General Partner will promptly notify each Limited Partner who has submitted a withdrawal

CONFIDENTIAL
G 001107

request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawal or distribution rights pursuant to this Section 5.5(j). The General Partner in its sole discretion may allow any such Partners to rescind their withdrawal request to the extent of any portion thereof for which withdrawal proceeds have not yet been remitted. The General Partner in its sole discretion may complete any withdrawals or distributions as of a date after the cause of any such suspension has ceased to exist to be specified by the General Partner as the effective date of withdrawal for all purposes of this Section 5.5 or at any other time.

(h)    The General Partner in its sole discretion may, by not less than 30 days' prior written notice to a Limited Partner, require the Limited Partner's interest to be withdrawn in part or in its entirety from the Partnership pursuant to this Section 5.5, effective at the end of any month. The amount due to any such Partner required to withdraw from the Partnership shall be equal to the value of such Partner's Capital Account as of the effective date of the withdrawal net of any charges imposed pursuant to Section 5.5(e) hereof.

(i)    The right of any Partner to withdraw or of any Partner to have distributed an amount from his Capital Account pursuant to the provisions of this Section 5.5 is subject to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies provided for in Section 3.6 herein.

(j)    A withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner after the effective date of the withdrawal except as provided in Section 3.6 herein.

## 5.6    Withdrawal of Organizational Limited Partner.

Upon the admission of any Limited Partner, the Organizational Limited Partner shall withdraw from the Partnership and shall be entitled to the return of his capital contribution, without interest or deduction.

**Article VI**
**Dissolution and Liquidation**

**6.1     Dissolution of Partnership.**

(a)     The Partnership shall be dissolved upon the first to occur of the following dates:

(i)     any date on which the General Partner in its sole discretion shall elect to dissolve the Partnership upon 60 days' prior written notice to the Limited Partners; or

(ii)     the date on which (A) the General Partner is declared bankrupt by a court with appropriate jurisdiction, (B) the General Partner files a petition commencing a voluntary case under any bankruptcy law, (C) the General Partner makes an assignment for the benefit of creditors, (D) a receiver for the property or affairs of the General Partner is appointed, (E) the entire partnership interest of the General Partner is withdrawn from the Partnership, or (F) the General Partner is dissolved and a winding up thereof commenced, unless (x) at the time there is at least one other General Partner and that General Partner agrees to continue the Partnership, or (y) within ninety (90) days after any such event all of the remaining Partners shall agree in writing to continue the Partnership and shall elect one or more replacement general partners; or

(iii)     any other event causing the dissolution of the Partnership under the Act.

(b)     Upon the occurrence of an event of withdrawal under Section 17402 of the Act with respect to the General Partner, all remaining Partners are authorized to carry on the business of the Partnership as permitted by Section 17801(3) of the Act and to the extent permitted by this Agreement.  Except as provided in Section 6.1(a) or in the Act, the death, mental illness, dissolution, termination, liquidation, bankruptcy, reorganization, merger, sale of substantially all of the stock or assets of or other change in the ownership or nature of a Partner, the admission to the Partnership of a new General or Limited Partner, the withdrawal of a Partner from the Partnership, or the transfer by a Partner of his interest in the Partnership to a third party shall not cause the Partnership to dissolve.

(c)     The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001109

dissolve the Partnership. Care has been taken in this Agreement to provide for fair and just payment in liquidation of the interests of all Partners. Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

**6.2    Liquidation of Assets.**

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority of Limited Partners shall liquidate the business and administrative affairs of the Partnership. Net Profit and Net Loss during the Fiscal Periods which include the period of liquidation shall be allocated pursuant to Article III. The proceeds from liquidation shall be divided in the following manner:

(i)    the debts, liabilities and obligations of the Partnership, other than debts to the Partners as Partners, and the expenses of liquidation (including legal and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be paid;

(ii)    such debts as are owing to the Partners as Partners shall next be paid; and

(iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) pro rata in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)    Anything in this Section 6.2 to the contrary notwithstanding, the General Partner or liquidator in its sole discretion may distribute ratably inkind rather than in cash, upon dissolution, any assets of the Partnership; provided, however, that if any inkind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.2 as of the actual date of their distribution, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) above and (ii) any gain or loss (as computed for book purposes) attributable to property distributed inkind shall be included in the Net Profit or Net Loss for the Fiscal Period ending on the date of such distribution.

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001110

**Article VII**
**Accounting and Valuations;**
**Books and Records**

**7.1    Accounting and Reports.**

(a)    The Partnership may adopt for tax accounting purposes any accounting method which the General Partner in its sole discretion shall decide is in the best interests of the Partnership and which is permissible for federal income tax purposes.

(b)    As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an examination of the financial statements of the Partnership as of the end of each such Fiscal Year to be made by a firm of certified public accountants selected by the General Partner in its sole discretion; and as soon as is practicable thereafter, but subject to Section 7.4, a copy of a set of financial statements prepared on a basis that uses generally accepted accounting principles as a guideline, including the report of such certified public accountants, shall be furnished to each Partner.

(c)    Within thirty (30) days after the end of each calendar quarter, but subject to Section 7.4, the General Partner shall arrange for the preparation and delivery to each Limited Partner of an interim report containing such information concerning the affairs of the Partnership (which need not be audited or include any financial statements) as the General Partner in its sole discretion considers appropriate.

(d)    As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for federal and state income tax purposes his distributive share of each Partnership item of income, gain, loss, deduction or credit for such year.

**7.2    Valuation of Partnership Assets and Interests.**

(a)    The General Partner shall value or have valued the Securities and other assets of the Partnership as of the close of business on the last day of each month and of any other date constituting the close of a Fiscal Period in accordance with United States generally accepted accounting principles, subject to any changes deemed appropriate by the General Partner. In addition, the General Partner shall value Securities which are being distributed in kind as of their date of distribution in accordance with Section 5.5(f) or 6.2(b). In determining the value of the assets of the Partnership, no value shall be placed on the goodwill or name of the Partnership, or the office records, files, statistical data or any similar intangible assets of the Partnership not normally reflected in the

30

CONFIDENTIAL
G 001111

Partnership's accounting records, but there shall be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date. Valuation of Securities made pursuant to this Section 7.2 shall be based on all relevant factors and is expected to comply generally with the following guidelines:

(i)     The value of each Security listed or traded on any established securities exchange or included in the United States Nasdaq National Market List or any comparable foreign overthecounter quotation system providing last sale data shall be the last sale price at the relevant valuation date on the composite tape or on the principal exchange on which such Security is traded. If no such sale of such Security was reported on that date, and in the case of overthecounter securities not described above in this paragraph, the value shall be the mean between the current bid and offer prices quoted on such valuation date by two unaffiliated market makers or other financial institutions that regularly trade similar Securities.

(ii)     Bonds and other fixed income securities are valued according to the broadest and most representative market, which ordinarily will be the overthecounter market. The market value of such Securities includes interest on fixed income securities, which is accrued daily unless collection is in doubt. Debt securities purchased with remaining maturities of 60 days or less are valued at amortized cost, if it approximates market value. In the event that amortized cost does not approximate market value, market prices as determined above will be used.

(iii)     Dividends declared but not yet received, and rights in respect of Securities which are quoted exdividend or exrights, shall be recorded at the fair value thereof, as determined by the General Partner in its sole discretion, which may (but need not) be the value so determined on the day such Securities are first quoted exdividend or exrights.

(iv)     Listed options, or overthecounter options for which representative brokers' quotations are available, shall be valued in the same manner as listed or overthecounter securities as hereinabove provided. Premiums for the sale of such options written by the Partnership shall be included in the assets of the Partnership, and the value of such options shall be included as a liability.

(v)     The value of any Security or instrument not referred to in Clauses (i) through (iv) of this Section 7.2(a) for which quotations are readily available shall be the last reported sale price at the relevant valuation date. If no such sale of such Security was reported on that date, the value shall be the mean between the current bid and offer prices quoted on such valuation date by two unaffiliated

CONFIDENTIAL
G 001112

market makers or other financial institutions that regularly trade similar Securities.

(vi)    The value of any Security or instrument for which no quotations are readily available (or the valuation of any assets referred to in Clauses (i) through (v) of this Section 7.2(a) in the event that the General Partner in its sole discretion shall determine that market prices or quotations do not fairly represent the value of particular assets) shall be determined by or pursuant to the direction of the General Partner. In these circumstances, the General Partner may (but is not required to) obtain independent appraisals at the expense of the Partnership.

(b)    Except as otherwise determined by or at the direction of the General Partner in its sole discretion, investment and trading transactions shall be accounted for on the trade date. Accounts shall be maintained in U.S. dollars, and except as otherwise determined by or at the direction of the General Partner: (i) assets and liabilities denominated in currencies other than U.S. dollars shall be translated at the rates of exchange in effect at the close of the Fiscal Period (and exchange adjustments shall be recorded in the results of operations); and (ii) investment and trading transactions and income and expenses shall be translated at the rates of exchange in effect at the time of each transaction.

## 7.3    Determinations by the General Partner.

(a)    All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to Sections 3.4 through 3.9 hereof, including any taxes thereon and accounting procedures applicable thereto, shall be determined by the General Partner in its sole discretion unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners.

(b)    The General Partner in its sole discretion may make such adjustments to the computation of Net Profit or Net Loss, the Performance Change with respect to any Limited Partner, or any component items comprising any of the foregoing as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner.

## 7.4    Books and Records.

(a)    The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains and losses, Partners' Capital Accounts and all transactions entered into by the Partnership. Such books and records of the Partnership shall be kept at its principal office.

CONFIDENTIAL
G 001113

(b)    The General Partner shall have the right to keep confidential from the Limited Partners, for such period of time as the General Partner in its sole discretion deems reasonable, any information which the General Partner in it sole discretion reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner in its sole discretion believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

031029.0006 New York 67195 v02

CONFIDENTIAL
G 001114

## Article VIII
## General Provisions

**8.1    Amendment of Partnership Agreement.**

(a)    Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) a Majority of Limited Partners.

(b)    Any amendment which would:

(i)    increase the obligation of any Partner to make any contribution to the capital of the Partnership,

(ii)    reduce the Capital Account of any Partner other than in accordance with Section 3.3(d), or

(iii)    change the provisions of Sections 3.4 through 3.9, 5.5 or 6.2 to alter any Partner's rights with respect to allocation of Net Profit or Net Loss or with respect to distributions and withdrawals,

may only be made if the prior written consent of each Partner adversely affected thereby is obtained.

(c)    Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner in its sole discretion without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner objecting to such amendment has an opportunity to withdraw from the Partnership as of a date determined by the General Partner that is not less than 90 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment.

(d)    The General Partner in its sole discretion may at any time without the consent of the other Partners:

(i)    add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)    cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

CONFIDENTIAL
G 001115

(iii)    make any changes required by any governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners; provided, that no such amendment referred to in this paragraph (iii) may be made unless it is for the benefit of, or not adverse to, the interests of the Limited Partners, such change does not affect the right of the General Partner to manage and control the Partnership's business, does not affect the allocation of profits and losses among the Partners and does not affect the limited liability of the Limited Partners;

(iv)    amend this Agreement to reflect a change in the identity of the General Partner following a transfer of the General Partner's partnership interest in accordance with the terms of this Agreement;

(v)    amend this Agreement (other than with respect to the matters set forth in Sections 8.1(b)) to effect compliance with any applicable laws or regulations (including the Investment Advisers Act of 1940, as amended, in the event that the General Partner in its sole discretion determines to become a registered investment adviser in the future); and

(vi)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)    The General Partner shall give written notice of any proposed amendment to this Agreement (other than any amendment of the type contemplated by clause (v) or (vi) of Section 8.1(d)) to all of the Limited Partners, which notice shall set forth (i) the text of the proposed amendment or (ii) a summary thereof and a statement that the text thereof will be furnished to any Limited Partner upon request.

## 8.2    Special Power of Attorney.

(a)    Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of their successors and permitted assigns), with full power of substitution, the true and lawful representative and attorneyinfact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file and/or publish:

(i)    an amendment to this Agreement which complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)    the Certificate and any amendment thereof required because this Agreement is amended; and

CONFIDENTIAL
G 001116

(iii)    all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the States of Delaware or New York, or any other jurisdiction in which the Partnership shall determine to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership or to effect the dissolution or termination of the Partnership.

(b)    Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without his consent.  If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such amendment or action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action lawfully taken or omitted.  Each Partner is fully aware that each other Partner will rely on the effectiveness of this special powerofattorney with a view to the orderly administration of the affairs of the Partnership.  This powerofattorney is a special powerofattorney and is coupled with an interest in favor of the General Partner and as such:

(i)    shall be irrevocable and continue in full force and effect notwithstanding the subsequent death or incapacity of any party granting this powerofattorney, regardless of whether the Partnership or the General Partner shall have had notice thereof; and

(ii)    shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of his interest in the Partnership, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this powerofattorney given by the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

**8.3    Notices.**

Notices which may or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by telecopier facsimile or by registered or certified mail, return receipt requested, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses or facsimile numbers as may be designated by any party hereto by notice addressed to (i) the General Partner, in the

031029.0006 New York 67195 v02

36

CONFIDENTIAL
G 001117

case of notice given by any Limited Partner, and (ii) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given when delivered by hand or transmitted by telecopier facsimile or on the date indicated as the date of receipt on the return receipt.

### 8.4    Agreement Binding Upon Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Sections 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such sections shall be void.

### 8.5    Governing Law.

This Agreement, and the rights of the Partners hereunder, shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof. The parties hereby consent to exclusive jurisdiction and venue for any action arising out of this Agreement in the Delaware Court of Chancery. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of Partners maintained by the General Partner.

### 8.6    Not for Benefit of Creditors.

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership. This Agreement is not intended for the benefit of nonPartner creditors and no rights are granted to nonPartner creditors under this Agreement.

### 8.7    Consents.

Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a signed copy thereof shall be filed and kept with the books of the Partnership.

### 8.8    Merger and Consolidation.

(a)    The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17211(b) of the Act.

CONFIDENTIAL
G 001118

(b)    Notwithstanding anything to the contrary contained elsewhere in the Agreement, an agreement of merger or consolidation approved in accordance with Section 17211(b) of the Act may, to the extent permitted by Section 17211(g) of the Act, (i) effect any amendment to the Agreement, (ii) effect the adoption of a new partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the partnership agreement of the surviving or resulting limited partnership.

(c)    The General Partner in its sole discretion shall have the authority to effect a transaction, without the consent of any Limited Partner, having the effect of splitting the Partnership into two separate entities, one of which is excluded from the definition of "investment company" pursuant to Section 3(c)(1) of the Investment Company Act and the other of which is so excluded pursuant to Section 3(c)(7) of the Investment Company Act, provided that (i) such transaction does not result in any material change in the rights, privileges and obligations of any Limited Partner, (ii) each Limited Partner's indirect beneficial interest in the net assets of the surviving entity of which such Limited Partner is a beneficial owner is substantially identical to such indirect beneficial interest in the net assets of the Partnership immediately prior to such transaction and (iii) there is no material difference between the Partnership and each surviving entity other than investor eligibility requirements relating to the Investment Company Act exclusion on which the surviving entity relies.

**8.9    Miscellaneous.**

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.

(b) This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

CONFIDENTIAL
G 001119

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

GENERAL PARTNER:

B. HAUPTMAN & ASSOCIATES, INC.

By:   /s/ Bruce A. Hauptman
      Bruce A. Hauptman
      President

ORGANIZATIONAL LIMITED PARTNER:

    /s/ William H. Hurlin
William H. Hurlin

CONFIDENTIAL
G 001120

# Exhibit B

## GAMELAN CAPITAL FUND, L.P.

### *Subscription Instructions*

**Subscription Documents**

Subscriptions to invest in limited partnership interests of Gamelan Capital Fund, L.P. (the "Partnership") may be made only by means of the completion, execution and delivery of the following subscription documents:

(a)    *Subscriber Information Form*:  Complete all requested information.  If you are purchasing an interest with any person other than your spouse, each of you must fill out a separate questionnaire and return both completed questionnaires to the General Partner in the same envelope.

(b)    *Subscription Agreement*:  Complete, date and sign the Signature Page of the Subscription Agreement.  If you are purchasing an interest with your spouse, you must both sign the Signature Page.

(c)    *Evidence of Authorization*:  Subscribers which are corporations should submit certified corporate resolutions authorizing the subscription and identifying the corporate officer(s) empowered to sign the subscription documents.  Partnerships should submit a certified copy of the partnership certificate (in the case of limited partnerships) or partnership agreement identifying general partners.  Trusts must submit a copy of the trust agreement or relevant portions thereof showing appointment and authority of trustee(s).

**Delivery Instructions**

Subscription documents should be delivered to the General Partner at the following address:

> B. Hauptman & Associates, Inc.
> 1661 Highway One
> Fairfield, Iowa  52556-8947
> Attention:  Bruce A. Hauptman

All subscription documents will be returned to the Subscriber if this subscription is not accepted.

031029.0006  New York  38588 v07

CONFIDENTIAL
G 000060

**Subscription Payments**

All subscription payments must be made by wire transfer as follows:

United Missouri Bank, N.A.
ABA #:                101000695
For Account Of:       Gamelan Capital Fund, L.P.
Account #:            9870723824

Unless otherwise agreed to by the General Partner, all subscription payments shall be payable in one installment as of the proposed acceptance of the Subscription Agreement specified by the General Partner.

**Acceptance of Subscriptions**

The acceptance of subscriptions is within the absolute discretion of the General Partner, which may require additional information prior to making a determination. The General Partner will seek to notify the Subscriber of its acceptance or rejection of the subscription prior to the date of the proposed investment. If the subscription is rejected, the Partnership will promptly refund (without interest) to the Subscriber any subscription payments received by the Partnership.

**Additional Information**

For additional information concerning subscriptions, prospective investors should contact the General Partner (telephone: (515) 472-8581; fax: (515) 472-2220).

CONFIDENTIAL
G 000061

# GAMELAN CAPITAL FUND, L.P.

### *Subscriber Information Form*

**THIS SUBSCRIBER INFORMATION FORM IS DIVIDED INTO THREE PARTS. ALL SUBSCRIBERS ARE REQUIRED TO COMPLETE PART I. SUBSCRIBERS WHO ARE NATURAL PERSONS OR GRANTOR TRUSTS MUST COMPLETE PART II. ALL OTHER SUBSCRIBERS MUST COMPLETE PART III.**

**PART I:**     **To be completed by ALL Subscribers.**

Each Subscriber for a limited partnership interest in Gamelan Capital Fund, L.P. (the "Partnership") is requested to furnish the following information (please print or type):

**1.**     **Identity of Subscriber**

Name: *William and Patricia Steinbrink*

Mailing Address: *1608 South Shore Drive*

*Erie, PA 16505*

Telephone: *(814) 436-2229*     *Home 814-456-5050*

Telecopier: *(814) 451-0555*

Is the Subscriber subscribing for limited partnership interests in the Partnership ("LP Interests") with the intent to sell, distribute or transfer LP Interests to any other person or persons?

_____ Yes          ✓ No

Is the Subscriber subscribing for LP Interests as agent, nominee, trustee, partner or otherwise on behalf of, for the account of or jointly with any other person or entity?

_____ Yes          ✓ No

CONFIDENTIAL
G 000062

Will any other person or persons have a beneficial interest in the LP Interest acquired (other than as a shareholder, partner or other beneficial owner of equity interests in the Subscriber)?

_____ Yes                    ✓ No

Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Partnership?

_____ Yes                    ✓ No

Note: If any of the above questions were answered "Yes," please provide identifying information or contact the General Partner:

_____

2.  **Amount of Subscription Commitment**  — *transfer from Genesis*

US$ _6,654,908.45_

Amount in words: *Six million six hundred fifty four thousand nine hundred eight dollars + 45/100*

3.  **Remitting Bank or Financial Institution**

All subscriptions are payable in full by check or wire transfer of readily available funds to the account of the Partnership as of the proposed acceptance of the Subscription Agreement by the General Partner, or on such later date as the General Partner shall determine.  Please identify the bank or other financial institution from which the Subscriber's funds will be wired.

Name of Financial
Institution:            _____

Address (City/State): _____

_____

_____

CONFIDENTIAL
G 000063

**PART II:**   **To be completed ONLY by Subscribers who are Natural Persons or Grantor Trusts**

1.   Please indicate desired type of ownership of LP Interest:

☐   Trust; or

☐   Individual; or

☑   Joint Tenants (rights of survivorship); or

☐   Tenants in common (no rights of survivorship); or

☐   Community Property (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington or Wisconsin). Note: If you are married and live in a community property state, both you and your spouse must sign the Signature Page.

2.   **Subscriber Qualification**

*Subscriptions will be accepted only from persons who qualify as accredited investors within the meaning of applicable United States federal and state securities regulations. Unless otherwise indicated, responses should be given by reference to the specific person for whose account the LP Interest is being acquired. In the case of a trust that is considered a "grantor trust" for income tax purposes, the response should be given with respect to the grantor.*

(a)   <u>Accredited Investor</u>.

The Subscriber (or the grantor, in the case of a grantor trust) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of subscription exceeds $1,000,000.

    ✓ Yes            _____ No

3.   **Tax Information**

(a)   Please provide your U.S. Social Security number:

*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*

CONFIDENTIAL
G 000064

If you are purchasing an LP Interest with your spouse, please provide your spouse's U.S. Social Security number:

_163 462188_

(b)    Is the Subscriber or trust grantor a United States citizen or permanent resident of the United States?

✓ Yes                         ____ No

If you are purchasing an LP Interest with your spouse, is your spouse a United States citizen or permanent resident of the United States?

✓ Yes                         ____ No

\* \* \* \* \*

**RETURN THIS COMPLETED SUBSCRIPTION INFORMATION FORM WITH
A DATED AND SIGNED COPY OF THE SIGNATURE PAGE
THAT FOLLOWS THE SUBSCRIPTION AGREEMENT.**

031029.0006  New York  38588 v07

CONFIDENTIAL
G 000065

**PART III:**   **To be completed ONLY by Subscribers that are Entities or Non Grantor Trusts**

1.       **Subscriber Qualification:**

(a)     <u>Accredited Investor</u>.
Each Subscriber other than a natural person must indicate whether it qualifies as an "accredited investor" pursuant to at least one of the following tests. (Please check all that apply, or, if none applies, consult the General Partner.)

☐     The Subscriber is a corporation, partnership, limited liability company, business trust or tax exempt organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership.

☐     The Subscriber is a personal (non business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment.

☐     The Subscriber is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended, (including an Individual Retirement Plan) which satisfies at least one of the following conditions:

    ☐     it has total assets in excess of $5,000,000; or

    ☐     the investment decision is being made by a plan fiduciary which is a bank, savings and loan association, insurance company or registered investment adviser; or

    ☐     it is a self directed plan (i.e., a tax qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐     The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, which has total assets in excess of $5,000,000.

031029.0006 New York 38588 v07

CONFIDENTIAL
G 000066

☐    The Subscriber is licensed, or subject to supervision, by U.S. Federal or state examining authorities as a "bank", "savings and loan association", "insurance company", or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐    The Subscriber is registered with the United States Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended).

☐    The Subscriber is an entity in which all of the equity owners are either (a) natural persons or grantor trusts having a net worth (individually or jointly with spouse) exceeding $1,000,000 or (b) non natural persons described above.

2.      **Supplemental Data**

(a)    Legal form of entity: _____

(b)    Jurisdiction of organization: _____

(c)    Year of organization: _____

(d)    Briefly identify the Subscriber's primary business: _____

_____

(e)    Total number of shareholders, partners or other holders of equity or beneficial interests or other securities (including any debt securities other than short term paper of the Subscriber): (If the number is more than 100, it is sufficient to respond "more than 100".)

_____

(f)    Is the Subscriber a wholly owned or majority owned subsidiary of another entity?

_____ Yes          _____ No

(g)    Was the Subscriber organized for the specific purpose of acquiring interests in the Partnership?

_____ Yes          _____ No

031029.0006  New York  38588 v07

CONFIDENTIAL
G 000067

(h)    Is the Subscriber is an entity engaged primarily in investing or trading securities?

    \_\_\_\_ Yes        \_\_\_\_ No

(i)    If yes,

    (i)    have shareholders, partners or other holders of equity or beneficial interests in the Subscriber been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Subscriber's investment in the Partnership (i.e., have investors in the Subscriber been permitted to determine whether their capital will form part of the specific capital invested by the Subscriber in the Partnership)?

    \_\_\_\_ Yes        \_\_\_\_ No

    (ii)    does the current value of the amount of the Subscriber's subscription to the Partnership exceed 40 percent of the value of the Subscriber's total assets?

    \_\_\_\_ Yes        \_\_\_\_ No

(j)    ERISA.

    (i)    Is the Subscriber a pension, profit sharing, annuity or employee benefit plan (a "Plan") described in the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, or is the Subscriber an entity whose underlying assets include Plan assets by reason of a Plan's investment in the Subscriber?

    \_\_\_\_ Yes        \_\_\_\_ No

    (ii)    Is the Subscriber a Plan which is both voluntary and contributory?

    \_\_\_\_ Yes        \_\_\_\_ No

    (iii)    If the Subscriber is subscribing as a trustee or custodian for an Individual Retirement Account, is the Subscriber a qualified IRA custodian or trustee?

    \_\_\_\_ Yes        \_\_\_\_ No

    (iv)    List below (and on a supplemental sheet if required) the name of each employer whose employees participate in each ERISA Plan

CONFIDENTIAL
G 000068

that is, directly or indirectly, making an investment in the partnership and each affiliate of such an employer as defined in Section 407(d)(7) of ERISA. Indicate next to each name the maximum dollar amount which the Partnership is permitted to invest in any class of publicly traded securities issued by such employer or affiliate.

_____  $_____

_____  $_____

3.    **Tax Information**

(a)    Please provide the Subscriber's U.S. employer identification number:

_____

(b)    Please indicate the last day of the Subscriber's taxable year:

_____

(c)    Is the Subscriber exempt from Federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax exempt organization described in Section 501(c)(3) of the Internal Revenue Code of 1986)?

_____ Yes                    _____ No

\* \* \* \* \* \*

RETURN THIS COMPLETED SUBSCRIPTION INFORMATION FORM WITH
A DATED AND SIGNED COPY OF THE SIGNATURE PAGE
THAT FOLLOWS THE SUBSCRIPTION AGREEMENT.

CONFIDENTIAL
G 000069

## GAMELAN CAPITAL FUND, L.P.

*Subscription Agreement*

B. Hauptman & Associates, Inc.
1659 Highway One
Fairfield, Iowa 52556-8947

Attention: Bruce A. Hauptman

Gentlemen:

The undersigned (the "Subscriber") hereby acknowledges having received and read the current Private Placement Memorandum (the "Memorandum") of Gamelan Capital Fund, L.P., a limited partnership organized under the laws of the State of Delaware (the "Partnership") and the Limited Partnership Agreement of the Partnership, as amended to the date hereof (the "Partnership Agreement"). Capitalized terms not herein defined are used as defined in the Memorandum. The Subscriber hereby agrees with the Partnership as follows:

**Subscription Commitment**

The Subscriber hereby subscribes for a limited partnership interest in the Partnership (the "LP Interest") and, as full payment therefor, agrees to pay to the Partnership, in cash, the amount set forth in the accompanying Subscriber Information Form completed and signed by the Subscriber (which shall be considered an integral part of this Subscription Agreement and hereinafter is referred to as the "Subscriber Information Form"). Such capital contribution ("Capital Contribution") shall be payable in readily available funds by wire transfer to the bank account of the Partnership, or with the consent of the General Partner, by a contribution to the Partnership of marketable securities in accordance with the Memorandum. The initial Capital Contribution shall be payable in one installment as of the proposed acceptance of the Subscription Agreement specified by the General Partner, or on such later date as the General Partner shall determine.

The Subscriber understands that this subscription is not binding on the Partnership until accepted by the General Partner, and may be rejected by the General Partner in whole or in part in its absolute discretion. If so rejected, the Partnership shall return to the Subscriber, without interest or deduction, any Capital Contribution tendered by the Subscriber, and the Partnership and the Subscriber shall have no further obligation to each other hereunder. Unless and until rejected by the General Partner, this subscription shall be irrevocable by the Subscriber.

CONFIDENTIAL
G 000070

**Representations, Warranties and Covenants**

To induce the Partnership to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Partnership and to the Partnership's general and limited partners:

(a)    The information set forth in the accompanying Subscriber Information Form is accurate and complete as of the date hereof, and the Subscriber will promptly notify the Partnership of any change in such information.  The Subscriber consents to the disclosure of any such information, and any other information furnished to the Partnership, to any governmental authority, self regulatory organization or, to the extent required by law, to any other person.

(b)    Except as otherwise specified in the Subscriber Information Form, the Subscriber is acquiring the LP Interest for the Subscriber's own account, does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the LP Interests, and is not acquiring the LP Interests of the Partnership with a view to or for sale in connection with any distribution of the interests.

(c)    The Subscriber (i) will not transfer or deliver all or any part of its LP Interest except in accordance with the restrictions set forth in the Memorandum and (ii) will notify the Partnership immediately if it becomes a non United States Person at any time during which it holds or owns any LP Interests.

(d)    To the full satisfaction of the Subscriber, the Subscriber has been furnished any materials the Subscriber has requested relating to the Partnership and the offering, and the Subscriber has been afforded the opportunity to ask questions of representatives of the Partnership concerning the terms and conditions of the offering and to obtain any additional information as it may require, and all such questions have been answered to the full satisfaction of the undersigned.  Other than the Memorandum, the Subscriber is not relying upon any representation or other information purported to be given on behalf of the Partnership or the General Partner in determining to invest in the Partnership (it being understood that no person has been authorized by the Partnership or the General Partner to furnish any representations or other information).

(e)    The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Partnership and to make an informed investment decision with respect thereto.  The Subscriber understands the Partnership's compensation arrangements with the General Partner and understands the risks described in the Memorandum.

(f)    The Subscriber is satisfied that it has received adequate disclosure from the General Partner to enable it to understand and evaluate the compensation arrangements of the Partnership with the General Partner and other terms of the Partnership Agreement and the risks associated therewith.

031029.0006  New York 38588 v07

CONFIDENTIAL
G 000071

(g)    The Subscriber understands that the LP Interests have not been and will not be registered under the Securities Act of 1933, as amended, or any state law and that the Partnership is not registered under the Investment Company Act.  The Subscriber agrees to notify the Partnership prior to any proposed sale, transfer, distribution or other disposition of any LP Interests or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of any LP Interests without the consent of the Partnership, which, may be granted or withheld in the Partnership's sole discretion, and unless the LP Interests are registered or such sale, transfer, distribution or other disposition is exempt from registration.  The Subscriber understands that the Partnership has no intention to register the Partnership or the LP Interests with the United States Securities and Exchange Commission or any State of the United States and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration.  The Partnership may require that a proposed transferee meet appropriate financial suitability standards and that the transferor furnish a legal opinion satisfactory to the Partnership and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws.  An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the LP Interests and appropriate stop transfer instructions may be placed with respect to the LP Interests.

(h)    The Subscriber recognizes that there is not now any public market for LP Interests of the Partnership and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Partnership. The Subscriber's overall commitment to the Partnership and other investments which are not readily marketable are not disproportionate to the Subscriber's net worth and the Subscriber has no need for immediate liquidity in the Subscriber's interest in the LP Interests.

(i)    If the Subscriber is a natural person, the Subscriber has the legal capacity to execute, deliver and perform this Subscription Agreement and the Partnership Agreement.

(j)    If the Subscriber is a corporation, partnership, trust or other entity, it is authorized and qualified to become a limited partner of, and authorized to make its Capital Contribution to, the Partnership and otherwise to comply with its obligations under the Partnership Agreement; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms.  In addition, such Subscriber will, upon request of the General Partner, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in LP Interests of the Partnership and the authority of the person executing this Subscription Agreement on behalf of the Subscriber, which may be requested by the General Partner.

(k)    If the Subscriber is, or is acting on behalf of, an employee benefit plan (a "Plan") which is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"): (i) the Plan, and any fiduciaries responsible for the Plan's investments, are aware of and understand the Partnership's investment objectives, policies and strategies and the decision to invest the Plan's assets in the Partnership was made with appropriate consideration of relevant investment factors with regard to the Plan including the diversification requirements of Section 404(a)(1)(c)(3) of ERISA; (ii) the decision to invest the Plan's assets in the Partnership is a

031029.0006 New York 38588 v07

CONFIDENTIAL
G 000072

prudent one and is consistent with the responsibilities imposed upon the Plan's fiduciaries with regard to their investment decisions under ERISA; (iii) the fiduciary or other person signing this Subscription Agreement is independent of the General Partner; and (iv) this subscription and the investment contemplated hereby is in accordance with all requirements applicable to the Plan under its governing instruments and under ERISA.

**Indemnification**

The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby may be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Partnership and the General Partner (including for this purpose each of its directors, officers, shareholders, affiliates and employees, and each person who controls the Partnership and each of such entities within the meaning of Section 20 of the Securities Exchange Act of 1934, as amended) from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which the Partnership may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Partnership.

**Miscellaneous**

(a)     The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights or interest herein or hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any LP Interests acquired pursuant hereto shall be made only in accordance with the provisions hereof and all applicable laws.

(b)     The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c)     All of the representations, warranties, covenants, agreements and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any LP Interests of the Partnership.

(d)     This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e)     Within ten days after receipt of a written request therefor from the Partnership, the Subscriber agrees to provide such information and to execute and deliver such documents as the

CONFIDENTIAL
G 000073

Partnership may deem reasonably necessary to comply with any and all laws and ordinances to which the Partnership is or may be subject.

**Power of Attorney**

Subject only to the acceptance of this Subscription Agreement by the General Partner, the Subscriber hereby (a) requests to be admitted to the Partnership as a limited partner and requests that the General Partner reflect such admission in the Partnership's register of partners; (b) joins in and agrees to be bound by the Partnership Agreement as a limited partner; and (c) makes, constitutes and appoints B. Hauptman & Associates, Inc., acting through any of its authorized directors and officers and with power of substitution, the Subscriber's true and lawful agent and attorney, with full power and authority in such Subscriber's name, place and stead, to make, execute, acknowledge, record and/or file (i) the Partnership Agreement, (ii) any certificate or other document required to effect the formation, continuation, qualification or dissolution of the Partnership in accordance with the terms of the Partnership Agreement, or which legal counsel to the Partnership deems necessary or desirable to comply with any federal, state or other law applicable to the Partnership, and (iii) any amendments to any of the foregoing adopted or otherwise made in accordance with the provisions of the Partnership Agreement. The power of attorney granted hereby is a special power of attorney coupled with an interest and shall be irrevocable to the fullest extent permitted by law.

**Notices**

Any notice required or permitted to be given to the Subscriber in relation to the Partnership shall be sent to the address specified in Item 1 of the Subscriber Information Form accompanying this Subscription Agreement or to such other address as the Subscriber designates by written notice received by the General Partner.

**Governing Law**

This Subscription Agreement shall be governed by the laws of the State of Delaware.

031029.0006 New York 38588 v07

CONFIDENTIAL
G 000074

# SIGNATURE PAGE

Execution of this Signature Page evidences the Subscriber's agreement to be bound by this Subscription Agreement and the Partnership Agreement of Gamelan Capital Fund, L.P.

The Subscriber confirms that the information contained in the Subscription Information Form is complete and accurate and will notify the General Partner immediately of any material change occurring prior to the acceptance of its subscription.

_10|1|99_
Date

_William Steinbrink_
Name of Subscriber

_Wm Stenbk_
Signature

_____
Name and title or representative capacity,
if applicable

_Patricia Steinbrink_
Name of Spouse
(if a natural person and purchasing jointly)

_Patricia M. Steinbrink_
Signature of Spouse
(if a natural person and purchasing jointly)

\* \* \* \*

The foregoing subscription is hereby accepted ~~on~~ _As of October 1, 1999_ .

B. Hauptman & Associates, Inc.
General Partner

By:    _____
Bruce A. Hauptman, President

031029.0006  New York  38588 v07

CONFIDENTIAL

# Exhibit C

# GAMELAN CAPITAL FUND, L.P.

*Subscription Instructions*

## Subscription Documents

Subscriptions to invest in limited partnership interests of Gamelan Capital Fund, L.P. (the "Partnership") may be made only by means of the completion, execution and delivery of the following subscription documents:

(a)   *Subscriber Information Form*:  Complete all requested information.  If you are purchasing an interest with any person other than your spouse, each of you must fill out a separate questionnaire and return both completed questionnaires to the General Partner in the same envelope.

(b)   *Subscription Agreement*:  Complete, date and sign the Signature Page of the Subscription Agreement.  If you are purchasing an interest with your spouse, you must both sign the Signature Page.

(c)   *Evidence of Authorization*:  Subscribers which are corporations should submit certified corporate resolutions authorizing the subscription and identifying the corporate officer(s) empowered to sign the subscription documents.  Partnerships should submit a certified copy of the partnership certificate (in the case of limited partnerships) or partnership agreement identifying general partners.  Trusts must submit a copy of the trust agreement or relevant portions thereof showing appointment and authority of trustee(s).

## Delivery Instructions

Subscription documents should be delivered to the General Partner at the following address:

> B. Hauptman & Associates, Inc.
> 1661 Highway One
> Fairfield, Iowa  52556-8947
> Attention:  Bruce A. Hauptman

All subscription documents will be returned to the Subscriber if this subscription is not accepted.

CONFIDENTIAL
G 000044

**Subscription Payments**

All subscription payments must be made by wire transfer as follows:

|                |                             |
|----------------|-----------------------------|
| United Missouri Bank, N.A. |                  |
| ABA #:         | 101000695                   |
| For Account Of: | Gamelan Capital Fund, L.P. |
| Account #:     | 9870723824                  |

Unless otherwise agreed to by the General Partner, all subscription payments shall be payable in one installment as of the proposed acceptance of the Subscription Agreement specified by the General Partner.

**Acceptance of Subscriptions**

The acceptance of subscriptions is within the absolute discretion of the General Partner, which may require additional information prior to making a determination. The General Partner will seek to notify the Subscriber of its acceptance or rejection of the subscription prior to the date of the proposed investment. If the subscription is rejected, the Partnership will promptly refund (without interest) to the Subscriber any subscription payments received by the Partnership.

**Additional Information**

For additional information concerning subscriptions, prospective investors should contact the General Partner (telephone: (515) 472-8581; fax: (515) 472-2220).

CONFIDENTIAL
G 000045

# GAMELAN CAPITAL FUND, L.P.

### *Subscriber Information Form*

**THIS SUBSCRIBER INFORMATION FORM IS DIVIDED INTO THREE PARTS. ALL SUBSCRIBERS ARE REQUIRED TO COMPLETE PART I. SUBSCRIBERS WHO ARE NATURAL PERSONS OR GRANTOR TRUSTS MUST COMPLETE PART II. ALL OTHER SUBSCRIBERS MUST COMPLETE PART III.**

**PART I:**          **To be completed by ALL Subscribers.**

Each Subscriber for a limited partnership interest in Gamelan Capital Fund, L.P. (the "Partnership") is requested to furnish the following information (please print or type):

1.          **Identity of Subscriber**

Name:          DLJSC Custodian for Bayside Obstetrics
Gynecology Infertility, Inc 401K Plan
Mailing Address:          _____  William Steinbrink,
1608 South Shore Drive                    Trustee
Erie, PA 16505

Telephone:          (814) 436-2229     Home 814-456-5050

Telecopier:          (____)_____

Is the Subscriber subscribing for limited partnership interests in the Partnership ("LP Interests") with the intent to sell, distribute or transfer LP Interests to any other person or persons?

____ Yes                    ✓ No

Is the Subscriber subscribing for LP Interests as agent, nominee, trustee, partner or otherwise on behalf of, for the account of or jointly with any other person or entity?

____ Yes                    ✓ No

031029.0006 New York 38588 v07

CONFIDENTIAL
G 000046

Will any other person or persons have a beneficial interest in the LP Interest acquired (other than as a shareholder, partner or other beneficial owner of equity interests in the Subscriber)?

_____ Yes                    ✔ No

Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Partnership?

_____ Yes                    ✔ No

Note: If any of the above questions were answered "Yes," please provide identifying information or contact the General Partner:

_____

2.    **Amount of Subscription Commitment** — *transfer from Genesis*

US$ *1,292,379.*⁴⁷  _____

Amount in words: *one million two hundred ninty two thousand three hundred seventy-nine. dollars and 47/100*

3.    **Remitting Bank or Financial Institution**

All subscriptions are payable in full by check or wire transfer of readily available funds to the account of the Partnership as of the proposed acceptance of the Subscription Agreement by the General Partner, or on such later date as the General Partner shall determine.   Please identify the bank or other financial institution from which the Subscriber's funds will be wired.

Name of Financial
Institution:              _____

Address (City/State):   _____

                          _____

                          _____

CONFIDENTIAL
G 000047

**PART II:**      **To be completed ONLY by Subscribers who are Natural Persons or Grantor Trusts**

1.          Please indicate desired type of ownership of LP Interest:

☐    Trust; or

☐    Individual; or

☐    Joint Tenants (rights of survivorship); or

☐    Tenants in common (no rights of survivorship); or

☐    Community Property (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington or Wisconsin).  Note:  If you are married and live in a community property state, both you and your spouse must sign the Signature Page.

**2.          Subscriber Qualification**

*Subscriptions will be accepted only from persons who qualify as accredited investors within the meaning of applicable United States federal and state securities regulations.  Unless otherwise indicated, responses should be given by reference to the specific person for whose account the LP Interest is being acquired.  In the case of a trust that is considered a "grantor trust" for income tax purposes, the response should be given with respect to the grantor.*

(a)    <u>Accredited Investor</u>.

The Subscriber (or the grantor, in the case of a grantor trust) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of subscription exceeds $1,000,000.

_____ Yes                    _____ No

**3.          Tax Information**

(a)    Please provide your U.S. Social Security number:

_____

CONFIDENTIAL

If you are purchasing an LP Interest with your spouse, please provide your spouse's U.S. Social Security number:

_____

(b)     Is the Subscriber or trust grantor a United States citizen or permanent resident of the United States?

_____ Yes                          _____ No

If you are purchasing an LP Interest with your spouse, is your spouse a United States citizen or permanent resident of the United States?

_____ Yes                          _____ No

\* \* \* \* \*

**RETURN THIS COMPLETED SUBSCRIPTION INFORMATION FORM WITH
A DATED AND SIGNED COPY OF THE SIGNATURE PAGE
THAT FOLLOWS THE SUBSCRIPTION AGREEMENT.**

031029.0006 New York 38588 v07

CONFIDENTIAL
G 000049

**PART III:**   **To be completed ONLY by Subscribers that are Entities or Non Grantor Trusts**

1.          **Subscriber Qualification:**

(a)   <u>Accredited Investor</u>.
Each Subscriber other than a natural person must indicate whether it qualifies as an "accredited investor" pursuant to at least one of the following tests. (Please check all that apply, or, if none applies, consult the General Partner.)

☐   The Subscriber is a corporation, partnership, limited liability company, business trust or tax exempt organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership.

☐   The Subscriber is a personal (non business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment.

☒   The Subscriber is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended, (including an Individual Retirement Plan) which satisfies at least one of the following conditions:

☒   it has total assets in excess of $5,000,000; or

☐   the investment decision is being made by a plan fiduciary which is a bank, savings and loan association, insurance company or registered investment adviser; or

☐   it is a self directed plan (i.e., a tax qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐   The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, which has total assets in excess of $5,000,000.

031029.0006 New York 38588 v07

CONFIDENTIAL

☐    The Subscriber is licensed, or subject to supervision, by U.S. Federal or state examining authorities as a "bank", "savings and loan association", "insurance company", or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐    The Subscriber is registered with the United States Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended).

☐    The Subscriber is an entity in which all of the equity owners are either (a) natural persons or grantor trusts having a net worth (individually or jointly with spouse) exceeding $1,000,000 or (b) non natural persons described above.

**2.**      **Supplemental Data**

(a)    Legal form of entity: _Bayside OB/GYN_

(b)    Jurisdiction of organization: _PA_

(c)    Year of organization: _1982_

(d)    Briefly identify the Subscriber's primary business: _Physician_

(e)    Total number of shareholders, partners or other holders of equity or beneficial interests or other securities (including any debt securities other than short term paper of the Subscriber): (If the number is more than 100, it is sufficient to respond "more than 100".)

_1_

(f)    Is the Subscriber a wholly owned or majority owned subsidiary of another entity?

      _____ Yes               X No

(g)    Was the Subscriber organized for the specific purpose of acquiring interests in the Partnership?

      _____ Yes               X No

CONFIDENTIAL

(h)    Is the Subscriber is an entity engaged primarily in investing or trading securities?

    \_\_\_\_ Yes           ⨯ No

(i)    If yes,

    (i)    have shareholders, partners or other holders of equity or beneficial interests in the Subscriber been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Subscriber's investment in the Partnership (i.e., have investors in the Subscriber been permitted to determine whether their capital will form part of the specific capital invested by the Subscriber in the Partnership)?

        \_\_\_\_ Yes           \_\_\_\_ No

    (ii)    does the current value of the amount of the Subscriber's subscription to the Partnership exceed 40 percent of the value of the Subscriber's total assets?

        \_\_\_\_ Yes           \_\_\_\_ No

(j)    <u>ERISA</u>.

    (i)    Is the Subscriber a pension, profit sharing, annuity or employee benefit plan (a "Plan") described in the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, or is the Subscriber an entity whose underlying assets include Plan assets by reason of a Plan's investment in the Subscriber?

        ⨯ Yes           \_\_\_\_ No

    (ii)    Is the Subscriber a Plan which is both voluntary and contributory?

        ⨯ Yes           \_\_\_\_ No

    (iii)    If the Subscriber is subscribing as a trustee or custodian for an Individual Retirement Account, is the Subscriber a qualified IRA custodian or trustee?

    N/A

        \_\_\_\_ Yes           \_\_\_\_ No

    (iv)    List below (and on a supplemental sheet if required) the name of each employer whose employees participate in each ERISA Plan

CONFIDENTIAL

that is, directly or indirectly, making an investment in the partnership and each affiliate of such an employer as defined in Section 407(d)(7) of ERISA. Indicate next to each name the maximum dollar amount which the Partnership is permitted to invest in any class of publicly traded securities issued by such employer or affiliate.

_____    $ _____

_____    $ _____

3.    **Tax Information**

    (a)    Please provide the Subscriber's U.S. employer identification number:

             25 - 1444258

    (b)    Please indicate the last day of the Subscriber's taxable year:

             12-31

    (c)    Is the Subscriber exempt from Federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax exempt organization described in Section 501(c)(3) of the Internal Revenue Code of 1986)?

         X  Yes                ____ No

* * * * * *

**RETURN THIS COMPLETED SUBSCRIPTION INFORMATION FORM WITH
A DATED AND SIGNED COPY OF THE SIGNATURE PAGE
THAT FOLLOWS THE SUBSCRIPTION AGREEMENT.**

CONFIDENTIAL

# GAMELAN CAPITAL FUND, L.P.

### *Subscription Agreement*

B. Hauptman & Associates, Inc.
1659 Highway One
Fairfield, Iowa  52556-8947

Attention:  Bruce A. Hauptman

Gentlemen:

The undersigned (the "Subscriber") hereby acknowledges having received and read the current Private Placement Memorandum (the "Memorandum") of Gamelan Capital Fund, L.P., a limited partnership organized under the laws of the State of Delaware (the "Partnership") and the Limited Partnership Agreement of the Partnership, as amended to the date hereof (the "Partnership Agreement").  Capitalized terms not herein defined are used as defined in the Memorandum. The Subscriber hereby agrees with the Partnership as follows:

## Subscription Commitment

The Subscriber hereby subscribes for a limited partnership interest in the Partnership (the "LP Interest") and, as full payment therefor, agrees to pay to the Partnership, in cash, the amount set forth in the accompanying Subscriber Information Form completed and signed by the Subscriber (which shall be considered an integral part of this Subscription Agreement and hereinafter is referred to as the "Subscriber Information Form").  Such capital contribution ("Capital Contribution") shall be payable in readily available funds by wire transfer to the bank account of the Partnership, or with the consent of the General Partner, by a contribution to the Partnership of marketable securities in accordance with the Memorandum.  The initial Capital Contribution shall be payable in one installment as of the proposed acceptance of the Subscription Agreement specified by the General Partner, or on such later date as the General Partner shall determine.

The Subscriber understands that this subscription is not binding on the Partnership until accepted by the General Partner, and may be rejected by the General Partner in whole or in part in its absolute discretion.  If so rejected, the Partnership shall return to the Subscriber, without interest or deduction, any Capital Contribution tendered by the Subscriber, and the Partnership and the Subscriber shall have no further obligation to each other hereunder.  Unless and until rejected by the General Partner, this subscription shall be irrevocable by the Subscriber.

CONFIDENTIAL

**Representations, Warranties and Covenants**

      To induce the Partnership to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Partnership and to the Partnership's general and limited partners:

      (a)    The information set forth in the accompanying Subscriber Information Form is accurate and complete as of the date hereof, and the Subscriber will promptly notify the Partnership of any change in such information. The Subscriber consents to the disclosure of any such information, and any other information furnished to the Partnership, to any governmental authority, self regulatory organization or, to the extent required by law, to any other person.

      (b)    Except as otherwise specified in the Subscriber Information Form, the Subscriber is acquiring the LP Interest for the Subscriber's own account, does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the LP Interests, and is not acquiring the LP Interests of the Partnership with a view to or for sale in connection with any distribution of the interests.

      (c)    The Subscriber (i) will not transfer or deliver all or any part of its LP Interest except in accordance with the restrictions set forth in the Memorandum and (ii) will notify the Partnership immediately if it becomes a non United States Person at any time during which it holds or owns any LP Interests.

      (d)    To the full satisfaction of the Subscriber, the Subscriber has been furnished any materials the Subscriber has requested relating to the Partnership and the offering, and the Subscriber has been afforded the opportunity to ask questions of representatives of the Partnership concerning the terms and conditions of the offering and to obtain any additional information as it may require, and all such questions have been answered to the full satisfaction of the undersigned. Other than the Memorandum, the Subscriber is not relying upon any representation or other information purported to be given on behalf of the Partnership or the General Partner in determining to invest in the Partnership (it being understood that no person has been authorized by the Partnership or the General Partner to furnish any representations or other information).

      (e)    The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Partnership and to make an informed investment decision with respect thereto. The Subscriber understands the Partnership's compensation arrangements with the General Partner and understands the risks described in the Memorandum.

      (f)    The Subscriber is satisfied that it has received adequate disclosure from the General Partner to enable it to understand and evaluate the compensation arrangements of the Partnership with the General Partner and other terms of the Partnership Agreement and the risks associated therewith.

CONFIDENTIAL
G 000055

(g)    The Subscriber understands that the LP Interests have not been and will not be registered under the Securities Act of 1933, as amended, or any state law and that the Partnership is not registered under the Investment Company Act.  The Subscriber agrees to notify the Partnership prior to any proposed sale, transfer, distribution or other disposition of any LP Interests or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of any LP Interests without the consent of the Partnership, which, may be granted or withheld in the Partnership's sole discretion, and unless the LP Interests are registered or such sale, transfer, distribution or other disposition is exempt from registration.  The Subscriber understands that the Partnership has no intention to register the Partnership or the LP Interests with the United States Securities and Exchange Commission or any State of the United States and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration.  The Partnership may require that a proposed transferee meet appropriate financial suitability standards and that the transferor furnish a legal opinion satisfactory to the Partnership and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws.  An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the LP Interests and appropriate stop transfer instructions may be placed with respect to the LP Interests.

(h)    The Subscriber recognizes that there is not now any public market for LP Interests of the Partnership and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Partnership.  The Subscriber's overall commitment to the Partnership and other investments which are not readily marketable are not disproportionate to the Subscriber's net worth and the Subscriber has no need for immediate liquidity in the Subscriber's interest in the LP Interests.

(i)    If the Subscriber is a natural person, the Subscriber has the legal capacity to execute, deliver and perform this Subscription Agreement and the Partnership Agreement.

(j)    If the Subscriber is a corporation, partnership, trust or other entity, it is authorized and qualified to become a limited partner of, and authorized to make its Capital Contribution to, the Partnership and otherwise to comply with its obligations under the Partnership Agreement; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms.  In addition, such Subscriber will, upon request of the General Partner, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in LP Interests of the Partnership and the authority of the person executing this Subscription Agreement on behalf of the Subscriber, which may be requested by the General Partner.

(k)    If the Subscriber is, or is acting on behalf of, an employee benefit plan (a "Plan") which is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"): (i) the Plan, and any fiduciaries responsible for the Plan's investments, are aware of and understand the Partnership's investment objectives, policies and strategies and the decision to invest the Plan's assets in the Partnership was made with appropriate consideration of relevant investment factors with regard to the Plan including the diversification requirements of Section 404(a)(1)(c)(3) of ERISA; (ii) the decision to invest the Plan's assets in the Partnership is a

CONFIDENTIAL

prudent one and is consistent with the responsibilities imposed upon the Plan's fiduciaries with regard to their investment decisions under ERISA; (iii) the fiduciary or other person signing this Subscription Agreement is independent of the General Partner; and (iv) this subscription and the investment contemplated hereby is in accordance with all requirements applicable to the Plan under its governing instruments and under ERISA.

### Indemnification

The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby may be accepted in reliance thereon.  The Subscriber agrees to indemnify and hold harmless the Partnership and the General Partner (including for this purpose each of its directors, officers, shareholders, affiliates and employees, and each person who controls the Partnership and each of such entities within the meaning of Section 20 of the Securities Exchange Act of 1934, as amended) from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which the Partnership may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Partnership.

### Miscellaneous

(a)     The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights or interest herein or hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any LP Interests acquired pursuant hereto shall be made only in accordance with the provisions hereof and all applicable laws.

(b)     The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c)     All of the representations, warranties, covenants, agreements and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any LP Interests of the Partnership.

(d)     This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e)     Within ten days after receipt of a written request therefor from the Partnership, the Subscriber agrees to provide such information and to execute and deliver such documents as the

CONFIDENTIAL
G 000057

## SIGNATURE PAGE

Execution of this Signature Page evidences the Subscriber's agreement to be bound by this Subscription Agreement and the Partnership Agreement of Gamelan Capital Fund, L.P.

The Subscriber confirms that the information contained in the Subscription Information Form is complete and accurate and will notify the General Partner immediately of any material change occurring prior to the acceptance of its subscription.

*10/1/99*
Date

*DLJSC Custodian for Bayside Obstetrics Gynecology Infertility, Inc 401K Plan*
Name of Subscriber

*William Steinbrink, Trustee*
Signature

*William Steinbrink Trustee*
Name and title or representative capacity,
if applicable

_____
Name of Spouse
(if a natural person and purchasing jointly)

_____
Signature of Spouse
(if a natural person and purchasing jointly)

\* \* \* \*

The foregoing subscription is hereby accepted ~~on~~ *As of October 1, 1999*.

B. Hauptman & Associates, Inc.
General Partner

By: _____
Bruce A. Hauptman, President

031029.0006 New York 38588 v07

CONFIDENTIAL
G 000059