IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | | |
|---|---|---|
| WILLIAM H. STEINBRINK, M.D. and<br>PATRICIA M. STEINBRINK, his wife, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BAYSIDE OBSTETRICS GYNECOLOGY<br>INFERTILITY, INC. 401(K) PROFIT<br>SHARING PLAN, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 01-382 ERIE |
| | ) | |
| v. | ) | |
| | ) | |
| ROTHSTEIN, KASS & COMPANY, P.C.,<br>B. HAUPTMAN & ASSOCIATES, LLC, and<br>BRUCE A. HAUPTMAN, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPENDIUM OF AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS**

Robert H. Pees
Lynda R. Stadler
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000

Robert M. Barnes
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-5200

*Attorneys for Defendants
B. Hauptman & Associates, LLC and
Bruce A. Hauptman*

COMPENDIUM OF AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS

**CASES**                                                                                   **TAB #**

*In re Advanta Corp. Sec. Litig.*, No. 97-CV-4343,
    1998 WL 387595 (E.D. Pa. July 9, 1998),
    *aff'd*, 180 F. 3d 525 (3d Cir. 1999) ....................................................................1

*Commonwealth of Pa. v. BASF Corp., et al.*, No. 120186,
    2001 WL 1807788 (Pa. Ct. Common Pleas
    March 15, 2001).........................................................................................2

*Continental Ill. Nat'l Bank & Trust Co. v. Hunt Int'l Res. Corp.*,
    Civ. Action Nos. 7888, 7844, 1987 WL 55826
    (Del Ch. Feb. 27, 1987) .............................................................................3

*Dickson v. Murphy*, No. 05-4728,
    2006 WL 2847238 (3d Cir. Oct. 6, 2006) ...................................................4

*Ervin v. First Am. Mktg Corp.*, No. 05-184,
    2006 WL 2456470 (E.D. Pa. Aug. 21, 2006).............................................5

*Hillier v. M.I.S.I., L.P*, No. 0513 Jan. Term 2004,
    2006 WL 299053 (Pa. Comm. Pl. Jan. 27, 2006) ...................................6

*Lynch v. Janson*, No. 90-5063, 1990 WL 188926
    (E.D. Pa. Nov. 28, 1990)...........................................................................7

*Marino v. Cross Country Bank*, No. C.A.02-65-GMS,
    2003 WL 503257 (D. Del. Feb. 14. 2003) .................................................8

*Neyer, Tiseo & Hindo, Ltd. v. Russell*, Civil Action No. 92-2983,
    1993 WL 53579 (E.D. Pa. March 2, 1993) ................................................9

*Nowicki v. United Timber Co.*, No. Civ.A. 99-257,
    2000 WL 1239966 (E.D. Pa. 2000)........................................................10

*Ragan Henry Broadcast Group, Inc. v. Hughes*,
    1992 WL 151308 (E.D. Pa. June 19, 1992) ...........................................11

*Sprout v. Ellenburg Capital Corp.*, No. Civ. A. 95C-05-025,
    1997 WL 716901 (Del. Super. Aug. 26, 1997) ......................................12

*Thomas v. Hobbs*, No. C.A. 04C-02-010 RFS,
    2005 WL 1653947 (Del. Super. April 27, 2005)....................................13

*Werner Kammann Machinenfabrik, GmbH v. Max Levy Autograph, Inc.*,
   2002 WL 126634 (E.D. Pa. 2002)...........................................................................14


**ARTICLE**

Erin E. Arvelund, E-gregious! 2000 Scoreboard,
   BARRONS ONLINE, January 1, 2001,
   *available at http://interactive.wsj.com/archive*........................................................15

TAB 1

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
In re ADVANTA, CORP., Securities Litigation.
**No. 97-CV-4343.**

July 9, 1998.

*MEMORANDUM*

BUCKWALTER, J.

I. INTRODUCTION

**\*1** After their stock lost approximately 20% of its value when Advanta Corporation ("Advanta") announced it expected to report a $20 million loss for the first quarter of 1997, plaintiffs, Advanta shareholders, filed this proposed securities class action suit against Advanta and seven of its present and former officers and directors. [FN1] Their three count amended complaint (the "Complaint") alleges violations of Section 10(b) (Count I); Section 20(a) (Count II) and Section 20(A) (Count III, against defendants Greenawalt and Marshall only) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Presently, all defendants move to dismiss Counts I and II and defendants Greenawalt and Marshall seek dismissal of Count III. [FN2] For the reasons that follow, Advanta's Motion is granted and Greenawalt's Motion is granted.

> FN1. Individual defendants are as follows: Richard A. Greenawalt ("Greenawalt"), former President and Chief Operating Officer; Dennis T. Alter ("Alter"), Chairman of the Board; Robert A. Marshall ("Marshall"), former Executive Vice President and Group Executive, Advanta Personal Payment Services; William A. Rosoff ("Rosoff"), Director and Vice Chairman of the Board of Directors; Alex Hart ("Hart"), Chief Executive Officer and Director; Gene S. Schneyer ("Schneyer"), Vice President, Secretary and General Counsel; and John J. Calamari ("Calamari"), Vice President, Finance and Principal Accounting Officer.

> FN2. Defendants, Advanta, Atler, Rosoff, Hart, Schneyer and Calamari, filed a motion to dismiss Counts I and II ("Advanta's Motion"). Defendants, Greenawalt and Marshall, filed a motion to dismiss the entire Complaint ("Greenawalt's Motion") and joined Advanta's motion.

II. BACKGROUND  [FN3]

> FN3. The facts are as alleged in the Complaint or taken from documents cited in Complaint, the full text of which are attached to either Advanta's or Greenawalt's motion to dismiss. *See In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426 (3d Cir.1997); *see also, San Leandro Emer. Med. Group Profit Sharing Plan v. Phillip Morris Co.,* 75 F.3d 801, 809 (2d Cir.1996) (district court properly considered full text of documents partially quoted in complaint in granting motion to dismiss). Furthermore, plaintiffs have not objected to this Court's consideration of such documents.

Advanta is a leading issuer of standard and gold MasterCard and VISA credit cards. Advanta cards typically carry no annual fee and a credit limit of approximately $6,000. Advanta is popularly known for its ability to attract customers by offering low "teaser" interest rates, about 7%, for a limited period. After the teaser period expires, Advanta raises the interest rate to a higher more competitive amount.

Historically, Advanta enjoyed strong credit quality and low charge-off rates.  [FN4] Advanta's 1995 annual report informed shareholders that the company's total number of customer accounts increased by 27%, in 1995, to more than 5 million by the end of the year. The company boasted that its emphasis on acquiring gold card customers, generally better credit risks, helped maintain its "enviable credit quality profile."

> FN4. A "charge-off" occurs when a credit card holder's unpaid balance becomes uncollectible, generally because a borrower is excessively delinquent, defaults, files for bankruptcy or an account is fraudulent. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unpaid balance is then "charged-off" against an established reserve.

In a press release issued on July 18, 1996, Advanta announced that earnings for the three and six months ending June 30, 1996, represented an increase of 35% and 25%, respectively, compared to the same periods in 1995. Advanta also reported that "return on equity surpassed the 25% goal for the twenty-second consecutive quarter, attaining 27.7%." This was an increase over both the previous quarters' results and the results for the same quarter in 1995.

Plaintiffs maintain that in an effort to continue its previous growth, Advanta engaged in several practices that severely undermined the company's future viability. Advanta began issuing credit cards with teaser rates and periods significantly lower and longer than industry standard. Advanta increased the number of high risk customers it extended credit to, contrary to representations made in its July 18, 1996 press release, and failed to increase personnel to monitor and enforce collection of such high risk accounts. Thus, by mid-1996 Advanta's credit card charge-off rate had significantly increased.

Additionally, in the third quarter of 1996, Advanta changed its charge-off methodology for consumer credit card bankruptcies to provide the company additional time (from 30 to 90 days) to investigate a bankruptcy before charging-off an account. Plaintiffs allege that the change was simply a way for Advanta to delay reporting the earnings impact of rising charge-off rates from the third and fourth quarters of 1996 to the first quarter of 1997 and to allow individual defendants in the interim to unload shares of Advanta stock at artificially inflated prices. [FN5]

> FN5. According to plaintiffs, during the months of November and December (in which the full negative impact of Advanta's weakened credit quality was masked) defendants Greenawalt, Alter, Marshall and Schneyer "dumped" more than one million shares of Advanta common stock for proceeds in excess of $44 million.

**\*2** Plaintiffs also note that the change in the charge-off methodology was likely to have little effect in decreasing overall charge-offs. Advanta lacked adequate personnel to conduct additional investigation the extended charge-off period provided for. Moreover, more than three quarters of personal bankruptcies are filed under Chapter 7, freeing the borrower from all debt and rendering additional

investigation by the creditor meaningless.

In a news release issued on March 17, 1997, Advanta announced that "[f]or the first quarter, the Company currently expects to report a loss in the area of $20 million, or approximately $0.44 cents per share, compared with earnings of $41 million for the first quarter of 1996." Advanta attributed the loss to "continuing increases in consumer bankruptcies and charge-offs and lower receivable balances than originally anticipated in the credit card business." [FN6] Advanta simultaneously announced that its Board of Directors and senior management "have commenced a thorough and systematic review of its business strategy, growth prospects and operating environment aimed at maximizing the Company's value." In this regard, Advanta listed a number of steps it would take towards increasing revenue and stemming rising credit card losses. Advanta proposed to reprice credit card interest rates, improve collection procedures, shorten its teaser period, tighten underwriting and attract more high-quality credit card holders.

> FN6. Advanta's predictions came true. The company reported a first-quarter net loss of $19.8 million, or 43 cents a share, compared with net income of $41 million, or 91 cents a share in the year-earlier quarter. Additionally, credit card charge-offs were 6.6%, up from 3.2% in the first quarter of 1996.

Immediately, the value of both classes of Advanta stock dropped. Advanta Class A stock dropped from $40.375 per share to $31.875 per share and Advanta Class B stock dropped from $39.6875 per share to $30.375 per share.

Against this background, plaintiffs allege that from August 13, 1996 until March 17, 1997 (the "Class Period"), defendants disseminated a series of materially false and misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I) and are liable as "control persons" under Section 20(a) of the Exchange Act (Count II). Additionally, Subclass plaintiff, Jerry Weinberg, seeks to hold defendants, Greenawalt and Marshall, liable as contemporaneous traders under Section 20(A) of the Exchange Act (Count III). Presently, defendants seek dismissal pursuant to Rule 12(b)6, for failure to state a claim, and Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), for insufficient pleading.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 3
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

When considering a motion to dismiss a complaint under Rule 12(b)(6), a court must primarily consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). The court must accept as true all allegations contained in the complaint and must give the plaintiff the benefit of every favorable inference that can be drawn from those allegations. *See J/H Real Estate Inc. v. Abramson,* 901 F.Supp. 952, 955 (E.D.Pa.1995); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). A complaint is properly dismissed only if it appears certain that the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. *See Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Although the fact specific inquiries common to securities cases generally preclude dismissal, courts will nonetheless grant a defendant's 12(b)(6) motion if the alleged misrepresentations or omissions are immaterial or not pled in accordance with Rule 9(b) or the PSLRA. Dismissal is not appropriate, however, merely because a court disbelieves a complaint's factual allegations. *See Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

### B. Rule 9(b) and the PSLRA

*3 Because 10b-5 claims by necessity involve allegations of fraudulent conduct, courts have long required that they be pled in accordance to Rule 9(b), which provides in pertinent part that in "all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs, through their pleadings, must inject precision and some measure of substantiation into their allegations of fraud. By way of example, allegations of who, what, when, where and how: the first paragraph of any newspaper story, would satisfy the particularity requirement of Rule 9(b). *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

In 1995, in response to debate over the impact of securities fraud litigation, Congress enacted the PSLRA, which substantially modified, among other things the standard for pleading securities fraud claims. The PSLRA places additional burdens on plaintiffs attempting to plead fraud in securities cases. Under 15 U.S.C. § 78u-4(b), a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Failure to meet these pleading requirements results in dismissal. 15 U.S.C. § 78u-4(b)(3).

## IV. DISCUSSION

### A. Count I

Plaintiffs assert claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs must therefore meet the three step test for Rule 10b-5 violations outlined by the Third Circuit Court of Appeals in *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1417 (3d Cir.1997). First, the plaintiff must establish that the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Second, the plaintiff must establish that the defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury. Finally, since the claim being asserted is a "fraud" claim, plaintiff must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. [FN7]

FN7. For facts or information to be material for purposes of securities fraud litigation they must be of a type that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Additionally, materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiar for the trier of fact. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 n. 11 (3d Cir.1992). Only if the alleged misrepresentations or omissions are so

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 4
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law. *Id.*

The private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of fact that effect trading on the secondary market. *See In Re Burlington Coat Factory,* 114 F.3d at 1417 (citations omitted).

*\*4 First, plaintiffs allege that numerous statements from forms filed with the SEC, press releases and annual and quarterly reports were misleading when issued because they failed to reveal adverse business practices adopted by Advanta and negative facts and trends relating to the company's credit card business. Additionally, plaintiffs single out one statement made by Janet Point ("Point"), Vice President of Investor Relations, claiming Point knew her statement was false when issued.

Presently, defendants argue that all statements contained in the Complaint evidence full disclosure and are not misleading and that plaintiffs' allegations concerning such statements fail to meet the heightened pleading standards of Rule 9(b) and the PSLRA. First, I discuss the sufficiency of plaintiffs' general allegations of non-disclosure and then turn to their specific allegations regarding Point's statement.

i. Disclosure of Negative Facts and Trends

Plaintiffs contend that certain statements made during the Class Period are actionable because they fail to disclose negative facts and trends Advanta's officers and directors were aware of and thus left investors with false impressions as to the quality of Advanta's credit card portfolio. Specifically, plaintiffs claim Advanta failed to reveal that: 1) to perpetuate customer growth, the company had relaxed its underwriting standards; 2) in an attempt to retain customers, after the initial teaser period expired, Advanta was not repricing accounts to normal industry standard interest rates; 3) it lacked adequate credit collection capabilities and personnel to follow through on delinquent accounts; and 4) that the extended investigative period provided in the new charge-off methodology was irrelevant as most customers filed Chapter 7 bankruptcy, releasing them from all credit card debt.

Two general categories of statements are attributed with these deficiencies: 1) statements issued by Advanta regarding the 30 to 90 day charge-off change [FN8] and 2) what plaintiffs characterize as overly optimistic reports regarding the quality and future profitability of Advanta's credit card division. I review these groups individually in light of plaintiffs' allegations.

> FN8. Initially, plaintiffs argued that statements regarding the charge-off change were misleading because they did not explain the full negative impact of the change (that charge-off loss reports would be delayed). They abandoned this argument when faced with defendants' motion to dismiss highlighting the fact that, as plaintiffs admit in the Complaint, on at least four occasions Advanta not only disclosed the new method but provided detail as to the exact effect the change would have on reported earnings and losses.

a. Charge-off Statements

Plaintiffs claim the following statements regarding the charge-off change were misleading because they failed to disclose the four adverse conditions listed above.

On September 18, 1996, Advanta Credit Card Master Trust (the securitization vehicle for Advanta) in a Form 8K disclosed the change in the charge-off methodology along with the following explanatory language:
> As a result of this new methodology, charge-offs of receivables held by the Trust were lower in August 1996 than they would have been under the previous methodology and, conversely, delinquent Receivables were higher by a like amount.

On October 17, 1996, Advanta filed a Form 8K stating the following:
> In the third quarter, the Company adopted a new charge-off methodology relating to credit card bankruptcies which provides for an investigative period following notification of the bankruptcy petition of up to 90 days (rather than up to 30-days) prior to charge-off. The longer investigative period, which is consistent with others in the industry, had an approximate $24 million net positive impact for the quarter.

*\*5 The change is next mentioned in Advanta's third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 5
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

quarter report filed on November 12, 1996:

> In the third quarter of 1996, the Company adopted a new charge-off methodology related to bankrupt credit card accounts, providing for a period of up to a 90-day (rather than a 30-day) investigative period following notification of the bankruptcy petition, prior to charge-off.

> Credit statistics following the paragraph reflected this change in methodology.

Finally, on January 21, 1997 Advanta issued the following:

> As, previously disclosed, the Company adopted a new charge-off methodology relating to credit card bankruptcies in the third quarter of 1996. As anticipated that change had an impact in the fourth quarter 1996 similar to the amount in the third quarter. [FN9]

>> FN9. Plaintiffs also cite to Advanta's second quarter Form 10-Q filed on August 13, 1996, which they note makes no mention of the charge-off change implemented in the beginning of the third quarter. They claim disclosure in the second quarter report was necessary as, at the time it was filed, the third quarter, along with the new policy were "well underway." Corporations, however, are not required to disclose events from the quarter in progress in reports regarding the previous quarter. *Zucker v. Quasha,* 891 F.Supp. 1010, 1019 (D.N.J.1995); *see also, In re Burlington Coat Factory,* 114 F.3d at 1432 (company not obligated to update public as to state of quarter in progress). Consequently, consideration of alleged omissions regarding charge-offs in Advanta's second quarter 1996 report is unnecessary.

Defendants correctly note that each statement contains full and accurate disclosure as to the discrete topic of charge-offs and inclusion of such unrelated topics as underwriting, teaser rates, general trends in bankruptcy and collection practices was not necessary to clarify the accounting change. I agree.

When a corporation makes a disclosure, such as Advanta's report of the charge-off change, there is duty to make it complete and accurate. *See U.S. v. Yeaman,* 987 F.Supp. 373, 378 (E.D.Pa.1997)(citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860-61 (2d Cir.1968)). This, however, does not mean that by revealing one fact one must reveal all others that would be interesting or market-wise, but means only

such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead. *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990)(interpreting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d. at 860).

Advanta's coverage of the charge-off change, as cited by plaintiffs, was both complete and accurate. It describes the impact the change will have on both receivables and losses, the company's justifications for the change, and the assurance that the switch conforms with industry standards. There was no need for Advanta to interject into these comprehensive statements the extraneous information plaintiffs assert was lacking. Furthermore, additional explanation of the change is contained in the full text of documents cited in the Complaint. For example, a footnote to the financial highlights section of Advanta's October 17, 1996 Form 8K explains "[t]hird quarter 1996 figures reflect the adoption of a new charge-off methodology. Without this change, managed credit card charge-off and delinquency rates for the third quarter 1996 would have been 4.6% and 3.7% respectively." [FN10]

>> FN10. In analyzing securities fraud claims, review of the full text of documents cited in plaintiffs' complaint is appropriate. It prevents plaintiffs from maintaining a claim of fraud by extracting an isolated statement from a document and placing it in a complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent. *In re Burlington Coat Factory Securities Litigation,* 114 F.3d at 1426 (citations omitted).

Therefore, I find Advanta's statements regarding implementation of the company's new charge-off policy neither materially false nor misleading and therefore not violative of Rule 10b-5. Accordingly, plaintiffs' 10b-5 claims based on such statements are dismissed pursuant to Rule 12(b)(6). [FN11]

>> FN11. Additionally, plaintiffs' argue that the September 18, 1996 statement is misleading because it was issued by Advanta Credit Card Master Trust, rather than Advanta. Although they fail to allege as much, presumably the inference to be drawn is that the report was never made available to Advanta shareholders. Neither party has commented on this subject, yet, for purposes

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

of Rule 12(b)(6), I will assume the report was unavailable. This consideration, however, does not alter my ultimate conclusion. It is evident from the remaining statements that Advanta's disclosure was sufficient.

b. Positive Portrayals

**\*6** Next plaintiffs cite to four sources which they assert contain overly optimistic portrayals of the company and fail to disclose negative business practices and information.

First, in its 1996 third quarter report Advanta emphasized "our track record underscores our commitment to excel;" described itself as "a rapidly growing consumer financial services enterprise;" reassured shareholders that "despite a challenging industry environment, we are pleased to report that Advanta produced continued, consistent earnings growth in the third quarter" and noted that "for the fifth consecutive year, return on equity has met or exceeded the 25% level achieved this quarter."

Second, in its Form 10-Q filed on November 12, 1996, Advanta stated "The changes in the delinquency and charge-off rates from year-to year ... reflect the trend in unsecured consumer credit quality which is being experienced throughout the credit industry."

Third, on November 13, 1996 Advanta increased Class A and Class B dividends and commented "this dividend increase reflects management's confidence in the company's earnings momentum and Advanta's continuing commitment to enhancing shareholder value."

Finally, commenting on Advanta's fourth quarter results, announced on January 21, 1997, Alter stated "I am pleased to report that in 1996, Advanta maintained the growth of its current businesses and accelerated its expansion into new ventures."

Defendants maintain that plaintiffs allegations lack specificity regarding disclosure--"the Complaint is silent as to the source, date, recipients, author or any other details about the undisclosed negative information."

Under the PSLRA, a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading,

and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

On the first page of the Complaint, plaintiffs state that the allegations contained within are based on information and belief, thus they must explain in some detail the basis for such belief. Towards this end plaintiffs claim that by virtue of their positions as officers/directors of Advanta, individual defendants were well aware of negative facts and trends within the company. "Because of Board membership and/or executive positions with Advanta, each of the Individual Defendants had access to the adverse undisclosed information about Advanta's business prospects and financial condition and performance ... and knew that these adverse facts rendered the positive representations made by and about Advanta and its business materially false and misleading."

Additionally, plaintiffs' characterize suggestions for future improvement made in Advanta's March 17, 1997 press release and made by Advanta's founder and Chairman of the Board, Dennis Alter in an article entitled "House of Cards" appearing in the June 1997 issue of Philadelphia Magazine as "admissions" that during the Class Period defendants were aware of Advanta's potential downfalls. In reaction to first quarter losses, both identify a number of potential problem areas for the company and list corrective measures the company may take. The March 17, 1997 press release included the following suggestions: (1) aggressively repricing interests rates for high risk customers; (2) bringing Advanta's credit card fees "more in line with current industry norms;" (3) reducing the teaser period; (4) tightening underwriting; (5) "[m]ore quickly identifying and intervening on potentially troubled accounts;" (6) increasing the number of high quality cardholders; and (7) "[c]ontinuing to develop additional products that offer customers added value, rather than relying solely on low price." Additionally, Atler explained to Philadelphia Magazine "[w]hat happened is when the introductory period ended, we were probably not as aggressive as we could have been [repricing our rates]...."

**\*7** Taken together, and assuming for present purposes only that defendants had a duty to disclose, plaintiffs support for their belief that defendants were of aware of negative facts during the class period is insufficient. Plaintiffs first "fact", that their positions within the company rendered defendants

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

Page 7

knowledgeable, is merely an unsupported conclusion. A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions, *Rosenbloom v. Adams, Scott & Conway, Inc.,* 552 F.2d 1336, 1338-39 (9th Cir.1977) (citations omitted), and plaintiffs have not pointed to specific reports, circulated among defendants, which contained the adverse information defendants are charged with knowing. *See San Leandro Emer. Med. Group Profit Sharing Plan v. Phillip Morris Co.,* 75 F.3d 801, 812- 13 (2d Cir.1996).

Additionally, Advanta's after the fact statements recognizing the causes of its first quarter losses do not constitute a basis for charging defendants with prior knowledge. Courts have uniformly rejected such attempts to plead fraud by hindsight, acknowledging that a plaintiff does not state a claim for securities fraud merely because a company discloses, after the fact, that its performance failed to meet expectations. *See Wallace v. Systems and Computer Technology Corporation,* 1997 WL 602808 * 5 (E.D.Pa. Sept.23, 1997); *In re Goodyear Tire & Rubber Co. Sec. Lit.,* 1993 WL 130381 at *2 (E.D.Pa. Apr.22, 1993); *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991); *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.1990). During 1995 and 1996 Advanta reassured investors that it was capable of maintaining its earnings momentum. During the Class Period, Advanta continued issuing encouraging messages. Later the company had to report significant losses in its credit card division. Yet, simple comparison of these descriptions does not create underlying factual support for plaintiffs' claims. Plaintiffs' must point to specific facts suggesting that the difference is attributable to fraud. *See In re Donald J. Trump Casino Securities Litigation,* 793 F.Supp. 543, 556-57 (D.N.J.1992); *DiLeo v. Ernst & Young,* 901 F.2d at 627. In the instant case plaintiffs have not brought such facts to the Court's attention. [FN12] Therefore, because they have not alleged circumstances indicating that any of the "positive portrayals" identified in the Complaint were false or misleading, plaintiffs have failed to adequately plead fraud. [FN13] Accordingly, plaintiffs' claims based on these statements are dismissed pursuant to Rule 9(b) and the PSLRA.

FN12. Furthermore, I note that the uncanny resemblance between plaintiffs' list of undisclosed adverse business conditions and the list of proposed corrective measures

contained in Advanta's March 17, 1997 press release only bolsters my conclusion.

FN13. Because I dismiss plaintiffs claim under 15 U.S.C. § 78u-4(b) for failure to adequately plead facts underlying their fraud claim, I do not address the issue of whether or not plaintiffs have adequately plead scienter as required by 15 U.S.C. § 78u-4(b)(2).

Additionally, I note that review of the full text of documents cited in plaintiffs' complaint demonstrates an effort by Advanta to address plaintiffs' concerns. [FN14] In its third quarter report Advanta notes "[t]he provision for credit card losses for the third quarter of 1996 was $24.2 million compared to $10.6 million for the comparable period of 1995. This increase was primarily ... In response to higher charge-off, impaired asset and delinquency levels." Also, in their 1995 annual report Advanta stated:

FN14. *In re Burlington Coat Factory, supra* note 10.

**\*8** Throughout the industry, credit card issuers and other lending institutions experienced deteriorations in credit quality as delinquencies and charge-offs rose. Advanta has enjoyed historically low delinquency and charge-off rates over the past few years. Given the changes in the recent credit cycle, coupled with the sheer size and seasoning of our portfolio, we expect to see delinquencies and charge-offs move upward to more normalized levels.

ii. Janet Point's Statement

Plaintiffs claim that a statement issued by on September 12, 1996 by Janet Point, Vice President for Investor Relations was false and misleading. Point informed the Dow Jones New Service that Advanta expected large revenue increases from repricing more than $5 billion of credit card receivables with current teaser rates of about 7% to what she described as Advanta's normal interest rate of 17%. Yet, in the June 1997 Philadelphia Magazine article, Alter is quoted as saying, "[w]hat happened is when the introductory period ended, we were probably not as aggressive as could have been [repricing our rates] ... Instead of repricing to 18 percent-we repriced closer to 13 or 14 percent in order to retain our image and the luster of being a low-cost provider." Comparison of these two statements, plaintiffs' allege, leads to the inference

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243

(Cite as: 1998 WL 387595 (E.D.Pa.))

that Point's statement was false and misleading.

Defendants contend that Point's statement is not actionable because it falls within a statutory safe harbor that protects forward-looking statements when the plaintiff fails to prove defendant made them with actual knowledge that they were false. Under the safe harbor that defendants refer to, 15 U.S.C. § 78u-5(c), "a person shall not be liable with respect to any forward-looking statement ... to the extent that ... the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge by that person that the statement was false or misleading...."

It is apparent that Point's statement meets the definition of a forward-looking statement--"a statement of plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," so I must determine whether it is worthy of statutory protection. In paragraph 33 of their complaint, plaintiffs allege generally that all statements by Advanta, or its representatives referred to in the complaint do not qualify for safe harbor protection because "at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of Advanta who knew that those statements were false when made." Presumably, additional support for plaintiffs' allegations comes from Alter's later "inconsistent" comments to Philadelphia Magazine.

Defendants characterize these allegations as conclusory and assert that they fail to allege the required state of mind, that the speaker had actual knowledge that the statement was false or misleading when made. I agree. Plaintiffs' catch-all allegation that all speakers knew that their statements were false when made is too broad and Alter's comments indicate nothing more than Advanta's failure to follow through exactly as planned on its proposed interest increase, rather than purposeful intent to fool the investing public. Therefore, mindful of the pleading requirements of Rule 9(b) and the PSLRA, I find plaintiffs' allegations as to Point's state of mind insufficient. Accordingly, Plaintiffs' claims of fraud based on such statement are dismissed pursuant to Rule 9(b) and the PSLRA.

B. Counts II and III

*9 Counts II and III are derivative of Count I and

therefore are also dismissed. In Count II, the Complaint alleges that individual defendants are liable as "control persons" under Section 20(a) of the Exchange Act. Because, plaintiffs have failed to state and/or adequately plead a primary violation of the Exchange Act, their "control persons" claims must also be dismissed. See Shapiro v. UJB Fin. Corp., 964 F.2d at 279. Likewise, under Section 20A, an insider who trades shares of stock while in possession of material, nonpublic information is liable to any person who traded contemporaneously with the insider. Generally, to state a claim under Section 20A a plaintiff must establish: (1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Exchange Act. See e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703-04 (2d Cir.1994); In re VeriFone Sec. Litig., 11 F.3d 865, 871-72 (9th Cir.1993). Accordingly, because plaintiffs have failed to state and/or plead a claim under the Exchange Act their Section 20A claim is also dismissed.

An appropriate Order follows.

ORDER

AND NOW, this 9th day of July 1998, upon consideration of a motion to dismiss Counts I and II of the complaint submitted by defendants, Advanta Corp., Dennis Alter, William A. Rossoff, Alex W. Hart, Gene S. Schneyer, and John J. Calamari (collectively "Advanta" and "Advanta's Motion") and joined by defendants, Richard A. Greenawalt ("Greenawalt") and Robert A. Marshall ("Marshall") (Docket No. 16); a motion to dismiss the entire complaint submitted by Greenawalt and Marshall ("Greenawalt's Motion") (Docket No. 15); Plaintiffs' combined response (Docket No. 20); a reply submitted by Greenawalt and Marshall (Docket No. 26) and a reply submitted by Advanta (Docket No. 27), it is hereby ORDERED that Advanta's Motion is GRANTED and Greenawalt's Motion is GRANTED.

As to Count I, claims based on statements regarding change in Advanta's charge-off policy are DISMISSED, with prejudice, pursuant to Rule 12(b)(6); claims based on Janet Point's statement regarding changes in interest rates are DISMISSED, without prejudice, pursuant to Rule 9(b) and the PSLRA; and claims based on remaining general statements regarding Advanta's credit card division are DISMISSED, without prejudice, pursuant to Rule 9(b) and the PSLRA. As they derive from Count I,

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

Counts II and III are also DISMISSED, without prejudice. Any amended complaint plaintiffs seek to file pursuant to this Memorandum and Order must be filed within thirty (30) days of this order, unless that time limitation is specifically extended by order of this court.

Not Reported in F.Supp., 1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243

**Motions, Pleadings and Filings (Back to top)**

• 2:97cv04343 (Docket) (Jun. 30, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

Page 1

**C**
Only the Westlaw citation is currently available.

Court of Common Pleas of Pennsylvania,
Philadelphia County.
COMMONWEALTH OF PENNSYLVANIA, by D.
Michael Fisher, Attorney General, Plaintiff
v.
BASF CORPORATION, et al., Defendants
No. 3127, CONTROL NO. 120186.

March 15, 2001.

OPINION

HERRON, J.

*1 Presently before this court are the Preliminary Objections of Defendants, BASF Corporation ("BASF"), Knoll Pharmaceutical Company ("Knoll"), Carter H. Eckert, Gilbert H. Mayor, Neil Kurtz, Barbara Buhler, Mark Kuhl, Scott E. Bowman and James J. Schimelfenig (collectively "Defendants") to the Amended Complaint of Plaintiff, the Commonwealth of Pennsylvania ("the Commonwealth").

For the reasons set forth in this Opinion, the Preliminary Objections are sustained in part and overruled in part.

BACKGROUND
A. *Factual History* [FN1]

> FN1. These facts were gleaned from the Amended Complaint, and are accepted as true for purposes of ruling on preliminary objections. See *Tucker v. Philadelphia Daily News,* 757 A.2d 938, 941-42 (Pa.Super.Ct.2000)

Millions of Americans suffer from hypothyroidism and other thyroid diseases because the thyroid gland cannot sufficiently produce thyroxine to regulate the human body's metabolism. Am.Compl. at ¶ 27. Synthroid, available only by prescription, was the first synthetic version of thyroxine, which is developed and manufactured by Defendants. *Id.* at ¶ 29. Several other levothyroxine sodium drugs have since been developed by different manufacturers and,

like Synthroid, were grand-fathered in under the Food, Drug and Cosmetics Act of 1938. *Id.* at ¶ 31. Consequently, these other drugs have never been through the New Drug Application or Abbreviated New Drug Application processes necessary for the FDA to establish bioequivalence (or "AB rating"). *Id.* at ¶ 36. When a drug is given an AB rating under the FDA's bioequivalence testing protocols, it can be interchanged or substituted with other drugs and is listed in the FDA publication known in the pharmaceutical industry as the "Orange Book." *Id.* at ¶ ¶ 34-39. Defendant, Boots Pharmaceuticals, Inc. ("Boots"), [FN2] successor by merger to Flint Laboratories ("Flint"), the manufacturer of Synthroid, openly publicized that there were no drugs that were AB-rated to Synthroid, though AB-rating does not necessarily equate with lack of bioequivalence or ability to interchange or substitute drugs. *Id.* at ¶ ¶ 37-39.

> FN2. Boots, a Delaware corporation authorized to do business in Pennsylvania and having done business in Pennsylvania during the relevant time period, merged with Knoll in April 1995. Am.Compl. at ¶ 6. Throughout this Opinion, any references to Boots or Flint Laboratories shall be understood as Knoll and/or BASF, which is the parent corporation of Knoll. And in April, 1995, BASF bought the drug division of the Boots Company, PLS, known as Boots Pharmaceuticals, Inc. *Id.* at ¶ ¶ 5-9.

In 1986, Daniels Pharmaceuticals, Inc. ("Daniels"), the manufacturer of Levoxyl (a competing synthetic version of levothyroxine sodium), asserted that Levoxyl was bioequivalent to Synthroid. *Id.* at ¶ 44. As a result of Daniels' efforts and an imminent threat of FDA action to withdraw levothyroxine sodium's "grand-fathered" status, Flint, in 1987, commissioned a study by Dr. Betty Dong ("Dr.Dong") to ascertain the bioequivalence of Synthroid, Levoxyl and two other generic levothyroxine sodium drugs. *Id.* at ¶ ¶ 49-51. Dr. Dong was known to favor Synthroid to other levothyroxine drugs and Boots purportedly expected the study to reveal that these drugs were inferior to Synthroid. *Id.* at ¶ ¶ 53-54. Then, in 1990, Boots received raw data from the study, indicating that the drugs were bioequivalent to Synthroid and therefore equally effective in treating hypothyroidism. *Id.* at ¶ 56. Boots realized that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

Page 2

unless immediate action were taken, Synthroid's market share would drop from 80% to 45% or less if the FDA were to rate generic and less expensive levothyroxine drugs as bioequivalent. *Id.* at ¶ 58. Thereafter, Boots allegedly took various actions in an attempt to discredit Dr. Dong's study and threatened to withhold its consent to the publication of the study's results and attempted to delay or suppress its publication. *Id.* at ¶¶ 59-78. The study, which proved sound upon review, had been ready for publication in January, 1995. *Id.* at ¶¶ 70, 84.

*2 Despite defendants' efforts, the FDA became aware of Dr. Dong's study. *Id.* at ¶ 85. On November 7, 1996, the FDA informed Knoll (successor to Boots) that it had violated the Food, Drug and Cosmetic Act, 21 U.S.C. § 331(a), by misbranding Synthroid when Knoll knew of and possessed Dr. Dong's study results. *Id.* at ¶ 86. Thereafter, on April 16, 1997, the *Journal of the American Medical Association* ("JAMA") published the study which had concluded that millions of dollars per year could be saved in the United States through the use of generic equivalents to Synthroid. *Id.* at ¶ 88. After news of Dr. Dong's study was publicized, some states considered changing their lists of approved generic equivalent drugs to include generic equivalents to Synthroid. *Id.* at ¶ 89. In response, Knoll, through its representatives, the individual defendants, began an allegedly misleading ad campaign, directed to state agencies, claiming that "there is no substitute for Synthroid." *Id.* at ¶ 90.

The Commonwealth is allegedly the fourth largest state user of Synthroid. *Id.* at ¶ 94. The Commonwealth paid for Synthroid prescriptions through Pennsylvania Medicaid, Pennsylvania's Pharmaceutical Assistance Contract for the Elderly ("PACE"), Pharmaceutical Assistance Contract for the Elderly Needs Enhancement Tier ("PACENET") and Pennsylvania Employees Benefit Trust Fund ("PEBTF"), plans which use state dollars to assist poor people, the elderly and state employees in paying for levothyroxine sodium. *Id.* at ¶ 95. Pursuant to contract and certain laws and regulations, defendants provide various rebates to the Commonwealth. *Id.* at ¶ 96. Pennsylvania citizens which receive prescriptions through PACENET and PEBTF pay a greater co-pay for generic levothyroxine sodium than for Synthroid. *Id.* at ¶ 97.

Between 1992 and April of 1996, representatives of Boots/Knoll/BASF, sent correspondence and letters to Commonwealth agencies which were designed to deceive Commonwealth employees and induce them

into making written representations about Synthroid to support Defendants' "scheme" to convince health care professionals that there is no bioequivalent or substitute for Synthroid. *Id.* at ¶¶ 98-102. As a result of the "misleading" ad campaign(s), Defendants persuaded Pennsylvania physicians to specify Synthroid in their levothyroxine sodium prescriptions and convinced patients to request it, causing the Commonwealth and payors to pay for or reimburse their insureds for Synthroid instead of other less expensive brand and generic levothyroxine sodium drugs. *Id.* at ¶ 107. Defendants' actions to delay the recognition and approval of bioequivalent alternatives to Synthroid has purportedly caused the Commonwealth to spend more than it otherwise would have spent for the purchase or reimbursement of thyroid medicine due to both (1) the artificial inflation of the price paid for Synthroid and (2) the selection of Synthroid instead of bioequivalent or generic alternative medicine. *Id.* at ¶ 108.

*3 Under this factual background, Plaintiff commenced the present action in this court. [FN3]

> FN3. As will be discussed in more detail below, as a result of the same conduct alleged in this action, dozens of federal class action claims were filed by individual consumers and third party payors, which were consolidated in the United States District Court for the Northern District of Illinois. *See In re Synthroid Marketing Litigation,* 1997 WL 564075, at *1 (N.D.Cal. Aug.21, 1997) ("MDL Class Action"). On August 4, 2000, the United States District Court entered an order granting final approval for the settlement of the class action lawsuit. *In re Synthroid Marketing Litigation,* 110 F.Supp.2d 676 (N.D.Ill.2000). Further, on September 8, 2000, the court entered a final order and judgment, approving the stipulation and settlement of both the consumer settlement class and the third party payor settlement, which permanently released defendants from the future claims for the same conduct alleged in this action. *See* Final Order and Judgment of *In re Synthroid Marketing Litigation,* Civ. A. No. 97 C 6017, MDL No. 1182 (N.D.Ill. Sept. 8, 2000). The Commonwealth purportedly participated in the MDL Class Action but did not settle nor was it a party to that action. *See* 2/12/01 N.T. 5-9.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

### B. *Procedural History*

On May 12, 2000, the Commonwealth filed its original Complaint, in its capacity as sovereign and as *parens patriae* on behalf of its citizens, seeking injunctive relief, civil penalties and monetary damages. Specifically, the Complaint set forth Counts for (1) violation of the Unfair Trade Practices and Consumer Protection Law ("UTP/CPL"), 73 Pa.C.S.A. § § 201-1 *et seq.;* (2) breach of contract; (3) false claims; (4) civil conspiracy; (5) fraud; (6) fraudulent misrepresentation; (7) fraudulent concealment; (8) negligent misrepresentation; (9) unjust enrichment; and (10) "unclaimed funds" pursuant to the "Escheat Property Act", 72 P.S. § § 1301.1 et seq. The gravamen of the Complaint is that Defendants have wrongfully secured and maintained the market share for their levothyroxine sodium drug product, Synthroid, by (1) misrepresenting in advertisements and promotional campaigns that Synthroid had no bioequivalent which would be interchangeable with generic levothyroxine sodium drug products and (2) by delaying the publication of a study which would have proved otherwise.

On July 11, 2000, Defendants filed their original Preliminary Objections. Plaintiff filed its Motion to Strike the Preliminary Objections and, in the alternative, requested to file an Amended Complaint on July 31, 2000. On October 4, 2000, this Court entered an Order, denying the Motion to Strike and granting the request to file an Amended Complaint, while deferring any ruling on the Preliminary Objections. On October 24, 2000, Plaintiffs filed their Amended Complaint. Thereafter, Defendants filed Preliminary Objections to the Amended Complaint, in the nature of a demurrer. [FN4] Specifically, these Objections asserted the following:

> FN4. For purposes of clarity, this court should emphasize that the only complaint before it is the Amended Complaint which supersedes the original complaint and takes its place, even though it is very similar to the original pleading. Therefore, the only Preliminary Objections before the court are those filed to the Amended Complaint since the original ones have been rendered moot. *See Vetenshtein v.. City of Philadelphia,* 755 A.2d 62, 67 (Pa.Commw.Ct.2000)(an amended complaint virtually withdraws the original complaint and takes its place). Moreover, Defendants did not reassert all of their original Objections, but only moved to dismiss Counts I, II, III, IV, IX and X. At

oral argument, defense counsel contended that Plaintiff's claim is essentially one for fraud and the other claims are legally insufficient. 2/12/01 N.T. 3, 39-40

(1) the inability of the Commonwealth to bring claims for restitution as *parens patriae* on behalf of Pennsylvania citizens;
(2) failure to state a cause of action under the UTP/CPL in Count I, asserting that civil penalties are not allowed for each "claim for payment" and that the alleged misrepresentations do not equate to "claims for payment", as well as requesting that the jury demand be stricken as to this count;
(3) failure to state a cause of action for breach of contract in Count II based on a failure to allege a breach of the Rebate Agreement and Addendum, as well as moving to strike the claim against all defendants but Knoll, the sole party to the Rebate Agreement and Addendum;
(4) failure to state a cause of action for unjust enrichment in Count IX, asserting that unjust enrichment cannot be pled in the alternative when the claim is based on a written contract;
(5) failure to state a cause of action for false claims in Count III, contending that Plaintiff does not allege facts to establish that Defendants submitted claims for payment, let alone false claims;
*4 (6) failure to state a cause of action for civil conspiracy in Count IV, arguing that Plaintiff fails to allege the requisite plurality to maintain this claim and fails to allege that the individual defendants acted beyond the scope of their agency roles;
and
(7) failure to state a cause of action for unclaimed funds under the Escheat Statute in Count X based on a failure to allege that the tangible property is located in the Commonwealth or that the funds from the settled class action lawsuit are actually unclaimed.
Preliminary Objections at ¶ ¶ 7-35.

This court heard oral argument on the Objections on February 12, 2001. The court will address each of the Objections *seriatim.*

### LEGAL STANDARD

Rule 1028(a)(4) of the Pennsylvania Rules of Civil Procedure [Pa.R.C.P.] allows for preliminary objections based on legal insufficiency of a pleading or a demurrer. When reviewing preliminary objections in the form of a demurrer, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

Page 4

*Tucker v. Philadelphia Daily News, 757 A.2d 938, 941-42 (Pa.Super.Ct.2000).* Preliminary objections, whose end result would be the dismissal of a cause of action, should be sustained only where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazara, 746 A.2d 642, 643 (Pa.Super.Ct.2000)* (citation omitted). Moreover,

[I]t is essential that the face of the complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible.

*Bailey v. Storlazzi, 729 A.2d 1206, 1211 (Pa.Super.Ct.1999).* However, the pleaders' conclusions of law, unwarranted inferences from the facts, argumentative allegations, or expressions of opinions are not considered to be admitted as true. *Giordano v. Ridge, 737 A.2d 350, 352 (Pa.Commw.Ct.1999), aff'd. 559 Pa. 283, 739 A.2d 1052 (1999), cert. denied, 531 U.S. 928, 121 S.Ct. 307, 148 L.Ed.2d 246 (U.S.2000).* In addition, it is not necessary to accept as true averments in the complaint which conflict with exhibits attached to the complaint. *Philmar Mid-Atlantic, Inc. v. York Street Associates II, 389 Pa.Super. 297, 300, 566 A.2d 1253, 1254 (1989).*

### DISCUSSION

A. The Commonwealth Has Standing as *Parens Patriae* to Bring Restitution Claims Only on Behalf of its Citizens Who Opted Out or Were Not Included in the Multi-district Class Action Settlement, But, the Commonwealth Can, in its Own Right, Bring its Request for Injunctive Relief, Civil Penalties and Restitution

Defendants first assert that the Commonwealth's claims as *parens patriae,* seeking restitution on behalf of its citizens, are barred with respect to all Pennsylvania consumers except the relatively few Pennsylvania consumers that opted out of the settlement and release in the MDL Class Action. Preliminary Objections at ¶ ¶ 7-9. At oral argument, counsel for defendants clarified that they were asserting that the Commonwealth can only bring direct claims on behalf of itself and also as *parens patriae* with respect only to citizens who have not already released their claims based on the same conduct in this action. 2/12/01 N.T. 8 ("N.T.").

*5 Plaintiff, in turn, argues that the settlement in the

MDL Class Action is not final but is currently on appeal to the Seventh Circuit, and that defendants oversimplify the concept of *parens patriae,* since that concept allows for the Commonwealth to maintain its other *parens patriae* claims (e.g., for injunctive relief) in order to protect all current and future consumers of levothyroxine sodium drugs. Pl. Mem. of Law, at 7-9. The Commonwealth also contends that "the proposed settlement and any possible recovery by Pennsylvania citizen-class members does not act to waive the statutory civil penalties the Commonwealth is entitled to recover from Defendants pursuant to the UTP/CPL." *Id.* at 9, 566 A.2d 1253. At oral argument, counsel for Plaintiff asserted that "the right of the Commonwealth to bring the suit isn't exactly coterminous with the release." N.T. 25. However, counsel did concede that "[t]o the extent that one of the persons upon whose basis we have brought suit has released his claim, then ... we cannot recover that which has been released by that person." *Id.* at 27, 566 A.2d 1253.

*Parens patriae* means literally "parent of the country" and "refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability. It is a concept of standing utilized to protect those quasi-sovereign interests such as [the] health, comfort and welfare of the people, interstate water rights, [the] general economy of the state, etc." Black's Law Dictionary 1003 (5th ed.1979)), *quoted in Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 599 n. 8, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).* Summarizing the principles of the *parens patriae* doctrine, the United States Supreme Court has stated the following:

In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development--neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract--certain characteristics of such interests are so far evident. These characteristics fall in two general categories. First, a State has a quasi-sovereign interest in the health and well-being--both physical and economic--of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

*Snapp, 458 U.S. at 607.*

Both federal and state courts in Pennsylvania

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consistently uphold the right of the Commonwealth to sue in its capacity as *parens patriae* to vindicate substantial state interests, both economic and physical. *See Pennsylvania v. Porter*, 659 F.2d 306, 314-16 (3d Cir.1981)(upholding right of Commonwealth to bring an action as *parens patriae* and in its own right to enjoin police officers and borough officials for violations of civil rights and upholding Commonwealth's interest in preventing further violations and in safeguarding the health and safety of its citizens); *Commonwealth v. Russell Stover Candies*, Civ.A.No. 93-1972, 1993 WL 145264, at *7 (E.D.Pa. May 6, 1993)("A state can sue as *parens patriae* for the protection of its people or its general economy."); *Commonwealth ex rel. Fisher v. Phillip Morris, Inc.*, 736 A.2d 693, 701-02 (Pa.Commw.Ct.1999)(footnotes and citations omitted)(Kelly, J., dissenting); *In the Interest of K.B.*, 432 Pa.Super. 586, 591 n. 11, 639 A.2d 798, 801 n. 11 (1994).

*6 In support of its position, Defendants rely upon *In re Baldwin-United Corporation*, 770 F.2d 328 (2d Cir.1985), which enjoined several states through their Attorneys General from bringing actions seeking recovery for damages which were already subject to multidistrict class action settlements. *Id.* at 341-42. In *Baldwin*, which involved class actions that had been consolidated in federal court, 18 of the 26 class actions had reached stipulated settlements which had been provisionally approved by the court and were awaiting final approval. *Id.* at 336. The United States Court of Appeals for the Second Circuit deemed that the injunction was appropriate to aid in the federal court's jurisdiction over the settlement because, as a condition of the settlement, the plaintiffs had agreed to release all claims arising under federal and state law on the same conduct alleged in the later state action. *Id.* The court further stated:

as a practical matter[,] no defendant in the consolidated federal actions in the present case could reasonably be expected to consummate a settlement of those claims if their claims could be reasserted under state laws, whether by states on behalf of the plaintiffs or by anyone else seeking recovery of money to be paid to the plaintiffs. Whether a state represented itself to be acting as a "sovereign" in such a suit or described its prayer as one for "restitution" or a "penalty" would make no difference if the recovery sought by the state was to be paid over to the plaintiffs. The effect would be to threaten to reopen the settlement unless and until it had been reduced to a judgment that would have res judicata consequences.... If states or others could derivatively assert the same claims on behalf

of the same class or members of it, there could be no certainty about the finality of any federal settlement.

*Id.* at 337. While federal cases are generally not binding on this court, this court finds the reasoning and circumstances in *Baldwin* to be instructive in the present instance.

Here, in its Amended Complaint, Plaintiff explicitly avers that it "brings this action in its capacity as sovereign, and as *parens patriae* on behalf of its citizens, for injunctive relief, civil penalties, and to recover damages which the Commonwealth and its citizens have sustained as a result of the unlawful and concerted action of the Defendants, manufacturers and marketers of the prescription drug Synthroid." Am.Compl. at ¶ 1. Plaintiff is apparently asserting its *parens patriae* claims on behalf of Pennsylvania citizens who receive prescriptions through PACENET and PEBTF and those who pay a greater co-pay for Synthroid than for other levothyroxine sodium. *Id.* at ¶ 97. Plaintiff is also bringing claims for damages on behalf of payors, including itself, where, as a result of Defendants' actions, it and other payors have been caused to pay for or reimburse their insureds for Synthroid instead of less expensive levothyroxine sodium drugs. *Id.* at ¶¶ 107, 109. In addition, Plaintiff is apparently stating its claim for injunctive relief on behalf of "thousands of Pennsylvanians [who] use Synthroid without question" and the thousands who would continue to use it throughout all or most of their lifetimes to their financial detriment. *Id.* at ¶ 111. Taking these allegations as true, this court finds that the Commonwealth has expressed a quasi-sovereign interest in protecting the physical and economic health of its citizens and would, at first glance, be able to maintain a *parens patriae* action. *See Snapp*, 458 U.S. at 607.

*7 However, as Plaintiff acknowledges, dozens of federal class action claims were filed by individual consumers seeking monetary damages and certain individual consumers opted out of the proposed settlement in the class action litigation, including Pennsylvania consumers. *Id.* at ¶¶ 113, 213. Both the consumer class actions and the third party payor actions, in which 37 states through their Attorney General have joined, were consolidated in the United States District Court for the Northern District of Illinois. *See In re Synthroid Marketing Litigation*, 1997 WL 564075, at *1 (N.D.Cal. Aug.21, 1997) ("MDL Class Action"). Defendants concede that Pennsylvania was not one of the 37 states which joined this class action. *See* N.T. 7. On July 19, 1999,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                           Page 6
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

the District Court entered orders certifying the consumer class, as those consumers in the United States who purchased Synthroid between January 1, 1990 to the present, as well as all insurance providers and other third party payors ("TPP"), including self-funded plans but excluding governmental agencies, that paid Synthroid expenses incurred by any consumer in the United States and Puerto Rico during the Class Period. *See In re Synthroid Marketing Litigation,* 188 F.R.D. 295, 302 (N.D.Ill. July 19, 1999); and *In re Synthroid Marketing Litigation,* 188 F.R.D. 287, 295 (N.D.Ill. July 19, 1999), respectively. On August 4, 2000, the United States District Court entered an order granting final approval for the settlement of the MDL class action lawsuit. *In re: Synthroid Marketing Litigation,* 110 F.Supp.2d 676 (N.D.Ill.2000). Further, on September 8, 2000, the District Court entered a final order and judgment, approving the stipulation and settlement of both the Consumer Settlement Class and the TPP Settlement Class, which permanently released defendants from future claims for the same conduct alleged in this action. *See* Final Order and Judgment of *In re: Synthroid Marketing Litigation,* Civ. A. No. 97 C 6017, MDL No. 1182 (N.D.Ill. Sept. 8, 2000) ("Final Order"). [FN5] The District Court explicitly declared that the Stipulation was binding on all Consumer Settlement Class Members and TPP Settlement Class Members and it was preclusive in all pending and future lawsuits or other proceedings. Final Order, at ¶ 18. The "Released Claims" included any of the claims by the Consumer Plaintiffs or by the TPP Settlement Class and include many of the same claims arising in the present action. *Id.* at ¶ 1(mm). The "Release" acts as a permanent bar to those included in the Consumer Settlement Class and the TPP Settlement Class. *See* Exhibit A to Final Order, at ¶ 13. However, it does not include any retail pharmacy that is not a TPP, any personal injury claims, or any claim arising out of an actionable breach of a service agreement entered into by the Releasees, their successors and assigns, and any TPP. *Id.* In addition, the Release does not include the Commonwealth and/or its agencies, as represented by the Attorney General, since the Commonwealth did not join in the MDL Class Action and was explicitly excluded from the definition of the Consumer Settlement Class and TPP Settlement Class. *See id.* at ¶¶ 1(j), 1(yy).

FN5.   The Stipulation and Settlement included in the definition for the "Consumer Settlement Class" all individuals or their legal representatives in the United States and Puerto Rico who purchased Synthroid

during the Class Period and (i) do not validly exclude themselves from participation under this Stipulation, and (ii) are not governmental entities and/or agencies represented by state Attorneys General, and (iii) are not TPPs or recipients of Synthroid exclusively through state funded pharmaceutical drug programs who made no payments for Synthroid, and (iv) are not the Individual Defendants. *See* Exhibit A to Final Order, at ¶ 1(j).

Further, the "TPP Settlement Class" means "individually and/or collectively, all TPPs in the United States and Puerto Rico who (i) do not validly exclude themselves from participation under this Stipulation, and (ii) are not governmental entities and/or agencies represented by state Attorneys General. *Id.* at ¶ 1(fff). "TPP Plaintiff(s)" includes Blue Cross & Blue Shield of Alabama; Louisiana Health Service & Indemnity Company d/b/a Blue Cross & Blue Shield of Louisiana; Aetna U.S. Healthcare, Inc.; Aetna Life Insurance Co.; Corporate Health Insurance Co., Inc.; and Brokerage Concepts, Inc. *Id.* at ¶ 1(bbb).

**\*8** In order to assure the finality of the Class Action settlement and to adhere to the District Court's exclusive jurisdiction over the settlement, this court cannot now allow the Commonwealth to assert *parens patriae* claims on behalf of Pennsylvania citizens who released the Defendants for the same conduct alleged in this action. However, those Pennsylvania citizens who did opt out or were not included in the settlement should not now be denied any right to recovery, even though the number of these citizens is unclear and must be determined through subsequent discovery. Further, government agencies such as, Pennsylvania Medicaid, PACE, PACENET, PEBTF, which assist poor people, the elderly and state employees in paying for levothyroxine sodium (*See* Am.Compl. at ¶ 95), were excluded from the settlement and the release. Exhibit A to Final Order, at ¶ 1(j). Under these circumstances, the Commonwealth may bring restitution claims as *parens patriae* only on behalf of those Pennsylvania citizens who opted out or were not included in the MDL Class Action Settlement. The Commonwealth, however, is not barred from bringing direct claims for restitution or civil penalties, or claims for injunctive relief either as *parens patriae* or on its own behalf.

Therefore, as outlined above, Defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

Preliminary Objection with respect to Plaintiff's standing as *parens patriae* is sustained in part and overruled in part.

B. Plaintiff States a Cause of Action for Civil Penalties and Injunctive Relief under the UTP/CPL Where it Alleges That "Each Claim for Payment of Synthroid Is Tainted by Defendants' Actions and Is Subject to Civil Penalty"; but Plaintiff Is Not Entitled to a Jury Trial for this Claim

Defendants argue that Plaintiff's claim in Count I under the UTP/CPL, seeking to impose civil penalties for each "claim for payment" fails as a matter of law because (1) the UTP/CPL does not provide for the payment of civil penalties based upon "claims for payment"; and (2) Plaintiff does not allege facts to establish that Defendants made any "claims for payment." Defs. Mem. of Law, at 7. Defendants also move to strike Plaintiff's demand for a jury trial with respect to its UTP/CPL claim. *Id.* at 6 n. 3. Plaintiff, in response, argues that Defendants misinterpret both the UTP/CPL and the allegations of the Amended Complaint which set forth a cause of action under the UTP/CPL. Pl. Mem. of Law, at 10-12.

At oral argument, Defendants' counsel asserted that the Commonwealth's request for civil penalties is really based on every reaction to a purported misrepresentation or every time the doctor who purportedly heard this misrepresentation prescribed Synthroid, while the statute only provides civil penalties for each time the defendant had committed an unlawful act. N.T. 16- 17. In response, Plaintiff's counsel argued that Defendants, through a chain of actions and misrepresentations regarding Synthroid, ultimately profit from the Commonwealth and its citizens who are caused to pay more for Synthroid and by doctors and druggists who are caused to prescribe it, rather than prescribing the generic drug. *Id.* at 20-21.

**\*9** "Unfair methods of competition" and "unfair or deceptive acts in the conduct of any trade or commerce" are unlawful under the UTP/CPL. 73 P.S. § 201-3. The UTP/CPL defines "unfair methods of competition" or "unfair or deceptive acts" as including but not limited to the following:

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have ...;

\* \* \*

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods

are of a particular style or model, if they are of another;

\* \* \*

(viii) Disparaging the goods, services or business of another by false or misleading representation of fact;

\* \* \*

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.
73 P.S. § 201-2(4). A "false advertising" claim under sub-section (v) may be sustained if the plaintiff shows (1) that defendants' advertisement is a false representation of fact, (2) that it actually deceives or has a tendency to deceive a substantial segment of its audience, and (3) that the false representation is likely to make a difference in a purchasing decision. *Weinberg v. Sun Co., Inc.,* 740 A.2d 1152, 1167 (Pa.Super.Ct.1999)(citing *Commonwealth v. Hush-Tone Indus.,* 4 Pa.Commw. 1, 21 (1971)).

The UTP/CPL empowers the Attorney General to bring an action, in the name of the Commonwealth, to restrain by temporary or permanent injunction any conduct declared to be unlawful under section 3 of the Act. 73 P.S. § 201-4. A court, in its discretion, may direct the defendant(s) to make restitution to any person injured on account of defendants' violation of the Act. 73 P.S. § 201-4.1. [FN6] In addition, Section 8 of the UTP/CPL states, in pertinent part, that:

> FN6. As noted in the analysis of the *parens patriae* claims, the Commonwealth may only bring claims for restitution on its own behalf, and for those citizens who opted out or were not included in the MDL Class Action settlement.

[i]n any action brought under section 4 of this act, if the court finds that a person, firm or corporation is wilfully using or has wilfully used a method, act or practice declared by section 3 of this act, the Attorney General ... acting in the name of the Commonwealth ... may recover, on behalf of the Commonwealth ... a civil penalty of not exceeding one thousand dollars ($1,000) per violation, which civil penalty shall be in addition to other relief which may be granted under sections 4 and 4 .1 of this act.
73 P.S. § 201-8(b). While a trial court has authority to impose a civil penalty for "each improper act, each false statement and each inadequate disclosure," the

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

court abuses its discretion if such penalties are merely duplicative fines. *Commonwealth ex rel. Corbett v. Ted Sopko Auto Sales and Locator,* 719 A.2d 1111, 1114 (Pa.Commw.Ct.1998)(quoting *Commonwealth ex rel. Kane v. Flick,* 33 Pa.Commw. 553, 560, 382 A.2d 762, 765 (1978)).

Here, Count I of the Amended Complaint incorporates by reference all of the preceding allegations. Am.Compl. at ¶ 132. The gravamen of Plaintiff's UTP/CPL claim is that between 1992 and April of 1996, defendants engaged in deceptive and/or fraudulent behavior, as well as conducting a misleading ad campaign, in suppressing the conclusion of their own commissioned study that Synthroid was bioequivalent with other levothyroxine sodium drugs. *Id.* at ¶ ¶ 134-145, 382 A.2d 762. Plaintiff also alleges that the individual defendants Schimelfenig and Bowman induced Commonwealth employees to make representations about Synthroid in order to induce Pennsylvania physicians, pharmacists, health care professionals to prescribe Synthroid and to induce consumers to request and continue using Synthroid. *Id.* at ¶ ¶ 135-140, 382 A.2d 762. In particular, Plaintiff sets forth the following allegations:

*10 141. Pennsylvania's consumers were harmed by Defendants' fraudulent and deceptive representations and actions when those consumers and their physicians made choices about their use of levothyroxine products.

142. Each misleading advertisement placed by Defendants and appearing in Pennsylvania is subject to civil penalty.

143. Defendants' unfair and/or deceptive acts or practices have limited the ability of numerous consumers to obtain or evaluate information material to their decision about the purchase of levothyroxine products.

144. The Commonwealth and its citizens have suffered and will continue to suffer irreparable harm unless the acts and practices complained of herein are permanently enjoined.

145. Each claim for payment of Synthroid is tainted by Defendants' actions and is subject to civil penalty...

*Id.* at ¶ ¶ 141-45, 382 A.2d 762. Plaintiff also explicitly alleges that Defendants designed, manufactured, marketed and sold Synthroid. *Id .* at ¶ ¶ 3-10, 382 A.2d 762. In addition, Plaintiff alleges that it paid 62,193 Synthroid claims for PACE and 51,604 Synthroid claims for Pennsylvania Medicaid in the first quarter of 1999. *Id.* at ¶ 117, 382 A.2d 762.

Accepting these allegations as true, as this court must when reviewing a demurrer, this court cannot now say with certainty that Plaintiff has failed to state a cause of action under the UTP/CPL or that "each claim for payment" for Synthroid could not be subject to civil penalty as constituting a "misrepresentation" by Defendants or those whom they induced to act. Rather, Defendants' Preliminary Objection to Count I seems to center on the propriety of assessing civil penalties for each "claim for payment" of Synthroid. Clearly, civil penalties may not be assessed if they are merely duplicative fines, but it is up to this court's discretion whether such penalties need to be assessed. *Commonwealth ex rel. Corbett,* 719 A.2d at 1114. However, the issue of whether civil penalties can be assessed for each time Synthroid was prescribed by Pennsylvania doctors and pharmacists, as a result of Defendants' actions, is better left to later discovery. Moreover, Plaintiff properly requests civil penalties for each misleading advertisement placed by Defendants and appearing in Pennsylvania. Am.Compl. at ¶ 142. Further, it is reasonable to infer that Defendants, as the manufacturers of Synthroid, would expect payment and to eventually make a profit each time Synthroid was sold, regardless of whether they, themselves, made the actual demand for payment.

Therefore, with respect to Plaintiff's prayer for civil penalties, this court overrules the Preliminary Objection to Count I.

Nonetheless, recently, this court explicitly held that the UTP/CPL does not include a right to demand a jury trial. *See Greiner v. Erie Ins. Exchange, et al.,* February 2000, No. 3053, slip op. at 15 (C.P.Phila.Nov. 15, 2000) (Herron, J.). Moreover, it is clear that only the court and not a jury may award injunctive relief. For this reason, Defendants' Motion to Strike the Jury Demand as to Count I is granted.

**C. Plaintiff Fails to State a Cause of Action for Breach of Contract by Failing to Allege a Breach of a Duty Imposed by the Contract and There Is No Independently Enforceable Duty of Good Faith; Defendants Other than Knoll May Not Be Held Liable for Breach of Contract Where They Are Not Parties to the Contract**

*11 Defendants first argue that Plaintiff fails to state a claim for breach of contract in Count II of its Amended Complaint since Plaintiff fails to allege that Defendant Knoll failed to perform any of its responsibilities under the Rebate Agreement and Addendum. Defs. Mem. of Law, at 9-10. Defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

further assert that Plaintiff cannot rely on any express or implied covenant of good faith and fair dealing because no separate cause of action for breach of the duty of good faith exists absent a breach of contract. Defs. Reply Br., at 6. In addition, Defendants assert that Count II should be dismissed as to the other Defendants besides Knoll since only Knoll and the Pennsylvania Department of Aging are parties to the Rebate Agreement and Addendum. Defs. Mem. of Law, at 9 n. 5. In response, Plaintiff contends that the Rebate Agreement and Addendum incorporated an "integrity" provision and that the law in Pennsylvania allows for a breach of the implied duty of good faith and fair dealing. Pl. Mem. of Law, at 13-14. *See* Am.Compl., Exhibit A--Rebate Agreement and Addendum.

In Count II of the Amended Complaint, Plaintiff sets forth the following allegations, in pertinent part:

147. On February 10, 1993, the Commonwealth, acting through the Department of Aging, entered into a Rebate Agreement with Knoll Pharmaceuticals, in part relating to Synthroid. That contract has been renewed yearly and was amended by Addendum dated March 21, 1997. Defendant Carter Eckert signed the Addendum as President of Knoll. The Contract and Addendum are attached hereto as Exhibit "A".

148. Contracts with the Commonwealth and its agencies contain General Terms and Conditions as a separate attachment.

149. In general, those terms and conditions contain promises to deal fairly and honestly with the Commonwealth.

150. Defendants' false, misleading and deceptive claims regarding Synthroid and other levothyroxine sodium products in advertising, promotion or labeling was and is not fair or honest.

151. Defendants have breached their contract with the Commonwealth as set forth above.

Am.Compl. at ¶¶ 147-149.

To establish a cause of action for breach of contract, the plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.1999) (citations omitted). Further, "[w]hile not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Id.* at 1058.

It is true that Plaintiff alleged the existence of a contract between itself and Knoll, as well as generally averring that Knoll, in misrepresenting the nature of Synthroid, breached either the express "integrity" provision in the General Terms and Conditions or the implied contractual duty of good faith. Further, in the "wherefore" clause to Count II, Plaintiff requests judgment against Defendants in an amount in excess of $100,000. Am.Compl. at 28. Though Plaintiff does not explicitly plead resultant damages from Defendants' purported breach of contract, its allegations sufficiently imply such damages. Despite these allegations, this court finds that Plaintiff has failed to state a breach by Knoll of its performance responsibilities under the Rebate Agreement and Addendum ("Agreement") and that Pennsylvania law does not allow for a cause of action for an independent breach of the duty of good faith in these circumstances.

*12 First, the Agreement requires that Knoll, as manufacturer is responsible for the following: (1) to "provide the Department the average manufacturer price for the calendar quarter;" (2) to "provide the identity of all of [its] covered prescription drugs;" (3) to "calculate and ... make a rebate payment to the Department;" and (4) "to pay to the Department an amount sufficient to cover all costs associated with providing electronic claims data to [Knoll] for verification purposes." Am.Compl., Exhibit A at 2-4. Further, under the General Terms and Conditions, attached and incorporated into the Agreement, Knoll promised it "shall maintain the highest standards of integrity in the performance of this Agreement and shall take no action in violation of state or federal laws, regulations, or other requirements that govern contracting with the Commonwealth." *Id.*, Attachment C, at ¶ 3(B). Plaintiff's allegations do not state how Knoll failed to perform its contractual duties, other than generally averring a breach of the duty of good faith. Though Plaintiff attempts to state a claim for breach of contract, the gravamen of the Amended Complaint, in its entirety, sounds more properly in fraud. Further, this court need not accept as true allegations in the complaint which conflict with exhibits attached to it. *Philmar*, 389 Pa.Super. at 300, 566 A.2d at 1254.

Moreover, Pennsylvania law does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract. The duty of good faith is said to arise under the law of contracts, not under the law of torts. *Creeger Brick and Building Supply Inc. v. Mid-State Bank and Trust Company, SEDA*, 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989). As a matter of law, "[e]very contract in Pennsylvania imposes on each party a duty of good faith and fair

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

dealing in its performance and its enforcement." _Donahue v. Federal Express Corp. .,_ 753 A.2d 238, 242 (Pa.Super.Ct.2000) (citations omitted). Good faith has been defined as "[h]onesty in fact in the conduct or transaction concerned." _Id._ (quoting 13 Pa.C.S.A. § 1201 of the Uniform Commercial Code). Types of bad faith in the performance of a contract include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. _Somers v. Somers,_ 418 Pa.Super. 131, 136, 613 A.2d 1211, 1214 (1992) (quoting Restatement (2d) of Contracts § 205(d)). The duty of good faith does not compel the parties to surrender rights which it has been given by statute or by the contractual terms. _Creeger Brick,_ 385 Pa.Super. at 36-37, 560 A.2d at 154. The underlying principle behind the implied covenant of good faith is "that neither party shall do anything to injure or destroy the rights of the other party to receive the benefits of the agreement." _CMS Enterprise Group v. Ben & Jerry's Homemade, Inc.,_ 1995 WL 500847, at * 7 (C.P. Northhampton Aug. 3, 1995) (citation omitted). However, the duty of good faith, whether express or implied in a contract, does not create independent substantive rights nor can it override the express contractual terms. _Id. See also, Marlin v. Borg-Warner Corp.,_ 1991 WL 346305, at *7 (C.P. York Aug. 14, 1991)("There may be an express or implied covenant of good faith and fair dealing in any contract between the parties, but if so, its breach is a breach of contract rather than an independent breach of a duty of good faith and fair dealing.")(citing _Engstrom v. John Nuveen & Co.,_ 668 F.Supp. 953, 958 (E.D.Pa.1987).

**\*13** Therefore, even taking all of Plaintiff's allegations as true, this court does not find that it has stated a cause of action for breach of contract since Plaintiff failed to allege that Knoll failed to or improperly performed one of its duties imposed by the Agreement and, absent a breach of contract, there is no independent duty of good faith under Pennsylvania law.

Moreover, Defendant BASF and the individual defendants may not be held liable where they are not parties to the contract. "[I]t is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." _Electron Energy Corp. v. Short,_ 408 Pa.Super. 563, 571, 597 A.2d 175, 178 (1991)(holding that corporate president cannot be liable for breach of contract where he is not a party to the contract). _See also,_

_Fleetway Leasing Co. v. Wright,_ 697 A.2d 1000, 1003 (Pa.Super.Ct.1997)("a person who is not a party to a contract cannot be held liable for breach by one of the parties to a contract"); _Commonwealth v. Noble C. Quandel Company,_ 137 Pa.Commw. 252, 260, 585 A.2d 1136, 1140 (1991)(same).

In addition, a parent corporation is not normally liable for the contractual obligations of its subsidiary, even if that corporation is its wholly-owned subsidiary. _Norbers v. Crucible, Inc.,_ 602 F.Supp. 703, 706 (W.D.Pa.1985) (citation omitted). "Such liability occurs only by application of the 'alter ego' theory to pierce the corporate veil." _Id. See also, Commonwealth v. Vienna Health Prods., Inc.,_ 726 A.2d 432, 434 (Pa.Commw.Ct.1999)("a corporation is to be treated as a separate and independent entity even if its stock is owned entirely by one person."); _Shared Communications, Servs. of 1800-80 JFK Blvd., Inc. v. Bell Atlantic Props.,_ 692 A.2d 570, 573 (Pa.Super.Ct.1997)("[a]lthough a parent and a wholly owned subsidiary do share common goals, they are still recognized as separate and distinct legal entities."). There is a strong presumption against piercing the corporate veil. _Lumax Indus., Inc. v. Aultman,_ 543 Pa. 38, 41- 42, 669 A.2d 893, 895 (1995). The general standard for piercing the corporate veil is "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." _Id._ (quoting _Zubik v. Zubik,_ 384 F.2d 267, 272 (3d Cir.1967), _cert. denied,_ 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). _See also, Kiehl v. Action Mfg. Co.,_ 517 Pa. 183, 190, 535 A.2d 571, 574 (1987)(adhering to the same standard for piercing the corporate veil); _Village At Camelback Property Owners Ass'n, Inc. v. Carr,_ 371 Pa.Super. 452, 461, 538 A.2d 528, 532-33 (1988)(relating the same standard as it applies to shareholders of the corporation);

It is also true that "[w]here a party contracts with a corporation through a corporate agent who acts within the scope of his authority and reveals his principal, the corporate principal alone is liable for breach of contract." _Daniel Adams Associates, Inc. v. Rimbach Publishing, Inc.,_ 360 Pa.Super. 72, 79, 519 A.2d 997, 1000-01 (1987)(stating also that "[a] corporation is a creature of legal fiction which can 'act' only through its officers, directors and other agents.") (citations omitted).

**\*14** Here, Plaintiff does not set forth any allegations which would compel this court to pierce the corporate veil and treat BASF as the "alter ego" of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

Knoll, in order to make BASF liable for a breach of contract. Plaintiff also does not allege that the individual employees acted outside the scope of their employment. Rather, as will be addressed in more detail below, Plaintiff's claim against Defendants in Count IV, sounding in civil conspiracy, belies an attempt to blend BASF and Knoll into the same legal entity or to hold that the individual defendants acted outside the scope of their employment, which would otherwise make them liable for a breach of contract.

Therefore, this court sustains Defendants' Preliminary Objections to Count II as against Knoll, BASF and the other Defendants.

D. Plaintiff Has Properly Pled its Unjust Enrichment Claim in the Alternative to its Breach of Contract Claim and Has Sufficiently Stated the Elements for Such a Claim

In a footnote, Defendants reassert their Preliminary Objection to Count IX of the Amended Complaint-- the unjust enrichment claim, arguing that this quasi-contractual doctrine is inapplicable where the claims are based on a written contract. Def. Mem. of Law, at 10 n. 6. Plaintiff, in turn, contends that the Commonwealth has properly pled its unjust enrichment claim in the alternative. Pl. Mem. of Law, at 15.

Clearly, Plaintiff is permitted to plead causes of action in the alternative. *See* Pa.R.C.P. 1020(c). Further, the complaint is not defective merely because the causes of action are inconsistent or conflicting. *Baron v. Bernstein,* 175 Pa.Super. 608, 610, 106 A.2d 668, 669 (1954). Plaintiff may properly plead causes of action for breach of contract and unjust enrichment in the same complaint. *See, e.g., J.A. & W.A. Hess, Inc. v. Hazle Township,* 465 Pa. 465, 468, 350 A.2d 858, 860 (1976)(holding that trial court erred in refusing to consider unjust enrichment claim along with breach of contract claim); *Lampl v. Latkanich,* 210 Pa.Super. 83, 88, 231 A.2d 890, 892 (1967).

Unjust enrichment is a quasi-contractual doctrine based in equity which requires the plaintiff to establish the following: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Wiernik v. PHH U.S. Mortgage Corp.,* 736 A.2d 616, 622 (Pa.Super.Ct.1999), *appeal denied,* 561 Pa. 700, 751

A.2d 193 (2000).

In Count IX of the Amended Complaint, Plaintiff clearly alleges that it conferred a benefit on the defendant pharmaceutical companies by paying them for the increased medical costs for Synthroid under Medicaid and state medical assistance programs, along with state employee health insurance. Am.Compl. at ¶ ¶ 206-208. Plaintiff also alleges that the defendant pharmaceutical companies "knew of and appreciated the benefits that Pennsylvania's payment of increased health care costs conferred on them." *Id.* at ¶ 209, 751 A.2d 193. Further, Plaintiff alleges that Defendants' acceptance and retention of the benefits (e.g., the millions of dollars of "ill-gotten" profits) from their unfair and deceptive acts would be inequitable, unconscionable and unjust. *Id.* at ¶¶ 209-211, 751 A.2d 193.

**\*15** Taking these allegations as true, it is clear that Plaintiff sufficiently plead a claim for unjust enrichment and is allowed to plead in the alternative. Therefore, Defendants' Preliminary Objection to Count IX is overruled.

E. Plaintiff Has Stated a Cause of Action under Pennsylvania's Medicaid Fraud Abuse and Control Act, 62 P.s. § § 1401 *et Seq.,* by Alleging That Defendants Directly and Indirectly Caused Exposure to the Commonwealth to Claims for Payment for Synthroid Through Providers Instead of less Expensive Bioequivalents

Defendants demur to Count III, arguing that Plaintiff failed to allege facts that Defendants submitted any claims, let alone false ones, to Plaintiff for the payment of Synthroid. Defs. Mem. of Law, at 11-12. Defendants also contend that Plaintiff cannot rely on Pennsylvania's Medicaid Fraud Abuse and Control Act, 62 P.S. § § 1401 *et seq.* ("Act"), since Plaintiff's allegations of "false claims" are apparently allegations of misrepresentation and are not the types of claims for payment prohibited by the Act. *Id.* In response, Plaintiff asserts that there is common law and statutory support for a cause of action for "false claims" and that the Act is especially pertinent to the present case since the Commonwealth has spent millions of dollars providing Synthroid to its elderly and impoverished citizens on medical assistance. Pl. Mem. of Law, at 16-17.

Section 1407(a) of the Act makes it unlawful, *inter alia,* to:
  (1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))

or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information for the purpose of obtaining authorization for furnishing services or merchandise under medical assistance.

* * *

(2) Solicit or receive or to offer to pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in case or in kind from or to any person in connection with the furnishing of service or merchandise for which payment may be in whole or in part under the medical assistance program ...

* * *

(7) Submit a claim which misrepresents the description of services, supplies or equipment dispensed or provided ...

* * *

(12) Enter into an agreement, combination or conspiracy to obtain or aid another to obtain reimbursement or payments for which there is not entitlement. 62 P.S. § 1407(a)(1), (a)(2), (a)(7), and (a)(12). A person who violates any provision of subsection (a) is guilty of a felony of the third degree with a maximum penalty of $15,000 and seven years imprisonment. Id. at § 1407(b)(1). In addition, the Commonwealth also has the authority to immediately terminate a provider agreement, upon notice to the provider, and institute a civil suit against such provider for twice the amount of excess benefits or payments plus legal interest from the date the violation(s) occurred. Id. at § 1407(c)(1). [FN7]

FN7. The term "provider" is defined in the Act as "any individual or medical facility which signs an agreement with the department to participate in the medical assistance program, including, but not limited to, licensed practitioners, pharmacies, hospitals, nursing homes, clinics, home health agencies and medical purveyors." 62 P.S. § 1401. Since neither party presents any argument for excluding Defendants from the Act, this court will assume that they may be included. Knoll, especially, may be construed as a "provider" since it is a party to the Rebate Agreement and Addendum, which is a requisite

agreement for getting reimbursed from PACE and the General Assistance Program. Am.Compl., Exhibit A, at 1.

*16 The Pennsylvania Supreme Court has stated that "[t]he purpose of the Medicaid Fraud and Abuse Control Act is 'to eliminate fraudulent, abusive and deceptive conduct and practices that may occur." Commonwealth v. Lurie 524 Pa. 56, 61, 569 A.2d 329, 331 (1990). As such, a violation under § 1407(a) requires knowing, willful or intentional conduct. Id. at 64, 569 A.2d 329, 569 A.2d at 333.

In Count III of the Amended Complaint, Plaintiff alleges the following, in pertinent part:
153. Defendants' products are widely distributed in the Commonwealth through a variety of channels. Defendants exercise control over the marketing and sales activity of the distributors of Synthroid in the Commonwealth.
154. By not providing notice of material facts, Defendants intended to, or carelessly and recklessly caused, exposure of the Commonwealth to claims for or payment of artificially inflated prices for Synthroid through providers, directly and indirectly, and/or claims for or payments of Synthroid purchases, instead of less expensive bioequivalent medicine.
155. The Commonwealth was unaware of the above-concealed facts, and would not have acted as it did had the Defendants disclosed the false and fraudulent facts of which they were aware as set forth above.
156. Defendants acted knowingly and willingly, or with careless disregard.
157. The Commonwealth is uniquely affected by the Defendants' actions due to the Commonwealth's administration of health programs for its citizens, expenditures of public funds to pay for Defendants' Synthroid products, and expenditures for health insurance of state employees.
Am.Compl. at ¶ ¶ 153-57. Plaintiff also alleges that certain individual Defendants induced Commonwealth employees to make written representations about Synthroid and the lack of its bioequivalent in other levothyroxine sodium products. Id. at ¶ ¶ 98-100. Further, Defendants allegedly sent these representations along with an alert sheet and other letters from the corporate defendants to health care professionals in the Commonwealth to persuade Pennsylvania physicians and pharmacists to prescribe Synthroid. Id . at ¶ ¶ 101-107. In addition, Plaintiff alleges that Defendants acted in concert with each other in deceiving the Commonwealth and suppressing the truth about

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Synthroid. *Id.* at ¶¶ 19-21.

Accepting these allegations as true, along with the other facts alleged in the Amended Complaint, it appears that Plaintiff may have stated a violation under § 1407(a)(1), (a)(7) and/or (a)(12) of the Medicaid Fraud and Abuse Control Act. Therefore, the demurrer to Count III is overruled.

F. Plaintiff Sufficiently States a Cause of Action in Count IV for Civil Conspiracy since a Parent Corporation and its Subsidiary Are Treated as Separate Legal Entities Absent Allegations to Treat Them as Each Other's "Alter-Ego;" Respective Employees of Both Corporations May Be Found Liable for Civil Conspiracy

Defendants demur to Count IV of the Amended Complaint, contending that Plaintiff has not alleged more than one conspirator since a corporate entity cannot be found to have conspired with itself and the individual defendants are not alleged to have acted outside the scope of their authority as employees. Defs. Mem. of Law, at 13-14. Plaintiff, in turn, asserts that Pennsylvania law allows for a civil conspiracy claim to be made against a parent corporation and one or more of its subsidiaries. Pl. Mem. of Law, at 18-20.

*17 "In order to state a cause of action for civil conspiracy, a plaintiff must show 'that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.' " *Brinich v. Jencka,* 757 A.2d 388, 403 (Pa.Super.Ct.2000) (citations omitted). Moreover, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Rutherfoord v. Presbyterian-University Hosp.,* 417 Pa.Super. 316, 333-34, 612 A.2d 500, 508 (1992)(determining that agents of a corporation acting within the scope of their employment cannot be liable for civil conspiracy). *See also, Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 212-13, 412 A.2d 466, 473 (1979)(holding that sole shareholder/director/officer of a corporation could not conspire with his corporation as a matter of law).

Nonetheless, the Pennsylvania Superior Court has held that there is no per se rule that a parent and a wholly owned subsidiary cannot be found liable for civil conspiracy. *Shared Communications Services,* 692 A.2d at 573. Rather, a parent and its subsidiary are separate and distinct entities and the corporate form will not be disregarded lightly. *Id.* at 573-74. In

addition, the court made the following distinction:

Unlike a sole shareholder/officer/director, who is necessarily involved in every intimate aspect of his corporation, a corporate parent may have varying degrees of involvement with its corporate subsidiary. While it is certainly possible to find a parent/subsidiary arrangement that is as close as the individual/corporate relationship in *Thompson Coal* [*supra* ], it is equally possible to find a parent/subsidiary relationship that is entirely distant.

*Id.* at 574. Under circumstances where a parent and its subsidiary are essentially corporate alter egos, a count for civil conspiracy will not lie because of the absent requisite plurality of actors. *Id.* A court decides this issue on a case-by-case basis. *Id.*

Here, the Amended Complaint alleges that prior to April, 1995, BASF, Knoll and Boots were separate and distinct legal entities with no corporate affiliation. Am.Compl. at ¶¶ 5-9. [FN8] After April, 1995, Boots merged with Knoll, which then became a subsidiary of BASF. *Id.* at ¶¶ 5-6. Defendants Eckert, Mayor, Kurtz and Bowman are alleged to be officers, directors, and/or employees of Boots. *Id.* at ¶¶ 11-13, 16. Defendants Buhler and Kuhl are representatives of Knoll. *Id.* at ¶¶ 14-15. Defendant Schimelfenig was an employee and account executive for Knoll/BASF. *Id.* at ¶ 17. The individual defendants allegedly participated actively in suppressing the facts about Synthroid as related to other levothyroxine sodium drugs. Further, as alleged, each defendant is sued individually, as a primary violator, and as an aider, abettor and co-conspirator who substantially assisted in the wrongful conduct complained of in the Complaint. *Id.* at ¶¶ 19-21. In addition, beginning in 1990, Defendants had reached a common agreement to participate in conduct to suppress, misrepresent and manipulate the Synthroid bioequivalency research and to engage in deceptive advertising and marketing of Synthroid. *Id.* at ¶¶ 159-163.

FN8. Plaintiff also asserted that in 1990, Boots acquired Flint, which commissioned Dr. Dong's Study. Pl. Mem. of Law, at 19 n. 7.

*18 Under the facts alleged, this court must hold that Defendants may be treated as separate suable entities who could be found liable for civil conspiracy, especially since the alleged wrongful conduct dates back to 1990 and the merger did not take place until 1995. Further, as analyzed in Part C of this Opinion, Plaintiff sets forth no allegations which compel this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court to treat BASF and Knoll as each other's corporate "alter ego". Therefore, the demurrer to Count IV is overruled.

G. Plaintiff Has Failed to State a Cognizable Claim under the Unclaimed Property Law, 72 P.s. § § 1301.1 et seq., since the District Court Holds Exclusive Jurisdiction over the Disbursement of All Settlement Funds from the Multi-district Class Action

Finally, Defendants demur to Count X of the Amended Complaint, asserting that a claim under the Unclaimed Property Law, [FN9] 72 Pa.C.S.A. § 1301.1 et seq., is an in rem proceeding and Plaintiff fails to aver that any of the funds are physically located within the Commonwealth in order for the court to have jurisdiction over the action. Defs. Mem. of Law, at 15. At oral argument, Defendants' counsel contended that the funds alleged in this count are the settlement funds that are under the jurisdiction of the United States District Court for the Northern District of Illinois and are not located in Pennsylvania. N.T. 14. Plaintiff, in turn, asserts that the language of the Unclaimed Property Law is broader than Defendants' position and that the settlement funds of the multi-district class action represent an intangible "chose in action." Pl. Mem. of Law, at 20-21. Further, plaintiff argues that it is undisputed that thousands of Synthroid consumers live in Pennsylvania and that the Commonwealth's claim is therefore authorized. Id. at 21.

> FN9. Defendants explicitly refer to this law as the "Escheat Statute" which is the previous name of the law that was repealed in 1971.1929, April 9, P.L. 343, art. XIII, § § 1301-1304, repealed 1971, Aug. 9, P.L. 286, No. 74, § 30, eff. Jan. 1, 1972. All future references to this law in this Opinion shall be understood as the "Unclaimed Property Law," added 1982, Dec. 9, P.L. 1057, No. 248, § 5, imd. effective.

The Unclaimed Property Law provides the following in pertinent part:
 (a) All abandoned and unclaimed property and property without a rightful or lawful owner as hereafter set forth is subject to the custody and control of the Commonwealth:
 1. If it is tangible and physically located within the Commonwealth; or
 2. If it is intangible, and (i) the last known address of the owner, as shown by the records of the holder, is within the Commonwealth; or (ii) the last

known address of the owner as shown by the records of the holder is within a jurisdiction, the laws of which do not provide for the escheat or custodial taking of such property, and the domicile of the holder is within the Commonwealth; or (iii) no address of the owner appears on the records of the holder and the domicile of the holder is within the Commonwealth.... or (iv) no address of the owner appears on the records of the holder and the domicile of the holder is not within the Commonwealth, but it is proved that the last known address of the owner is in the Commonwealth.
72 Pa.C.S.A. § 1301.2(a). Under the clear language of this statute, Defendants are correct that tangible property must be physically located within the Commonwealth for this court to exercise jurisdiction over it. See O'Connor v. Sperry and Hutchinson Co., 32 Pa.Commw. 599, 603, 379 A.2d 1378, 1380 (1977), aff'd, 488 Pa. 340, 412 A.2d 539 (1977)(noting that "an action in escheat ... is essentially an in rem proceeding ... in order for the court to have jurisdiction over the cause of action in escheat, it must have jurisdiction over the res ... [or] the court is without power to adjudicate with respect to the subject matter."). See also, Texas v. New Jersey, 379 U.S. 674, 677, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965)("With respect to tangible property, real or personal, it has always been the unquestioned rule in all jurisdictions that only the State in which the property is located may escheat.").

*19 Here, it appears that plaintiff seeks the portion of the proposed settlement (in excess of $200 million) in the multi-district class action to which Pennsylvania consumers are entitled. See Am.Compl. at ¶ ¶ 213-15. Therefore, one characterization of this property may be the right to receive settlement funds in the future which is an intangible "chose in action." [FN10] See Texas, 379 U.S. at 677 (stating that "intangible property, such as a debt which a person is entitled to collect, is not physical matter which can be located on a map."). Under the Unclaimed Property Law, the Commonwealth may take custody over unclaimed intangible property if the last known address of the holder is within the Commonwealth. 72 Pa.C.S.A. § 1301.2(a)(2). See also, Texas, 681-82 (holding that the State of the creditor's last known address as shown by the debtor's books and records has the power to escheat the debt; otherwise the right to escheat belongs to the debtor's State of corporate domicile, subject to the claims of another State upon proof that the last known address of the creditor was within its borders). See also Delaware v. New York, 507 U.S. 490, 498-500, 113 S.Ct. 1550, 123 L.Ed.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1807788 (Pa.Com.Pl.))**

211 (1993).

> FN10. "Chose in Action" includes "a right to personal things of which the owner has not the possession" and "personalty to which the owner has a right of possession in future, or a right of immediate possession." Black's Law Dictionary at 219 (5th ed.1979) (citations omitted).

Notwithstanding how the property in question is characterized, the real issue before this court is whether the Northern District of Illinois has exclusive jurisdiction over the unclaimed settlement funds so that this court is divested of jurisdiction over Plaintiff's claim. The Final Order of the District Court included the following pertinent passage:

> The Court retains continuing and exclusive jurisdiction over the parties to the Stipulation for purposes necessary or proper: (1) for the consummation, administration, supervision, interpretation, construction and/or enforcement of the Stipulation and the Final Order and Judgment; (2) for supervising the management and disbursement of the funds in the First Settlement Fund and/or the Second Settlement Fund; (3) to protect and effectuate the Final Order and Judgment; and (4) for any other necessary purpose.

Final Order at ¶ 31. Similarly to this court's analysis above regarding the *parens patriae* claims, this court should not now interfere with the District Court's jurisdiction over the MDL Class Action settlement since such interference would frustrate that settlement. *See Baldwin,* 770 F.2d at 336- 37. Moreover, it is unclear that any of the settlement funds is currently unclaimed. Under these circumstances, this court finds that it does not have jurisdiction over the settlement funds.

Therefore, Defendants' Preliminary Objection to Count X is sustained.

CONCLUSION

For the reasons stated, this court sustains the demurrers to Counts II and X, pursuant to Rule 1028(a)(4), Pa.R.C.P. Counts II and X are dismissed without prejudice. [FN11] This court also sustains, in part, the Preliminary Objection regarding the Commonwealth's standing to bring *parens patriae* claims insofar as the Commonwealth is barred from bringing claims on behalf of its citizens, except for those citizens who opted out or were not included in the MDL Class Action. The Commonwealth may assert direct claims for restitution or civil penalties, as well as its claim for injunctive relief on its own

behalf or as *parens patriae*. The motion to strike the jury demand as to the UTP/CPL claim in Count I is granted. This court also overrules the Preliminary Objections to Counts I, III, IV and IX. An Order will be entered this date in accord with this Opinion.

> FN11. In the event that Plaintiff can cite a cognizable breach of contract claim against Defendants or should Plaintiff demonstrate that the District Court disbursed the settlement funds and those funds remain unclaimed, then Plaintiff may reassert its claims under Counts II and X.

ORDER

**\*20** AND NOW, this 15th day of March, 2001, upon consideration of Defendants' Preliminary Objections to the Amended Complaint, Plaintiff's opposition thereto, all other matters of record, having heard oral argument on these Preliminary Objections and in accord with the Opinion being filed contemporaneously with this Order, it is hereby ORDERED as follows:

1. The Preliminary Objection regarding the Commonwealth's standing to bring *parens patriae* claims is Sustained in part and Overruled in part, insofar as the Commonwealth is only barred from bringing restitution claims on behalf of those Pennsylvania citizens who released Defendants in the Multi-District Class Action Settlement. In any event, the Commonwealth may bring restitution claims, claims for injunctive relief and claims for civil penalties on its own behalf and on behalf of those Pennsylvania citizens who opted out or were not included in the settlement.

2. the demurrers to Counts I; III; IV; and IX are Overruled.

3. the demurrers to Counts II and X are Sustained; Counts II and X are dismissed without prejudice; and

4. the motion to strike the jury demand as to the claim under the UTP/CPL is Granted.

Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

Westlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255
**(Cite as: 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255)**

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
CONTINENTAL ILLINOIS NATIONAL BANK
AND TRUST COMPANY OF CHICAGO, as
Trustee for
the Holders of Certain Subordinated Debentures,
Plaintiff,
v.
HUNT INTERNATIONAL RESOURCES
CORPORATION, Planet Investment Corporation,
Nelson
Bunker Hunt, William H. Hunt, Douglas H. Hunt,
Houston B. Hunt, and Glen Adams,
Defendants.
Charles DIMSTON, Jerome Berko, Enid Mindich
and Phyllis Dworkin, Plaintiffs,
v.
PLANET INVESTMENT CORPORATION, Hunt
International Resources Corporation, Nelson
Bunker Hunt, William H. Hunt, Douglas H. Hunt,
Houston B. Hunt, Glen Adams and
Manufacturers Hanover Corporation, Defendants.
**CIVIL ACTION Nos. 7888, 7844.**

Submitted Oct. 21, 1986.
Decided Feb. 27, 1987.
**\*\*258** Kevin Gross, of Morris and Rosenthal, P.A.,
Wilmington, and Michael P. Fuchs, of Wolf, Popper,
Ross, Wolf & Jones, New York City, for plaintiff in
Civil Action No. 7844.

Robert K. Payson and Richard L. Horwitz, of Potter,
Anderson & Corroon, Wilmington, Harold L.
Kaplan, Kelly R. Welsh and Locke E. Bowman III, of
Mayer, Brown & Platt, Chicago, Illinois, for **\*\*259**
Continental Illinois National Bank and Trust
Company of Chicago.

John H. Small, James L. Holzman, Vernon R.
Proctor, and Norman L. Pernick, of Prickett, Jones,
Elliott, Kristol and Schnee, Wilmington, Shank,
Irwin & Conant, Dallas, Texas, of counsel, for Planet
Investment Corporation and the individual
defendants.

R. Franklin Balotti and Gregory P. Williams, of
Richards, Layton & Finger, Wilmington, Melvin L.

Cantor and Thomas C. Rice, of Simpson, Thacher &
Bartlett, New York City, for defendant
Manufacturers Hanover Corporation.

Lawrence C. Ashby and Stephen E. Jenkins, of
Ashby, McKelvie & Geddes, Wilmington, for
HIRCO Trustee.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

**\*1** Presently pending are motions to dismiss Count
III of the complaint in Civil Action No. 7888 and to
amend the complaint in Civil Action No. 7844. These
two separate but related civil actions arise out of a
default on interest payments on Series A
Subordinated 9 7/8 % Debentures due December 31,
2004 (the "Debentures"), issued by Hunt
International Resource Corporation ("HIRCO")
pursuant to an Indenture Agreement between HIRCO
and Continental Illinois National Bank and Trust
Company of Chicago ("Continental").

The first action, *Charles Dimston, et al. v. Planet
Investment Corporation, et al.,* C.A. No. 7844 (the
"Dimston action"), filed on November 15, 1984, is a
class action on behalf of all holders of the Debentures
against HIRCO, its corporate parent, Planet
Investment Corporation ("Planet"), Manufacturers
Hanover Corporation ("MHC"), and HIRCO's
directors, most of whom were also directors of
Planet. The Dimston complaint charges that the
defendants, aided and abetted by MHC, caused
HIRCO to make fraudulent conveyances of its assets
to its parent company, Planet, and that as a result,
HIRCO became financially unable to make
semiannual interest payments on the Debentures.
The Dimston plaintiffs seek, **\*\*260** essentially, to
recover the unpaid interest and principal on the
Debentures.

The second action, Civil Action No. 7888 (the
"Continental action"), filed on December 14, 1984, is
brought on behalf of all the Debenture holders, by
Continental as Trustee under the Indenture. Named
as defendants are the persons and corporations that
were named as defendants in the Dimston action,
excluding MHC. The Continental complaint alleges
that HIRCO breached the Indenture agreement
(Count I), that the defendants caused HIRCO's assets

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255
**(Cite as: 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255)**

to be fraudulently conveyed to Planet (Count II), that the defendants committed breaches of their fiduciary duties and fraud (Count III), and that the individual defendants caused dividends to be illegally declared (Count IV). Continental seeks recovery of the unpaid principal and interest on the debentures, plus money damages.

Between December 1984 and March 1985, discovery was conducted in both actions on a consolidated basis. On March 26, 1985, an involuntary petition for reorganization was filed against HIRCO in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, under Chapter 11 of the United States Bankruptcy Code. (*In re Hunt International Resources Corporation,* Case No. 385-30831-M-11). Initially, the Bankruptcy Court stayed both the Dimston and the Continental actions under Section 362 of the Bankruptcy Code. On July 29, 1985, that court confirmed its prior stay of those two actions, except that with respect to the Continental action, the stay order provided that the stay "[will] not apply to the claims asserted by Continental in Count III [which alleges breach of fiduciary duty and fraud] against defendants other than HIRCO...."

Prompted by that provision of the stay order, the Dimston plaintiffs sought leave from this Court to file an amended complaint that, in essence, would track Count III of the Continental complaint. The defendants in the Dimston action oppose that motion. After briefing was completed on the Dimston plaintiffs' motion to amend, but before oral argument was held, the individual defendants and Planet moved to dismiss Count III of the Continental complaint. After additional briefing, both pending motions--defendants' motion to dismiss Count III of the Continental complaint and the Dimston plaintiffs' motion for leave to amend their complaint--were argued. This is the decision of the Court on those motions.

I.

*2 What next follows is a summary of the pertinent facts alleged **261 in the Dimston and Continental complaints. HIRCO, a Delaware corporation, issued the Debentures on February 22, 1978 in connection with a merger of HIRCO and Great Western United Corporation ("GWU"). In the 1978 merger, the former shareholders of GWU became holders of the Debentures, which were issued pursuant to an Indenture Agreement between HIRCO and Continental, as Indenture Trustee.

On October 2, 1979, a second merger took place, as

a result of which HIRCO became a wholly-owned subsidiary of Planet. In the 1979 merger, a newly formed subsidiary of Planet ("Newco") was caused to merge with HIRCO, which became the surviving corporation. The consideration for the merger was $47 million in cash and 3,000 shares of HIRCO $3.00 preferred stock, which Planet contributed to HIRCO to fund the merger. Of the $47 million, $37 million was financed by a loan from Manufacturers Hanover Trust Company ("Manufacturers"), a subsidiary of MHC, which was guaranteed by defendants Nelson and William Hunt. By the terms of that loan, Planet was obligated to make twelve semiannual repayment installments beginning in April, 1981.

Planet's sole asset is its 100% common stock interest in HIRCO. All of Planet's outstanding common stock is owned by nine testamentary trusts of which the children of defendants Nelson Bunker Hunt and William H. Hunt are the primary life beneficiaries. Defendants Nelson Bunker Hunt and William H. Hunt own all of Planet's outstanding nonvoting 10% cumulative preferred stock.

It is alleged that between 1980 and 1984, the individual defendants caused assets of HIRCO to be periodically transferred to Planet in exchange for promissory notes of Planet, to enable Planet to meet its repayment obligations to Manufacturers. Plaintiffs charge that the transfers of HIRCO assets to Planet were for inadequate consideration, were concealed by the individual defendants, and were the cause of HIRCO's inability to pay the interest on the Debentures which fell due on June 30, 1984. HIRCO's continuing failure to make interest payments allegedly caused HIRCO to be in default under the terms of the Indenture, and caused Continental, as Indenture Trustee, to accelerate the principal amount due on the Debentures.

II.

Three arguments are advanced as to why Count III of the Continental complaint should be dismissed. First, the Continental defendants assert that as a matter of law no fiduciary duty is owed **262 to the Debenture holders or to Continental as Indenture Trustee. Second, they contend that Count III fails to state a claim for fraud. Finally, defendants argue that a "No Recourse" provision in the Indenture bars the claims asserted in Count III.

The Dimston defendants argue that the aforementioned grounds for dismissal should apply equally to preclude the Dimston plaintiffs from filing a proposed amended complaint [FN1] that would be

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255
(Cite as: 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255)

virtually identical to Count III of the Continental action. MHC (which is named as a defendant only in the Dimston action) joins in that opposition, on the ground that since no fiduciary duty is owed to the Debenture holders, MHC could not have aided and abetted a breach of any such duty. MHC also argues that the proposed amended complaint fails to state a cognizable claim against it, and that insofar as the amended Dimston complaint seeks to level charges against MHC, it violates the Bankruptcy Court's stay order.

A.

*3 I first turn to the defendants' argument that the fiduciary duty claim in Count III of the Continental complaint should be dismissed because no fiduciary duty is owed to the Debenture holders. In support of that argument the defendants rely upon *Norte & Co. v. Manor Healthcare Corp.*, Del.Ch., C.A. Nos. 6827 and 6831, Berger, V.C. (November 21, 1985), *reargument denied*, May 30, 1986, wherein the Court dismissed a claim brought on behalf of debenture holders for "lack of entire fairness" arising out of a merger involving the corporation that had issued the debentures. In arriving at that result, the Court in *Norte & Co.* relied upon *Harff v. Kerkorian*, Del.Supr., 347 A.2d 133 (1975) (per curiam). In *Harff*, then-Chancellor Quillen held that the duty owed by an issuing corporation and its directors to the holders of convertible debentures was not a fiduciary duty, and that the rights of debenture holders were contractual and confined to the terms of the indenture. *Harff v. Kerkorian*, Del.Supr., 324 A.2d 215, 222 (1974), *aff'd in part and rev'd in part*, 347 A.2d 133 (1975).

**263 On appeal the Delaware Supreme Court reversed a grant of summary judgment to the defendants, but it did so on the ground that fraud had been sufficiently alleged in the complaint to give rise to a triable issue of fact. *Harff*, 347 A.2d at 134. In its opinion the Supreme Court observed that the debenture holders had been found not to have stated a valid claim for breach of fiduciary duty, "because the right upon which the plaintiffs rely is not within the terms of the Indenture to which the plaintiffs are confined in the absence of 'fraud, insolvency, or a violation of a statute.' " 347 A.2d at 134. (Citation omitted).

In *Norte & Co.*, Vice Chancellor Berger analyzed the Supreme Court's decision in *Harff* as follows:

The Supreme Court's choice of language [in *Harff*] strongly suggests that it was not disturbing the trial court's holding that convertible debenture holders may not state a claim for breach of fiduciary duty. Moreover, given the fundamental distinctions between stockholders and creditors, highlighted above, I must assume that the Supreme Court would have explained the basis for its holding if it had determined that plaintiffs had standing to maintain a breach of fiduciary duty claim.

*Norte & Co., supra*, at 13-14.

Continental argues that the defendants' reliance upon *Norte & Co.* is misplaced. It urges that the correct interpretation of the Supreme Court's decision in *Harff* is that a debenture holder's claim for breach of fiduciary duty is not dismissible where (as here) fraud is also alleged. Continental insists that *Norte & Co.* does not hold to the contrary, because in *Norte & Co.* (unlike *Harff* and the instant case) the debenture holders had not alleged fraud in conjunction with their breach of fiduciary duty claim. [FN2] Alternatively, Continental argues that *Norte & Co.* misinterpreted the Supreme Court's decision in *Harff*, which, if properly understood, holds that the debenture **264 holders were entitled to pursue a claim for breach of fiduciary duty.

*4 In my opinion neither of Continental's positions is tenable. As I read *Harff*, that case holds that (i) a debenture holder has no independent right to maintain a claim for breach of fiduciary duty, and (ii) in the absence of fraud, insolvency or a statutory violation, a debenture holder's rights are defined by the terms of the indenture. *See Harff* 347 A.2d at 134. I therefore concur in the interpretation of *Harff* in *Norte & Co., viz.*, that a debenture holder may not maintain a claim for breach of fiduciary duty (as distinguished from fraud) against the issuing corporation and its directors. The proposition-- announced in *Harff* and followed in *Norte*--that the relationship between a corporation and its directors and debenture holders is contractual, not "fiduciary," in nature, is well settled in this state. *See Jebwab v. MGM Grand Hotels, Inc.*, Del.Ch., 509 A.2d 584, 593 n. 5 (1986); *Katz v. Oak Industries Inc.*, Del.Ch. 508 A.2d 873, 879 (1986); *Revlon, Inc. v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173, 182 (1986); *Mann v. Oppenheimer & Co.*, Del.Supr., 517 A.2d 1056, 1061 (1986).

Accordingly, to the extent that Count III of Continental's complaint alleges a claim for breach of fiduciary duty it must be dismissed.

B.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 4
Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255
**(Cite as: 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255)**

Next, the defendants argue that Count III of the Continental complaint is barred by the "No Recourse" provision of Article Nine of the Indenture between HIRCO and Continental, which provides:

Section 9.01.    No recourse whatsoever, either directly or through the Company or any trustee, receiver or assignee, shall be had in any event or in any manner against any past, present or future stockholder, director or officer of the Company by virtue of any past, present or future constitution, statute or rule of law or equity or by the enforcement of any assessment or penalty or by any legal or equitable proceeding or otherwise for the payment of the principal of or premium or interest on the Debentures or any of them or for any claim based thereon or otherwise in respect to the Debentures or of the Indenture; the Indenture and each of the Debentures being each a corporate obligation only, all individual liability of whatsoever kind or nature of, and all rights and claims against, such stockholders, directors and officers founded in any way directly **265 or indirectly upon the Indenture or the Debentures or growing out of the issue thereof or out of the indebtedness evidenced thereby are expressly waived and released by the acceptance of the Debentures by each of the holders thereof and as a condition of a part of the consideration for the issue thereof and the execution and delivery of the Indenture.

Continental responds that although Article Nine of the Indenture might bar a contract claim for principal and interest on the Debentures, it does not bar a tort claim against the individual defendants based on fraudulent conduct.

The Delaware case law is supportive of Continental's argument.    In *Harff v. Kerkorian, supra,* the defendants argued that a class action, brought on behalf of debenture holders pursuant to an indenture, was barred by the "no action" clause of the indenture. The plaintiffs countered that the "no action" clause was inapplicable, because their claim was for an alleged breach of fiduciary duty, totally outside of the indenture.    On that issue the Chancellor held:

*5 It is apparent that unless there are special circumstances which affect the rights of the debenture holders as creditors of the corporation, e.g., fraud, insolvency, or violation of a statute, the rights of the debenture holders are confined to the terms of the Indenture Agreement pursuant to which the debentures were issued.

324 A.2d at 222.    Because he found that the plaintiffs had not alleged insolvency, a statutory violation, or fraud, and also because he found that no fiduciary duty was owed, it became unnecessary for the Chancellor to address the "no action" clause defense.    *See* 324 A.2d at 221-22.

In reversing and remanding the case for trial on the issue of fraud, the Supreme Court stated:

The claim of fraud is thus clearly sounded in the complaint;    and it permeates the plaintiffs' position vis-a-vis the Indenture limitations....

347 A.2d at 134.    By recognizing that the debenture holders were entitled to proceed on a claim of fraud independent of the terms and limitations of the Indenture, the Supreme Court in *Harff* implicitly ruled that the no-action clause of the indenture would not bar an action for fraud.

**266 More recently, in *Mann v. Oppenheimer & Co.,* Del.Supr., 517 A.2d 1056 (1986) the Supreme Court again implicitly recognized that a debenture holder may proceed on the basis of common law fraud, independent of the terms and limitations of the indenture, including its "no recourse" clause. *Mann* was a class action by debenture holders who alleged that the defendant, Oppenheimer & Co. ("Oppenheimer") had committed violations of Sections 17(a) and 12(2) of the Securities Act of 1933, as well as common law fraud, in an exchange offer involving subordinated debentures.    The indenture contained a "no action" clause similar to the one involved in *Harff.* Relying upon that clause, Oppenheimer argued that the debenture holders were barred from pursuing their claims, because they had failed to satisfy the requirement of the no-action clause, that debenture holders give notice to the indenture trustee before filing suit.    *See Mann v. Oppenheimer & Co.,* Del.Ch. No. 7275, Walsh, V.C. (April 4, 1985), at 5-6.    Relying upon this Court's decision in *Harff,* the Vice Chancellor rejected that argument, holding that "[e]ven though [the] dispute may implicate the terms of the Indenture, the allegations of fraud and Federal security law violations are sufficient to support an independent action." *Id.* at 6.    (Citation omitted).    The Court proceeded to grant summary judgment in favor of Oppenheimer, on the ground that the plaintiff had shown no basis for either the alleged violation of § 12(2) of the 1933 Act or the claim of common law fraud. *Id.* at 14-15.

On appeal, the Delaware Supreme Court reversed on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255
(Cite as: 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255)

the ground that the plaintiffs should have been permitted to take discovery in connection with the common law fraud claims. *Mann,* 517 A.2d 1056, 1060-61, 1063 (1986). In so doing, the Supreme Court again recognized the right of a debenture holder to maintain a claim for common law fraud independent of the terms and limitations of the indenture.

*6 Based upon the foregoing authorities, I conclude that the "no recourse" clause involved here, even if perhaps broader in scope than those involved in *Harff* and *Mann,* does not operate to bar Continental from maintaining an action for common law fraud.

C.

The final issue relating to Count III of the Continental complaint (captioned "Breach of Fiduciary Duty and Fraud") is whether Continental has pleaded with requisite particularity a legally sufficient claim for fraud under Court of Chancery Rules 9(b) and 12(b). The defendants contend that Continental has not.

**267 In Delaware, "[t]he elements of 'actionable fraud' consist of a false representation of a material fact knowingly made with intent to be believed to one who, ignorant of its falsity, relies thereon and is thereby deceived." *Harman v. Masoneilan International, Inc.,* Del.Supr., 442 A.2d 487, 499 (1982), citing *Twin Coach Co. v. Chance Vought Aircraft, Inc.,* Del.Super, 163 A.2d 278 (1960). Chancery Rule 9(b) requires that the complaint state with particularity the circumstances constituting the alleged fraud. Ch.Ct.R. 9(b). That requirement appears to be satisfied where sufficient circumstances are alleged so as to fairly apprise the defendant of the basis for the claim. *See Halpern v. Barran,* Del.Ch., 313 A.2d 139, 143 (1973); *Dann v. Chrysler Corporation,* Del.Ch., 174 A.2d 696, 700 (1961).

The defendants first argue that Count III fails to allege that the asserted misstatements or omissions were made with intent that they be believed. While Count III does not specifically use the word "intent", paragraph 35 does allege that the defendants "made knowingly, or with reckless disregard for the truth, untrue statements of material fact...." That is legally sufficient. *See In Re National Student Marketing Litigation,* 413 F.Supp. 1156, 1158, and n. 9 (D. DC 1976), quoting 2A Moore's Federal Practice ¶ 9.03 (the requirement that fraud be stated with particularity does not require particularization of allegations of fraudulent intent). Similarly, the requirement that the plaintiff and the debenture

holders must have been "ignorant of the falsity" of the representations is sufficiently pleaded in paragraph 39, which alleges that the defendants "deceived Continental and the Debenture holders as to the facts of this diversion."

With respect to the other elements of fraud, however, the complaint is wanting. In particular, Count III fails to allege circumstances showing specifically how Continental and the Debenture holders relied to their detriment upon the misstatements and/or omissions. Similarly, the complaint is barren of particularized factual allegations as to how the alleged fraud proximately caused Continental to suffer damages.

The Court is mindful that in pleading common law fraud under Rule 9(b), a plaintiff need not allege evidentiary details. *Strasburger v. Mars Inc.,* Del.Super., 83 A.2d 101, 104 (1951) (interpreting identical Superior Court Rule 9(b)); *Nutt v. A.C. & S., Inc.,* Del.Super., 466 A.2d 18, 23 (1983) (same). However, "it is essential that the precise theory of fraud with supporting specifics appear in the complaint." *Nutt,* 466 A.2d at 23. In that respect, and for the reasons previously noted, Count III of the Continental **268 complaint is deficient under Rule 9(b). The defendants' motion to dismiss will be granted, with leave to Continental to file an amended Count III in conformity with this Opinion.

III.

*7 What remains to be decided is the Dimston plaintiffs' motion for leave to file an amended complaint. The defendants, including MHC, argue that the Dimston plaintiffs' proposed amended complaint violates the Dallas Bankruptcy Court's stay order, which pertinently provides:

1. That the plaintiffs Dimston, et al, are stayed from any further action in the Delaware Court that would bind or obligate Hunt International Resources Corp. ("HIRCO") as to any liability claimed by the plaintiffs, or would finally determine any recovery for the benefit of HIRCO from its directors, controlling persons, or parent, on the theory of fraudulent conveyance or the payment of illegal dividends, as alleged in paragraphs 28, 29, 33, and 34 of the *Dimston* complaint.

2. The stay does apply to (i) the commencement or continuation of any proceeding or action against the Debtors and (ii) the commencement of any proceeding or action against any and all past and present officers, directors and affiliates of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255
(Cite as: 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255)

Page 6

Debtors to the extent that such proceedings or actions assert claims based upon the "corporate trust fund" doctrine, the "denuding the corporation" theory (as those terms are described in *In re Mortgage America Corp.*, 714 F.2d 1266 (5th Cir.1983) and as that doctrine and theory are applied to the Debtors), or an alleged fraudulent conveyance or transfer by the Debtors (collectively, the "barred claims").

The directors and corporate defendants urge that the proposed amended complaint in *Dimston* asserts claims based on the "corporate trust fund" doctrine and "on the theory of fraudulent conveyance," both of which are barred by the stay order. MHC contends that insofar as the proposed amended complaint levels allegations against it, the allegations amount to a claim of fraudulent conveyance and, thus, are likewise violative of the stay order.

Counsel have cited authority for the proposition that this Court has the power to interpret the Bankruptcy Court's stay order **269 to determine whether its terms would be violated by the proposed amended complaint. In deference to the Bankruptcy Court, I feel that the opportunity to make that determination should be afforded in the first instance to the court that issued the stay. There being no procedural obstacle to the Dimston plaintiffs' seeking such a determination, I will refrain from ruling on the Dimston plaintiffs' motion in order to permit the Bankruptcy Court to determine that issue. Continental should likewise seek leave of the Bankruptcy Court to proceed in this Court, in the event that it seeks to amend Count III of its present complaint.

\* \* \*

Counsel shall confer upon, and submit, an appropriate form of order implementing the rulings contained in this Opinion.

FN1. At oral argument counsel for the Dimston plaintiffs advised the Court that a "Second Proposed Amended Complaint" had been prepared and submitted with the expectation that if the first Amended Complaint were found legally insufficient, the Court would see fit to consider the second proposed amended complaint. Briefing and oral argument, however were directed only toward the first proposed amended complaint. Accordingly, in deciding this motion, it is only that complaint which the Court has considered. Transcript of Oral Argument, at 64-65.

FN2. In support of its reading of *Norte & Co.*, Continental points out that on reargument in *Norte & Co.*, the plaintiff was granted leave to file an amended complaint which set forth a fraud claim. Continental attempts to distinguish *Katz v. Oak Industries, Inc.*, Del.Ch., 508 A.2d 873 (1986), and *MacAndrews & Forbes v. Revlon, Inc.*, Del.Ch., 501 A.2d 1239 (1985), *aff'd*, Del.Supr., 506 A.2d 1973 (1986) on that same basis (*i.e.*, failure to allege fraud). In those cited cases, standing was denied to debenture holders to maintain a claim for breach of fiduciary duty against the issuer corporation and its directors.

Not Reported in A.2d, 1987 WL 55826 (Del.Ch.), 13 Del. J. Corp. L. 255

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

**Westlaw.**

Slip Copy                                                                                     Page 1
Slip Copy, 2006 WL 2847238 (3rd Cir.(Pa.))
**(Cite as: 2006 WL 2847238 (3rd Cir.(Pa.)))**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Jeffrey S. DICKSON; Davis Yacht Sales, Inc.,
Appellants
v.
Wendell MURPHY, Jr.; Mark Roberts.
No. 05-4728.

Submitted Under Third Circuit LAR 34.1(a) Sept. 13, 2006.
Filed Oct. 6, 2006.

On Appeal from the United States District Court for the Middle District of Pennsylvania, (D.C. No. 04-cv-01687), District Judge: Honorable James M. Munley.

Charles A. Shaffer, Mahler, Shaffer, Pugliese & Finnegan, Kingston, PA, for Appellants.

Albert Bates, Jr., Reed Smith, Pittsburgh, PA, for Appellees.

Before FUENTES, FISHER and McKAY, [FN*] Circuit Judges.

> FN* The Honorable Monroe G. McKay, United States Circuit Judge for the Tenth Circuit, sitting by designation.

OPINION OF THE COURT

FISHER, Circuit Judge.

**\*1** Jeffrey S. Dickson and Davis Yacht Sales, Inc.

appeal the District Court's dismissal of their claims against Wendell Murphy, Jr. The issue on appeal is whether the District Court erred in granting a motion to dismiss for failure to join indispensable parties who were signatories of the two agreements at issue in this case. For the reasons that follow, we will affirm the dismissal.

I.

As we write only for the parties, who are familiar with the factual context and the procedural history of the case, we will set forth only those facts necessary to our analysis.

Wendell Murphy, Jr., entered into an Asset Purchase Agreement ("Agreement") to purchase the assets of Davis Yacht Sales, Inc. ("Yacht Sales") and Davis & Dickson Enterprises, Inc. ("Enterprises, Inc."). [FN1] Jeffrey S. Dickson is the sole owner and President of Yacht Sales, the sole owner of Davis & Dickson Enterprises, LLC ("Enterprises, LLC"), and a fifty-percent owner of Enterprises, Inc. The other fifty percent of Enterprises, Inc. is owned by Carson R. Davis, Jr., and Barbara Davis. In turn, Enterprises, Inc. owns one hundred percent of Davis Boat Works, Inc., Carolina Yacht Interiors, Inc., Carolina Welders, Inc., Buddy Davis & Associates, Inc., Mill Landing Marine Maintenance Center, Inc., and Davis Resources Management, Inc. The sellers on the Agreement are all of these corporations, Carson Davis, Barbara Davis, and Dickson. Murphy entered into a second agreement, the Boat Agreement, to purchase a boat and boat slips from Davis Boat Works, Inc., Yacht Sales, and Dickson. Both of these agreements provide that they are governed by North Carolina law and lawsuits under the Boat Agreement must be brought in North Carolina courts.

> FN1. Although the caption still includes Mark Roberts as an appellee, Mr. Roberts is no longer a party to this dispute because Dickson and Yacht Sales voluntarily dismissed their claim against Mr. Roberts on July 16, 2005.

Dickson is a citizen of Pennsylvania and Yacht Sales is a Pennsylvania corporation. Every other corporation that signed the two agreements are North Carolina corporations, and Murphy, Carson Davis and Barbara Davis are citizens of North Carolina.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2847238 (3rd Cir.(Pa.))
**(Cite as: 2006 WL 2847238 (3rd Cir.(Pa.)))**

Page 2

Murphy decided not to go through with the terms of the Agreement. Dickson and Yacht Sales brought suit in the United States District Court for the Middle District of Pennsylvania against Murphy based on diversity of citizenship. The complaint alleged various fraud, contract and quasi-contract claims related to the two agreements. Murphy and others brought suit in a North Carolina state court against Dickson, Yacht Sales and all of the other signatories to the two agreements. Then, Murphy moved to dismiss the federal court complaint for failure to join indispensable parties or in the alternative improper venue. The District Court granted Murphy's motion to dismiss for failure to join indispensable parties. Dickson and Yacht Sales now appeal.

## II.

The District Court had jurisdiction over this diversity suit pursuant to 28 U.S.C. § 1332 because for diversity purposes Dickson and Yacht Sales are citizens of Pennsylvania, and Murphy is a citizen of North Carolina. We have appellate jurisdiction over the final order of the District Court dismissing the claims pursuant to 28 U.S.C. § 1291.

**\*2** Federal Rule of Civil Procedure 19 determines whether a non-joined party is indispensable and must be joined in the action. The first step of the analysis is to decide whether the non-joined party must be joined. If the court determines that the non-joined party must be joined and that joinder is not feasible, the next step of the analysis is to determine whether the non-joined party is indispensable under Rule 19(b). If the court determines that the non-joined party is indispensable, the suit must be dismissed. See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 404 (3d Cir.1993).

We exercise plenary review over the District Court's determinations that are conclusions of law, but we review only for clear error the subsidiary findings of fact. We review for abuse of discretion the District Court's Rule 19(b) determination that a party is indispensable and that dismissal is required because the party's joinder would destroy subject matter jurisdiction in diversity.

## A.

Rule 19(a) states in pertinent part:
> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the

person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). The District Court found that the non-joined parties were necessary parties because they were signatories to one or both of the agreements.

Dickson and Yacht Sales argue that the non-joined parties are not necessary to this action because the non-joined corporations have no claims being pursued in this action. However, the complaint alleges that Murphy interfered with the business of Davis Boat Works, Inc., a non-joined party, by contacting vendors. Additionally, under the terms of the Agreement, the non-joined parties as sellers contracted to conduct its operations according to its ordinary and usual course of business. Considering the complaint alleges breach of contract claims, whether or not the sellers fulfilled their side of the bargain is very relevant to this action.

We recognized a distinction between co-obligees and co-obligors in the context of Rule 19(a) in our decision in Janney Montgomery Scott, Inc. See Janney, 11 F.3d at 408. In Janney, we were faced with the question of whether Rule 19(a) required joinder of a co-obligor to a contract. See id. at 402. In our analysis we explained that generally a co-obligor was not necessary. See id. at 413. However, co-obligees usually are indispensable parties. We pointed to one commentator's explanation that "[j]oint obligees, ... [as compared to joint obligors], usually have been held indispensable parties and their nonjoinder has led to a dismissal of the action." Id. (citing Federal Practice & Procedure § 1614 at 182-85). Additionally, the Advisory Committee note to Rule 19(a) explains that:
> **\*3** [c]lause (1) stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court. The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter.

Bank of Am. Nat'l Trust & Savs. Assoc. v. Nilsi, 844 F.2d 1050, 1055 n. 5 (3d Cir.1988) (citing Fed.R.Civ.P. 19(a) Advisory Committee note to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amended rule).

Dickson, Yacht Sales and the other non-joined signatories are co-obligees under the agreements. An obligee is "[o]ne to whom an obligation is owed." *See Black's Law Dictionary* 1106 (8th ed.2004). Murphy owed obligations to all of the signatories. The claims that are being pursued in this action relate to the conduct of Murphy in relation to Davis Boat Works, Inc. Adjudication of this action absent the non-joined signatories will not further the public interest of preventing lawsuits on the same essential matter. Because we agree with the District Court that the non-joined signatories to the agreements are necessary parties under Rule 19(a), we will affirm this finding by the District Court.

Rule 19(a) requires joinder of necessary parties if feasible. It is not disputed that joinder in this case is not feasible because joinder of any of the non-joined parties will defeat complete diversity. Like Murphy, all of the non-joined parties are citizens of North Carolina for diversity purposes. In order for a federal court to have jurisdiction in a diversity suit, complete diversity of citizenship must exist. *See City of Indianapolis v. Chase Nat'l Bank,* 314 U.S. 63, 69 (1941). The District Court did not err in determining that the non-joined parties were necessary parties under Rule 19(a) and that their joinder was not feasible.

### B.

When a court determines that joinder is necessary under Rule 19(a) and that joinder is not feasible, the court must then determine whether the non-joined party is indispensable under Rule 19(b). *See HB General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1190 (3d Cir.1996). The question under Rule 19(b) is whether "in equity and good conscience" the court should proceed without the non-joined parties. Fed.R.Civ.P. 19(b). Rule 19(b) provides factors that should be considered by the court in making the determination of whether to proceed or dismiss the action. Those factors include:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**\*4** Fed.R.Civ.P. 19(b). This is not an exhaustive list

of factors that can be considered, but they are the most important factors. *See Gardiner v. V.I. Water & Power Auth.,* 145 F.3d 635, 640-41 (3d Cir.1998). The District Court determined that the rights of the absent signatories would be prejudiced if they were not present, and that Dickson and Yacht Sales had an adequate remedy in state court. It considered the pending North Carolina state court case that involves the same issues as the present action and includes all of the signatories as defendants. Additionally, the District Court considered the fact that both of the agreements provide that North Carolina law applies and the Boat Agreement provides that any lawsuits should be brought in North Carolina state court.

The first factor favors dismissal because the analysis under this factor "overlaps considerably with the Rule 19(a) analysis." *Gardiner v. V.I. Water & Power Auth.,* 145 F.3d 635, 641 n. 4 (3d Cir.1998). As we explained in our Rule 19(a) analysis, a judgment rendered in this action may prejudice Murphy because he may be subject to multiple identical claims and multiple or inconsistent judgments in other actions.

The second factor considers whether a judgment or a remedy can be shaped in order to lessen the prejudice of not having the non-joined parties involved in the action. Dickson and Yacht Sales argue that there is an identity of interests between them and the other signatories because all of the people with the power to bring suit on behalf of the non-joined signatories are before the District Court; Dickson controls all of the absent corporations. In support of this argument, Dickson and Yacht Sales rely on our decision in *HB General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185 (3d Cir.1996). In *HB General,* we held that in a suit between partners of a partnership the partnership itself was a necessary party under Rule 19(a), but was not indispensable under Rule 19(b). *Id.* at 1190-91. We determined that non-joinder of the partnership would not leave the defendant partner subject to multiple identical claims because the court could protect his interests by enjoining "all of the partners from bringing a subsequent suit on behalf of the [p]artnership." *Id.* In the present case, the District Court cannot enjoin all of the individuals or corporations who could bring a subsequent lawsuit. Dickson is not the sole shareholder of Enterprises, Inc. and the other shareholders are not before the Court; the Court cannot enjoin the other shareholders from bringing a subsequent derivative suit on behalf of the corporation. Furthermore, there are two absent signatories who are individuals, Carson Davis and Barbara Davis. There is a difference between an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

absent entity and an absent human being. *HB General,* 95 F.3d at 1193 n. 3. Relief cannot be shaped so as to lessen prejudice to Murphy.

The third factor, whether a judgment will be adequate, also weighs in favor of dismissal. The United States Supreme Court has interpreted this factor to be a determination of the interest of the public in having a dispute completely, consistently and efficiently resolved. *See Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 111 (1968). Under the agreements in the present action, the non-party signatories can bring claims against Murphy and Murphy has brought claims against them. Such additional litigation is inefficient and could lead to inconsistent determinations.

**\*5** Finally, the fourth factor of whether an adequate remedy exists for the plaintiff if the action is dismissed is answered in the affirmative. Although this factor is not dispositive, it is clear that the North Carolina courts would be an appropriate forum. *See Bank of Am. Nat'l Trust & Savs. Assoc. v. Nilsi,* 844 F.2d 1050, 1055 (3d Cir.1988).

In balancing these factors, we find that the District Court did not abuse its discretion in determining that the non-joined parties were indispensable to this action under Rule 19(b).

### III.

Because we agree with the District Court's determination that the non-joined parties are indispensable under Rule 19, we will affirm the judgment of the District Court.

Slip Copy, 2006 WL 2847238 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

• 05-4728 (Docket) (Oct. 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

Westlaw.

Not Reported in A.2d                                                          Page 1
Not Reported in A.2d, 2006 WL 299053 (Pa.Com.Pl.)
**(Cite as: 2006 WL 299053 (Pa.Com.Pl.))**

**C**

Only the Westlaw citation is currently available.

Court of Common Pleas of Pennsylvania,
Philadelphia County.
Paul HILLIER and Louise Hillier, h/w
v.
M.I.S.I., LP, P.I.S.I., Inc., Stephen Izzi, and
Northeast Executive Abstract
Agency, Inc.
v.
STAHL CAMPBELL REALTY
No. 0513 JAN.TERM 2004.

Jan. 27, 2006.

**Background:** Real estate vendor brought action against purchaser, general partner, limited partner, and title company for breach of contract and misrepresentation after purchasers refused to consummate purchase due to environmental problems.

**Holdings:** The Court of Common Pleas, Philadelphia County, January 2004 No. 0513, Abramson, J. held that:

(1) purchaser's delay in notifying vendor that purchaser was terminating contract based on environmental problems was unreasonable;

(2) limited partner was not personally liable for buyer's obligations;

(3) general partner was subject to purchaser's liabilities;

(4) title company was not liable under breach of contract claim;

(5) gist of the action doctrine barred vendor's fraudulent and negligent misrepresentation claims against purchaser and its general partner;

(6) there was no evidence that limited partner directed that false deposit slip be sent to vendor such that limited partner was liable to vendor for fraudulent misrepresentation;

(7) title company was liable for fraudulent misrepresentation for false deposit slip; and

(8) there was no evidence regarding title company's wealth such that court could award punitive damages to vendor.

Judgment for plaintiff.

**[1] Vendor and Purchaser** ☞119

400k119 Most Cited Cases
Purchaser's two-month delay in notifying vendor that purchaser was terminating real estate contract based on environmental problems was unreasonable under contract provision which allowed purchaser to terminate contract within a reasonable period of time after the inspection; purchaser cancelled the agreement the day before the settlement date, vendor had no indication that purchaser was not going to go through with the agreement until she received notice on the day before the settlement, and vendor was ready, willing, and able to settle on the property.

**[2] Partnership** ☞371

289k371 Most Cited Cases
Purchaser's limited partner was not personally liable for buyer's obligations
to vendor of real property. 15 Pa.C.S. § 8533.

**[3] Partnership** ☞353

289k353 Most Cited Cases
Purchaser's general partner was subject to purchaser's liabilities in connection with failed purchase of real estate.

**[4] Partnership** ☞371

289k371 Most Cited Cases
Purchaser's limited partner was not personally liable as a general partner in connection with purchaser's failed purchase of real estate; sales agreement clearly stated purchaser was a limited partnership, and there was no evidence vendor only signed the agreement because she believed that limited partner was a general partner with personal liability.

**[5] Vendor and Purchaser** ☞11

400k11 Most Cited Cases
Title company was not liable to vendor of real property under vendor's breach of contract claim, as title company was not a party to the contract, but was a fiduciary stakeholder that was supposed to hold escrow money.

**[6] Fraud** ☞32

184k32 Most Cited Cases
Gist of the action doctrine barred vendor's fraudulent and negligent misrepresentation claims against purchaser and its general partner, as all of the alleged fraudulent and negligent acts arose in the course of the parties' contractual relationship and stemmed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2006 WL 299053 (Pa.Com.Pl.)
**(Cite as: 2006 WL 299053 (Pa.Com.Pl.))**

from duties that were imposed by the contract itself.

**[7] Fraud** 🔑**32**
184k32 Most Cited Cases
Gist of the action doctrine did not bar vendor's claims for fraudulent misrepresentation and negligent misrepresentation against purchaser's limited partner and title company, as they were not parties to real estate sales agreement between vendor and purchaser.

**[8] Fraud** 🔑**13(2)**
184k13(2) Most Cited Cases
There was no evidence or argument that purchaser's limited partner directed that false deposit slip be sent to vendor or knew that such was the plan and did nothing to prevent it such that limited partner was liable to vendor for fraudulent misrepresentation.

**[9] Deposits and Escrows** 🔑**13**
122Ak13 Most Cited Cases
Title company was liable to vendor for fraudulent misrepresentation, where title company made out a false deposit slip in response to a specific inquiry regarding escrow deposit, and title company sent deposit slip to vendor even though deposit had in fact not been made, check was in its file, there was no bank receipt for the deposit, and no bank statement could have reflected the deposit.

**[10] Deposits and Escrows** 🔑**13**
122Ak13 Most Cited Cases
There was no evidence regarding title company's wealth such that court could award punitive damages to vendor, who was sent false deposit slip by title company with regard to escrow payment; court could not determine what amount of punitive damages would constitute punishment or deterrence.

**[11] Vendor and Purchaser** 🔑**330**
400k330 Most Cited Cases
Real estate vendor failed to show fair market value of the subject property at the time that purchaser breached purchase agreement and thus vendor was not entitled to damages for lost profits.

JUDGMENT

ABRAMSON, J.

**\*1** AND NOW, this 27th day of January, 2006, the Court finds in favor of plaintiff Louise Hillier and against M.I.S.I., LP, P.I.S.I., Inc., and Northeast Executive Abstract Agency, Inc. in the amount of $50,000. Plaintiff may collect a single judgment of

$50,000 from any one or all of these defendants.

FINDINGS OF FACT
1-55. The Joint Stipulation of Facts is incorporated herein by reference. (See Court Exhibit).

56. A standard agreement (the "Agreement") for the sale of the property at 1801 County Line Road, Southampton, PA (the "Property") was entered into between Louise M. Hillier as the seller ("seller") and M.I.S.I. Limited Partnership (MISI) as the buyer ("buyer"). Exh. P-1; Stipulated Facts, at ¶ 5. It was signed by Louise M. Hillier for the seller and Stephen Izzi ("Izzi") for the buyer, who signed his name with the word "partner" after his signature. Exh. P-1; N.T. vol. 2, 8:1-5 (Aug. 23, 2005).

57. P.I.S.I., Inc. ("PISI") is the general partner of MISI. See Stipulated Facts, at ¶ 1. Izzi is a limited partner of MISI and a shareholder of PISI. See Stipulated Facts, at ¶ 2. Izzi is the shareholder of Northeast Executive Abstract Agency, Inc. ("Northeast"). Izzi is also an officer of PISI and Northeast. Id.

58. The Agreement was entered into by the parties on August 30, 2003. Exh. P-1; Stipulated Facts, at ¶ 5.

59. The Agreement stated that settlement was to occur on or before November 30, 2003. Exh. P-1; Stipulated Facts, at ¶ 10.

60. The Agreement contained a "time is of the essence" provision. That provision specifically stated that "the said date for settlement, and all other dates and times referred to for the performance of any of the obligations of this Agreement are agreed of the essence of this Agreement and are binding." Exh. P-1; Stipulated Facts, at ¶ 10.

61. Paragraph 29(B) of the Agreement stated:
BUYER SHALL HAVE FIFTEEN (15) DAYS AFTER THE WRITTEN APPROVAL OF THIS AGREEMENT, BY SELLER, TO INSPECT THE PROPERTY. IF, FOR ANY REASON, BUYER FINDS ENVIRONMENTAL PROBLEMS THAT WOULD COST IN EXCESS OF FIVE THOUSAND DOLLARS ($5,000) THEN BUYER HAS THE RIGHT TO TERMINATE THIS AGREEMENT OF SALE WITH ALL DEPOSIT MONIES RETURNED TO THE BUYER. Exh. P-1.

62. Keating Environmental Management, Inc.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

("Keating"), the environmental engineering company retained by buyer, performed an environmental inspection on the Property on September 5, 2003. N.T. vol. 1, 154:1-7 (Aug. 22, 2003).

63. After its environmental inspection, Keating issued a report on September 13, 2003. The report stated, in part:
> It is Keating Environmental's recommendation that the UST system be closed by excavation and removal. At that time, further investigation of potential subsurface soils or groundwater contamination can be performed. In the interim, the remaining fuel oil in the tank should be removed and properly disposed of in accordance with applicable environmental regulations. The estimated cost to remove the UST and perform assessment sampling is approximately $5,000. This cost does not include any remediation activities that may be necessary. Exh. P-2.

**\*2** 64. Buyer received the Keating report on or around September 13, 2003. N.T. vol. 2, 24:6-16 (Aug. 23, 2005). Seller received the Keating report on or around September 16, 2003. N.T. vol. 1, 45:10-17 (Aug. 22, 2005).

65. Following Keating's September 13, 2003 report, a settlement date of Friday, November 28, 2003 was agreed upon by the parties. Stipulated Facts, at ¶ 18.

66. At no time between the receipt of the Keating report and November 26, 2003 did buyer indicate to seller that buyer was going to cancel the Agreement because of environmental problems. N.T. vol. 1, 50:17-22 (Aug. 22, 2003).

67. On November 26, 2003, two days before the scheduled settlement, buyer wrote to seller requesting a one week extension of the settlement date (until December 5, 2003). The letter stated that the extension was being requested because "of environmental and termite issues" on the Property. Exh. P-3.

68. Seller rejected buyer's request to extend the settlement date by letter dated November 26, 2003. The letter stated that "seller is ready and able to complete settlement on Friday, November 28, 2003." Exh. P-4; N.T. vol. 1, 55:2-13 (Aug. 22, 2003).

69. On November 27, 2003, in response to seller's rejection of buyer's request, buyer notified seller by letter that buyer was electing its right to terminate the Agreement under Paragraph 29(b) of the Agreement.

Exh. P-5.

70. On December 1, 2003, buyer's attorney called Keating to ask for clarification of the costs set out in the September 13, 2003 environmental report. N.T. vol. 2, 48:13-17 (Aug. 23, 2003).

71. This request for clarification occurred after seller had brought it to buyer's attention that the September 13, 2003 report did not say that costs were in excess of $5,000. N.T. vol. 2, 49:8-13 (Aug. 23, 2003); Stipulated Facts, at ¶ 20.

72. After Keating received the request from buyer's attorney for clarification of its September 13, 2003 report, Keating issued a second report dated December 1, 2003. Stipulated Facts, at ¶ 20.

73. Keating's second report stated, in part:
> The cost to perform the initial environmental investigation activities at the two identified areas of recognized environmental concern was $2,663.76 ... As was stated in our 13 September 2003 letter, the estimated cost to remove the UST system and perform the necessary soil assessment activities is $5,000 ... In summary, the minimum cost to address environmental conditions at the site will be in excess of $7,600, and could be significantly higher if contaminated soils are encountered. Exh. P-9.

74. Settlement did not occur on November 28, 2003 or any other day. Stipulated Facts, at ¶ 23.

75. Paragraph 27 of the Agreement, entitled "Default," provides that "Seller has the option of retaining all sums paid by Buyer, including the deposit monies, should Buyer: 1) fail to make any additional payments as specified in paragraph 3; or 2) furnish false or incomplete information to Seller, Broker(s), or the mortgage lender, if any, concerning Buyer's legal or financial status ... or 3) violate or fail to fulfill and perform any other terms or conditions of this Agreement." Exh. P-1; Stipulated Facts, at ¶ 24.

**\*3** 76. Paragraph 3(B) of the Agreement of Sale states: "Deposit to be held at title co. of buyer's choice." Exh. P-1. Buyer chose Northeast as the title company to hold the deposit. N.T. vol. 2, 12:3-9 (Aug. 23, 2005).

77. Paragraph 21 of the Agreement states:
> (A) Deposits, regardless of the form of payment and the person designated as payee, will be paid in U.S. Dollars to Broker or party identified in

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 299053 (Pa.Com.Pl.)
(Cite as: 2006 WL 299053 (Pa.Com.Pl.))

Page 4

paragraph 3(B), who will retain them in an escrow account until consummation or termination of this Agreement in conformity with all applicable laws and regulations. Any uncashed check tendered as deposit monies may be held pending the acceptance of this offer.
(B) Upon termination of this Agreement, the Broker holding the deposit monies will release the deposit monies in accordance with the terms of a fully executed written agreement between Buyer and Seller. Exh. P-1.

78. MISI drew a check for $50,000 for deposit into escrow with Northeast, and delivered that $50,000 check to Northeast. Stipulated Facts, at ¶ 13. However, that check was never cashed or deposited into an escrow account. Stipulated Facts, at ¶ 13; N.T. vol. 2, 20:4-25 to 21:1-10 (Aug. 23, 2005).

79. On September 17, 2003, Northeast sent to James Neidhardt ("Neidhardt"), the broker for seller, a copy of a deposit slip showing a $50,000 deposit into Northeast's settlement account, bearing the handwritten notation "1801 County Lane." Northeast sent this deposit slip in response to the request made by Neidhardt for confirmation that the deposit had been made by buyer under the Agreement. Unbeknownst to either Neidhardt or seller until after December 3, 2003, when seller through counsel made a demand upon Northeast for a turnover of the $50,000 deposit, the $50,000 check for the deposit given by Izzi to Northeast was never deposited. Stipulated Facts, at ¶ 26.

80. The $50,000 check that MISI wrote to Northeast is still in existence and is being held by Northeast in the file. N.T. vol. 2, 42:7-10, 44:9-13 (Aug. 23, 2005).

81. The Property was never re-listed for sale by seller after the subject transaction fell through. N.T. vol. 1, 137:14-18 (Aug. 22, 2003).

82. Paul Hillier is not, and has never been, on the deed to the Property. N.T. vol. 1, 123:9-16 (Aug. 22, 2005).

83. The current fair market value of the Property is stipulated by the parties to be $615,000. N.T. vol. 2, 61:20-25 to 62:1-10 (Aug. 23, 2005). The fair market value at the time of the breach was not shown.

CONCLUSIONS OF LAW

1. Time may be made of the essence of the performance of a contract for the sale of realty by an express provision to that effect, and such a provision is valid and enforceable. See 1 P.L.E. Sales of Realty § 59 ("Time as of the Essence"), citing *Jeffrey v. Pennsylvania Mining Co.,* 204 Pa. 213, 53 A. 772 (1902).

2. The Agreement contained an express clause stating that time was of the essence for the "date for settlement, and all other dates and times referred to for the performance of any of the obligations of this Agreement." See P-1, at ¶ 5 (emphasis added).

*4 3. Under Paragraph 29(B) of the Agreement, buyer had fifteen days after the Agreement was approved by seller to inspect the Property. This inspection was a prerequisite to buyer's decision on whether or not buyer would elect to terminate the Agreement based on environmental problems in excess of $5,000. The fact that there was a time limit (fifteen days) for the inspection to take place, coupled with the fact that the contract contained the "time is of the essence" clause, shows that the parties intended that buyer had to elect its right to terminate within a reasonable period of time after the inspection.

4. Buyer received the Keating report on September 13, 2003. Buyer attempted to terminate the Agreement based on the environmental problems on November 27, 2003, one day before settlement was scheduled to take place. See P-5. This was a period of over two months. During this period, the Property was tied up by this contract, and seller could not offer the Property for sale to any other potential buyers.

[1] 5. Buyer breached the contract by allowing an unreasonable amount of time to elapse before notifying seller that buyer was terminating the contract based on the environmental problems. It was unreasonable for buyer to cancel the Agreement the day before the settlement date when buyer had knowledge of the environmental problems for over two months beforehand. Seller had no indication that buyer was not going to go through with the Agreement until she received notice on the day before the settlement. Seller was ready, willing, and able to settle on the Property on November 28, 2003.

6. According to Paragraph 27 of the Agreement, seller is entitled to the deposit money based on buyer's default. Therefore, seller is entitled to the $50,000 as a result of buyer's breach of the Agreement. MISI, as the named buyer in the contract, is liable for this amount.

7. Buyer is liable to Louise Hillier only, because she

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 299053 (Pa.Com.Pl.)
**(Cite as: 2006 WL 299053 (Pa.Com.Pl.))**

was the named seller in the Agreement. Paul Hillier has no standing to assert claims for breach of contract or fraud.

8. "A limited partnership in Pennsylvania is an entity in which one or more persons, with unlimited liability, manage the partnership, while one or more other persons only contribute capital; these latter partners have no right to participate in the management and operation of the business and assume no liability beyond the capital contributed." *See Freedman v. Philadelphia Tax Review Board, 212 Pa.Super. 442, 446, 243 A.2d 130, 133 (1968).* The limited partner "is in a position analogous to that of a corporate shareholder, an investor who likewise has limited liability and no voice in the operation of an enterprise." *Id. at 134.*

9. A limited partner "is not liable for the obligations of the limited partnership." *See Commonwealth, Dept. of Revenue for Bureau of Accounts Settlement v. McKelvey, 526 Pa. 472, 476, 587 A.2d 693, 695 (1991), citing Freedman, 212 Pa.Super. 442, 243 A.2d 130.*

**\*5** [2] 10. MISI is a limited partnership. Izzi, as a limited partner of MISI, is not personally liable for the obligations of MISI.

11. The law in Pennsylvania is that "all general partners of a Pennsylvania limited partnership are liable for the debts and obligations of the partnership." *See TPS Technologies, Inc. v. Rodin Enterprises, Inc., 816 F.Supp. 345, 350 (E.D.Pa.1993); see also 15 Pa.C.S. § 8533.*

12. The general partner in the limited partnership is ordinarily exposed to unlimited personal liability for the debts of the partnership. When the general partner is itself a corporation, this exposure to unlimited personal liability is avoided. *See In re Estate of Hall, 517 Pa. 115, 121, 535 A.2d 47, 50 (1987).*

[3] 13. PISI, as the general partner of MISI, is subject to the liabilities of MISI.

[4] 14. Izzi is not personally liable as a general partner. *See Findings of Fact, at ¶ 57.* The Agreement clearly stated that the buyer in the contract was a limited partnership. Seller did not testify that she only signed the Agreement with buyer because she believed that Izzi was a general partner with personal liability. Therefore, seller may not raise an estoppel argument to convert a limited partner into a general partner on the basis of a misnomer.

[5] 15. Northeast is not liable to seller under the breach of contract claim. Northeast was not a party to the contract, but was a fiduciary stakeholder that was supposed to hold the escrow money. [FN1]

> FN1. *See Janson v. Cozen & O'Connor, 450 Pa.Super. 415, 676 A.2d 242 (1996), citing Kreuer v. Union National Bank of McKeesport, 276 Pa. 201, 119 A. 921 (1923)* ("The depositary (of an escrow or) under an escrow agreement is generally considered to be an agent (or trustee) for both parties").

16. The gist of the action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *See Etoll, Inc. v. Elias/Savion Advertising, Inc., 2002 Pa.Super. 347, \*P14, 811 A.2d 10, 14 (2002).*

17. The gist of the action seeks to uphold the conceptual difference between breach of contract claims and tort claims, in that "tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." *Id., citing Bash v. Bell Tel. Co., 411 Pa.Super. 347, 601 A.2d 825 (1992).*

18. Pennsylvania courts have held that the gist of the action doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. *See Hart v. Arnold, 2005 Pa.Super. 328, \*P43, 884 A.2d 316, 340 (2005), citing Etoll, 2002 Pa.Super. at \*28.*

[6] 19. Seller's claims for fraudulent misrepresentation and negligent misrepresentation against defendants MISI and PISI are barred by the gist of the action doctrine. All of the fraudulent and negligent acts that are alleged by seller arose in the course of the parties' contractual relationship and stem from duties that were imposed by the contract itself. Therefore, these claims against MISI and PISI are barred.

**\*6** [7] 20. Seller's claims for fraudulent misrepresentation and negligent misrepresentation

against defendants Izzi and Northeast are not barred by the gist of the action doctrine because Izzi and Northeast were not parties to the contract.

21. The elements of fraudulent misrepresentation are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance. *See Porreco v. Porreco,* 571 Pa. 61, 69, 811 A.2d 566, 570 (2002). The party alleging fraud must prove these elements by clear and convincing evidence. *Id.*

22. The elements of negligent misrepresentation are: 1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *See Heritage Surveyors & Engineers, Inc. v. Nat'l Penn Bank,* 2002 Pa.Super. 194, *P13, 801 A.2d 1248, 1252 (2002).

[8] 23. Izzi is not liable for fraudulent misrepresentation, which must be proven by clear and convincing evidence. There was no evidence or argument that Izzi directed that the false deposit slip be sent to seller or knew that such was the plan and did nothing to prevent it.

24. There is insufficient evidence of negligent misrepresentation on the part of Izzi.

[9] 25. Northeast is liable to seller for fraudulent misrepresentation. Northeast's actions in making out a false deposit slip in response to a specific inquiry regarding the escrow deposit and sending it to seller (under circumstances where the deposit had in fact not been made, the check was in its file, there was no bank receipt for the deposit, and no bank statement could have reflected the deposit), were at least reckless, if not intentional.

[10] 26. The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant. *See Reading Radio, Inc. v. Fink,* 2003 Pa.Super. 353, P43, 833 A.2d 199, 214 (2003). The Court will not award punitive damages because there is no evidence regarding the wealth of Northeast as a means of determining what would constitute

punishment or deterrence. Northeast should derive no solace from this, however, because this issue will likely recur if the conducts recurs.

[11] 27. Seller has not produced sufficient evidence showing that seller is entitled to damages for lost profit. Seller has failed to show the fair market value of the Property at the time of the breach of the Agreement. *See Bafile v. Borough of Muncy,* 527 Pa. 25, 29-30, 588 A.2d 462, 464 (1991).

FINDING
*7 The Court finds in favor of plaintiff Louise Hillier and against defendants MISI, PISI, and Northeast in the amount of $50,000. Plaintiff may collect a single judgment for $50,000 from any one or all of these defendants. An Order consistent with this judgment will be issued.

Not Reported in A.2d, 2006 WL 299053 (Pa.Com.Pl.)

END OF DOCUMENT

TAB 6

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 188926 (E.D.Pa.)
**(Cite as: 1990 WL 188926 (E.D.Pa.))**

**c**

**<u>Motions, Pleadings and Filings</u>**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Debra A. LYNCH
v.
Alicja M. JANSON, and Hickory Hut Corporation,
Inc.
**Civ. A. No. 90-5063.**

Nov. 28, 1990.
<u>Glenn D. De Santis</u>, Philadelphia, Pa., for plaintiff.

<u>Steven E. Angstreich</u>, <u>Carolyn C. Lindheim</u>, Levy,
Angstreich, Finney, Mann & Burkett, P.C.,
Philadelphia, Pa., for defendant.

*MEMORANDUM AND ORDER*

<u>HUTTON</u>, District Judge.

**\*1** Now before this Court are Defendants' Motion to
Dismiss, Plaintiff's response thereto, and Defendants'
Reply. For the reasons discussed below, this Court
will dismiss Count V of the Complaint with prejudice
and dismiss Counts I, II, III and IV without prejudice.

FACTUAL BACKGROUND [FN1]
In January of 1988 defendant Alicja M. Janson

("Janson"), approached the plaintiff, Debra A. Lynch
("Lynch") regarding an investment in a corporation
which would own and operate a restaurant. Janson's
intention was to open a restaurant in Newtown,
Pennsylvania, which, if successful, would lead to a
chain of restaurant franchises. During a nine month
period, Janson continually offered Lynch half-
ownership in the corporation in exchange for her
investment. Early in January 1988, Janson
persuaded Lynch to invest $150,000 into the
corporation, then known as Hickory Hut Co.
("Hickory Hut").

Janson acknowledged receipt of the investment by
providing Lynch with a series of notes (the "Notes").
Each Note specified the amount received by Hickory
Hut from Lynch and promised that Hickory Hut
would repay the amount twenty-four (24) months
from the date received. No interest was to accrue
during this twenty-four month period. [FN2] Lynch
further alleges that the receipt of $4,000 was not
acknowledged by Janson or Hickory Hut. Lynch
maintains that these Notes were issued as receipts for
the funds received and at no time did she accept them
as a substitute for equity participation. During the
period in which Lynch was providing these funds to
Hickory Hut, she received from Janson a
Shareholders Agreement which contained the
following provisions:

1.0 The Shareholders shall be as follows:

| | | |
|---|---|---|
| 1.1 Alicja Janson | -- | 50% |
| Debra Lynch | -- | 50% |

1.2 Alicja Janson shall manage the day to day affairs of
the company and shall have full control and decision
making power subject to the restrictions set forth below in
paragraph 6.

1.3 Both Shareholders shall have full signature authority
on all corporate accounts which shall at all times be
maintained at the corporate offices in Newtown,
Pennsylvania.

\* \* \*

6.0 *Restrictions.*   The shareholders agree that the

following restrictions shall apply

6.1 Alicja Janson shall have the right of first refusal to
purchase the stock of Debra Lynch as set forth herein.

6.2 It shall require unanimous approval of each
Shareholder in order to take the following corporate
actions:

6.2.a Change the purpose of the business.

6.2.b Borrow funds in excess of $75,000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6.2.c Sell the assets or stock of the Company.

6.2.d Admit new shareholders which can be done only with pro rata dilution of shares.

In August of 1988 Janson supplied Lynch with a Business Plan, and in May 1989 Janson gave Lynch a Private Placement Memorandum. The Shareholders Agreement was not executed and became the focus of negotiations between the parties. In particular, Lynch questioned the authority granted to Janson in paragraph 1.2. Lynch contends that upon questioning this paragraph Janson terminated the negotiations. Lynch filed the present action attempting to recover her investment plus interest and attorneys' fees.

## DISCUSSION

### 1. Standard

**\*2** Federal Rule of Civil Procedure 8(a) requires that a plaintiff's Complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a). Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss, this Court shall take all allegations contained in the Complaint as true and construe them in the light most favorable to the plaintiffs. H.J. Inc. v. Northwestern Bell Tel. Co., 109 S.Ct. 2893, 2906 (1989). The complaint shall only be dismissed if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " Id. (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In deciding a motion to dismiss, the court is permitted to consider only the pleadings and matters of public record. C. Wright and A. Miller, Federal Practice and Procedure § 1357 (1990) ("in determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the Complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."). See also Mir v. Little Co. of Mary Hospital, 844 F.2d 646, 649 (9th Cir.1988). In addition, any written instrument attached to a pleading becomes a part of that pleading and may be considered when deciding a motion to dismiss. Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); Rose v. Bartle, 871 F.2d 331, 339-40 n. 3 (3d Cir.1989).

### 2. Contractual Sufficiency

The plaintiff alleges that by reason of defendant Janson's failure to provide fifty-percent ownership in Hickory Hut, Janson breached an agreement existing between the plaintiff and Hickory Hut. The defendants aver that no agreement ever existed between the parties. In the alternative, the defendants contend that the Notes represent the entire extent of any agreement existing between the parties.

The plaintiff maintains that the communications between the parties prior to the plaintiff's funding of the corporation constituted a contract for the purchase of securities. The sale of investment securities is governed in Pennsylvania by the Commercial Code-Investment Securities Act, Pa.Stat.Ann. tit. 13, § § 8301 et seq. Section 8319 of the Act codifies the common law principle known as the Statute of Frauds. This section states in relevant part:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;

**\*3** Pa.Stat.Ann. tit. 13, § 8319 (Purdon 1984).

Here, the securities were shares of stock in a closely held corporation which were to be endorsed with transfer restrictions. [FN3] Such shares are not easily marketable and thus it might be argued that these stockshares are not "securities" within the meaning of section 8319. For section 8319 purposes, a "security" is defined as follows:

(1) A "security" is an instrument which:

(i) is issued in bearer or registered form;

(ii) is of a type commonly dealt in as a medium for investment;

(iii) is either one of a class or series or by itself is divisible into a class or series of instruments; and

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

Pa.Stat.Ann. tit. 13, § 8102 (Purdon 1990).

The issue was addressed by the Superior Court of Pennsylvania in Jennison v. Jennison, 346 Pa.Super. 47,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 188926 (E.D.Pa.)
(Cite as: 1990 WL 188926 (E.D.Pa.))

499 A.2d 302 (1985). That case was an action in equity for specific performance of a stock purchase agreement wherein the purchase agreement was absent the price term of the stock. The Chancellor ruled that the court could not supply the missing term since the Statute of Frauds applied to the transaction. On appeal, the Superior Court found that:

The language of section 8204 clearly implies that shares bearing transfer restrictions are still "securities" as that term is defined in section 8201. The comments to section 8201 include a cross-reference to the definition of "security" in section 8201 and a statement that section 8204 is intended to encompass the customary transfer restrictions imposed on stock in closely-held corporations. If drafters of the UCC did not intend restricted shares to be covered by Article 8, section 8294 either is surplusage or it is misplaced. Both interpretations are untenable.

*Id.* at 305. Since section 8201 defines the term "securities" for the purposes of section 8319, it is clear that the sale of the close corporation stock in the instant case is regulated by the writing requirement of section 8319.

Having concluded that the Statute of Frauds applies to the agreement in this case, this Court must decide whether the writings alleged are sufficient to state an enforceable contract. One of the principle requirements of section 8319 is that the writing be executed by the party against whom the contract is to be enforced. In this case that party would be Janson, either individually or as promotor or president of Hickory Hut. The only writings allegedly executed by Janson in connection with the stock purchase agreement are the Notes.

Pennsylvania law recognizes that several interrelated documents can memorialize an agreement. *Conaway v. 20th Century Corp., 491 Pa. 189, 420 A.2d 405 (1980)*. When these interrelated documents are integrated, if they provide all of the terms of the agreement necessary to satisfy section 8319, then the documents would satisfy the statute. *Id.* This is not the case here. In the instant action the plaintiff alleged that there was never mutual assent as to the contents of the agreement. The very nature of the stockshares and the participation of the plaintiff in the enterprise were questions left unresolved. Therefore, no enforceable stock purchase agreement can be construed from the Notes.

**\*4** The defendants contend Hickory Hut is not obligated to return the plaintiff's funds until the maturity dates specified by the Notes. This position is untenable. The Notes are not enforceable contracts. One of the fundamental elements of a contract is lacking in the

Notes: consideration. Consideration is a bargained-for exchange. *Commonwealth Department of Transportation v. First Pennsylvania Bank, N.A., 77 PaCmwlth 551, 466 A.2d 753 (1983)*. "Valid consideration confers a benefit on the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." *Universal Computer Systems, Inc. v. Medical Services Association, 474 F.Supp. 472 (M.D.Pa.1979) (citing Cardamone v. University of Pittsburgh, 253 Pa.Super. 65, 384 A.2d 1228 (1978); Utility Appliance Corp. v. Kuhns, 393 Pa. 414, 143 A.2d 35 (1958); Hillcrest Foundation v. McFeaters, 332 Pa. 497, 2 A.2d 775 (1938)*).

The Notes provide no benefit to the plaintiff. Indeed, they deprive the plaintiff of the use of substantial sums promising no accrual of interest. The defendants allege that the Notes obligate repayment on specified dates, and that this obligation satisfies the consideration requirement. This obligation confers no benefit on the plaintiff. Thus, the defendant's promise of repayment confers no benefit on the plaintiff and the contract fails for lack of consideration.

Since no contractual relationship exists between the parties, the defendants has no legal claim of possession to the plaintiff's funds. Having failed to return these funds upon the plaintiff's demand, the defendant committed the tort of conversion. "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shoneberger v. Oswell, 365 Pa.Super. 481, 530 A.2d 112 (1987) (citing Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964)*) It is well settled in Pennsylvania law that money can be the object of conversion. *See, e.g., Pearl Assur. Co. v. National Insurance Agency, Inc., 151 Pa.Super. 146, 156, 30 A.2d 333, 337 (1943)*.

When conversion occurs, the plaintiff may bring suit if he had either actual or constructive possession, or if he had an immediate right to possession. *Eisenhauer v. Clock Towers Associates,* No. 01164, slip op. WESTLAW PA-CS file 3, (Pa.Super. November 8, 1990). Fraudulent intent is not required, and ordinarily there is no inconsistency between "finding that the defendant acted in good faith and finding that he is a converter." *Bank of Landisburg v. Burruss, 362 Pa.Super. 317, 320, 524 A.2d 896, 899 (1987)*. Having determined that no contractual relationship existed between the parties, the plaintiff has a right to immediate possession of her funds. The refusal on the part of the defendant to return these funds to the plaintiff constitutes conversion.

**\*5** The proper party against whom such action can be

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 188926 (E.D.Pa.)
**(Cite as: 1990 WL 188926 (E.D.Pa.))**

Page **4**

brought is the party in possession of the plaintiff's money. *Eisenhauer,* at 3. In this case that "person" would be Hickory Hut. Janson, whose signature appears on the Notes, signed as president of Hickory Hut when the Notes were executed. The signatures on the Notes are as follows: "Hickory Hut by Alicja Janson, Pres." Count I of the Complaint does not seek redress against the corporation, but only against Janson individually. Thus, Count I will be dismissed without prejudice and the plaintiff will be granted leave to file an Amended Complaint within twenty (20) days of the date of the Order accompanying this memorandum.

### 3. *Fraud in the Inducement*

Count II of the plaintiff's Complaint alleges that the defendant knowingly made false and misleading statements intended to induce the plaintiff to provide funds to Hickory Hut. The defendants assert that the plaintiff fails to allege sufficient facts to satisfy the stringent pleading requirements of Federal Rule of Civil Procedure 9(b). This Rule provides special pleading requirements for allegations of fraud. Specifically, it states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). Defendants assert that the plaintiff does not satisfy the requirements of this Rule because the Complaint fails to set forth specific statements made by the defendants and the time and place of such statements. The plaintiff maintains that the Complaint adequately sets forth the claims of fraud since the pleadings leave no question that fraud is the matter in controversy.

The Court of Appeals has identified five criteria required by Rule 9(b):

(1) A specific false representation of material facts; (2) knowledge by the person who made it falsely; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) the plaintiff acted upon it to his damage.

*Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96 (3d Cir.1983) (quoting C. Clark, Code Pleadings § 48, at 312 (2d ed. 1947). In this case only one of the five elements is in question: the specificity of the alleged false representations.

Normally plaintiffs are required to plead with specificity the time and place of particular false representations.

This is a common law rule which grows out of a concern for fairness in face-to-face transactions. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 744-45 (1975) *rehearing denied* 423 U.S. 884 (1977) (comparing the typical setting of common law fraud with that of securities fraud). Here the plaintiff failed to allege such specificities. The allegations are not of specific instances, but rather of generalities. Accordingly, the claim of common law fraud will be dismissed without prejudice and the plaintiff will be granted leave to file an Amended Complaint within twenty (20) days of the date of the Order accompanying this memorandum.

### 4. *Securities Fraud*

*\*6 The plaintiff's Count V alleges that defendant Janson violated section 401 of the Pennsylvania Securities Act. The defendants again assert that the plaintiff fails to allege sufficient facts to satisfy the more stringent pleading requirements for fraud. Here the defendants rely on Rule 1019(b) of the Pennsylvania Rules of Civil Procedure.

Before reaching this issue, however, the appropriateness of a claim under section 401 must be considered. This section reads:

It is unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly:

(a) to employ any device scheme or artifice to defraud;

(b) to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements make, in light of the circumstances under which they are made, not misleading; or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Pa.Stat.Ann. tit. 70, § 1-401 (Purdon 1990).

No private right of action can be implied to exist under the Pennsylvania Securities Act of 1972. Section 1-506 provides "Except as explicitly provided in this act, no civil liability in favor of any private party shall arise against any person by implication from or as a result of the violation of any provision of this act or any rule or order hereunder." Pa.Stat.Ann. tit. 70, § 1-501. This limitation applies to section 1-401. *In re Cantanella & E.F. Hutton & Co., Secur. Litigation,* 583 F.Supp. 1388 (E.D.Pa.1984). Plaintiff's Count V is therefore dismissed with prejudice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 188926 (E.D.Pa.)
(Cite as: 1990 WL 188926 (E.D.Pa.))

### 5. Corporate Veil

The plaintiff's Count III alleges that the defendant has no investment in Hickory Hut and therefore seeks the imposition of a constructive trust upon the assets of the corporation. The defendants contend that neither Janson nor the corporation is liable under any theory alleged and therefore Count III is moot.

One of the fundamental concepts in corporate law is that shareholders cannot be held liable for the acts of the corporation. The corporation as a general rule is considered to be a legal entity distinct from its shareholders. _Commonwealth v. J.P. Mascaro & Sons, Inc.,_ 266 Pa.Super. 8, 402 A.2d 1050, 1052 (1979); _Ashley v. Ashley,_ 482 Pa. 228, 392 A.2d 637 (1978). This is ordinarily true whether or not the stockshares are held publicly or by a sole individual. _Zubik v. Zubik,_ 384 F.2d 267 (3d Cir.1967), _cert. denied,_ 390 U.S. 988 (1968); _College Watercolor Group, Inc. v. William H. Newbauer, Inc.,_ 468 Pa. 103, 360 A.2d 200 (1976); _Kaites v. Commonwealth Dept. of Environmental Resources,_ 108 PaCmwlth. 267, 529 A.2d 1148 (1987).

Piercing the corporate veil allows liabilities that are nominally the corporation's to be considered those of the shareholders. It is a "means of assessing liability for the acts of a corporation against an equity holder in the corporation." _Village at Camelback Property Owners Assn. v. Carr,_ 371 Pa.Super. 452, 538 A.2d 528 (1988). The standard for piercing the corporate veil in Pennsylvania is as follows:

**\*7** The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy require and where rights or innocent parties are not prejudiced nor the theory of corporate entity rendered useless.... We have said that whenever one in control of a corporation uses the corporate assets, to further his or her own personal interests, the fiction may properly be disregarded.

_Gagnon v. Speback,_ 389 Pa. 17, 131 A.2d 619 (1957); cited in _Ashley v. Ashley,_ 482 Pa. 228, 237, 393 A.2d 637, 641 (1978).

In applying this standard Pennsylvania courts have looked to several factors, including: (1) were the appropriate corporate formalities observed; (2) were there functioning corporate officers and directors existing other than the shareholder; and (3) has the dominant shareholder used the assets of the corporation as if they were his own. _Ashley,_ 482 Pa. at 237, 393 A.2d at

641. Some courts have suggested that liability for the acts of a corporation "may be assessed against the owners thereof wherever equity requires that such be done either to prevent fraud, illegality or injustice or when recognition of the corporate entity would defeat public policy or shield someone from public liability for a crime." _Carr,_ 371 Pa.Super. at 461, 538 A.2d at 546.

Thus, in piercing the corporate veil, courts are concerned with preventing an abuse of the legal fiction of corporate identity. _Zubik v. Zubik,_ 384 F.2d 267 (3d Cir.1967), cert. denied 390 U.S. 988 (1968). Such an abuse has not been alleged in this case. Here the plaintiff alleges that Janson has invested no funds of her own into the corporation, and that the plaintiff's funds are the only capital assets of the corporation. This contention, even when considered true, does not allege an abuse of the corporate identity. The contention is not that the corporation is under-capitalized, but that the capitalization plan is deficient. The difference between these two contentions is significant. A sham corporation that is grossly under-capitalized would shield a defendant shareholder from liability and offer no recourse for potential plaintiffs. This would be an abuse of the corporate legal identity. _Carr,_ 371 Pa.Super. 452, 538 A.2d 528. An adequately funded corporation would allow plaintiffs the potential to recover up to the amount of capitalization. This does not abuse the legal identity of the corporation. _Id._ Accordingly, the plaintiff has failed to allege facts sufficient to pierce the corporate veil, and the claims asserted against defendant Janson in her individual capacity will be dismissed without prejudice. The plaintiff will be granted leave to file an Amended Complaint within twenty (20) days of the date of the Order accompanying this memorandum.

### 6. Punitive Damages

In Count IV of the Complaint the plaintiff seeks punitive damages. The plaintiff avers that Janson was willful and wanton in her disregard for the plaintiff's rights, and therefore punitive damages are warranted. The underlying basis for this claim is the allegation of common law fraud. Having found that fraud has not been sufficiently alleged to satisfy the pleading requirement of Rule 9(b), the claim for punitive damages will be dismissed without prejudice. The plaintiff will be granted leave to file an Amended Complaint within twenty (20) days of the date of the Order accompanying this memorandum. An appropriate Order follows.

### ORDER
**\*8** AND NOW, this 26th day of November, 1990, IT IS HEREBY ORDERED that

(1) Count V of Plaintiff's Complaint is dismissed with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 188926 (E.D.Pa.)
**(Cite as: 1990 WL 188926 (E.D.Pa.))**

prejudice; and

(2) Counts I, II, III and IV of Plaintiff's Complaint are dismissed without prejudice and Plaintiff is granted leave to file an Amended Complaint within twenty (20) days of this Order.

> FN1. Plaintiff's Complaint must be read in light of the liberal pleading requirements of Federal Rule of Civil Procedure 8(a)(2). In the Third Circuit, Rule 8 represents "a simplified standard that impose [s] minimal burdens on the plaintiff at the pleading stage, and allow[s] great generality' in stating the basis of the pleader's claim." *Frazier v. Southeastern Pennsylvania Transportation Authority, 785 F.2d 65 at 67 (3d Cir.1986).* The factual background was derived from the Complaint and, for purposes of this motion, must be taken as true.

> FN2. Janson executed these Notes as president of Hickory Hut.

> FN3. The Subscription Agreement provides that the stock certificates will bear a legend evidencing certain transfer restrictions. Subscription Agreement ¶ 6.

Not Reported in F.Supp., 1990 WL 188926 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:90cv05063 (Docket) (Aug. 02, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Marino v. Cross Country BankD.Del.,2003.Only the
Westlaw citation is currently available.
United States District Court,D. Delaware.
Kenneth J. MARINO, Plaintiff
v.
CROSS COUNTRY BANK, Applied Card Systems,
Inc., and Rocco A. Abessinio, Defendants.
**No. C.A.02-65-GMS.**

Feb. 14, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

**\*1** The plaintiff, Kenneth J. Marino, filed the instant
action on January 25, 2002, alleging various tort and
contract claims arising from an employment
agreement with the defendants, Cross Country Bank
("CCB"), Applied Card Systems, Inc. ("ACS"), and
Rocco A. Abessinio (collectively "the defendants").
Abessinio is Chairman of both corporate defendants.
The defendants move to dismiss several counts of the
Amended Complaint (D.I.34) on various grounds.
For the following reasons, the court will grant in part
and deny in part the defendants' motion.

II. BACKGROUND

The plaintiff is a lawyer. In September of 2000, he
entered into a written employment agreement with
CCB to serve as General Counsel for that
corporation. After serving approximately eighteen
weeks in that position, Marino was terminated. On
July 11, 2001, following tensions between the parties,
CCB filed a Demand for Arbitration pursuant to the
employment agreement's arbitration provision. The
plaintiff filed the present suit on January 25, 2002,
alleging fraud, breach of the implied covenant of
good faith and fair dealing, defamation, violation of
the Delaware Wage Payment and Collection Law,
interference with prospective business relations,
injurious falsehood, and conspiracy. The defendants
moved to dismiss the majority of the plaintiff's claims
on April 18, 2002. Shortly thereafter, in June 2002,
the parties abandoned arbitration and agreed to
consolidate all of the claims, defenses, and

counterclaims raised in the arbitration case into this
action. The defendants' motion to dismiss was
therefore dismissed as moot, and the plaintiff
amended his pleading. The defendants now move to
dismiss several counts of the amended complaint.

II. STANDARD OF REVIEW

The defendants move to dismiss Counts I, II, V, VII,
and VIII as to the corporate defendants, and all
counts as to Abessinio personally, pursuant to
Federal Rule of Civil Procedure 12(b)(6). The role of
a motion to dismiss is to test the sufficiency of a
complaint, not to resolve disputed facts or decide the
merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176,
183 (3d Cir.1993). Thus, in deciding a motion to
dismiss, the court must "accept as true the facts
alleged in the complaint and all reasonable inferences
that can be drawn from them." *Markowitz v.
Northeast Land Co.,* 906 F .2d 100, 103 (3d
Cir.1990). In particular, the court looks to 'whether
sufficient facts are plead to determine that the
complaint is not frivolous, and to provide defendants
with adequate notice to frame an answer.' *Colburn v.
Upper Darby Township,* 838 F.2d 663, 666 (3d
Cir.1988) (quoting *Frazier v. Southeastern Pa.
Transp. Auth.,* 785 F.2d 65, 68 (3d Cir.1986)). In this
analysis, however, the court should disregard a
complaint's 'bald assertions' and 'legal conclusions.'
*In re Burlington Coat Factory Sec. Litig.,* 114 F.3d
1410, 1429-30 (3d Cir.1997) (quoting *Glassman v.
Computervision Corp.,* 90 F.3d 617, 628 (1st
Cir.1996). The court will dismiss a complaint only if
the plaintiff can prove no set of facts, consistent with
the allegations, upon which relief could be granted.
*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229,
249-50 (1989); *see also Conley v. Gibson,* 355 U.S.
41, 45-46 (1957).

III. DISCUSSION

A. Claims against CCB and ACS

**\*2** The defendants contend that Marino has failed to
state a cause of action against the corporate
defendants, CCB and ACS, for fraud (Count I),
breach of the implied covenant of good faith and fair
dealing (Count II), interference with prospective

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

business relations (Count V), and conspiracy (Count VII). Additionally, the defendants contend that Marino's breach of contract claim (Count VIII) is time-barred under prior arbitration proceedings. The court will discuss each of the defendants' contentions in turn.

### 1. Fraud

In Count I of his amended complaint, Marino alleges that the defendants intentionally made false and misleading representations to him in connection with his employment contract and termination from CCB. Additionally, the plaintiff alleges that the defendants made misrepresentations of fact to Wilmington Trust, a third party, regarding Marino's lease of a vehicle pursuant to his employment contract. For the reasons discussed below, the court finds that Marino has sufficiently pled a cause of action for fraud.

Under Delaware law, a plaintiff claiming fraud must demonstrate:
(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

_Brooks v. Fiore_, 2001 WL 1218448, at *7 (D.Del.2001) (citing _Stephenson v. Capano Dev. Inc._, 462 A.2d 1069, 1074 (Del.1983)). In addition, Federal Rule of Civil Procedure 9(b) requires that a pleading of fraud or mistake "be stated with particularity." Fed. R. Civ. P. 9(b). Thus, in order to sufficiently plead a claim of fraud, Marino must "provide sufficient factual detail regarding the circumstances of the alleged fraud to place the defendants on notice of the precise misconduct charged." _Brug v. Enstar Group, Inc._, 755 F.Supp. 1247, 1253 (D.Del.1991) (citing _Seville Indus. Machine Corp. v. Southmost Machinery Corp._, 742 F.2d 786, 791 (3d Cir.1984)). Count I of the amended complaint meets this standard.

In his amended complaint, the plaintiff alleges that the "defendants committed fraud by intentionally misleading Marino with false material statements regarding the scope of the Contract which reasonably induced Marino to enter the Contract." Pl.'s An. Br. at 14. The plaintiff alleges that the defendants falsely told him he would: (1) be given full authority over

their legal departments; (2) be encouraged to provide legal advice; (3) be considered senior management; (4) participate in management of the company; and (5) be allowed to make reforms. _See_ Amended Compl. ¶ 33(a)-(e). Marino contends that these false and misleading statements fraudulently induced him to leave his position with Blank Rome and to enter into an employment contract with the corporate defendants. Clearly, the amended complaint states a claim for fraud.

*3 The defendants note that under Delaware law, however, allegations of fraud cannot be based upon statements of future results. _See Craft v. Bariglio_, 1984 WL 8207, at *8 (Del. Ch.1984) ("Mere expressions of opinion as to probabl[e] future results, when clearly made and understood as such, do not constitute false representation even though they may relate to material matters."). It is unknown at this point, however, whether the alleged representations of the defendants were clearly made and understood as mere expressions of opinion as to probable future results, or whether they were false representations intended to fraudulently induce the plaintiff into entering the employment contract. For purposes of this motion, the plaintiff's averments are sufficient to state a claim of fraud.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, "every employment contract made under the laws of this State, consonant with general principles of contract law, includes an implied covenant of good faith and fair dealing." _Merrill v. Crothall-American, Inc._, 606 A.2d 96, 101 (Del.1992). A cognizable action for breach of the implied covenant of good faith and fair dealing exists where the termination violates public policy. _See DuPont v. Pressman_, 679 A.2d 436, 441 (Del.1996) (noting recognized exceptions to employment at will). In such a case, the employee "must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest." _Shearin v. E.F. Hutton Group, Inc._, 652 A .2d 578, 587-88 (Del. Ch.1994). Additionally, "Delaware will not invoke the public policy exception absent some illegal act by the employer." _Paolella v. Browning-Ferris, Inc._, 158 F.3d 183, 191 (3d Cir.1998).

In Count II of his amended complaint, Marino alleges that the defendants' conduct constituted a breach of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the implied covenant of good faith and fair dealing. Specifically, the plaintiff asserts:

Marino discovered that the mismanagement, misconduct and illegal activities conducted by ... [defendants] was far more extreme and pervasive than Marino had previously been led to believe. As Marino proceeded in his efforts to address and resolve those problems cost-effectively and expeditiously, Marino met with unanticipated and immovable resistance from ... [the defendants].

Amended Compl. ¶ 20. Further, the plaintiff alleges that "[a]s a result ... [the defendants] took measures to ensure that Marino would (1) not continue in his investigations; (2) not report the findings of those investigations; (3) lose his credibility and reputation with the appropriate governmental and law enforcement agencies...." *Id.* ¶ 22. Marino alleges that he "was wrongfully terminated for investigating and threatening to uncover unethical and illegal banking activities by the defendants." Pl.'s An. Br. at 16. Finally, Marino asserts that he was terminated, "though no termination notice compliant with the terms of the Contract was ever provided to Marino by either CCB or ACS." *Id.* ¶ 24.

*4 Accepting the plaintiff's allegations as true for purposes of this motion, Count II survives a motion to dismiss because Marino has sufficiently stated a cause of action for breach of the implied covenant of good faith and fair dealing. Retaliatory terminations violate public policy. Indeed, "the paradigmatic dismissal giving rise to a public policy cause of action is the termination of an employee in retaliation for the employee's refusal to act contrary to public policy." *Lawrence v. National Westminster Bank,* 98 F.3d 61, 73 (3d Cir.1996). Furthermore, to the extent the plaintiff's termination resulted from his attempt to uphold the code of ethics governing the legal profession, the termination may have been wrongful. *See, e.g., Shearin,* 652 A.2d at 587 ("[T]he law would protect to some extent an employee who upheld a legally significant professional standard against attempted invasion."). In short, the amended complaint suffices, for purposes of this motion, to state a claim of breach of the implied covenant of good faith and fair dealing.

3. Interference with Prospective Business Relations

In Count V of the amended complaint, Marino alleges that the defendants interfered with prospective business relations. Under Delaware law, to establish a claim for tortious interference with

prospective business relations, the claimant must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Lucent Information Mgmt., Inc. v. Lucent Techs., Inc.,* 5 F.Supp.2d 238, 243 (D.Del.1998) (citing *Dionisi v. DeCampli,* 1995 WL 398536 (Del. Ch. June 28, 1995)). Additionally, "the plaintiff must be able to cite 'actual or potential contracts.' " *Id.* (citing *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.,* 1995 WL 411319 (Del.Super. Ct. June 30, 1995)).

Count V does not sufficiently plead a claim of interference with prospective business relations. Marino fails to allege an actual or potential contract with any identifiable entity. Naturally, because he names no valid contract or expectancy, the plaintiff also fails to allege a breach or termination of such a contract or expectancy. Marino alleges only that the defendants' conduct caused him to "lose the ability to earn a living as a banking lawyer to support his wife and children" and that the defendants "took actions which were designed to destroy Marino's reputation and ability to find employment in his profession." Amended Compl. ¶¶ 22, 27. This broad grievance which, at best, implies a loss of potential future employment contracts, is purely speculative and does not sufficiently state a claim for interference with prospective business relations. *See Lucent Information Mgmt.,* 5 F.Supp.2d at 243 (granting summary judgment to the defendant because plaintiff "only makes [a] broad claim [regarding] 'potential' customers, but does not cite any actual contract, or even contract discussions, with any of these parties."). Count V, therefore, is dismissed.

4. Conspiracy

*5 In Count VII of his amended complaint, Marino alleges that the "defendants conspired to cause harm to Marino and took action in furtherance of that conspiracy." Amended Compl. ¶ 53. Rule 8(a) of the Federal Rules of Civil Procedure governs allegations of civil conspiracy. Under the liberal pleading requirements of Rule 8(a), Delaware courts have required that the "allegations must be sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in the conspiracy.' " *China Resource Prods. (U.S.A.), Ltd. v. Fayda Int'l, Inc.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

788 F.Supp. 815, 819 (D.Del.1992) (citing *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989)). Additionally, in order to plead a civil conspiracy under Delaware law, a plaintiff must allege: "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *Id.* at 820 (citing *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987)). Moreover, Delaware courts have recognized that civil conspiracy is not a separate cause of action and "must arise from an underlying cause of action." *See Ramunno v. Cawley,* 705 A.2d 1029, 1039 (Del.1998) (discussing pleading standards for civil conspiracy). Finally, where the underlying cause of action is defamation, "[t]he complaint must set forth specific facts such as 'meetings, conferences, telephone calls or joint signatures on written recommendations to indicate a conspiracy.' " *Id.* (quoting *Petula v. Mellody,* 588 A.2d 103, 107 (Pa.Commw.Ct.1991)).

Count VII does not sufficiently allege a claim of conspiracy. Marino describes the general composition of the conspiracy as including CCB, ACS, Abessinio, Dougherty, "and others." The complaint states that these parties conspired "to fabricate false and/or wildly exaggerated grounds for the termination of Marino's employment at CCB and ACS." Although this may be viewed as stating the broad objective of the conspiracy, it does not allege an unlawful act done in furtherance thereof. Marino also alleges that the defendants "communicated false, defamatory and misleading statements to officials of Wilmington Trust Company that Marino was not authorized to enter into an automobile lease as part of his compensation from CCB and ACS and that Marino had in fact stolen the leased automobile" and that the defendants "took actions which were designed to destroy Marino's reputation and ability to find employment in his profession." Amended Compl. ¶ ¶ 25, 27. Although this language is sufficient to allege defamation as the unlawful act underlying the conspiracy, it does not provide specific facts to support a claim of conspiracy to defame. For example, the amended complaint fails to allege any meetings, phone calls, or other specific conduct that points to the existence of a conspiracy. In addition, the plaintiff fails to allege any actual damage arising from the conspiracy. *See Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del. Ch.1989) ( "Facts, not legal conclusions, must be pled, including facts showing damages.").

*6 In sum, Marino's allegations, even when viewed in a light most favorable to him, do not sufficiently plead a claim of conspiracy because they fail to meet the pleadings criteria for such a claim. Thus, the court will dismiss Count VII.

### 5. Breach of Contract

The plaintiff alleges a breach of contract claim in Count VIII; the defendants contend that the claim is time-barred. In support of their argument, the defendants cite Marino's failure to meet deadlines during the parties' prior arbitration proceedings. The defendants' basic contention is that the plaintiff's breach of contract claim is time-barred because Marino "flouted the deadlines imposed by the arbitrator" to such an extent that his claim in the arbitration proceeding became barred. Defs.' Opening Br. at 24. Therefore, the defendants argue, the plaintiff "should not ... be allowed to amend his pleadings here to asset a time-barred claim." *Id.*

The court finds this argument most unpersuasive. First, it is unclear whether the plaintiff's counterclaim would have been barred in the arbitration proceedings. This is so because counterclaims in the arbitration context are permissive and not mandatory. *See* Am. Arb. Ass'n. Comm. Arb. R. 4(b)(iii)(1) (providing for permissive counterclaims). Moreover, the arbitrators did not rule on the timeliness of Marino's counterclaims before the parties agreed to forego arbitration in June 2002. Pl.'s An. Br. at 19.

Second, and more importantly, the defendants have offered no caselaw, and the court can fathom none, for their position that relevant statutes of limitations and the rules of federal procedure and practice do not apply in federal court once parties have voluntarily abandoned the arbitration process and brought their dispute to federal court. Thus, the plaintiff's breach of contract claim is subject only to the three-year statute of limitations governing such claims. *See* 10 Del. C. § 8106 (setting three-year statute of limitations for suits "based upon alleged wrongful termination of [a] contract and seeks damages therefor"); *see also Goldman v. Braunstein's, Inc.,* 240 A.2d 577, 578 (Del.1968) (discussing statute of limitations governing actions for breach of contract based on wrongful termination). According to the amended complaint, Marino's breach of contract claim accrued on February 12, 2001, when the plaintiff was suspended from his employment with CCB and ACS. *See* Amended Com pl. ¶ 23-24. The present action was instituted on January 25, 2002. Clearly, Marino's claim is not time-barred. Therefore, the defendants' motion to dismiss the breach of contract claim is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

denied.

### B. Claims against Abessinio Individually

The defendants urge that Abessinio cannot be sued in his individual capacity for the present claims. They maintain that Abessinio, as Chairman of the Board of both CCB and ACS, is shielded from liability for actions performed in his corporate capacity and on behalf of the corporations. Because all of the claims at issue arise only from the defendants' employment relationship with the plaintiff, the defendants assert, and because all of Abessinio's dealings with Marino were performed in his capacity as an agent for the corporate defendants, Abessinio is protected from personal liability arising from these actions. In addition, the defendants note that Abessinio was not a signatory in his personal capacity to the employment agreement with the plaintiff. Nor can the conspiracy claim survive against Abessinio, they argue, because an officer or director acting in his or her corporate capacity can not conspire with the corporation. Because the court has dismissed the claims of tortious interference with prospective business relations and conspiracy, it need not address Abessinio's liability as to these claims. The remaining claims against Abessinio are: fraud; breach of the implied covenant of good faith and fair dealing; breach of contract; defamation; and injurious falsehood.[FN1]

FN1. Count IV, alleging violations of the Delaware Wage Payment and Collection Act, implicates the corporate defendants only. Therefore, it is not addressed in the analysis of Abessinio's personal liability.

### 1. Breach of Contract and of Implied Covenant of Good Faith and Fair Dealing

*7 Abessinio cannot be held personally liable for these claims. It is well-established that directors and officers are not personally liable on contracts signed by them on behalf of the corporation unless they purport to bind themselves individually. *Wallace v. Wood*, 752 A.2d 1175, 1180 (Del. Ch.1999) ("Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."); *see also International Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42*, 814 F.Supp. 392, 400 ("[A]n officer or director may be held personally liable for tortious interference

with a contract of the corporation if, and only if, said officer or director exceeds the scope of his agency in so doing."). The plaintiff has not alleged that Abessinio purported to bind himself individually on the employment contract, or that he exceeded the scope of his agency with regard to the employment contract. Counts II and VIII are dismissed as to Abessinio personally.

### 2. Fraud, Defamation, and Injurious Falshood

Abessinio may be held personally liable for fraud, defamation, and injurious falsehood. "Corporate officers are liable for their tortious conduct even if they were acting officially for the corporation in committing the tort. A corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant." *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V.*, 2002 WL 31439767, at *8, n. 27 (citing cases). As stated above, the amended complaint suffices to state a claim for fraud. It also appears to allege all of the elements of the torts of defamation and injurious falsehood.[FN2] The plaintiff has sufficiently pled these claims. Thus, the defendant Abessinio is not entitled to immunity regarding these torts. Counts I, III, and VI survive the defendants' motion.

FN2. The defendants did not challenge the sufficiency of the pleadings regarding these claims, nor have they moved to dismiss these claims regarding the corporate defendants.

### IV. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Dismiss the Amended Complaint (D.I.34) is GRANTED in part and DENIED in part.
2. Counts V (Interference with Prospective Business Relations) and VII (Conspiracy) are DISMISSED as to each defendant.
3. Counts II (Breach of the Implied Covenant of Good Faith and Fair Dealing) and VIII (Breach of Contract) are DISMISSED as to the defendant Rocco A. Abessinio.

D.Del.,2003.
Marino v. Cross Country Bank

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

Not Reported in F.Supp.2d, 2003 WL 503257
(D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 8

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 126634 (E.D.Pa.), 47 UCC Rep.Serv.2d 1023
**(Cite as: 2002 WL 126634 (E.D.Pa.))**

C

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Werner Kammann MASCHINENFABRIK, GmbH,
Plaintiff,
v.
MAX LEVY AUTOGRAPH, INC. and Wise
Electronic Systems, Defendants/Third-Party
Plaintiffs,
v.
COORSTEK; RESONETICS, INC.; Lindberg/Blue,
and LSP Industrial Ceramics, Inc.,
Third-Party Defendants.
**No. CIV.A. 01-1083.**

Jan. 31, 2002.

MEMORANDUM

REED, S.J.

*1 Currently before the Court in this diversity breach of contract case is the motion of third-party defendant Lindberg/Blue ("Lindberg") to dismiss the first amended third-party complaint (Document No. 25) pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon consideration of the motion, as well as the response and reply thereto, and for the reasons which follow, the motion will be granted in part and denied in part.

I. Background

This multi-party case stems from an alleged breach of contract for the development of a print head assembly asserted by plaintiff Werner Kammann Maschinenfabrik GmbH ("Kammann") against defendants/third-party plaintiffs Max Levy Autograph, Inc. ("Max Levy") and Wise Electronic Systems ("Wise") who in turn have brought suit against third-party defendant Lindberg among others. [FN1]

   FN1. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(2), as plaintiff Werner Kammann Maschinenfabrik GmbH ("Kammann") is a citizen of Germany, and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

The amended third-party complaint alleges the following: Max Levy purchased a Lindberg furnace through a distributer on or about May 11, 1999 based upon Lindberg's express representation that the heating elements of the furnace were enclosed. (Compl. ¶ ¶ 24-25.) Max Levy required such enclosure to eliminate the risk of contamination to the materials being fired from the oxidation of heating element particles. (Id. ¶ 26.) The furnace supplied by Lindberg, however, failed to have such enclosure. (Id. ¶ 27.) Lindberg failed and refused to assist Max Levy in rectifying the problem, and Max Levy was forced to design and purchase custom-made shelving and related products which were not received until on or about November 22, 1999. (Id. ¶ ¶ 28-29.) The project involving Kammann and defendants/third-party plaintiffs was delayed as a result. (Id. ¶ 27.) [FN2]

   FN2. Third-party plaintiffs make additional allegations in their counterclaim: They assert that Max Levy contacted Lindberg about the problem, and Lindberg suggested that Max Levy use half of a ceramic tube to shield the parts being fired. (Counterclaim ¶ 43.) Third-party plaintiffs further claim that Lindberg offered to find something and ship it to Max Levy, but never did. (Id.) As these allegations were not incorporated into the amended third-party complaint, I will not rely on those allegations.

Max Levy and Wise bring the following four causes of action against Lindberg: (1) breach of contract; (2) breach of warranty; (3) fraudulent misrepresentation; and (4) negligent misrepresentation.

II. Standard

Rule 12(b) of the Federal Rules of Civil Procedure provides that "the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under Rule 12(b)(6), a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. See Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 126634 (E.D.Pa.), 47 UCC Rep.Serv.2d 1023
**(Cite as: 2002 WL 126634 (E.D.Pa.))**

Because the Federal Rules of Civil Procedure require only notice pleading, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

A motion to dismiss should be granted if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). In considering a motion to dismiss, the proper inquiry is not whether a plaintiff will ultimately prevail, but rather whether a plaintiff is permitted to offer evidence to support its claims. *See Children's Seashore House v. Waldman,* 197 F.3d 654, 658 (3d Cir.1999), *cert. denied,* 530 U.S. 1275, 120 S.Ct. 2742, 147 L.Ed.2d 1006 (2000) (quoting *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996)). The moving party bears the burden of showing that the non-moving party has failed to state a claim for which relief can be granted. *See Gould Elec. Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000).

III. Analysis

A. Limitations of Damages Clause

**\*2** Lindberg first argues that the limitations of damages clause in Lindberg's product warranty bars all claims asserted by Wise and Max Levy. Lindberg attaches the clause, which is not part of the pleadings, to its motion to dismiss. (Third-party Def.'s Ex. 1.) Under Rule 12(b), where "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." This process is known as conversion. *See In re Rockefeller Ctr. Prop., Inc. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir.1999). The Court of Appeals has determined that a district court may consider " 'a document *integral to or explicitly relied upon* in the complaint.' " *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996))) (emphasis in original).

Thus, this Court can examine any " 'undisputedly authentic document' " attached as an exhibit to a motion to dismiss where plaintiff bases its claims on the document. *See id.* (quoting *Pension Ben. Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). The rational behind this exception is that the main concern in looking at documents beyond the pleadings is that the plaintiff lacks notice; this problem is dissipated where the plaintiff relies on

such document in framing the complaint. *See id.* (citing *In re Burlington,* 114 F.3d at 1426). Upon conversion, this Court is directed to provide parties "reasonable opportunity" to present all material relevant to a summary judgment inquiry which requires "unambiguous" notice to the parties; it is recommended that the notice also be "express." *See id.* (citing *Rose v. Bartle,* 871 F.2d 331, 340 (3d Cir.1989)). I conclude that the limitations of damages clause as part of the product warranty is integral to the third-party complaint; however, I further conclude that since, for the reasons which follow, this Court will be rejecting defendant's argument that the clause bars recovery, express notice is not necessary here as plaintiff will not be prejudiced.

The clause at issue here provides:
11.1 Domestic Warranty (United States and Canada)
Lindberg/Blue M warrants this product to the owner for a period of twelve (12) months from the date of shipment by Lindberg/Blue M. Under this warranty Lindberg/Blue M through its authorized Dealer or service organizations, will repair or at its option replace any part found to contain a manufacturing defect in material or workmanship, without charge to the owner, for a period of ninety (90) days, the labor, and a period of one (1) year, the parts, necessary to remedy any such defect.
....
**\*3** This warranty is in lieu of any other warranties, expressed or implied, including merchantability or fitness for a particular purpose. The owner agrees that Lindberg/Blue M's sole liability with respect to defective parts shall be set forth in this warranty, and *any claims for incidental or consequential damages are expressly excluded.*
(Third-party Def.'s Ex. 1) (emphasis added).

As this is a contract for goods, the Pennsylvania Commercial Code ("the Code"), which is Pennsylvania's version of the UCC, governs this action. The parties agree that Pennsylvania courts routinely uphold limiting liability clauses as codified in 13 Pa.C.S.A. § 2719. *See, e.g., Valhal Corp. v. Sullivan Assoc., Inc.,* 44 F.3d 195, 203 (3d Cir.1995). Section 2719 provides:
§ 2719. Contractual Modification or limitation of remedy
(a) General rule.--Subject to the provisions of subsections (b) and (c) and of section 2718 (relating to liquidation or limitation of damages; deposits):
(1) The agreement may provide for remedies in addition to or in substitution for those provided in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 126634 (E.D.Pa.), 47 UCC Rep.Serv.2d 1023
(Cite as: 2002 WL 126634 (E.D.Pa.))

this division and may limit or alter the measure of damages recoverable under this division, as by limiting the remedies of the buyer to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.
(2) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
(b) Exclusive remedy failing in purpose.--Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.
(c) Limitation of consequential damages.-- Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Lindberg argues that under the valid and enforceable limitation of remedies clause, the third-party plaintiffs are not entitled to any consequential damages thus there claims should be dismissed. Max Levy and Wise contend that the limitation clause does not apply because it falls under the enumerated exception found in subsection (b) of section 2719 since the clause failed in its essential purpose and therefore third-party plaintiffs are entitled to all remedies under the Pennsylvania Commercial Code.

This Court is not unfamiliar with section 2719. In *Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc.*, 123 F.Supp.2d 826 (E.D.Pa.2000), I predicted that the Pennsylvania Supreme Court would conclude that where an exclusive remedy in a limitation on liability provision failed in its essential purpose because defective pieces were not repaired as warranted, the damages disclaimer within the clause is rendered inoperative, and the buyer may invoke all remedies available under the Code. *Id.* at 831-32 (acknowledging that (1) neither the Supreme Court of Pennsylvania nor the Pennsylvania Superior Court has ruled on the matter; and (2) courts are in disagreement on the issue of whether a finding that the exclusive remedy provision fails in its essential purpose automatically nullifies a clause excluding consequential damages). *See also Amsan, LLC v. Prophet 21, Inc.*, Civ.A. Nos. 01-1950, 01-1954, 2001 WL 1231819 (E.D.Pa. Oct. 15, 2001) (reaffirming prediction rendered in *Caudill Seed* ).

Lindberg contends that this case does not fit into the "repair and replace" rubric which most often serves as the basis for applying the "failure in its essential purpose" exception because this case boils down to the fact that Max Levy bought the wrong furnace, and Lindberg played no part in that decision. I find that, at the very least, a "repair and replace" analysis is awkward here because the furnace does in fact "function" in a very technical sense of the word. In other words, this case involves a buyer who allegedly received a furnace which works, but is not the furnace for which it contracted. Thus, the issue is really whether an alleged fraud can void application of the limitations clause.

*4 The majority of courts which have addressed this issue, have held that bad faith conduct on the part of the seller can prevent enforcement of an otherwise valid limitation of damages clause. *See Select Pork, Inc. v. Babcock Swine, Inc.*, 640 F.2d 147, 149-50 (8th Cir.1981) (seller cannot enforce limitations clause where it delivered different breed of pigs than that which parties had contracted); *Jannus Group, Inc. v. Indep. Container, Inc.*, No. 98 Civ. 1075(LBS), 1999 WL 294846, at * 3 (S.D.N.Y. May 10, 1999) (under Kentucky law where seller sent corrugated cardboard boxes of a strength specification that was different than called for under contract, the limitation clause would be invalidated); *Christina Marine Serv. Corp. v. Seaboard Shipping Corp.*, No. Civ.A. 96-8705, 1997 WL 587292, at *2 (E.D.Pa. Sept. 10, 1999) (under New York law where seller conceals a defect, such bad faith estopps seller from invoking limitations clause); *Brunsman v. DeKalb Swine Breeders, Inc.*, 952 F.Supp. 628, 634-35 (N.D.Iowa 1996), *aff'd*, 138 F.3d 358 (8th Cir.1998) (seller is prevented from applying limitations clause where it provided boars that did not conform to contract description; court found conformity, thus limitations clause found enforceable); *PC COM, Inc. v. Proteon, Inc.*, 946 F.Supp. 1125, 1140 (S.D.N.Y.1996) (under Massachusetts law, an intentional breach of contract bars seller from using clause to prevent payment of consequential damages); *International Connectors Indus., Ltd v. Litton Sys., Inc.*, Civ.A. No. B-88-505 (JAC), 1995 WL 253089, at *11 (D.Conn. Apr. 25, 1995) (multiple acts of bad faith conduct including, *inter alia*, failing to fill orders and misrepresenting that conforming goods would be forthcoming to replace non-conforming goods, barred application of limitations clause); *Potomac Plaza Terraces, Inc. v. QSC Prod., Inc.*, 868 F.Supp. 346, 353 (D.D.C.1994) (seller's bad faith proposals to repair goods made limitations clause inoperable); *AT & T v. New York City Human Res. Admin.*, 833 F.Supp. 962, 989-90 (S.D.N.Y.1993) (recognizing rule but determining

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 126634 (E.D.Pa.), 47 UCC Rep.Serv.2d 1023
(Cite as: 2002 WL 126634 (E.D.Pa.))

that record failed to demonstrate bad faith conduct); *Colonial Life Ins. Co. of Am. v. Elec. Data Sys. Corp.,* 817 F.Supp. 235, 243 (D.N.H.1993) (selling products with known defects precluded use of limitations clause); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1458-59 (S.D.N.Y.1986) (limitations clause did not apply where seller concealed defects); *See also McNally Wellman Co., a Div. of Boliden Allis, Inc. v. New York State Elec. & Gas Corp.,* 63 F.3d 1188, 1198 n. 9 (2nd Cir.1995) (recognizing legal support exists for proposition that bad faith exception exists under Commercial Code, but not resolving issue because record lacked evidence of bad faith conduct); *Metalized Ceramics for Elec., Inc. v. Nat'l Ammonia Co.,* 444 Pa.Super. 238, 248, 663 A.2d 762, 767 (1995) (concluding that essential purpose of provision was met, but noting that the buyer "does not allege fraud or incompetence to excuse itself from the terms of the contract;" thus suggesting that fraud or bad faith conduct may be an exception).

I am persuaded by the inherent logic and reasonableness of this rule and predict that the Pennsylvania courts would not depart from this majority approach, particularly when the Pennsylvania Code imposes a duty of good faith in every contract thereunder. *See* 13 Pa.C.S.A. § 1203. Rejection of this rule would not only be counter to the good faith requirement embodied in the code, but also to one of the general policies behind permitting limitations clauses at all; that is, allowing the parties to allocate risks among themselves. *See Jim Dan, Inc. v. O.M. Scott & Sons Co.,* 785 F.Supp. 1196, 1200 (W.D.Pa.1992). If sellers who act in bad faith may still invoke a limitations clause, that means a buyer could be left without a remedy in a situation where such buyer did not contract to assume that risk. [FN3] In addition, the first comment to § 2719 of the Code provides:

> FN3. Related to this point is Lindberg's argument that this case is analogous to latent defect cases. *See Borden, Inc. v. Advent Ink Co.,* 701 A.2d 255 (Pa.Super.1997). The Court in *Borden,* however, reasoned that latent defects do not deem the limitation clause inoperable because limitations clauses are meant to apportion undeterminable risks. *See id.* at 263. In other words, a latent defect case would be one in which the furnace came with the heating elements enclosed and there existed some sort of latent defect concerning that enclosure. Here, the buyer did not agree to

assume the risk that he may receive a product other than what he bargained for; rather, the buyer agreed to assume the risk that the enclosure would not work exactly how the buyer had hoped.

*5 Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract.

Accordingly, if a bad faith exception were disallowed, "at least minimum adequate remedies" may be unavailable.

To the extent that Lindberg argues that even if the limitations on damages clause were rendered inoperable, the exclusive remedy provision still bars recovery, I disagree. In *Caudill Seed,* as explained above, I concluded that where an exclusive remedy provision, which is included in a limitation on liability clause, is found to have failed in its essential purpose, the remaining damage disclaimers are mooted. *See Caudill Seed,* 123 F.Supp.2d at 830-32. In so holding, I disagreed with the logic that the limited remedy and an exclusion of consequential damages are not inextricably linked clauses in a contract. *See id.* at 831-32 ("exclusive remedy clauses often (if not only) arise in situations where there is also a disclaimer of damages, because without a disclaimer of damages, a remedy is not exclusive."). I now conclude that where a limitations of damages clause is rendered invalid because of alleged bad faith conduct, the exclusive remedy provision must also be rendered invalid for the same reasons that the bad faith conduct prevents the seller from invoking the limitations on damages clause. *See Potomac Plaza,* 868 F.Supp. at 353 ("Most jurisdictions ... hold that a seller who acted in bad faith may not claim the benefit of a limitation of *remedy* that by itself would be valid.") (citation omitted).

Third-party plaintiffs here allege that third-party defendant misrepresented that the heating elements of the furnace were enclosed, when in fact they were not. (Compl. ¶ 25.) Under Pennsylvania law, bad faith conduct includes, but is not limited to: " 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 126634 (E.D.Pa.), 47 UCC Rep.Serv.2d 1023
**(Cite as: 2002 WL 126634 (E.D.Pa.))**

performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.' " *See Kaplan v. Cablevision of Pa., Inc.*, 448 Pa.Super. 306, 318, 671 A.2d 716, 722 (1996) (quoting *Somers v. Somers*, 418 Pa.Super. 131, 135, 613 A.2d 1211, 1213 (1992) (quoting *Restatement (Second) of Contracts § 205*(d))); *Fremont v. E.I. DuPont DeNemours & Co.*, 988 F.Supp. 870, 877 (E.D.Pa.1997) (quoting the same). If such a misrepresentation were in fact shown, I conclude it would meet the definition of bad faith conduct. [FN4]

> FN4. In support, third-party plaintiffs present an internet catalogue description of the furnace. (Third-Party Pls.' Ex. 1.) As this exhibit was not part of the pleadings, I will not here consider it. It is sufficient for the purpose of resolving the pending motion that the complaint alleges that Lindberg misrepresented that the heating elements were enclosed. (Compl. ¶ ¶ 25, 27.) Wise and Max Levy need not prove such misrepresentation at this stage in the litigation.

**\*6** I therefore conclude that Lindberg will not be granted relief under its converted motion to dismiss the claims on the ground that the limitation on damages clause bars recovery for consequential damages. Accordingly, to be clear, the claims for breach of contract (First Cause of Action), as well as for breach of express warranty (Second Cause of Action) will not be dismissed.

*B. Gist of the Action Test*

Lindberg's second argument is that the claims for fraudulent misrepresentation (Third Cause of Action) and negligent misrepresentation (Fourth Cause of Action) are essentially a recasting of the relief sought under the breach of contract claims and should therefore be dismissed under the "gist of the action" test. I have previously predicted that the Pennsylvania Supreme Court would adopt this test, and I reaffirm that holding here. *See Asbury Automative Group LLC v. Chrysler Ins. Co.*, No. 01-3319, 2002 WL 15925, at \*3 n. 3 (E.D.Pa. Jan. 7, 2002) (citing *Phico Ins. Co. v. Presbyterian Meed. Serv. Corp.*, 444 Pa.Super., 221, 227-30, 663 A.2d 753 (1995) and *Redevelopment Auth. v. Int'l Ins. Co.*, 454 Pa.Super. 374, 391-95, 685 A.2d 581 (1996)); *Caudill Seed*, 123 F.Supp.2d at 833 n. 11; *Amsan*, 2001 WL 1231819, at \*3 n. 4. *Accord Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103 (3d Cir.2001), *cert. filed*, 70 USLW 3444, No. 01-94 (Dec. 21, 2001).

" 'When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious.' " *Caudill Seed*, 123 F.Supp.2d at 833 (quoting *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 651 (W.D.Pa.1999) (citing cases)). The gist of the action test requires the court to determine the essential nature of the claim alleged by distinguishing between contract and tort claims on the basis of the source of the duties allegedly breached; where the duties essentially flow from an agreement between the parties, the claim is deemed contractual in nature, whereas if the duties breached were of a type imposed on members of society as a matter of social policy, the claim is deemed essentially based in tort. *See id.* (citing *Phico*, 444 Pa.Super. at 229, 663 A.2d 753).

Wise and Max Levy assert that Lindberg misrepresented the fact that the heating elements of the purchased furnace were enclosed, when they were not. The express statement that the heating elements would be enclosed was part of the contract, and third-party plaintiffs have, as discussed, alleged breaches of the contract and that specific express warranty. Thus, the misrepresentation claims are completely intertwined with those contractual claims, and the contract claim is not collateral to the tort claims. The duties allegedly breached were created and grounded in the contract itself. A mere allegation of fraud and negligence is insufficient to create a distinct tort remedy. *See Horizon Unlimited, Inc. v. Silva*, No. Civ.A. 97-7430, 1998 WL 88391, at \*5 (E.D.Pa. Feb. 26, 1998) (dismissing negligent misrepresentation claim premised on statements in promotional literature).

**\*7** Third-party defendants argue that under this Court's reasoning in *American Guarantee and Liability Insurance Company v. Fojanini*, 90 F.Supp.2d 615 (E.D.Pa.), *recon. granted in part*, 99 F.Supp.2d 558 (E.D.Pa.2000), the misrepresentation claims should survive. I find that case distinguishable. In *Fojanini*, the defendants misrepresented the financial soundness of the defendant corporation. While I observed that the tort action there presented was grounded "in the general duty to exercise reasonable care in making

representations that could result in reliance," *id.* at 623, it was also essential that the representations did not concern specific duties outlined in the contract. I thus concluded that the plaintiff's contract allegations were collateral to the tortious conduct alleged. *See id.* Such is not the case here where the claims of misrepresentations are rooted in the agreement between the parties.

I therefore conclude that the claims for fraudulent misrepresentation (Third Cause of Action) and negligent misrepresentation (Fourth Cause of Action) will be dismissed. Because third-party defendant has been successful in its argument that the claim should be dismissed under the gist of the action test, I will not address the merits of its arguments concerning the economic loss doctrine,  [FN5] the heightened pleading requirements of Federal Rule of Civil Procedure 9, or what appears to be an argument that third-party defendants fail to state a claim of misrepresentation.

> FN5. This doctrine prevents plaintiffs from "recovering in tort economic losses to which their entitlement flows only from a contract." *Bohler-Uddeholm, 247 F.3d at 79*.

IV. Conclusion

The motion of Lindberg that the claims should be dismissed because Max and Wise Levy are not permitted under the limitation clause to pursue consequential damages will be denied and the claims for breach of contract (First Cause of Action) and breach of express warranty (Second Cause of Action) will not be dismissed. The motion of Lindberg that the claims for fraudulent misrepresentation (Third Cause of Action) and negligent misrepresentation (Fourth Cause of Action) should be dismissed under the gist of the action test will be granted and those claims will be dismissed.

An appropriate Order follows.

*ORDER*

**\*8** AND NOW this 31st day of January, 2002, upon consideration of the motion of third-party defendant Lindberg/Blue ("Lindberg") to dismiss (Document No. 25) pursuant to Federal Rule of Civil Procedure 12(b)(6), and for the reasons set forth in the foregoing memorandum, it is hereby ORDERED that:

1. The motion is GRANTED in part and DENIED in part.

2. It is DENIED because the claims for breach of contract (First Cause of Action) and breach of warranty (Second Cause of Action) are not barred by any limitation clause in the warranty and will remain in the case.

3. It is GRANTED because the claims for fraudulent misrepresentation (Third Cause of Action) and negligent discrimination (Fourth Cause of Action) are DISMISSED under the gist of the action test.

IT IS FURTHER ORDERED that Lindberg shall file an answer to the amended third-party complaint, except for the Third and Fourth Causes of Action, no later than February 21, 2002.

Not Reported in F.Supp.2d, 2002 WL 126634 (E.D.Pa.), 47 UCC Rep.Serv.2d 1023

**Motions, Pleadings and Filings (Back to top)**

• 2:01CV01083 (Docket) (Mar. 06, 2001)

END OF DOCUMENT

TAB 9

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 53579 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

# H

Briefs and Other Related Documents

Neyer, Tiseo P Hindo, Ltd. v. RussellE.D.Pa.,1993.Only the Westlaw citation is currently available.

United States District Court,E.D. Pennsylvania.
NEYER, TISEO & HINDO, LTD., Plaintiff
v.
Teddy W. RUSSELL, et al., Defendants
Teddy W. RUSSELL, et al., Counterplaintiffs
v.
NEYER, TISEO & HINDO, LTD., Jerome C. Neyer,
Benedict Tiseo Khalid R. Hindo and Dhafir E. Nona,
Counterdefendants
**No. CIV. 92-2983.**

March 3, 1993.

## MEMORANDUM AND ORDER

YOHN.

*1 Neyer, Tiseo & Hindo, Ltd. ("NTH") has filed a motion to dismiss all of the defendants'/counterplaintiffs' counterclaims against Messrs. Neyer, Tiseo, Hindo and Nona for failure to seek leave of the court to add these parties. NTH has also filed a Fed.R.Civ.P. 12(b)(6) motion to dismiss count II, conversion, count III, civil conspiracy, and count IV, violation of Mich. Comp. Laws § 450.1404, of the counterclaims against itself. Neyer, Tiseo, Hindo and Nona have joined in NTH's motion to dismiss counts II, III and IV. The court will: (1) deny the motion as to failure to seek leave of the court to add parties; (2) grant the motion to dismiss count II, conversion; (3) grant the motion to dismiss count III as it relates to the civil conspiracy claim of conversion but deny the motion to dismiss count III as it relates to all other civil conspiracy claims; and (4) deny the motion to dismiss count IV for violation of Mich. Comp. Laws § 450.1404.

## FACTUAL BACKGROUND

NTH is a closely held Michigan corporation with its principal place of business in Farmington Hills, Michigan. NTH is registered to do business in Pennsylvania and conducts business from an office in Exton, Chester County, Pennsylvania.

The defendants/counterplaintiffs are Teddy W.

Russell ("Russell") and Daniel A. Daily ("Daily"). Both began working for NTH in 1986 out of the Exton office. Russell was employed as a vice-president of NTH and also served as an NTH director and as a fiduciary for the NTH Employee Stock Ownership Plan ("NTH ESOP"). Daily was employed as a vice-president of NTH and also served as fiduciary for the NTH ESOP. Russell and Daily ceased working for NTH on April 3, 1992.

Sometime during 1992, Russell and Daily formed a company called Advance GeoService Corp. They also attempted to purchase NTH's Exton office. Russell and Daily were unable to reach an agreement with NTH as to an acceptable purchase price. On May 21, 1992, after the parties terminated discussions on the sale of the Exton office, NTH sued Russell, Daily, and Advance GeoService Corp. The NTH complaint alleged that Russell and Daily, during their employment with NTH, devised a scheme to intentionally diminish the value of the Exton office and to solicit and entice away the Exton office's largest clients and key employees.

In response to NTH's complaint, Russell and Daily filed counterclaims against NTH. They also filed counterclaims against Jerome C. Neyer ("Neyer"), Benedict Tiseo ("Tiseo"), Khalid Hindo ("Hindo") and Dhafir Nona ("Nona") (collectively referred to as "counterdefendants") in their individual capacity. All four individuals are citizens of Michigan. In their corporate capacity, the individuals have the following positions with NTH: (1) Neyer is a director and chief executive officer; (2) Tiseo is a director and president; (3) Hindo is a director and vice-president; and (4) Nona is a director and vice-president.

Russell and Daily filed counterclaims because they are stockholders of NTH. Russell owns 9500 shares of NTH stock and Daily owns 2700 shares. Because NTH is a closely held corporation, all of its stockholders, including Russell, Daily and the four individual counterdefendants, entered into a stock purchase agreement. Pursuant to paragraph 2 of the stock purchase agreement, each party to the agreement acknowledged that NTH's by-laws restricted ownership of NTH stock to NTH employees. Paragraph four of this agreement gave the NTH ESOP the first option to purchase a stockholder's shares of NTH stock within 60 days of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his termination of employment with NTH. If the NTH ESOP did not exercise this option, paragraph seven of the stock purchase agreement, with a heading of *Mandatory Redemption of Stock,* required NTH to purchase the stock of a terminated employee.

**\*2** After Russell and Daily ceased working for NTH on April 3, 1992, they tendered their stock to the NTH ESOP as required by the stock purchase agreement. The NTH ESOP declined to exercise its option to purchase these shares under the stock purchase agreement. Russell and Daily then tendered their shares to NTH. Even though the stock purchase agreement required NTH to purchase Russell and Daily's NTH stock, NTH refused to purchase their stock in a letter dated October 8, 1992. As a result of the refusal to comply with the terms of the stock purchase agreement, Russell and Daily filed counterclaims against NTH and the four individual counterdefendants seeking damages based on breach of contract [FN1], conversion and civil conspiracy. Russell and Daily's counterclaims also assert a violation of a Michigan statute concerning notice of shareholder meetings. NTH and the four counterdefendants have now moved to dismiss the conversion, civil conspiracy and Michigan statute counterclaims.

DISCUSSION

I. *Joinder of Parties in Counterclaims Not Parties to the Original Action*

Without obtaining leave of the court, Russell and Daily filed counterclaims against Messrs. Neyer, Tiseo, Hindo and Nona who had not been parties to the original action. NTH requests dismissal of the counterclaims against the four individual counterdefendants based on Fed.R.Civ.P. 13(h) ("Rule 13(h)). NTH asserts that Russell and Daily should have filed a motion with the court to issue an order joining the additional parties.

Rule 13(h) provides:

(h) Joinder of Additional Parties. Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.
Fed. R.Civ.P. 13(h).

Federal Rules of Civil Procedure 19 and 20 deal with mandatory and permissive joinder. Neither rule on

its face requires a party to file a motion before it joins additional parties.[FN2]

NTH urges this court to follow *Mountain States Sports, Inc. v. Sharman,* 353 F.Supp. 613 (D. Utah 1972), *rev'd on other grounds,* 548 F.2d 905 (10th Cir.1977) and two of the cases it cites, *Ulichny v. General Electric Co.,* 309 F.Supp 437 (N.D.N.Y.1970) and *Timely Products Corp. v. Arron,* 303 F.Supp. 713 (D.Conn.1969), and find that Russell and Daily should have filed for leave of court to join the four individual counterdefendants. This court has reviewed these three cases and all are distinguishable from the present case. In *Ulichny* and *Timely Products Corp.* the courts never reached the issue of whether leave of court was required to join a party to a counterclaim since the party asserting the counterclaim had filed a motion for leave of the court. Moreover, the *Mountain States Sport* did not hold that Fed.R.Civ.P. 13(h) requires a motion for leave to join. Instead, the *Mountain States Sports* court held that the general practice apparently continues to contemplate an order to join additional parties and that court would comport with this practice. *Mountain States Sports* at 618.

**\*3** Not all courts agree with the *Mountain States Sports* approach to rule 13(h). In *Vermont Castings, Inc. v. Evans Products Co., Grossman's Div.,* 510 F.Supp. 940 (D.Vt.1981) and *Northfield Ins. Co. v. Bender Shipbuilding & Repair Co.,* 122 F.R.D. 30 (S.D.Ala.1988), the courts held that leave of the court was not required to join an additional party pursuant to Rule 13(h). These two courts based their holdings on the fact that the 1966 revision of Rule 13(h) dropped the words that "the court shall order [additional parties] to be brought in" and thus eliminated the need to obtain leave of the court to bring in new parties. *Northfield Ins. Co.,* 122 F.R.D. at 31; *Vermont Castings, Inc.,* 510 F.Supp. at 946. These two courts also held that eliminating the need to obtain leave complied with the spirit of the Federal Rules of Civil Procedure by eliminating unnecessary motions. *Id.; See also, MII Exports, Inc. v. Feingold,* Civ. No. 90-3224, 1990 WL 149298 (E.D.Pa. Sept. 18, 1990) (only case found in this district which addressed this issue; the court rejected *Mountains States Sports* and held that no motion for leave of court to join additional parties was required by Rule 13(h)).

This court rejects NTH's argument since the real issue is whether Rule 13(h) requires a motion for leave to join additional parties. The fact that some

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 53579 (E.D.Pa.)

(Cite as: Not Reported in F.Supp.)

Page 3

courts continue to comport with the practice of filing a motion for joining additional parties does not elevate that practice to a rule requirement. Instead, this court is persuaded by the spirit of the Federal Rules to eliminate unnecessary motions and by those courts that have held that Rule 13(h) does not require leave of the court to join additional parties. Thus, the court will not dismiss the counterclaims against the four individual counterdefendants for failure of Russell and Daily to seek leave of the court join these individuals.[FN3]

II. *Motion to Dismiss Counts II, III and IV of the Counterclaims*

A. *Dismissal Under Rule 12(b)(6)*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir.1980). A court must determine whether the party making the claim would be entitled to relief under any set of facts that could be established in support of his or her claim. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In reviewing a motion to dismiss, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. *See Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989); *D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984).

B. *Count II Conversion*

Russell and Daily's counterclaims allege that NTH and the four individual counterdefendants converted the funds representing the value of their NTH stock, which NTH has refused to pay to them. They assert that this conversion was done with the intent to deprive Russell and Daily of the use of the funds to which they were entitled under the stock purchase agreement.

*4 Russell and Daily also assert that NTH continues to use and possess the funds they are entitled to because of this conversion. Counterclaims, ¶¶ 30-41. All of the counterdefendants seek dismissal of this count.

Conversion is an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession. Baram v. Farugia, 606 F.2d 42, 43 (3d Cir.1979); Welded Tube Co. v. Phoenix Steel Corp., 512 F.2d 342 (1975); Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 451, 197 A.2d 721 (1964). The mere existence of a contract between the parties does not automatically foreclose the parties from raising a tort action. Stoudt v. Peugeot Motors of America, 662 F.Supp. 1016, 1018 (E.D.Pa.1986). However, a plaintiff should not be allowed to sue in tort for damages arising out of a breach of contract. Id.; Glazer v. Chandler, 414 Pa. 304, 308 & n.1, 200 A.2d 416 (1964). Likewise, a party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract. Massive Paper Mills v. Two-Ten Corporation, 669 F.Supp. 94 (S.D.N.Y.1987); See also, Transportes Aereos de Angula v. Ronair, Inc., 693 F.Supp. 102, 113 (D.Del.1988) (when contract damages not distinct from conversion, no action for conversion). Russell and Daily, in count I of their counterclaims, have made claim for breach of contract against NTH for not purchasing their NTH stock in accordance with the stock purchase agreement. Counterclaims ¶¶ 25-29. This breach of contract claim does not automatically preclude Russell and Daily from raising their conversion claim.

Russell and Daily's conversion claim asserts that the funds to which they were entitled under the stock purchase agreement were converted by the counterdefendants for the use of NTH. Counterclaims ¶¶ 36-39. However, Russell and Daily's right to the funds is solely predicated on the stock purchase agreement. If the counterdefendants caused any harm to Russell and Daily, it was for breach of an obligation imposed by a contract between the parties. While Russell and Daily attempt to properly plead a conversion claim, when the court views the pleadings, even in a light most favorable to Russell and Daily, the court simply views their claim as a request for damages for breach of contract. Therefore, the court will dismiss count II alleging conversion since it fails to state a claim upon which relief can be granted.

C. *Count III Civil Conspiracy*

Count III of Russell and Daily's counterclaims allege a civil conspiracy. They assert that "NTH, Neyer, Tiseo, Hindo and Nona, acting together and with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 53579 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

common, unlawful purpose of depriving Russell and Daily of funds to which they were entitled and converting such funds to the use of NTH, conspired to commit the unlawful acts described above in Counts I (breach of contract) and II (conversion) and conspired to cause a reduction in the December 31, 1991 appraised value of NTH stock." Counterclaims ¶ 43. All counterdefendants have moved to dismiss this count.

**\*5** To state a cause of action for a civil conspiracy under Pennsylvania law, Russell and Daily must allege that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co., 488 Pa 198, 412 A.2d 466 (1979); Burnside v. Abbott Laboratories, 351 Pa.Super. 264, 505 A.2d 973 (1985).* The counterclaim alleges a conspiracy among NTH and the four individual counterdefendants. All of the individual counterdefendants are directors of NTH and Neyer is NTH's chief executive officer, Tiseo is NTH's president, Hindo and Nona are vice-presidents of NTH.

A corporation cannot conspire with its officers and directors since a corporation can only act through its agents. *Robison v. Canterbury Village, Inc., 848 F.2d 424, 431 (3d Cir.1988); Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport Authority, 767 F.Supp. 672 (E.D.Pa.1991).* When individuals within the same corporate entity undertake certain acts on behalf of the corporation, these acts become that of a single corporate entity that cannot give rise to a conspiracy since a conspiracy requires the collective act(s) of two individuals. *Jagielski v. Package Machine, Co., 489 F.Supp. 232 (E.D.Pa.1980); Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198; 412 A.2d 466, 473 (1979).* Thus, the four individual counterdefendants could not conspire with NTH as long as they were acting in their corporate capacities.

The law recognizes, however, that when corporate agents or employees act on their own behalf, they are legally capable of an intracorporate conspiracy. *Robison, supra.; McLendon v. Continental Group, Inc., 602 F.Supp. 1492, 1510 (D.N.J.1985); Denenberg v. American Family Corp., 566 F.Supp. 1242, 1253 (E.D.Pa.1983).* In *Denenberg, supra.,* the court found that the plaintiff's allegations were sufficient to state a civil conspiracy claim when his complaint alleged that the defendant corporation's attorney acted both on his own behalf and as corporate counsel. Also, in *Plemmons v. Pennsylvania Mfrs. Ass'n Ins. Co., No. 90-2495, 1991 WL 125982 (E.D.Pa. July 3, 1991),* the court held that the plaintiff had stated a cognizable intracorporate conspiracy where the complaint alleged that the two corporate officers owned all of the corporation's stock and thus the officers would benefit personally by conspiring to deny the employee the stock they promised upon the employee's hire. Thus, this court can find that Russell and Daily stated a cognizable intracorporate conspiracy if they allege that the four individual counterdefendants acted in their individual capacities for their own benefit.

Paragraph 6 of Russell and Daily's counterclaims states:
At a 11 times relevant to the allegations in this complaint, each of defendants Neyer, Tiseo, Hindo and Nona was acting *on his own behalf* and also as agents of NTH and was acting under the control or right of control of NTH and within the scope of his agency.

**\*6** Counterclaims, ¶ 6 (emphasis added).

The parties agree that the four counterdefendants are NTH shareholders. On a motion to dismiss, the court must construe the pleadings liberally in favor of the plaintiffs (here the counterplaintiffs). This counterclaim can be read to state that the four individuals conspired with NTH in a personal capacity so that they could preserve their NTH investment value by declining to purchase Russell and Daily's NTH stock. Viewed in this perspective, the four individual counterdefendants acted in their individual capacity and were capable of conspiring with NTH.

The inquiry into the motion to dismiss the civil conspiracy count does not end just because Russell and Daily have properly plead that the counterdefendants conspired with each other. Russell and Daily must also allege that the intent of the conspiracy was to perform an unlawful act or to do an otherwise lawful act by unlawful means. *Thompson Coal Co. v. Pike Coal Co., supra.* Pennsylvania courts have held that absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act. *Ford v. Isdaner, 374 Pa.Super. 40, 542 A.2d 137 (1988); Pelagatti v. Cohen, 370 Pa.Super. 422, 536 A.2d 1337, 1342 (1987); Gordon v. Lancaster Osteopathic Hospital Ass'n, Inc., 340 Pa.Super. 253, 489 A.2d 1364, 1372 (1985)* (no cause of action for conspiracy to defame where no basis for defamation

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 53579 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 5

suit); *Rose v. Wissinger,* 294

Pa.Super. 265, 439 A.2d 1193, 1199 (1982) (where no basis for defamation or outrageous conduct theories, no basis for conspiracy to commit these acts).

As previously discussed, Russell and Daily have failed to allege a civil cause of action for conversion because their right to the funds for the stock is based solely on a contract claim. Thus, since no basis exists for a conversion action, the civil conspiracy claim as it refers to count II, conversion, must be dismissed. However, Russell and Daily also allege a conspiracy as to their breach of contract counterclaim (count I). A review of the breach of counterclaim shows that Russell and Daily properly state a civil cause of action. Also, none of the counterdefendants contest that Russell and Daily have properly stated a civil cause of action as to count I. Therefore, since the four individual counterdefendants could conspire with NTH and they state a civil cause of action, the court will deny the motion to dismiss the civil conspiracy counterclaim as it relates to count I, breach of contract.

### D. *Count IV Shareholder Meeting Notice*

All the counterdefendants seek to dismiss count IV of Russell and Daily's counterclaims. In count IV, Russell and Daily assert that all the counterdefendants have violated Mich. Comp. Laws Ann. § 450.1404 for failing to provide them with a proper notice of any NTH shareholders' meetings. Michigan Compiled Laws § 450.1404 provides that: Except as otherwise provided in this act, written notice of the time, place, and purpose of a meeting of shareholders shall be given not less than 10 nor more than 60 days before the date of the meeting, either personally or by mail, to each shareholder of record entitled to vote at that meeting.

**\*7** Mich. Comp. Laws Ann. § 450.1404

The parties agree that Russell and Daily are stockholders of NTH. Russell owns 9,500 shares of NTH stock and Daily owns 2,700 shares of NTH stock. Counterclaims ¶ 11, Plaintiff's Answer to Counterclaims ¶ 11. Russell and Daily allege in their counterclaims that they continue to hold these shares of NTH stock, Counterclaims ¶ 47; that on information and belief, one or more NTH shareholders' meetings have been held or scheduled since their termination of employment with NTH on April 3, 1992 [FN4], Counterclaims ¶ 49; and, that they

have received no notice of any NTH shareholders' meetings, Counterclaims ¶ 50. These facts, if proven, would support a finding that all the counterdefendants violated Mich.Comp. Laws Ann. § 450.1404, and thus Russell and Daily have sufficiently plead this counterclaim.

The counterdefendants have claimed that even if they violated a duty to provide notice to Russell and Daily of NTH shareholders' meetings, the court should dismiss count IV of the counterclaims since this count does not provide an action for damages as a result of NTH's actions. When a shareholder challenges a corporate action under Mich. Comp. Laws Ann. § 450.1404 for lack of notice of a shareholders' meeting, the remedy is to invalidate any actions taken at the meeting. *See Darvin v. Belmont Industries, Inc.,* 40 Mich.App. 672, 199 N.W.2d 542, 547 (1972); *Bourne v. Sanford,* 327 Mich. 175, 41 N.W.2d 515, 521-22 (1950). However, Russell and Daily's counterclaims not only seek damages but also seek that judgment be entered declaring that any actions taken at any NTH stockholders' meeting since April 3, 1992 are invalid. Thus, the motion to dismiss by the counterdefendants must fail as to count IV since Russell and Daily have requested the proper relief under Mich. Comp. Laws Ann. § 450.1404.

An appropriate order follows.

### ORDER

AND NOW, this day of March, 1993, upon consideration of the counterdefendants motion to dismiss all counts against Jerome C. Neyer, Benedict Tiseo, Khalid R. Hindo and Dhafir E. Nona and counts II, III and IV of counterplaintiffs' counterclaims, and the counterplaintiffs' response thereto, IT IS HEREBY ORDERED AS FOLLOWS:
(1) the motion to dismiss Neyer, Tiseo, Hindo and Nona for failure to seek leave of the court to add these individual parties IS DENIED;
(2) the motion to dismiss count II, conversion, IS GRANTED;
(3) the motion to dismiss count III, civil conspiracy, IS GRANTED as it relates to the conspiracy to commit conversion, but IS DENIED as it relates to all other civil conspiracy claims;
(4) the motion to dismiss count IV, violation of Mich. Comp. Laws § 450.1404 IS DENIED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 53579 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

FN1. The breach of contract claim was only brought against NTH. All of the other counterclaims were brought against NTH and Messrs. Neyer, Tiseo, Hindo and Nona.

FN2. Rule 19 may be read as implying that leave to join is not required: "If the person has not been so joined, the court shall order that the person be made a party." Fed.R.Civ.P. 19. Similarly, Rule 20 states, in pertinent part: "(a) ... All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded." Fed.R.Civ.P. 20.

FN3. If this court had found that Rule 13(h) required leave of the court to add additional parties as counterclaims defendants, Russell and Daily requested that in the interests of avoiding further delay that the court treat their memorandum as a motion for leave to file counterclaims against the director defendants and enter an order granting such leave *nunc pro tunc*. Memorandum of Counterplaintiffs Russell and Daily at 6, n.2. Russell and Daily were not informed by NTH that it would not purchase their NTH stock until October 8, 1992. As such, Russell and Daily could not have raised these counterclaims until after that date. The counterclaims were filed on October 26, 1992. These counterclaims were filed within a reasonable time of when the cause of action arose. Thus, if this court had found that Rule 13(h) required leave of the court, it would have granted Russell and Daily's request for leave to join the additional counterdefendants.

FN4. The counterdefendants urge this court to go beyond the pleadings with an assertion in their present motion to dismiss that "no NTH shareholders' meetings have been held, nor has any shareholders' action been taken, since April 3, 1992." NTH Mem. at 19. Under a Rule 12(b)(6) motion, a court must determine whether Russell and Daily would be entitled to relief under any set of facts which could be established in support of their claim. *Conley v. Gibson,* 355 U.S. 41 (1957). When reviewing a motion to dismiss, all the allegations in the counterclaims and all reasonable inferences that can be drawn therefrom must be accepted as true and in the light most favorable to the non-moving party, *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969). Since the assertion made by the counterdefendants goes beyond the pleadings, the court will not consider this assertion in a motion to dismiss. However, if discovery were to prove that no NTH shareholder meeting were either held or scheduled without giving Russell and Daily the required notice, then this count would be ripe for summary judgment.

E.D.Pa.,1993.

Neyer, Tiseo & Hindo, Ltd. v. Russell

Not Reported in F.Supp., 1993 WL 53579 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:92cv02983 (Docket) (May. 21, 1992)

END OF DOCUMENT

TAB 10

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
**(Cite as: 2000 WL 1239966 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Allan NOWICKI et al.,
v.
UNITED TIMBER CO. et al.
**No. CIV.A. 99-257.**

Aug. 31, 2000.

MEMORANDUM AND ORDER

YOHN

**\*1** The plaintiffs, Allan and Dianne Nowicki ("plaintiffs" or "Nowickis"), have sued the defendants, Paul Pomeroy and United Timber Corporation ("United Timber"; collectively the "defendants") for claims arising out of the alleged breach of a contract for the purchase of timber by United Timber from a tract of land located in Wayne County, Pennsylvania, owned by the Nowickis. In their complaint, the plaintiffs allege that United Timber and Pomeroy are liable for breach of contract and fraud for their failure to follow through with the agreement to purchase the timber from the plaintiffs. *See* Compl. ¶¶ 24-35.

Currently pending before the court are the summary judgment motions of United Timber and Pomeroy (collectively the "defendants"). *See* Motion for Summary Judgment of Defendant United Timber Company (Doc. No. 31) ("United Timber's Mot."); Motion for Summary Judgment of Defendant Paul Pomeroy (Doc. No. 32) ("Pomeroy's Mot.").

For the reasons that follow, I will deny United Timber's motion for summary judgment. I will grant in part and deny in part the motion for summary judgment of Paul Pomeroy.

FACTUAL BACKGROUND
The plaintiffs were the principals in a partnership known as Stockport Associates ("Stockport"), which purchased a tract of land in 1986 in Wayne County, Pennsylvania (the "property"). Stockport owned this

property from the time of purchase until it was sold at a sheriff's sale in July, 1999.

The facts with reference to liens and encumbrances on the property, as stated by United Timber, and undisputed by the plaintiffs, are as follows: In October, 1998, First Union Bank (or its predecessor CoreStates Bank) held a perfected mortgage on the property in the principal amount of $360,000. In addition, in October, 1998, Allen Green held two mortgages on the land. One mortgage was for $260,000 and the other was for $772,000. Both were disputed by the Nowickis. Also as of October, 1998, the unpaid property taxes on the property had accrued to approximately $130,000. In addition, Commonwealth Bank had filed mortgage foreclosure actions against the plaintiffs on the land at issue and judgments were entered in the amount of $111,000 and $301,000 against the plaintiffs. Nowicki contends that he avoided liability for those judgments by filing for personal bankruptcy in November, 1997. First Union Bank, which is the successor in interest to several intermediate banks, succeeded to Commonwealth Bank's rights under the mortgage and the judgments. First Union then sold its rights to Stockport Forest Preservation, Inc. in 1999, which executed on the judgments. Accordingly, the property was sold at a sheriff's sale in July, 1999.

Other relevant undisputed facts are as follows: In the summer of 1998, Allan Nowicki ("Nowicki") [FN1] and Pomeroy began discussing the possibility of having United Timber purchase timber from the Nowicki's property. Pomeroy and Nowicki entered into negotiations which culminated in the signing of a contract on October 23, 1998, for the sale of timber on the property (the "October contract"). After Pomeroy signed the contract on behalf of United Timber, he began to feel concerned about the deal he had reached with Nowicki. On October 26, 1998, Pomeroy spoke with his lawyer, Jeffrey M. Fetter, Esquire, and told him his concerns about the contract with Nowicki. On October 28, 1998, Fetter sent a letter to the plaintiff's attorney, Bruce Marks, Esquire, in which Fetter requested confirmation that Nowicki had full right to enter into the October 23, 1998, contract and that the property was free from all liens and encumbrances. On January 4, 1999, Pomeroy signed a handwritten agreement, in which he stated that United Timber agreed to a specified payment schedule for timber on Nowicki's land,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
(Cite as: 2000 WL 1239966 (E.D.Pa.))

Page 2

"subject to bank acceptance and clear title of lands." Nowicki accepted this proposal. *See Brief of Plaintiffs, Allan Nowicki and Diane Nowicki, d/b/a Stockport Associates, in Opposition to Defendant, United Timber Company's Motion for Summary Judgment ("Pls.' Opp.")* ¶ 139. On the same date, Nowicki and Pomeroy signed a handwritten statement that read: "Prior to any other money being paid, other than the first 100,000, contract between United Timber Corp. and Allen Nowicki will be renegotiated. Highlights of renegotiation will be ... price change on soft maple & chestnut oak. As well as other details." Over the next couple of weeks, attorneys for Nowicki and United Timber corresponded concerning, among other things, the issue of back taxes owed on the property. On January 14, 1999, the plaintiff made the following proposal concerning the tax delinquency on the land: "The Owner [Nowicki] will use his best efforts to enter into a contract with the Wayne County Taxing Authority in regard to the outstanding real estate taxes on the Property in order to prevent a sheriff's sale of the Property during the time period of this Agreement." The next day, January 15, 1999, Fetter wrote a letter to Marks informing him that United Timber would not be able to perform under the contract.

FN1. Any reference to Nowicki in the singular refers to Alan Nowicki.

**\*2** On January 19, 1999, the plaintiffs filed suit against United Timber and Pomeroy alleging breach of contract and fraud. United Timber and Pomeroy have both filed motions for summary judgment. This memorandum and order addresses those summary judgment motions.

STANDARD OF REVIEW

Either party to a lawsuit may file a motion for summary judgment, and it will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* Where the movant bears the burden of persuasion at trial, the movant satisfies this initial burden by "identifying [the evidence] which it believes demonstrate[s] the absence of a genuine issue of material fact." *Id. at 323.* Where the nonmovant bears the burden of persuasion at trial, the moving party

may meet its initial burden and shift the burden of production to the nonmoving party "by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Id. at 325.* Thus, summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Id. at 322.*

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).* Additionally, "all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* At the same time, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990).* The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson, 477 U.S. at 252.* Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)* (citations omitted).

DISCUSSION [FN2]

FN2. Both parties agree that the court is to apply Pennsylvania law in this case.

A. United Timber's Motion for Summary Judgment

United Timber sets forth three main arguments that it is not required to perform under the October 23, 1998, contract. First, it contends that the parties rescinded the contract. *See Brief of Defendant United Timber Company in Support of Motion for Summary Judgment ("United Timber's Brief")* at 11-12. Second, it argues that the plaintiffs breached a warranty of clear title to the timber in the October contract and therefore, United Timber's obligation to perform under the contract was discharged. *See id.* at 13-21. Finally, it asserts that the plaintiffs repudiated the October contract by failing to provide adequate assurance that the timber would be free from all liens and encumbrances throughout the term of the contract. *See id.* at 23-24. United Timber then addresses the January writings, arguing that these writings did not constitute a binding obligation on United Timber because they did not satisfy the statute

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
(Cite as: 2000 WL 1239966 (E.D.Pa.))

Page 3

of frauds, and because the plaintiffs failed to satisfy a condition precedent under these writings. *See id.* at 26-29. Finally, United Timber addresses the plaintiff's fraud claim, arguing that it should be dismissed because there is no evidence of United Timber's fraudulent intent at the time of signing of the contract. *See id.* at 29-34. I will address each of these separate arguments in turn.

### 1. *Rescission of the October Contract*

**\*3** According to United Timber, it had no duty to perform under the October contract and plaintiffs' claims based on that contract must be dismissed because the parties mutually agreed to abandon that contract. *See id.* at 11- 12. United Timber argues that the January 4, 1999, handwritten agreement to "renegotiate" the contract was an express rescission of the October contract. *See id.* at 12. The plaintiffs respond that the January writings do not constitute a rescission of the contract, but rather, an amendment of the October contract. *See* Pls.' Opp. at 31. Because the documents are handwritten by the parties, they are subject to substantial ambiguities. In addition, due to the conditions placed in the documents there is a very significant issue as to whether they even became effective. There is, therefore, a genuine issue of material fact as to whether the January writings constituted an amendment of the October contract, a rescission of the contract and an agreement to renegotiate a new contract, or nothing at all. Because a genuine issue of material fact remains as to these questions, I will deny the defendants' motion for summary judgment on this ground.

### 2. *Breach of the October Contract*

United Timber next argues that the plaintiffs breached the October contract and therefore, the defendants were relieved of any obligation to perform under the contract. *See* United Timber's Brief at 13-21. United Timber contends that the plaintiffs were unable to transfer clear title to the timber and thus, breached the October contract. According to United Timber, the plaintiff breached the following two separate warranties: (1) the implied warranty of clean title made pursuant to Pa.C.S.A. § 2312; and (2) an express warranty of clear title stated in the October contract. Because I find that there is a genuine issue of material fact as to whether the plaintiffs breached either of these warranties, I will deny the motion of United Timber for summary judgment on this ground.

United Timber first argues that the plaintiffs

breached an implied warranty of title. *See* United Timber's Brief at 13-18. According to 13 Pa.C.S.A. § 2312, in any contract for the sale of goods, [FN3] the seller provides an implied warranty that the title is good and the transfer rightful and the goods are delivered free from liens and encumbrances of which the buyer at the time of the contracting has no knowledge. *See* 13 Pa.C.S.A. § 2312(a). The statute also provides, however, that the warranty of title will be excluded or modified only "by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have." 13 Pa.C.S.A. § 2312(b). In this case, there is a clear dispute as to whether United Timber had knowledge of the liens and encumbrances that could have affected the timber. Accordingly, summary judgment is not proper on this ground because the issue of United Timber's knowledge is material and is in dispute. I will therefore deny United Timber's motion for summary judgment on this ground.

> FN3. The plaintiffs argue that this contract for the sale of uncut timber was not an agreement for the sale of goods and therefore is not governed by the Uniform Commercial Code. *See* Pls.' Opp. at 32. The statute clearly provides, however, that a "contract for the sale apart from the land of ... timber to be cut is a contract for the sale of goods within this division whether the subject matter is to be severed by the buyer or the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance." 13 Pa.C.S.A. § 2107. Therefore, the provisions of the U.C.C. do apply to the contract for the sale of timber from the plaintiffs to United Timber. The parties do not address at all the questions of whether the liens against the real estate, which arise from the mortgages, judgments, and unpaid taxes, are lost as to the timber when it becomes personalty under the U.C.C. and whether the enactment of the U.C.C. in any way changed the law of Pennsylvania as set forth in *Havens v. Pearson*, 6 A.2d 84 (Pa.1939).

**\*4** Second, United Timber argues that the plaintiffs breached an express warranty of title in the October contract and therefore, United Timber's performance under the contract is excused. *See* United Timber's Brief at 18-19. In the October contract, the plaintiffs

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
**(Cite as: 2000 WL 1239966 (E.D.Pa.))**

promised that they had the "full right to enter into [the] agreement [and that] the said premises are free from all liens and encumbrances that would prohibit the sale of the timber herein specified." *See id.* at 19. According to United Timber, therefore, the plaintiffs failed to provide the timber "free from all liens and encumbrances" and thus, such failure constituted a breach of the October contract and relieved United Timber from its duty to perform. *See id.* United Timber, however, focuses only on part of the language in the contract. As noted above, the clause in the October contract provided that the premises was "free from all liens and encumbrances *that would prohibit the sale of the timber herein specified.*" *See id.* (emphasis added). According to the plaintiffs, they had carefully structured the deal with United Timber so as to eliminate encumbrances and liens on the property that would threaten the sale of the timber. *See* Pls.' Opp. at 37. In fact, the plaintiffs contend that the January writings and discussions concerning renegotiations involved an adjustment of the payment schedule to ensure that the payments from United Timber corresponded with the payment schedule established by the bank. *See id.* Thus, the plaintiffs maintain that if United Timber had gone forward with their payments there would not have been any lien or encumbrance on the property that would have prohibited the sale of the timber specified in the October contract. [FN4] For that reason, it is unclear from the present record whether there was any breach of the express warranties included in the October contract and I will deny United Timber's motion for summary judgment. [FN5]

> FN4. Again, the parties do not address the issue of whether liens resulting from mortgages, judgments, and back taxes, subsequent to the enactment of the U.C.C., would have prohibited the sale of the timber.

> FN5. United Timber also argues that the plaintiffs breached the October contract by failing to notify United Timber about the judgment lien and tax lien on the property. *See* United Timber's Brief at 22. The plaintiffs maintain, however, that they did, in fact, inform the defendants of the liens on the property. *See* Pls.' Opp. at 38. There is a genuine issue of material fact as to this issue, therefore, and I will deny United Timber's motion for summary judgment on this ground.

*3. Repudiation of the October Contract*

United Timber also contends that it was discharged of its obligation to perform under the October contract because the plaintiffs repudiated the contract. *See* United Timber's Brief at 23-24. United Timber argues that it had reasonable grounds for insecurity, it demanded adequate assurance of due performance, and the plaintiffs did not provide adequate assurance. *See id.* at 24. Hence, United Timber contends that the plaintiffs repudiated the October contract. *See id.*

The plaintiffs respond, among other things, that they did provide adequate assurances to United Timber concerning their ability to go through with the deal and that United Timber's financial interest in the timber was secure. *See* Pls.' Opp. at 39. Whether the plaintiffs did provide adequate assurances so as to avoid repudiating the contract is a question of disputed material fact that is better left for the jury to decide. For that reason, I will also deny United Timber's motion for summary judgment on this ground . [FN6]

> FN6. Next, United Timber argues that it was excused from performance under the October contract because the plaintiffs failed to tender delivery of the timber. *See* United Timber's Brief at 25. The plaintiffs, however, contend that they were willing and able to perform under the contract by providing access to the land so that United Timber could harvest the timber. *See* Pls.' Opp. at 28, 40. I also conclude that this issue--of whether the plaintiffs were able to perform under the October contract--is an issue of material fact that is not appropriate for disposition at the summary judgment stage, but rather, is better left for the jury to decide. I will deny United Timber's motion for summary judgment on this ground as well.

*4. The January Writings Do Not Satisfy the Statute of Frauds*

**\*5** After addressing the October contract, United Timber next argues that the January writings were invalid, and thus, did not create binding obligations. *See* United Timber's Brief at 26-29. United Timber contends that the January writings are invalid because they do not satisfy the statute of frauds. *See* United Timber's Brief at 26-27. Pursuant to 13 Pa.C.S.A. § 2201, any contract for the sale of goods for a price of $500 or greater must be in writing to be enforceable. *See* 13 Pa.C.S.A. § 2201. To embody an enforceable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
**(Cite as: 2000 WL 1239966 (E.D.Pa.))**

agreement, the writing need not include all material terms, but must, at a minimum, include the quantity of the goods to be sold. *See id.* In this case, United Timber argues that the January writings do not satisfy the statute of frauds because there is no information in the writings as to the quantity or the price of the timber by the plaintiffs to United Timber. *See* United Timber's Brief at 27. The plaintiffs respond, however, that the defendants misunderstand the meaning of the January writings. *See* Pls.' Opp. at 40-41. The plaintiffs contend that these writings were intended to be amendments to the October contract and they were merely establishing a payment schedule for the goods identified in the original October contract. *See id.* at 41. Accordingly, the plaintiffs assert that the October and January writings considered together satisfy the requirements of the statute of frauds. *See id.* Again, the court is faced with an issue that can not be determined at the summary judgment stage as a matter of law. Whether the parties intended to form an independent contract, or merely an amendment to the original agreement, is a genuine issue of material fact that must be decided by the jury. I will therefore deny United Timber's motion for summary judgment on this ground.

### 5. Failure to Satisfy a Condition Precedent

Next, United Timber argues that the January writings did not require it to perform because its obligation to make payments was expressly conditioned on the plaintiffs having bank acceptance of the parties' agreement and the plaintiffs having clear title to the timber. *See* United Timber's Brief at 28- 29. According to United Timber, the plaintiffs never demonstrated that they had obtained bank acceptance of the parties' agreement and that they had clear title to the timber. *See id.* As a result, United Timber asserts that it was not required to perform because none of the conditions precedent occurred. *See id.* The plaintiffs, however, argue that they had obtained bank acceptance of the parties' payment schedule and therefore, there was no issue as to the title of the property because the payments would satisfy the liens and encumbrances on the land. *See* Pls.' Opp. at 41- 42. The plaintiffs further contend that they informed United Timber of the bank's acceptance of the payment schedule and thus, the conditions precedent were satisfied and United Timber was not excused from performance. *See id.* Again, this is a disputed genuine issue of material fact and therefore, I will deny United Timber's motion for summary judgment on this ground.

### 6. Insufficient Evidence of Fraud

\*6 United Timber next argues that the court should grant summary judgment on the plaintiffs' fraud claim. *See* United Timber's Brief at 29-34. In essence, the plaintiffs' fraud claim (Count II of the complaint) alleges that United Timber and Pomeroy represented that they would honor the October contract and any amendments to it, when in fact they did not intend to honor the agreements. *See* Compl. ¶¶ 28, 31-32. The plaintiffs allege that they reasonably relied on these misrepresentations and incurred damages as a result. *See id.* ¶ 30, 35.

In its motion, United Timber argues that summary judgment is appropriate on this claim because the plaintiffs have failed to produce more than a mere scintilla of evidence as to this claim. *See* United Timber's Brief at 32. Specifically, United Timber contends that the plaintiffs have failed to demonstrate any facts that establish that the defendants did not intend to honor the October contract or its amendments at the time that the agreements were executed. *See id.* at 32. Instead, United Timber argues that the evidence demonstrates that United Timber did intend to perform its obligations under the contract when the agreement was formed. *See id.*

In response, the plaintiffs contend that between December and January 15, 1999, the defendants misrepresented their intention to go forward with the deal. *See* Pls.' Opp. at 43. Specifically, the plaintiffs argue that they have presented evidence that between the signing of the October contract and December, 1998, the defendants began questioning the wisdom of entering the deal with the plaintiffs. *See id.* at 42-43. In December, 1998, the defendants began negotiating a deal with another company for the harvesting of timber similar in quantity to the plaintiffs' property (the "Raja" deal). *See id.* at 43. The defendants were aware that they were not in a financial position to go forward with the October contract and the Raja deal. *See id.* Nonetheless, the defendants continued to represent that they were going forward with the October contract and indeed, on January 4, 1999, signed an amendment to the contract that established an amended payment schedule. *See id.* The plaintiffs further claim that the parties continued to discuss the agreement between January 4, 1999, and January 15, 1999, and that the defendants relied to their detriment on misrepresentations made by the defendants during this time. *See id.* The plaintiffs contend that this is sufficient evidence that the defendants misrepresented their intention to perform under the October contract and therefore, the claim survives

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
(Cite as: 2000 WL 1239966 (E.D.Pa.))

Page 6

summary judgment. *See id.* at 42- 43. There is no evidence of fraud at the time of the October 23, 1998, contract. There is some evidence, however, from which a jury might infer fraud in connection with the January 4, 1999, amendments. Although this evidence is clearly a thin reed, it is sufficient to survive the defendants' motion for summary judgment. Accordingly, I will deny United Timber's motion for summary judgment on the claim of fraud.

B. Pomeroy's Motion for Summary Judgment

**\*7** The plaintiffs' complaint also alleges that Pomeroy is individually liable for breach of the contract and for fraud. In his motion, Pomeroy argues that the court should grant summary judgment on these claims. I will address each of the claims against Pomeroy in turn.

1. *Breach of Contract Claim Against Pomeroy*

In his motion for summary judgment, Pomeroy argues that he is entitled to summary judgment because he can not be held personally liable as a corporate officer for the alleged breach of contract committed by United Timber. *See* Memo. of Law in Support of Defendant Paul Pomeroy's Motion for Summary Judgment ("Pomeroy's Brief") at 11-14. In essence, Pomeroy argues that he is not liable for the breach of contract by United Timber because he executed the contract on behalf of the corporation and not on behalf of himself individually. *See id.*

In response, the plaintiffs argue that individual liability may be imposed on Pomeroy because it is unclear from the face of one of the January writings whether Pomeroy was acting in a corporate or an individual capacity when he signed the agreement. *See* Plaintiff's Brief in Opp. to Motion for Summary Judgment of Defendant Paul Pomeroy ("Pls.' Opp. to Pomeroy's Mot.") at 2-3. The plaintiffs, however, maintain that the writing signed by Pomeroy on January 4, 1999, was an amendment to the October contract, which they concede was executed by Pomeroy solely in his corporate capacity as the President of United Timber. *See id.* at 3. As noted above, throughout their response briefs, the plaintiffs argue that the October contract was still in force and the January writing was merely an amendment to the original agreement. *See, e.g., id.* This contention is inconsistent with the argument that Pomeroy should be individually liable for the entire agreement simply because he signed only his name, without a title, on the amendment to the contract. Moreover, the other January document, relating to a proposed new

payment schedule, was clearly signed in his corporate capacity. Because the plaintiffs contend that the January writings supplemented the October agreement, and did not negate the agreement, then the designation of Pomeroy as the President of United Timber is also incorporated into the January writing. For that reason, I reject the plaintiffs' argument that Pomeroy executed the agreement in his individual capacity and I conclude that this basis does not permit the plaintiffs to hold Pomeroy individually liable for breach of contract.

The plaintiffs also argue that Pomeroy may be held personally liable for the alleged breach of contract committed by United Timber because "he is the sole owner of the stock and personally did the acts complained of and the circumstances of the case are that justice and public policy demand disregarding the corporate fiction." *See* Pls.' Opp. to Pomeroy's Mot. at 4. For this reason, the plaintiffs ask that the court pierce the corporate veil and impose liability on Pomeroy, a corporate officer, for the acts of the corporation. I decline to do so for the following reasons.

**\*8** Under Pennsylvania law, "there is a strong presumption ... against piercing the corporate veil." *Lumax Indus., Inc. v. Aultman,* 669 A.2d 893, 895 (Pa.1995). "[T]he general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Lumax Indus., Inc.,* 669 A.2d at 895. The factors to be considered when deciding whether to pierce the corporate veil are: 1) undercapitalization; 2) failing to observe corporate formalities; 3) substantial intermingling of affairs; 4) using the corporate form for fraudulent purposes. *See id.* "Piercing the corporate veil is admittedly an extraordinary remedy preserved for cases involving exceptional circumstances." *Village at Camelback Property Owners Assn. Inc. v. Carr,* 538 A.2d 528, 533 (Pa.Super.Ct.1988).

In this case, the plaintiffs point only to the fact that Pomeroy was the sole shareholder in United Timber and he communicated directly with Nowicki concerning the agreement with United Timber. *See* Pls.' Opp. to Pomeroy's Mot. at 4. The plaintiffs do not point to any evidence that United Timber was undercapitalized or that Pomeroy did not observe corporate formalities. The plaintiffs also fail to demonstrate in any way that the corporate form was established for a fraudulent purpose. I will not disregard the corporate form of United Timber merely because Pomeroy was United Timber's sole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)
**(Cite as: 2000 WL 1239966 (E.D.Pa.))**

shareholder. Thus, I will grant Pomeroy's motion for summary judgment as to the breach of contract claim against him.

### 2. *Fraud Claim Against Pomeroy*

Pomeroy also contends that the plaintiffs have failed to produce sufficient evidence to support the fraud claim and therefore, Pomeroy urges the court to grant his motion for summary judgment on this claim. *See* Pomeroy's Brief at 14- 19. Pomeroy makes essentially the same arguments as set forth by United Timber in its motion for summary judgment on the fraud claim. *See id.* For the reasons outlined above, I conclude that the plaintiffs have produced sufficient evidence of fraud to survive the Pomeroy's motion for summary judgment on the fraud claim. Thus, I will deny Pomeroy's motion for summary judgment on the claim of fraud.

### CONCLUSION

Based on the foregoing reasons, I will deny in its entirety the motion for summary judgment of United Timber. I will grant the motion for summary judgment of Paul Pomeroy as to the breach of contract claim, but will deny Pomeroy's motion for summary judgment as to the fraud claim.

An appropriate order follows.

### ORDER

AND NOW, this __ day of August, 2000, upon consideration of the motion for summary judgment of the defendant United Timber Company (Doc. No. 31) and the brief in support of the motion, the plaintiffs' original and supplemental briefs in opposition, and United Timber's reply brief, as well as the motion for summary judgment of the defendant Paul Pomeroy (Doc. No. 32) and the brief in support of the motion, and the plaintiffs' original and supplemental briefs in opposition thereto, IT IS HEREBY ORDERED:

**\*9** 1. the motion for summary judgment of United Timber is DENIED IN ITS ENTIRETY;

2. the motion for summary judgment of Paul Pomeroy is GRANTED AS TO THE BREACH OF CONTRACT CLAIM, AND DENIED AS TO THE FRAUD CLAIM.

Not Reported in F.Supp.2d, 2000 WL 1239966 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:99cv00257 (Docket) (Jan. 19, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 11

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 151308 (E.D.Pa.)
**(Cite as: 1992 WL 151308 (E.D.Pa.))**

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
RAGAN HENRY BROADCAST GROUP, INC.
U.S. Radio Group, Inc. and RAGAN A. HENRY,
Plaintiffs,
v.
Robert J. HUGHES, Defendant.
**Civ. A. No. 91-CV-6157.**

June 19, 1992.

David M. Doret, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for plaintiffs.

Ragan Henry Broadcast Group, Inc., pro se.

US Radio Group, Inc., pro se.

Ragan A. Henry, pro se.

Magsood Mir, Washington, D.C., Herbert R. Rubenstein, Washington, D.C., for Robert J. Hughes.

*MEMORANDUM AND ORDER*

GAWTHROP, District Judge.

**\*1** Plaintiffs bring this diversity case, under 28 U.S.C. § 1332 and 28 U.S.C. § 2201, asking for declaratory judgment that they terminated defendant's employment properly, for cause, in accordance with their agreement of February 15, 1989. There are two motions pending. Defendant has moved to join the other Henry partnerships which employed him as indispensable parties, under Fed.R.Civ.P. 19, and to disqualify the law firm of Wolf, Block, Schorr & Solis-Cohen from further representation in this case. Upon the following reasoning, I shall grant both motions.

BACKGROUND

In February, 1989, plaintiff Ragan Henry ("Henry") hired defendant, Hughes, to be President of Ragan Henry Broadcast Group ("RHGB") and U.S. Radio Group ("USRG") and Chief Operating Officer of several other partnerships affiliate with Mr. Henry.

In December 1989, Mr. Hughes signed an "affirmation agreement" under which "(a) The employment was subject to termination with cause, provided six months compensation was to be paid to Hughes pursuant to the Agreement. (b) Hughes was subject to termination with cause and without compensation, provided there existed 'misconduct having a material adverse effect on the business of the Partnerships." (Complaint ¶ 10). The employment contract was to run until December 31, 1994. However, on February 8, 1991, plaintiffs fired defendant from his various positions in the Henry corporations and partnerships. Plaintiffs seek declaratory judgment that the termination was for cause and that they do not owe Mr. Hughes compensation. Mr. Hughes has counterclaimed for breach of contract, bad faith, unfair dealing, and defamation, and he seeks injunctive relief. The case is currently before the court on two issues: (1) whether the affiliated Henry partnerships, in which Mr. Hughes served, should be indispensable parties under Fed.R.Civ.P. 19, and (2) whether the law firm of Wolf, Block, Schorr & Solis-Cohen, legal counsel to the Henry organizations, should be disqualified for conflict of interest. Hughes alleges that in its capacity as corporate counsel and for breach of confidentiality, the law firm allegedly advised Hughes as a client on a number of business deals and become privy to personal, confidential matters of his employment and finances which would preclude their representing the parties adverse to him in this litigation.

DISCUSSION
1. *Joinder of Indispensable Party*

Defendant Hughes seeks to join Communications Management National, L.P., Ragan Henry National Radio, L.P., Ragan Henry Communications, L.P., and U.S. Radio, L.P. as indispensable plaintiffs to this law suit. Under Fed.R.Civ.P. 19(a), a person whose joinder does not deprive the court of jurisdiction

> shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 151308 (E.D.Pa.)
(Cite as: 1992 WL 151308 (E.D.Pa.))

risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
*2 Fed.R.Civ.P. 19(a)

Generally, where rights sued upon arise from a contract, all parties thereto must be joined. *See Ward v. Deavers*, 203 F.2d 72 (D.C.Cir.1953); *Japan Petroleum Co (Nigeria) Ltd. v. Ashland Oil*, 456 F.Supp 831, 836 (1978). Here, the proposed indispensable parties were identified as the defendant's employer in the contested employment contract. The employment contract of February 15, 1989, states that Hughes "will be employed by any one and all of Communications Management National, L.P., Ragan Henry National Radio, L.P., Ragan Henry Communications Group, L.P." By the December 26, 1989, letter affirming the contract, "U.S. Radio, L.P. is inserted as a party to the agreement." After Mr. Hughes's employment by Ragan Henry and his affiliates under the February 15, 1989 agreement. Ragan Henry controls these entities, which defendant avers, are his composite employers under the contract. Thus, it appears that under the general rule, complete litigation of this employment dispute would call for the presence of the four employer-plaintiffs. Mr. Hughes's counterclaims run against his employers for wrongful discharge, breach of contract, and defamation, which would also make them indispensable parties to the suit.

Defendant also argues that if these entities are not joined as plaintiffs, he will be subject to the risk of multiple or inconsistent obligations. It is the purpose of Rule 19 "to avoid unnecessary multiple litigation, to provide complete relief to parties before court, and to protect rights and interests of absent parties." *CBS, Inc. v. Film Corp. of America*, 545 F.Supp. 1382 (E.D.Pa.1982). If all of his employers under the contract are not party to the suit, he would have to bring separate, parallel actions against each party to the contract to receive complete relief and would expose himself to multiple claims by the other non-party employers, resulting in duplicative litigation and the risk of inconsistent judgments, precisely the result Rule 19 was meant to avoid.

Plaintiffs assert that because these other entities are under the control of the existing plaintiffs, as the general partners in the proposed indispensable parties, joinder is unnecessary. However, where, as here, the entities are separately parties to an employment contract, and the central issue to be decided is defendant's fulfillment of his employment

obligations to each of them under the contract, the presence of those entities is necessary to assure the complete adjudication of defendant's counterclaim.

Defendant avers, without objection from the plaintiffs, that the joinder of these entities will not deprive this court of jurisdiction, here based on diversity of citizenship. Thus, because these other entities were parties to the contract at the core of this dispute and because their non-joinder could result in redundant and inconsistent litigation, they should be joined as indispensable parties under Rule 19.

2. *Motion to Disqualify the Law Firm of Wolf, Block, Schorr and Solis-Cohen from Further Representation of the Plaintiffs*

*3 Defendant Hughes argues that the law firm, which served as corporate counsel to various of the plaintiff entities, should be disqualified because of conflict of interest and breach of its duty of loyalty to him. Hughes states that the law firm, of which Henry is a partner, was in a *de facto* attorney-client relationship with him. During the course of this relationship, Hughes says, the law firm became privy to the details of his business decisions, which he had taken on the advice of the law firm, and the law firm had advised him on aspects of the disputed employment contract as well as his stock options and personal finances. (Hughes Aff., Feb. 21, 1992, ¶ 7). Hughes also avers that Henry told him that he did not need outside counsel in his dealings with the plaintiffs because the law firm, and he, in particular, could advise him. (Hughes Aff., Feb. 21, 1992, ¶ 10). Finally, because the key budgeting decision which led to his dismissal was based on advice from the law firm, which the law firm told him to follow, Hughes says that the members of the law firm's corporate and tax sections are likely be witnesses at the trial, thus giving a further reason for disqualification.

Under the Local Rules of Civil Procedure, Rule 14, "The Rules of Conduct adopted by this court are the rules of Professional Conduct adopted by the Supreme Court of Pennsylvania." [FN1] The Rules of Professional Conduct, 1.9
A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation; or (b) use information relating to the representation to the

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 151308 (E.D.Pa.)
**(Cite as: 1992 WL 151308 (E.D.Pa.))**

Page 3

disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known. Rules of Professional Conduct, Rule 1.9(a), 204 Pa.Code § 81.4.

"Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties." *United States v. Moscony*, 927 F.2d 742, 751 (3d Cir.1991) (citations omitted). Here, the law firm was corporate counsel, acting as attorney to both the plaintiffs and defendant, for example, on the disputed contract. At that time, this joint representation may not have been problematic, although I today need not and do not decide that question. However, as the employment relationship unraveled, the clients' interests devolved into the adverse. Although joint representation is permissible, under Rule of Professional Conduct 1.7(b), when the clients relationship places them on opposite side in litigation on the matter in which the attorney advised them, the prohibition against representation of opposing parties, under Rule 1.7(a) prevails. "A substantial relationship between successive representations often triggers concerns about divided loyalties and conflict of interest. *United States v. Moscony*, 927 F.2d 742, 750 (3d Cir.1991) (citations omitted).

**\*4** To determine whether there is a substantial relationship, courts have identified three factors: (a) What is the nature and scope of the prior representation at issue? (b) What is the nature of the present lawsuit against the former client? (c) In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation. *INA Underwriters Ins. v. Nalibotsky*, 594 F.Supp. 1199, 1206 (E.D.Pa.1984).

a. Nature and Scope of Prior Representation

Here, Hughes argues that the law firm, as corporate counsel to plaintiffs, gave him advice in his corporate capacity, and he further argues that his communications with corporate counsel are privileged under Rule of Professional Conduct 1.13 and 1.6. Here, the defendant had confidential communications with the corporate counsel and Mr. Henry, in both his business and personal decision-making. (Hughes Aff., Feb. 21, 1992, ¶ 7) Henry told Hughes to rely on his advice and the advice of the law firm in making decisions about the very employment contracts that are at the core of this case. (Hughes Aff., Feb. 21, 1992, ¶ 10). In course of his tenure as President of the plaintiff entities, he confided in corporate counsel and relied upon their advice in his business decisions, which will now be at issue in determining whether he was fired with or without cause. (Hughes Aff., Feb. 21, 1992, ¶ 3). Indeed, many of the meetings were held at the law firm's offices and several documents central to the case are on law firm stationery. (Hughes Aff., Feb. 21, 1992, ¶ 4, Def.Ex. 3). Hughes says that the law firm's advice goes to the heart of the very budgeting and business decisions for which he allegedly was fired. (Hughes Aff., Feb. 21, 1992, ¶ 3). The law firm also gave Hughes and his wife advice on their stock option investments made through the Henry affiliates. (Def.Ex. 6). Thus, the law firm's representation is inextricably intertwined with the dispute.

b. The Nature of the Present Case

The present case focuses on Hughes's contract and his performance as president of the plaintiff entities. Because of the plaintiff's status as a partner in the law firm and because the key budgeting decision which allegedly led to his dismissal arose out of advice from the law firm, the law firm is directly and intimately involved in central issues of the case. In fact, it is likely that the law firm will be called as a witness.

c. Relevance of Confidences Disclosed in Earlier Representation to Present Action

Here, the law firm was involved not only in the decision-making process but also in advising the now-adverse party on the decisions and contract which are the subject of the law suit. The exhibits submitted by defendant in support of this motion, document dealings during which the defendant confided in the law firm his concerns and his thought processes to which the law firm would not have been privy but for its confidential relationship with the defendant. The defendant would have been unlikely to have discussed his personal financial decisions on stock options or his contractual agreements with the law firm if their relationship had been adversary or if he had not been encouraged to do so by the assurances of Henry that the law firm would advise him.

**\*5** Thus, all three factors point to the existence of a confidential relationship between Hughes and the law firm, which under the Rules of Professional Conduct,

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 151308 (E.D.Pa.)
**(Cite as: 1992 WL 151308 (E.D.Pa.))**

would preclude the law firm from representing his adversary in this law suit.

The likelihood of the law firm's being called as a witness in this case, in addition to being an independent basis for disqualification, lends further support to the conclusion that the law firm's participation as plaintiffs' counsel in this law suit is improper. Under Rule of Professional Conduct 3.7, "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness ... (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or 1.9." Here, the representation would violate 1.9, because of the former confidential relationship between Hughes and the law firm, thus the law firm may not represent the plaintiffs against Hughes. It would also violate Rule 1.7 because the earlier joint representation of the company and principals in business decisions central to this suit.

Although the law firm asserts that a different department or different lawyers will be involved in the case, the involvement of the firm's corporate and tax sections pervades the central issues in this lawsuit. Absent extraordinary precautions to cordon off dealings with this client from the rest of the firm-- precautions which based on the evidence before the court do not appear to have been made, the firm must be disqualified if any of its members are, under Rule of Professional Conduct 1.10 Imputed Disqualification, 204 Pa.C.S. § 81.4. [FN2] In this litigation, the law firm's corporate and tax attorneys who advised the defendant would be directly adverse to that of the defendant, thus by the rule of imputed disqualification the entire firm would be disqualified.

Conflicts of interest, including potential conflicts of interest, are a threat not only to the rights and interests of clients and attorneys, but also to the integrity of the court. United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir.1978). For this reason, the District Court "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Wheat v. United States, 486 U.S. 153, 163 (1988).

CONCLUSION

Because the law firm's representation of plaintiffs would be directly adverse to the defendant with whom the firm had numerous confidential communications, in his personal and corporate capacities, and because members of the law firm are likely to be called as witnesses at trial, the professional rules impel my disqualifying them from further representation of the plaintiffs in this case.

***6** An order follows.

*ORDER*

AND NOW, this 18th day of June, 1992, upon consideration of defendant's Motion to Join Indispensable Parties, under Fed.R.Civ.P. 19, and defendant's Motion to Disqualify the law firm of Wolf, Block, Schorr & Solis-Cohen from Further Representation of Plaintiffs, and the responses thereto, it is ORDERED that both motions are GRANTED.

> FN1. The defendant avers, and plaintiffs do not dispute, that the Rules of Professional Conduct applicable to this issue are the same for Delaware law, which is the law governing the contract. Thus, the choice of law would not affect the result of this analysis.

> FN2. Rule 1.10(a) reads "while lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9, or 2.2."

Not Reported in F.Supp., 1992 WL 151308 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:91cv06157 (Docket) (Oct. 01, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 12

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 716901 (Del.Super.)
**(Cite as: 1997 WL 716901 (Del.Super.))**

Page 1

**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Robert SPROUT and John Schmuck, Plaintiffs,
v.
ELLENBURG CAPITAL CORPORATION, d/b/a
"Ell-Cap Rehoboth Communities, Inc."
and
Christoff A.G. Tulou, in his capacity as Secretary of
the Department of Natural
Resources & Environmental Control, State of
Delaware,
and
Camelot Mobile Home Park, Inc., and W.J. Chappy
Lehman
and
Frederick Warwick, in his capacity as Investigative
Supervisor, State Division
of Consumer Affairs., Defendants.
**No. Civ.A. 95C-05-025.**

Aug. 26, 1997.
Gerry Gray, Georgetown, DE, for plaintiff.

Michael Malkiewicz, Barros, McNamara, Scanlon,
Malkiewicz & Taylor, P.A., Dover, DE, for
defendant, Ellenburg Capital Corporation.

Jeanne L. Langdon, Department of Natural
Resources and Environmental Control, Dover, DE,
for defendant, Christoff A.G. Tulou, in his capacity
as Secretary of the Department of Natural Resources
& Environmental Control and Frederick Warwick, in
his capacity as Investigative Supervisor, State
Division of Consumer Affairs.

MEMORANDUM OPINION

GRAVES, J.

**\*1** Robert Sprout and John Schmuck ("Plaintiffs")
filed this action against Defendants Ellenburg Capital
Corporation, d/b/a Ell-Cap Rehoboth Communities,
Inc. ("Ellenburg"), Camelot Mobile Home Park, Inc.
("Camelot"), W.J. Chappy Lehman ("Lehman"),
principal owner and operator of Camelot, Christoff

A.G. Tulou ("Tulou"), in his official capacity as
Secretary of the Department of Natural Resources &
Environmental Control ("DNREC"), and Frederick
Warwick ("Warwick"), in his official capacity as
Investigative Supervisor for the State Division of
Consumer Affairs ("Division"), stating claims
resulting from episodes related to septic discharges
into their mobile home. At this time, Defendants
Tulou and Warwick (also referred to collectively as
"the State") and Ellenburg have moved to dismiss
Plaintiffs' claims pursuant to Super.Ct.Civ.R.
12(b)(6). The issues have been briefed and this
constitutes my decision herein.

**PROCEDURAL AND FACTUAL HISTORY**
On or about July 18, 1990, Plaintiffs purchased a
mobile home and subsequently leased a lot from
Camelot and Lehman in the Camelot Mobile Home
Park ("the park") in Rehoboth, Delaware. After
loving into their home, Plaintiffs noticed a repugnant
odor emanating from under their master bedroom,
and upon investigating, discovered problems with
their septic system. Plaintiffs allege that Lehman
and Camelot knew about these problems at the time
of purchase and concealed the fact that a septic
drainage field ran beneath their home. However, this
Court dismissed Defendants Camelot and Lehman
because the statute of limitations barred Plaintiffs'
claims against them.

In April, 1992, Lehman and Camelot sold the park to
Ellenburg. At that time, Camelot and Ellenburg
attempted to fix the defective septic system.
However, a backhoe was parked on the existing
drainage field and part of the field collapsed, thus
exacerbating the septic problems in Plaintiffs' home.
In an attempt to remedy the situation, Ellenburg
contracted with Leon Burton & Son, Inc. ("Leon") to
install a new septic system on Plaintiffs' lot.
However, Leon incorrectly attached the final
couplings, thereby causing additional raw sewerage
to accumulate beneath Plaintiffs' home.

After Ellenburg installed the proper couplings,
Plaintiffs continued to complain about foul odors
coming into their home. Plaintiffs claim that
because the original septic system for the two
adjacent lots continued to run directly beneath
Plaintiffs' master bedroom, the offensive smell never
abated. Plaintiffs assert that Ellenburg began
harassing them after they complained about the septic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

problems to DNREC and the Division by attempting to evict them, by sending maintenance personnel into their home without notice for non-emergency repairs, and by accusing them of violating certain set-back requirements after giving them permission to install a carport and driveway.

In April, 1994, Ellenburg instituted an action for back rent and possession of the lot in the Justice of the Peace Court No. 17 ("J.P.Court"). Plaintiffs elected not to file a counterclaim at that time in reliance on 10 Del.C. § 9536. [FN1]

> FN1. At the time Ellenburg sued Plaintiffs in J.P. Court in 1994, 10 Del.C. § 9536 stated in pertinent part:
> (a) In every action before a justice of the peace, within his jurisdiction, the defendant, if he has against the plaintiff any account, demand, or cause of action, cognizable before a justice of the peace, shall bring it forward and plead it as a setoff; and the justice shall enter on his docket the nature and amount of such counterclaim. Any defendant, neglecting to do so, shall, if the action against him be prosecuted to judgment, lose such account, demand, or cause of action, and be forever barred from recovering it.
> (b) If the defendant has any account, demand or cause of action, against the plaintiff, exceeding $5,000, the defendant may bring it forward and plead it as a setoff as specified in subsection (a) of this section, or not, at the defendant's pleasure, and shall not, by neglecting so to plead it, lose such cause of action.
> Subsequently, 10 Del.C. § 9536(b) was amended on January 15, 1995, to increase the monetary threshold to $15,000.

**\*2** At the hearing before the J.P magistrate, Ellenburg claimed that Plaintiffs wrongfully withheld rent, failed to correct an encroachment on an adjacent lot, and failed to reduce the height of a shed. The J.P Court granted Ellenburg back rent, but denied Ellenburg possession of the lot. Additionally, the J.P. magistrate refused to rule on the alleged encroachment and height violations because of a lack of evidence. Plaintiffs never appealed the magistrate's decision.

With respect to Plaintiffs' complaint against Tulou, plaintiffs claim that DNREC responded late on many occasions to calls for assistance, and that DNREC

merely told them to put lime in their soil after testing it and finding unhealthy levels of contaminants. Plaintiffs argue that DNREC knew the lot contained unhealthy levels of contaminants but failed to take appropriate remedial measures to protect the public's health, safety, and welfare. With respect to Plaintiffs' complaint against Warwick, Plaintiffs contend that when they requested the Division to enforce the Mobile Home Lots and Leases Act, the Division lost their complaint after a lengthy delay and then failed to take any further action.

On October 13, 1995, Plaintiffs filed an amended complaint in this Court seeking the following relief: (1) rent abatement; (2) damages against Ellenburg for retaliatory eviction, failure to disclose material defects on the lot, consumer fraud, and negligence; (3) damages against the State for gross or wanton negligence; and, (4) damages against Leon for negligence for incorrectly installing the new septic system. However, Plaintiffs never served any of the defendants with the amended complaint. Although I do not consider this amended complaint relevant to this motion since it never has been served, I do examine Count VIII thereof for the sake of judicial economy.

On August 23, 1995, the State filed a motion to dismiss and the Court ordered the parties to brief the motion. After briefing, the Court permitted Plaintiffs to conduct discovery on the issue of whether the State had insurance to cover Plaintiffs' claim. Although the Court initially set the discovery deadline for May 31, 1996, Plaintiffs later were given until August 1, 1996 to complete discovery. Subsequently, Plaintiffs informed the Court that they would not conduct discovery until the Court ruled on the State's motion to dismiss. At this time, therefore, the only evidence before the Court on the issue of State insurance is an affidavit submitted by Debra Lawhead, Insurance Coverage Officer for the State, swearing that there is no insurance to cover Plaintiffs' claim. The affidavit, moreover, renders the State's motion to dismiss a motion for summary judgment. Super.Ct.Civ.R. 12(b).

As noted earlier, this Court dismissed Lehman and Camelot from this action. In addition, the parties agree that Count III against Ellenburg has been resolved.

On October 23, 1995, Ellenburg filed a motion to dismiss and the parties subsequently entered into a briefing schedule. However, Ellenburg failed to file its reply brief until April 17, 1997, which caused this

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 716901 (Del.Super.)
**(Cite as: 1997 WL 716901 (Del.Super.))**

Page 3

matter to languish in the meantime.

**\*3** Currently, Plaintiffs have the following claims against the State and Ellenburg:

  1) In Count VI, Plaintiffs have sued Tulou in his official capacity as Secretary of DNREC for gross and wanton negligence;
  2) In Count VII, Plaintiffs have sued Warwick in his official capacity as Investigative Supervisor for the Division for gross and wanton negligence;
  3) In Counts I, II, IV, V, and VIII, Plaintiffs have sued Ellenburg for rent abatement, retaliatory eviction, consumer fraud pursuant to 6 *Del.C.* § 2513, common law fraud, and negligence.

Accordingly, at this time the Court considers the State's motion for summary judgment and Ellenburg's motion to dismiss.

### STANDARD OF REVIEW

When the Court considers a motion to dismiss for failure to state a claim pursuant to Super.Ct.Civ.R. 12(b)(6), the Court accepts all well-pleaded allegations as set forth in the complaint as true and determines whether the plaintiff could recover under "any reasonably conceivable set of circumstances susceptible to proof under the complaint." *Silence v. Funk,* Del.Supr., 396 A.2d 967 (1978). However, if a defendant supplements the pleadings with an affidavit, the Court will treat a motion to dismiss as a motion for summary judgment. *Shultz v. Delaware Trust Co.,* Del.Super., 360 A.2d 576 (1976). As noted earlier, the State has submitted an affidavit for the Court's consideration. Consequently, the Court will treat the State's motion to dismiss as one for summary judgment pursuant to Super.Ct.Civ.R. 56.

When considering a motion for summary judgment, the Court will view the record in a light most favorable to the non-moving party. *Alabi v. DHL Airways, Inc.,* Del.Super., 583 A.2d 1358 (1990). The moving party bears the burden of showing that there are no genuine issues of material fact so that he is entitled to judgment as a matter of law. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979). To overcome the moving party's motion, the opposing party must allege specific facts demonstrating a genuine issue of material fact. *E.K. Geyser v. Blue Rock Shopping Center, Inc.,* Del.Super., 229 A.2d 499 (1967). If the non-moving party fails to controvert the movant's affidavits or otherwise supplement the record with an affidavit of his own, then the motion for summary judgment should be granted. *Nix v. Sawyer,* Del.Super., 466 A.2d 407 (1983).

### DISCUSSION
### I. State's Motion for Summary Judgment

In its motion for summary judgment, the State presents one issue for the Court's consideration: whether Plaintiffs' claim is barred by sovereign immunity. The essence of the State's argument is that if there is no insurance to cover Plaintiffs' claim, nor any other independent waiver of immunity under the State Tort Claims Act ("the Act"), [FN2] then the inquiry ends and summary judgment must be granted in the State's favor. In response, Plaintiffs argue that summary judgment is improper because factual questions exist as to whether Defendants Tulou and Warwick engaged in ministerial acts and committed gross negligence, and whether the State independently waived its sovereign immunity by providing DNREC and the Division with the statutory power to sue and be sued. additionally, Plaintiffs argue that they should be given the opportunity to conduct discovery to determine whether the State has insurance to cover their claim. The parties' arguments are evaluated below.

FN2. 10 *Del.C.* § 4001-04.

**\*4** Article I, § 9 of Delaware's Constitution of 1897 provides hat the only way the State's sovereign immunity may be waived is by act of the General Assembly. *Shellhorn v. Hill,* Del.Supr., 187 A.2d 71, 74-75 (1962). Therefore, unless Plaintiffs can identify some means by which the State has waived DNREC's and the Division's sovereign immunity, Plaintiffs' suit must fail. *Doe v. Cates,* Del.Supr., 499 A.2d 1175, 1176-77 (1985).

While the State is considered to have presumptively waived its sovereign immunity under 18 *Del.C.* § 6511 [FN3] for any risk or loss covered by the State's insurance coverage program, if there is no insurance to protect the State against a particular wrongful act, then the State retains its sovereign immunity. *Turnbull v. Fink,* Del.Supr., 668 A.2d 1370, 1376 (1995); *Pipkin v. Department of Highways and Transp.,* Del.Super., 316 A.2d 236, 239 (1974). In this case, the State has submitted an affidavit from Debra Lawhead stating that there is no insurance applicable to Plaintiffs' claim. In spite of this, Plaintiffs claim that Tulou and Warwick are liable under 10 *Del.C.* § 4001 for committing gross acts of negligence in the performance of their ministerial duties.

FN3. 18 *Del.C.* § 6511 states in pertinent part:
The defense of sovereign immunity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 716901 (Del.Super.)
(Cite as: 1997 WL 716901 (Del.Super.))

waived and cannot and will not be asserted as to any risk or loss covered by the state insurance coverage program, whether same be covered by commercially procured insurance or by self-insurance, and every commercially procured insurance contract shall contain a provision to this effect, where appropriate.

Under 10 Del.C. § 4001, [FN4] the Legislature provided State agencies and employees with sovereign immunity for acts done in good faith, without gross or wanton negligence, and arising out of and in connection with their official duties involving the exercise of discretion. Conversely, public employees may be liable for ministerial acts performed in a grossly negligent or bad faith manner. However, even if public employees perform their duties in bad faith or with gross negligence, Plaintiffs' suit is barred by sovereign immunity if the State does not possess insurance to cover Plaintiffs' claim. Doe v. Cates, Del.Supr., 499 A.2d 1175, 1176-77 1985).

FN4. 10 Del.C. § 4001 states in pertinent part:
Except as otherwise provided by the Constitutions or laws of the United States or of the State ... no claim or cause of action shall arise, and no judgment, damages, penalties, costs or other money entitlement shall be awarded or assessed against the State or any public officer or employee ... in any civil suit ... where the following elements are present:
(1) The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion on the part of the public officer ...;
(2) The act or omission complained of was done in good faith and in the belief that the public interest would best be served thereby; and
(3) The act or omission complained of was done without gross or wanton negligence ....

In Doe, the Supreme Court held that 10 Del.C. § 4001 serves to limit the State's liability where it has, by some means independent of § 4001, waived immunity." Doe, 499 A.2d at 1181 (emphasis

added). In other words, the Court determined that § 4001 did not provide a cause of action against officials who performed their duties with gross negligence or in bad faith if there was no insurance to cover the claim. Id. The Court determined that any other interpretation of § 4001 would have the unintended effect of waiving immunity even in cases where no insurance coverage had been provided under the Insurance Act of 18 Del.C. ch. 65." Id.

In this case, Debra Lawhead has submitted an affidavit explaining that there is no insurance to cover Plaintiffs' claim, and Plaintiffs have failed to allege any specific facts to the contrary. Instead, Plaintiffs' argue that they should be entitled to conduct discovery on the issue of State insurance to determine if they can find evidence to dispute Ms. Lawhead's affidavit. Super.Ct.Civ.R. 12(b). However, on April 16, 1996, I authorized Plaintiffs to conduct discovery on this issue, and Plaintiffs chose not to conduct discovery until the Court ruled on the State's motion to dismiss. At this time, therefore, I will not delay the proceedings any further to allow further discovery, and thus, I find no merit to this argument. Accordingly, because there is no genuine issue of material fact on this issue, I find that the State has waived its sovereign immunity pursuant to 18 Del.C. § 6511, where there is no insurance to cover Plaintiffs' claim.

*5 Alternatively, Plaintiffs attempt to show that the State has waived DNREC's and the Division's sovereign immunity by providing them with the "statutory power to sue or be sued." Sandt v. Delaware Solid Waste Auth., Del.Super., 640 A.2d 1030 (1994); Masten v. State, Del.Super., 626 A.2d 838 (1991) (citing Department of Community Affairs and Econ. Dev. v. M. Davis & Sons, Inc., Del.Supr., 412 A.2d 939 (1980) (hereinafter "Davis "). Plaintiffs contend that DNREC has the power to sue under 7 Del.C. § 6005, and the power to be sued under 7 Del.C. § 6009. Additionally, Plaintiffs contend that the Division has the power to sue and be sued under 29 Del.C. § 8824. However, in spite of Plaintiffs' contentions, the Court finds that neither DNREC nor the division have the power "to sue or be sued", as that phrase is used in Sandt and Davis, supra.

In Sandt, a pedestrian sued the Delaware Solid Waste Agency ("DSWA") after being struck by a DSWA vehicle. In finding that the state had waived DSWA's sovereign immunity, the Court noted that the "General Assembly clearly provided in 7 Del.C. § 6406(a)(5) that the DSWA has the power to '[s]ue and be sued' ". Sandt, 640 A.2d at 1035. Similarly,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 1997 WL 716901 (Del.Super.)
**(Cite as: 1997 WL 716901 (Del.Super.))**

in *Davis* a corporation brought a mechanics' lien action against the Department of Community Affairs and Economic Development ("DCAED"). The Court found that DCEAD waived its sovereign immunity pursuant to 6 *Del.C.* § 7003(c)(1), which stated:

> The Department may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes including ... the rights and powers described below:
> (1) To sue and be sued, implead and be impleaded, complain and defend in all courts.

In contrast to the clear statutory language analyzed by the court in *Sandt* and *Davis,* in this case there is no statutory language which specifically empowers DNREC or the Division to sue or be sued. *7 Del.C.* § 6005 merely provides DNREC with the authority to take enforcement actions for violations of 7 *Del.C.,* Chapter 60, while *7 Del.C.* § 6009 simply permits an aggrieved party to appeal a decision of the Environmental Appeals Board ("Board") to Superior Court. As the State points out, the Board is not being "sued" when a claimant appeals one of its decisions any more than this Court is being "sued" when an appeal is taken to the Supreme Court.

Likewise, Plaintiffs' argument that the Division has the power to sue or be sued also fails because 29 *Del.C.* § 8824 simply provides the Consumer Affairs Board with authority to hear appeals from the Division's decisions. There is simply no other basis independent of *10 Del.C.* § 4001 by which the State has waived DNREC's or the Division's sovereign immunity. *Doe, supra.*

Thus, in light of the foregoing, and considering the facts in the light most favorable to Plaintiffs, I find that the State has not waived its sovereign immunity either by providing insurance to cover Plaintiffs' claim or by providing DNREC or the Division with the authority to "to sue or be sued". *See Sandt* and *Davis, supra.* Accordingly, I grant the State summary judgment on Plaintiffs' complaint against Tulou and Warwick by finding that their claims are barred by sovereign immunity.

## II. Ellenburg's Motion to Dismiss

**\*6** In its motion to dismiss, Ellenburg first argues that Plaintiffs' claims for rent abatement and retaliatory eviction under Counts I and II are barred by the principle of collateral estoppel because these issues were litigated previously in J.P. Court. In response, Plaintiffs assert that *10 Del.C.* § 9536 presently allows them to bring their counterclaims in

a separate civil suit in this Court. The parties arguments are evaluated below.

The doctrine of collateral estoppel, or issue preclusion, bars a party from relitigating a factual issue previously litigated in a prior case. *Columbia Cas. Co. v. Playtex FP, Inc.,* Del.Supr., 584 A.2d 1214 (1991). For collateral estoppel to apply, the issue must have been actually raised, fully litigated, and identical to the issue concluded in the earlier action, the issue must have been material and relevant to the disposition of the prior action, and the determination of the issue in the prior action must have been necessary and essential to the resulting judgment. *Elder v. El Di, Inc.,* Del.Super., C.A. No. 96C-09-007, Graves, J. (April 24, 1997) at 12-13. Where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive. *Id.* at 1216 (citing *Tyndall v. Tyndall,* Del.Supr., 238 A.2d 343 (1968)). Notably, final judgments rendered in a J.P. Court are conclusive in this Court. *Desmond v. Lucks,* Del.Super., C.A. No. 87C-AP-20, Steele, J. (August 19, 1988).

In its decision below, the J.P. magistrate considered Ellenburg's claims for back rent and possession of Plaintiffs' lot. After hearing testimony, the magistrate determined that Plaintiffs owed Ellenburg $3,298.00 in back rent, but refused to evict plaintiffs or grant Ellenburg possession of the leased lot. Plaintiffs now claim a cause of action for rent abatement and retaliatory harassment in their complaint by arguing that *10 Del.C.* § 9536 permits them to litigate these issues in this Court.

While Plaintiffs are correct in stating that *10 Del.C.* § 9536 permits them to assert their counterclaims over $5,000 in a separate proceeding, Plaintiffs are incorrect in construing § 9536 to mean that they may bring previously litigated issues before this Court. Although Plaintiffs cite *Walker v. Fala,* Del.Super., C.A. No. 1122, Christie, J. (February 25, 1977) and *Bomba's Restaurant & Cocktail Lounge, Inc. v. Lord De La Warr Hotel, Inc.,* Del.Supr., 389 A.2d 766 (1978) (hereinafter "*Bomba* ") to support their position, neither case holds that collateral estoppel is inapplicable by operation of *10 Del.C.* § 9536.

In *Walker,* a commercial tenant received a default judgment in J.P. Court on a summary possession hearing and then filed a counterclaim in Superior Court. Because none of the tenant's counterclaims in Superior Court were previously before the J.P. magistrate, the Court held that the tenant could bring

his counterclaims separately even if the counterclaim was an absolute defense in the summary possession suit below. The Court in *Walker* never mentioned 10 *Del.C.* § 9536. Similarly, in *Bomba* the Court merely held that a plaintiff had the right to litigate matters other than the right to possession in another court of competent jurisdiction. Nothing in *Bomba* could be construed to mean that a plaintiff may relitigate issues previously decided below.

*7 In this case, the J.P. Court denied Ellenburg's claim for possession and instead awarded back rent. Thus, the magistrate's final judgment on the issue of rent abatement is conclusive in this Court. *Desmond, supra.* However, the J.P. magistrate never considered Plaintiffs' retaliatory harassment claim under 25 *Del.C.* § 7018(b) [FN5] because Plaintiffs withheld the claim pursuant to 10 *Del.C.* § 9536. While the magistrate refused to evict Plaintiffs and determined that the parties presented a good faith dispute on the eviction issue, the magistrate never addressed Plaintiffs' claim that Ellenburg sent maintenance personnel into their home for non-emergency repairs and accused them for violating certain setback requirements after giving them permission to install a carport and driveway. Accordingly, because the J.P. magistrate never considered the claim, and because this Court is unable to determine whether the claim exceeds the $5,000 threshold under 10 *Del.C.* § 9536(b), I decline to dismiss Plaintiffs' claim against Ellenburg for retaliatory harassment at this time. Thus, I find that only Plaintiffs' claim for rent abatement is barred by collateral estoppel.

> FN5. 25 *Del.C.* § 7018(b) states:
> (b) Harassment of a tenant in the form of interruption of services, invasions of privacy or similar means in retaliation for any of the above actions shall constitute grounds for a civil suit in damages by the tenant against the landlord.

Ellenburg next argues, without citing any authority, that plaintiffs' claim under the Consumer Fraud Act ("the Act") is not ripe for adjudication in this Court because Plaintiffs failed to exhaust their administrative remedies. Alternatively, Ellenburg contends that the Act is inapplicable to leased mobile home lots. As an initial matter, I dismiss Plaintiffs' claim under the Act with respect to the allegation that Ellenburg induced them to purchase the mobile home because I find that Ellenburg had no involvement with the sale of Plaintiffs' mobile home.

With respect to Ellenburg's claim that Plaintiffs first must exhaust their administrative remedies before pursuing a claim under the Act in this Court, it is well-settled in Delaware that the Act permits a private cause of action for damages predicated upon 6 *Del.C.* § 2513(a). [FN6] *Young v. Joyce,* Del.Supr., 351 A.2d 857 (1975). In *Joyce,* the Supreme Court found that although the Act did not specifically create a private remedy, "sound logic and reason dictate that the consumer ought to be able to enforce the same claim in his own right." *Id.* at 859. Accordingly, the Court held that a consumer could assert a private cause of action under 6 *Del.C.* § 2513 without having to proceed first through the Attorney General. *Id.* Therefore, I find no merit to Ellenburg's argument that Plaintiffs' claim is not ripe for adjudication.

> FN6. 6 *Del.C.* § 2513(a) states in pertinent part:
> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

Ellenburg alternatively argues that the Act does not apply to "leased" mobile home lots because the term "sale" in 6 *Del.C.* § 2513 does not include leased real property. The Act defines "sale" as "any sale, offer for sale, or attempt to sell any merchandise for cash or on credit." 6 *Del.C.* § 2511(4). The Act defines "merchandise" as "any objects, wares, goods, commodities, intangibles, real estate or services". 6 *Del.C.* § 2511(2).

*8 While the Act is liberally construed to protect the consumer, *Young, supra,* there are no Delaware cases which hold that the term "sale" includes leased real property, and the Court will not rewrite the plain language of 6 *Del.C.* § 2511(2) to provide plaintiffs a cause of action under the Act. Accordingly, I dismiss plaintiffs' claim under the Act because I find that the leased mobile home lot does not constitute a sale under 6 *Del.C.* § 2511 (4).

Finally, Ellenburg contends that because Plaintiffs failed to plead fraud and negligence with particularity, their claims should be dismissed

*

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 716901 (Del.Super.)
**(Cite as: 1997 WL 716901 (Del.Super.))**

Page 7

pursuant to Super.Ct.Civ.R. 9(b). [FN7]  Under Rule 9(b), in order to plead fraud sufficiently, Plaintiffs must specify the time, place, and contents of the false representations, as well as the identity of the person making the representations. *Nutt v. A.C. & S., Inc.,* Del.Super., 466 A.2d 18, 23 (1983).  Additionally, in order to plead negligence sufficiently, Plaintiffs must specify that duty, if any, was breached, who breached it, what act or failure to act breached the duty, and the party upon whom the act was performed. *Myer v. Dyer,* Del.Super., 542 A.2d 802, 805 (1987).  The purpose of the particularity requirement is to enable the defendant to prepare a defense to the charges.

> FN7. Super.Ct.Civ.R. 9(b) states in pertinent part:
> **Fraud, Negligence, Mistake, Condition of Mind.** In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake shall be stated with particularity.

In this case, Plaintiffs' complaint for common-law fraud rely alleges that "Defendants' actions constitute common-law fraud in the State of Delaware." The pleading here is wholly insufficient to make a claim for fraud under Rule 9(b) in that it fails to provide the dates of the alleged misrepresentations, the contents of the alleged misrepresentations, and the identity of the persons making the alleged misrepresentations. *Nutt,* 466 A.2d at 23.  Similarly, Plaintiffs' complaint is insufficient to make a claim for negligence because it merely alleges that Ellenburg's acts constitute "reckless or intentionally negligent conduct". Plaintiffs fail to specify Ellenburg's duty, who breached it, and the acts and omissions which constitute the alleged breach. *Myer,* 542 A.2d at 805. Therefore, because I find that Plaintiffs failed to plead the circumstances of the alleged fraud and negligence with particularity, I grant Ellenburg's motion to dismiss with respect to Plaintiffs' common-law fraud and negligence claims.

## CONCLUSION

Based on the foregoing, I grant the State summary judgment on Counts VI and VII of Plaintiffs' complaint for gross and wanton negligence because I find Plaintiffs' claims barred by sovereign immunity. Additionally, I grant Ellenburg's motion to dismiss Count I for rent abatement because the J.P. magistrate previously issued a final judgment on that issue, and thus, it is barred by collateral estoppel.  I grant Ellenburg's motion to dismiss Count IV for statutory fraud because I find that the Act does not apply to leased real property.   Finally, I grant

Ellenburg's motion to dismiss Counts V and VIII of Plaintiffs' complaint for common law fraud and negligence because Plaintiffs failed to plead their allegations with particularity.   At this time, then, Plaintiffs' only outstanding claim is Count II of their complaint for retaliatory harassment against Ellenburg.  Again, I note that the amended complaint has been allowed, but has not been served.

**\*9** IT IS SO ORDERED.

Not Reported in A.2d, 1997 WL 716901 (Del.Super.)

END OF DOCUMENT

TAB 13

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 913930 (D.Del.)
**(Cite as: 1994 WL 913930 (D.Del.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
William **SEIDEL**, Plaintiff,
v.
Thomas H. **LEE**, Thomas H. **Lee** Advisors, Inc.,
ML-**Lee** Acquisition Fund, L.P.,
Vernon R. Alden, Joseph L. Bower, Stanley H.
Feldberg, ML Mezzanine, Inc.,
Mezzanine Investments, L.P., ML Fund
Administrators, Inc., Merrill Lynch,
Pierce, Fenner & Smith, Inc., Merrill Lynch & Co.,
Inc., John W. Childs, Thomas
R. Shepherd, David V. Harkins, Glenn H. Hutchins,
C. Hunter Boll, Scott A.
Schoen, Wendy L. Masler, Lester Schoenfeld, Kevin
K. Albert, Jerome P. Green,
J. Huston McCollough II, Rosalie Y. Goldberg,
Joseph J. Aurilia, James V.
Caruso, Mark M. Collins, Joseph W. Sullivan, Emily
L. Wong, Margaret A. Burke,
Robert T. Discolo, Matthew D. Castagna, and
Patricia A. Quane, Defendants.
**No. CIV. A. 93-494-JJF.**

Oct. 14, 1994.

Pamela S. Tikellis, Carolyn D. Mack, James C. Strum, Chimicles Jacobsen & Tikellis, Wilmington, DE, William J. French, Gibbs Roper Loots & Williams, Milwaukee, WI, Carol V. Gilden, Much Shelist Freed Denenberg & Ament, Chicago, IL, James S. Youngblood, Youngblood & Associates, Atlanta, GA, for Plaintiff.

Stephen E. Herrmann, Lisa A. Paolini, Richards Layton & Finger, Wilmington, DE, Sanford F. Renz, Richard S. Nicholson, Alan J. Cooke, Laura A. Pritzker, Robert L. Kirby, Jr., Hutchins Wheeler & Dittmar, Boston, MA, for Defendants Thomas H. Lee Advisors I, Thomas H. Lee, John W. Childs, Thomas R. Shepherd, David V. Harkins, Glenn H. Hutchins, C. Hunter Boll, Scott A. Schoen, and Wendy L. Masler.

Kenneth J. Nachbar, Morris Nichols Arsht & Tunnell, Wilmington, DE, James N. Benedict, Mark

Holland, David I. Lewittes, Rogers & Wells, New York City, for Defendants ML Mezzanine, Inc., Mezzanine Investments, L.P., ML Fund Administrators, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Lester Schoenfeld, Kevin K. Albert, Jerome P. Greene, J. Huston McCollough II, Rosalie Y. Goldberg, Joseph J. Aurilia, James V. Caruso, Mark M. Collins, Joseph W. Sullivan, Emily L. Wong, Margaret A. Burke, Robert T. Discolo, Matthew D. Castagna, and Patricia A. Quane.

Michael D. Goldman, Stephen C. Norman, Potter Anderson & Corroon, Wilmington, DE, John D. Donovan, Jr., Michael K. Fee, John Baraniak, Ropes & Gray, Boston, MA, for Defendants ML-Lee Acquisition Fund, L.P., Vernon R. Alden, Joseph L. Bower, and Stanley H. Feldberg.

*MEMORANDUM OPINION*

FARNAN, District Judge.

I. *INTRODUCTION*

**\*1** Plaintiff, William Seidel, commenced this class action on behalf of all limited partners of ML-Lee Acquisition Fund, L.P. ("Fund I") who invested in Fund I from August 12, 1987 to December 10, 1993 against Fund I, [FN1] the Lee Defendants, [FN2] the Merrill Lynch Defendants, [FN3] and the Independent General Partner Defendants. [FN4] The Complaint alleges that "defendants have breached their fiduciary duties and have engaged in personal misconduct by causing Fund I to engage in prohibited affiliated transactions, to deviate from its stated investment policies, and to engage in transactions which were unreasonable, unfair, or involved the overreaching of the investors of Fund I." Complaint, at ¶ 30. The Complaint cites over 20 investments involving 10 companies which allegedly violated sections 36(a), [FN5] 56(a), [FN6] 57(a), [FN7] 57(d) [FN8] and 17(j) [FN9] of the Investment Company Act. Complaint, at ¶¶ 31-101. The Complaint also alleges the defendants are liable for breach of contract [FN10] and breach of fiduciary duty [FN11] under state law.

> FN1. Fund I is a Delaware Limited partnership with its principal place of business in Boston, Massachusetts. Fund I is a registered investment company that has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 913930 (D.Del.)
(Cite as: 1994 WL 913930 (D.Del.))

elected to operate as a business development company pursuant to the Investment Company Act. Fund I units were sold to the public in 1987 and 1988.

FN2. The Lee Defendants include Thomas H. Lee ("Lee"), the Thomas H. Lee Company ("Lee Co."), Advisors I, and the Advisor I Individual Defendants. Lee is an individual general partner of Fund I. He also controls Advisors I, the investment advisor to Fund I. Advisors I is a Massachusetts business trust with its principal place of business in Boston, Massachusetts. The Advisors I Individual Defendants are the officers and directors of Advisors I. The Advisors I Individual Defendants are: Lee, Chairman, John W. Childs, President, Thomas R. Shepherd, Executive Vice President, David V. Harkins, Senior Vice President, Glenn H. Hutchins, Vice President, C. Hunter Boll, Vice President, Scott A. Schoen, Vice President, Wendy L. Masler, Treasurer and Clerk.

FN3. The Merrill Lynch Defendants include: (1) Merrill, Lynch, Pierce, Fenner & Smith ("MLPF & S"), (2) Mezzanine Investments, L.P. ("Mezzanine Investments I"), (3) ML Mezzanine Inc. ("Mezzanine I"), (4) ML Fund Administrators, Inc. ("Administrators"), (5) Merrill Lynch & Co., Inc., and (6) Mezzanine I Individual Defendants. MLPF & S is a Delaware Corporation with its principal place of business in New York, New York. MLPF & S served as the principal underwriter of Fund I.
Mezzanine Investments is a Delaware Limited Partnership with its principal place of business in New York, New York. It is the managing general partner of Fund I. Mezzanine Investments is also a registered investment adviser. Advisors I is the sole limited partner of Defendant Mezzanine Investments I. Mezzanine I is a Delaware Corporation and the general partner of Mezzanine Investments I.
Administrators has been the administrator of Fund I since June 30, 1989. Administrators, along with MLPF & S and Mezzanine I is wholly owned by Merrill, a Delaware corporation.
Mezzanine I Individual Defendants are the officers and directors of Mezzanine I. The

Mezzanine I Individual defendants are: Lester Schoenfeld, Chairman, Kevin K. Albert, Jerome P. Greene, J. Huston McCollough II, Rosalie Y. Goldberg, Joseph J. Aurilia, James V. Caruso, Mark M. Collins, Joseph W. Sullivan, Emily L. Wong, Margaret A. Burke, Robert T. Discolo, Matthew D. Castagna, Patricia A. Quane.

FN4. There are three Independent General Partner Defendants: Vernon R. Alden, Joseph L. Bower, and Stanley H. Feldberg. Alden, Bower and Feldberg are general partners of Fund I.

FN5. See Complaint, at ¶ 103-108 (Count I).

FN6. See Complaint, at ¶ ¶ 109-111 (Count II).

FN7. See Complaint, at ¶ ¶ 112-115 (Count III).

FN8. See Complaint, at ¶ ¶ 116-119 (Count IV).

FN9. See Complaint, at ¶ ¶ 120-124 (Count V).

FN10. See Complaint, at ¶ ¶ 125-128 (Count VI).

FN11. See Complaint, at ¶ ¶ 129-131 (Count VII).

Defendants have moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint. Because many of Plaintiff's allegations are barred by the statute of limitations, or are otherwise not cognizable under the Investment Company Act, the Court will grant in part and deny in part, Defendants' motion.

## II. *DISCUSSION*

Defendants advance five principal arguments in support of their motion to dismiss. First, Defendants argue that a substantial number of Plaintiff's allegations are barred by the statute of limitations. Second, Defendants argue that private causes of action do not exist under sections 36(a), 56(a), 57(a), 57(d), and 17(j) of the Investment Company Act. Third, Defendants contend that aider and abettor liability for private right of action is not recognized

under the Investment Company Act. Fourth, Defendants assert that Plaintiff's claims are derivative claims, and that in pursuing individual claims, Plaintiff has failed to fulfill the prerequisites for bringing a derivative action. Finally, Defendants argue that the Complaint fails to properly allege primary violations of the Investment Company Act.

When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all well-pleaded facts contained in the complaint as true, and views Plaintiff's allegations in a light most favorable to the Plaintiff, drawing all reasonable inferences therefrom in favor of the Plaintiff. Thus, the Court will grant Defendants' motion to dismiss only where it appears beyond doubt that Plaintiff can prove no set of facts entitling him to relief. *See Conley v. Gibson,* 355 U.S. 69, 73 (1957).

Many of the arguments and issues raised by Defendants' instant Motion to Dismiss were raised and resolved by the Court in *In re ML-Lee,* 848 F.Supp. 527 (D.Del.1994), a similar case involving the same counsel, the same plaintiff, and a substantial number of the same defendants. In *In re ML-Lee,* the Court determined: (1) that implied private causes of action are maintainable under sections 17(j), 36(a), 57(a), and 57(d); (2) the appropriate statute of limitations that governs these implied rights of action is the 1-3 statute of limitations--3 years from the alleged violation and one year from discovery--that applies generally to actions brought under the 1933 and 1934 Acts; (3) private causes of action against aiders and abettors do not exist under sections 17(j), 36(a), 57(a), 57(d) of the Investment Company Act.

*\*2 To the extent that the present motion to dismiss raises the same issues of law, the Court incorporates the analysis and conclusions contained in *In re ML-Lee.* Therefore, the Court will deny Defendants' Motion to Dismiss to the extent it seeks dismissal on the grounds that there are no implied private rights of action under sections 17j, 36(a), 56(a), 57(a), 57(d) of Investment Company Act. However, the Court will grant Defendants' Motion to Dismiss with regard to those counts of the Complaint that are based on secondary liability. The Court will address Defendants' remaining arguments below.

A. Statute of Limitations

  1. *Pre-October 14, 1990 Transactions*
As stated above, the applicable limitations period for Plaintiff's causes of action is one year from discovery and three years from the alleged wrong. Plaintiff filed

his initial complaint on October 14, 1993. Thus, any count of the Complaint related to transactions that occurred prior to October 14, 1990 are barred outright by the 3 year repose period.

Plaintiff argues that even if the Court were to apply a one year limitations period, the Court should not dismiss the claims because the challenged conduct was part of a continuous pattern of violations of the Investment Company Act that continued into 1993. The continuing violation doctrine is well-established in the Third Circuit. Under this doctrine, if a plaintiff is injured by a defendant's conduct which is part of a continuing course of conduct, an action does not violate the statute of limitations if the last act evidencing the continuing conduct falls within the limitations period. *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1129 (3d Cir.1988). The continuing wrong doctrine is premised on the unfairness of requiring a plaintiff to institute an action before he can predict his damages. *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1039 (2d Cir.1992) (citing *Taylor v. Meirick,* 712 F.2d 1112, 1119 (7th Cir.1983) ).

Plaintiff asserts that the Complaint adequately alleges a continuing course of conduct in violation of the fiduciary duty and affiliated person provisions of the Investment Company Act beginning on March 17, 1988, Complaint at ¶ 35, and continuing through June 30, 1993, Complaint at ¶ 57. Therefore, Plaintiff asserts that the statute of limitations did not begin to run until June 30, 1993.

Defendant contends that the continuing wrong doctrine is inapplicable for two reasons. First, Defendant contends that each transaction challenged by Plaintiff is a discrete act for which Plaintiff claims discrete damages, and thus, there is not a single continuing wrong. Second, Defendants contend that the continuing wrong doctrine is inapplicable to securities laws violations, in particular to the three year limitations period.

Read as a whole, the Complaint alleges a number of discrete transactions, each of which by themselves may constitute a violation of the Investment Company Act. The Court recognizes that Plaintiff alleges he was injured by Defendants' repeated (and in that sense "continuing") violations of the Investment Company Act. But, the continuing wrong theory is not applicable merely because a defendant engages in a series of similar acts that all violate the same statute. For this reason, the Court will dismiss those counts of the Complaint that are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 913930 (D.Del.)
(Cite as: 1994 WL 913930 (D.Del.))

Page 4

premised on liability resulting from transactions that occurred prior to October 14, 1990.

### 2. Post-October 14, 1990/Pre-October 14, 1992 Transactions

*3 A number of transactions alleged by the Plaintiff occurred within the three year repose time but more than one year prior to filing of the Complaint.

Cole National.    Plaintiff alleges that Fund I's September 1990 purchase of Cole National securities and the subsequent repurchase of those securities by Cole National in November 1990 constituted an unlawful short-term loan to a person related to Fund I in violation of section 57(a)(3) of the Investment Company Act.

Holdingflower.    Plaintiff alleges that in October 1990, Lee Co. sold preferred stock of Holdingflower, Inc. to Fund I without the required exemptive order from the SEC.    Plaintiff further alleges that the Defendants caused Fund I to execute a $1.5 million guarantee of additional bank borrowing, which was described as a "follow-on investment."    As of December 31, 1990, Fund I wrote down $11,674,340 of its Magicsilk investment, which included its entire investment in Magicsilk stock, and 75% of its subordinated note.    Fund I also wrote off the entire amount of Magicsilk's accrued and unpaid interest. Fund I eventually sold its $15,205,000 Note for $375,000, resulting in a total realized loss of $17,077,000.

Defendants contend that the Cole National repurchase transaction and Holdingflower transactions were disclosed in the proxy statement for the May 21, 1991 annual meeting, giving Plaintiff inquiry notice more than one year prior to the filing of his Complaint.    A review of the Proxy Statement demonstrates that the Holdingflower and Cole National transactions were disclosed to the limited partners.    Moreover, with regard to the Cole National transaction, the Proxy statement stated that Thomas Lee was a director of CNC and Child World.    With regard to the Holdingflower transaction, the Proxy Statement stated that C. Hunter Boll and David V. Harkins, officers of Advisor I, were also directors of a wholly-owned subsidiary of Holdingflower.    The Proxy Statement described each of the transactions and disclosed the Lee Company's interest in the transactions.

Plaintiff counters that Defendants reliance on the March 31, 1991 proxy is unavailing because Defendants falsely stated that the required exemptive

orders had been obtained.    The proxy states:

Certain of the Mezzanine Investments and Bridge Investments which may be made by the Fund may involve co-investments with entities affiliated with the Investment Adviser.    Such co-investments are generally prohibited absent exemptive relief from the Securities and Exchange Commission (the "Commission").

As a result of these affiliations and the Fund's expectation of engaging in such co-investments, the Fund sought an exemptive order from the Commission allowing such co-investment, which was received on September 23, 1987.    An additional exemptive order allowing co-investment with ML-Lee Acquisition Fund II, L.P. ("Fund II") and MLLee Acquisition Fund (Retirement Accounts)

II, L.P. ("Retirement Fund") was received from the Commission on September 1, 1989.

*4 During the Fund's fiscal year ended December 31, 1990, and through the date hereof, the Fund made investments in nine Portfolio Companies in which affiliates of the Investment Adviser co-invested pursuant to the above exemptive orders.

Notice of 1991 Annual Meeting of Limited Partners, dated March 31, 1991, D.I. 10, Exhibit 2, at 17. Plaintiff alleges that this statement is false in that Defendants neither sought nor obtained exemptive orders for the Cole National and Holdingflower sales to Fund I.    Therefore, argues Plaintiff, Defendants cannot claim that the proxy was sufficient to put Plaintiff on inquiry notice that Defendants consummated these transactions without the required exemptive orders because the proxy assures them that such orders were obtained.

The Court finds that Plaintiff was not put on notice by the proxy.    The Court agrees with Plaintiff's assertion that if the proxy contained false and/or fraudulent statements and information concerning the subject transactions, Defendants can not now argue that Plaintiff had inquiry notice of the alleged misdeeds of Defendants.    On the present record, the Court concludes Plaintiff's knowledge of the various statements in the proxy did not initiate commencement of the relevant limitations period and, therefore, Defendants' application to dismiss on this ground will be denied.

### 3. Post-October 14, 1992 Transactions

There are five transactions which Defendants concede are timely even under the 1 year/3 year statute of limitations.    The Court agrees that the Counts of the Complaint as they relate to these transactions are timely.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1994 WL 913930 (D.Del.)
**(Cite as: 1994 WL 913930 (D.Del.))**

B. Derivative Versus Individual

Defendants next contend that Plaintiff's claims should be dismissed for failure to fulfill the prerequisites to maintaining a derivative action in Delaware. Defendants claim that although Plaintiff has instituted this action as an individual class action, the claims are by their nature, derivative.

As a preliminary matter, Defendants assert, and Plaintiff does not contest, that Delaware law controls the determination of whether Plaintiff's claims are individual or derivative. *In re Sunrise Sec. Litig.,* 916 F.2d 874, 879 (3d Cir.1990); *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 97-99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (federal court entertaining a derivative action under the 1940 Act must apply applicable state law to determine whether pre-suit demand is required). Under Delaware law, the determination of whether a fiduciary duty lawsuit involving a limited partnership is derivative or direct in nature is similar to that involving a corporation. *Litman v. Prudential-Bache Properties,* 611 A.2d 12, 15 (Del.Ch.1992); *Katell v. Morgan Stanley Group, Inc.,* [1992-93 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97, 437 at 96, 440. For the plaintiff to maintain this action individually (directly), rather than derivatively on behalf of the partnership as defendants claim he must, the plaintiff is required to allege more than an injury resulting from a wrong to the corporation; he must be injured independently of the partnership. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.Super.Ct.1988). Stated alternatively, the test is whether the Plaintiff has suffered an injury distinct from that suffered by other limited partners. *Brug v. The Enstar Group, Inc.,* 755 F.Supp. 1247, 1257 (D.Del.1991) (citing *Kramer v. Western Pacific Indus., Inc.,* 546 A.2d 348, 351 (Del.1988)). Thus, the Court must look not only to the nature of the wrong, but to the relief that Plaintiff would be entitled if he were to prevail. *Kramer,* 546 A.2d at 352.

**\*5** Plaintiff cites a number cases where litigants have brought direct actions alleging 1940 Act violations. However, the Court finds most of those authorities unhelpful, because those cases did not apply Delaware law, and the issue of the proper form of the action was not raised.

Plaintiff, William Seidel, owned 15 units of Fund I worth $15,000. He alleges individual injury with respect to each of the nine transactions in which Defendants were unjustly enriched and Plaintiff

suffered losses. Plaintiff seeks recessionary, compensatory and punitive damages, as well as an accounting of Defendant's misuse of Fund I monies, credits and funds.

As in *In re ML-Lee,* Plaintiff alleges Defendants engaged in a complex, far-reaching scheme to defraud Fund I investors and advance their own interests. Plaintiff claims that this scheme did not merely diminish the value of the Fund's units. Rather, Plaintiff claims individual injury in each of the nine transactions owing to numerous securities laws violations. Given the injury incurred by Plaintiff, the Court is persuaded that the nature of the wrongs alleged in this case can be fairly characterized as individual.

C. Plaintiff's Failure to Properly Allege Primary Violations of the 1940 Act

1. *Section 36(a)*

In Count I, Plaintiff alleges that Lee, the Individual General Partners of Fund I, Advisors I, the officers of Advisors I, and Mezzanine Investments I, breached their fiduciary duties "as the officers, directors, members of an advisory board, or the investment advisor of Fund I." Complaint, at ¶ 107. Defendants allege that the Complaint fails to specify the capacity in which the officers of Advisors I are liable.

Plaintiff counters that the Complaint clearly alleges that the Advisors I Officers are liable under Section 36(a) as members of an advisory board and as investment advisors. The Investment Company Act defines an advisory board as:
> a board ... which is distinct from the board of directors or board of trustees, of an investment company, and which is composed solely of persons who do not serve such company in any other capacity, whether or not the functions of such board are to render its members "directors" within the definition of
> that term, which board has advisory functions as to investments but has no power to determine that any security or other investment shall be purchased or sold by such company.

15 U.S.C. § 80a-2(a)(1). The Investment Company Act defines "investment advisor" as:
> (A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 913930 (D.Del.)
(Cite as: 1994 WL 913930 (D.Del.))

securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A);

**\*6** 15 U.S.C. § 80a-2(20). Person for purposes of the Investment Company Act means a natural person or a company. 15 U.S.C. § 80a-2(28).

Notwithstanding Defendants' arguments to the contrary, the Court is unable to conclude, as a matter of law, that accepting all of Plaintiff's allegations as true, under any set of facts alleged by Plaintiff, Plaintiff would not be able to prove that the Advisor I officers are either an advisory board, or investment advisors. Therefore, the Court finds that Plaintiff's 36(a) allegations against these defendants are sufficient to overcome Defendants' 12(b)(6) challenge.

### 2. Section 57(a)

Count III of Plaintiff's complaint alleges that Defendants Lee, Lee Co., Advisors I, Childs, Shepherd, Harkins, Hutchins, Boll, Schoen, and Masler breached their fiduciary duties under section 57(a)(1) with respect to the Amerace, Chadcliff, Chadwick-Miller, Cole National, and Holdingflower transactions, and section 57(a)(3) with respect to the Cole National transaction. Defendants argue that the Complaint fails to plead a violation of section 57 on the part of the Lee defendants because the Lee defendants did not "act as principals" as that phrase is commonly understood.

Count III of the Complaint seeks to impose liability on the Lee defendants under a theory that has been dubbed "control person liability." At ¶ 114, Plaintiff states that the Lee defendants were acting as principals when they, "by virtue of their control over Fund I and Amerace, Chadcliff, Chadwick-Miller, Cole National, and Holdingflower or their affiliates," caused certain transactions between Fund I and these companies. Defendants urge the Court to reject Plaintiff's control person liability theory. Defendants, on the other hand, argue that Congress's omission of a control person liability provision in the Investment Company Act conclusively demonstrates that no such liability exists.

While the Court is unpersuaded by Plaintiff's argument that the Lee Defendants' status as close

affiliates of the seller [alone] is sufficient to render them liable as principals, the Court is unwilling to accept Defendants' arguments that there is absolutely no control person liability under the 1940 Act. If Plaintiff is able to demonstrate that the Lee Defendants controlled these entities in such a way and to such a degree as to have "caused" these entities to complete the challenged transactions, Plaintiff may have a cause of action against the Lee Defendants under section 57(a). *See In re ML-LEE,* 848 F.Supp. at 544-45, 15 U.S.C. § 80a-47.

### 3. Section 17(4)

Plaintiff alleges in Count V of the Complaint that the Lee Defendants violated section 17(j) with respect to the Chadcliff, Chadwick-Miller and GNC/Diet Center transactions. Section 17(j) grants the SEC power to promulgate rules governing securities transactions by insiders of investment companies. Rule 17j-I(a)(4), promulgated pursuant to this authority, makes it unlawful for any affiliated person of a registered investment company or an investment adviser to engage in fraudulent, deceptive, or manipulative practice in connection with the affiliate's purchase or sale of any security held or to be acquired by the investment company.

**\*7** Relying on caselaw interpreting the requisite pleading requirements under section 10(b) of the 1934 Act, Defendants contend that Plaintiff alleges nothing more than a breach of fiduciary duty, and that such conduct [by itself] is not actionable under section 17(j). Defendants note the absence in the Complaint of any allegations of fraud, or manipulation with regard to the Chadcliff or GNC transactions. [FN12] Moreover, Defendants allege that Rule 17j-1(a) does not apply to the GNC transactions because these transactions did not involve the purchase or sale of securities by the Lee Defendants.

> FN12. Defendants also contend that the section 17(j) allegations fail to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

The Court agrees with Defendants that section 17(j) and Rule 17j-1's reference to deceptive, manipulative, and fraudulent conduct requires some material misrepresentation or omission, or other deception. However, the Court does not agree that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 913930 (D.Del.)
**(Cite as: 1994 WL 913930 (D.Del.))**

Page 7

Complaint fails to allege this conduct. When read as a whole, the Complaint alleges that the Defendants used the assets of Fund I for their own gain, and that they did so by deceiving the SEC and the Funds I investors as to the nature of the transactions. Whether or not Plaintiff will succeed in proving these allegations, the Court finds that Plaintiff has adequately plead manipulative and deceptive conduct.

### III. *CONCLUSION*

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Amended Complaint will be granted in part and denied in part. Plaintiff's Motion to File a Surreply in Opposition to Defendants' Motion to Dismiss will be denied.

An appropriate Order has been entered.

Not Reported in F.Supp., 1994 WL 913930 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:93cv00494 (Docket) (Oct. 14, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 14

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1653947 (Del.Super.)
**(Cite as: 2005 WL 1653947 (Del.Super.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
William A. THOMAS, Jr., M.D., Plaintiff,
v.
Debra A. HOBBS d/b/a Tara Venture, LLC,
Defendant.
**No. C.A. 04C-02-010 RFS.**

Submitted Jan. 28, 2005.
Decided April 27, 2005.

*ORDER*

STOKES, J.

**\*1** Upon careful review of the filings in the above captioned matter, Defendant, Debra A. Hobbs', Motion for Summary Judgment is granted. It appears to the Court that:

1) On September 17, 2002, Plaintiff William A. Thomas ("Dr.Thomas") entered a written contract ("the Contract") with Defendant Debra A. Hobbs ("Dr.Hobbs"), through her limited liability company, Tara Venture, L.L.C. ("Tara Venture") [FN1] to complete a "fit out" to construct the interior of Dr. Thomas' office into a physician's office. The total cost was to be $141,391.00. When Dr. Hobbs failed to substantially complete the construction in the time specified in the contract, the Plaintiff signed a contract with another company to complete the work for $172,836.00.

> FN1. This law suit centers in part around a dispute over what entity Dr. Thomas signed a contract with--a company called Tara Venture, LLC (the name under which the limited liability corporation was formed) or Taraventures L.L.C. or Taraventure L.L.C. As printed, the Contract is between Dr. Thomas and "Taraventures, L.L.C.;" however, it is signed by Debra A. Hobbs as a Member of "Taraventure LLC." It is clear to this Court, however, as it was clear to the Plaintiff, given his admissions, that the

mistake in the Contract was the result of clerical error, and Tara Venture, Taraventures and Taraventure are all the same company. The Court notes that Dr. Thomas gave to Dr. Hobbs a check on September 17, 2002, the date the Contract was signed, for $8000, made payable to "Tara Ventures LLC." (Reply to Def.'s resp. to S.J. Mot., D.I. 30, Ex. C.)

2) Dr. Thomas has brought a claim against Dr. Hobbs, seeking damages and costs for breach of contract. On February 18, 2005, this Court allowed the Plaintiff to amend the Complaint in order to add Tara Venture, L.L.C. as a Defendant. Dr. Thomas alleges that the Defendants breached the Contract by failing to complete the construction and by failing to install a three-phase electrical service. He also requests the return of deposits in the amounts of $14,500.00 paid under the Contract.

3) Before the Contract was entered into, Dr. Hobbs filed a Certificate of Formation on August 20, 2002 with the Secretary of State to form Tara Venture as a limited liability corporation. She is the sole member of Tara Venture. [FN2]

> FN2. The original Certificate of Formation contained a mistake. While it stated that the name of the company was Tara Venture, LLC, it also stated that the certificate was executed for "Air Pollution Control Supplies LLC." A Certificate of Correction was filed on August 13, 2004. Pursuant to Delaware's Limited Liability Company Act, 6 *Del. C.* § § 18- 101 through 18-1109, a Certificate of Correction applies retroactively to the date the original Certificate of Formation was filed, "except as to those persons who are substantially and adversely affected by the correction." 6 *Del. C.* § 18-211. The Plaintiff does not dispute that the Certificate of Correction in this case should apply retroactively to the date of formation of Tara Venture, August 8, 2002. More specifically, the Plaintiff "does not believe [the retroactive correction] is of any consequence since the correction did not retroactively change the name to that of the LLC with which he contracted." (Pl.'s Resp. to Def.'s Mot. for S.J., D.I. 28, ¶ 6.) Since Dr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1653947 (Del.Super.)
(Cite as: 2005 WL 1653947 (Del.Super.))

Page 2

Thomas does not allege he was substantially and adversely affected by the correction, the Court finds that the correction is retroactive to August 8, 2002. *See Siegman v. Palomar Medical Technologies, Inc.,* 1998 WL 118201 (Del. Ch.) (discussing the meaning of "substantial and adverse affects" under 8 *Del. C. § 103(f),* a similar provision for correcting corporate instruments filed with the Secretary of State). Therefore, an analysis of whether or not Tara Venture was a *de jure* or a *de facto* company at the time of the contract is not necessary. *See, e.g., Cleary v. North Delaware A-OK Campground, Inc.,* 1987 WL 28317 (Del.Super.Ct.); *Leber Assocs., LLC. v. The Entertainment Group Fund, Inc.,* 2003 WL 21750211, at *9-10 (S.D.N.Y.).

4) Defendant Dr. Hobbs has filed this Motion for Summary Judgment, pursuant to Superior Court Civil Rule 56. She claims that Dr. Thomas has no cause of action against her personally, and that he must pursue his action against Tara Venture only. She argues that if he wants to pierce the corporate veil to find her liable he must proceed in Chancery Court. In Dr. Thomas' response, he contends that he thought he was contracting with Dr. Hobbs, or with "Taraventures" or "Taraventure," and not with Tara Venture. He also claims through his unsworn responses to Defendant's Request for Admissions that Dr. Hobbs agreed to be personally responsible for the construction of the project. As proof that he contracted with Dr. Hobbs, Dr. Thomas points to a check that was made payable to "Debra Hobbs." However, a contemporaneous receipt prepared by him reflected advance payment to "Debra A. Hobbs, president of Tera Ventures LLC." Thomas admitted not only to preparing receipts but also to making other checks payable to the LLC.

5) This Court will grant summary judgment only when no material issues of fact exist, and the moving party bears the burden of establishing the nonexistence of material issues of fact. *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979). Once the moving party meets its burden, the burden shifts to the nonmoving party to establish the existence of material issues of fact. *Id.* at 681. The Court views the evidence in a light most favorable to the nonmoving party. *Id.* at 680. Where the moving party produces an affidavit or other evidence sufficient under *Superior Court Civil Rule 56* in support of its motion and the burden shifts, the nonmoving party may not rest on its own pleadings, but must provide

evidence showing a genuine issue of material fact for trial. *Super. Ct. Civ. R.* 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

*2 6) Corporations protect the stockholders and officers against individual liability. An officer may not be held liable for breach of a corporate contract, unless the officer has signed the contract in her own capacity and not just as an agent for the corporation. *See Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,* 752 A.2d 1175, 1180 (Del. 1999) ( "Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually." (citations omitted)). Consequently, a plaintiff who seeks to sue an officer of a corporation must pierce the corporate veil to do so. Piercing the corporate veil, however, is an argument that can be considered only in the Chancery Court. *Sonne v. Sacks,* 314 A.2d 194, 197 (Del.1973).

7) A limited liability company, a relatively new entity, was created to allow tax benefits similar to a partnership, while still providing limited liability protection, much like a corporation. *Elf Atochem North Am., Inc. v. Jaffari,* 727 A.2d 286, 287 (Del.1999). As with a corporation, a member of a limited liability company may not be held liable for the debts, obligations and liabilities of the company. *See 6 Del. C. § 18-303.* [FN3] It follows that this Court has no jurisdiction to pierce the corporate veil of a limited liability company, just as it would not with a corporation. *Cf. Gillen v. 397 Properties, L.L.C.,* 2002 WL 259953 (Del. Ch.); *Trustees of Arden v. Unity Constr. Co.,* 2000 WL 130627 (Del. Ch.) (discussing piercing of the corporate veil in the context of limited liability companies). *See also Elf Atochem North Am., Inc.,* 727 A.2d at 292 (discussing the fact that jurisdiction is vested in the Chancery Court under the Limited Liability Company Act, but that another forum may be selected by agreement).

FN3. (a) Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1653947 (Del.Super.)
**(Cite as: 2005 WL 1653947 (Del.Super.))**

Page 3

limited liability company.

8) There are two exceptions, however, to the rule that a member may not be liable for breach of contract. First, Dr. Hobbs could be liable on the Contract she signed with Dr. Thomas if she signed it on her own behalf, rather than for the company. *See Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P., 752 A.2d at 1180.* Second, the Limited Liability Company Act provides an exception, permitting a member to agree to be obligated personally for the obligations and liabilities of the company. *6 Del. C. § 18-303(b).*

9) It is clear to the Court that Dr. Hobbs did not sign the Contract on her own behalf, and therefore she cannot be held personally liable under this theory. It is a well-accepted principle of agency law that "an agent cannot be found liable for a contract he signed on behalf of the principal as long as somewhere in the contract it is made clear that it is between the principal and a third party." *Brandt v. Rokeby Realty Co., 2004 WL 2050519, at *10* (Del.Super.Ct.), *citing,* The Restatement (Second) of Agency § 157 (1958). The Contract unequivocally states that it is between Dr. Thomas and "Taraventures L.L.C., c/o Debra A. Hobbs," as the Contractor, which is a defined term. In this vein, it is signed with "Taraventure LLC" listed as the Contractor, by Dr. Hobbs, member. In its body, the Contract refers to "the Contractor" and never to Dr. Hobbs. Although, at times, the pronoun "her" is used to describe the contractor, rather than "it," this is a logical clerical choice of words. It is not an indication that the Contract was meant to be between Dr. Hobbs and Dr. Thomas, rather than between Tara Venture and him. The facts simply cannot support a conclusion that Dr. Hobbs signed the contract other than for Tara Venture, LLC.

*3 10) *6 Del. C. § 18-303(b)* provides "[n]otwithstanding the provisions of subsection (a) of this section, under a limited liability company agreement or under another agreement, a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company." No evidence has been submitted that there is a limited liability agreement that might contain a clause in which Dr. Hobbs takes personal responsibility for the obligations of Tara Venture. Dr. Thomas states in his responses to the Defendant's Request for Admissions that she did agree to be personally responsible for the obligations of the Contract. However, an unsworn statement is not sufficient to create a dispute of fact to avoid

summary judgment.

Furthermore, it is presumed that such a guarantee was made orally, since no such clause can be found in the Contract itself and no evidence has been submitted of any written agreement. This raises a question of whether the Contract is fully integrated and whether the Parol Evidence Rule would allow extrinsic evidence of earlier negotiations of the terms of the contract. *See, e.g., Concord Mall v. Best Buy Stores, L.P., 2004 WL 1588248, at *3-4* (Del.Super. Ct.) (noting that when the parties reduce a contract to writing, a party may not seek to introduce earlier negotiations to show that the terms are not as shown on the face of the writing). There is also a question of whether any subsequent modification must be in writing or not.

11) In this regard, the Contract provides that it is fully integrated and that any modification must be made in writing. [FN4] Proper interpretation of a contract is a question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195* (Del.1992). "A contract is completely integrated if, on its face, it is clear that the parties intended the writing to be a final and total expression of their agreement." *Concord Mall, 2004 WL 1588248, at *4* (citation omitted). The parol evidence rule bars a party from introducing extrinsic evidence to modify or contradict the written terms of a fully integrated contract. *Id.* "Only in limited circumstances will parol evidence be admissible, such as when the terms of the parties' agreement are ambiguous, or to show 'that the agreement was rendered invalid, void [or] voidable by such causes as fraud, illegality, duress, mutual mistake, lack or failure of consideration, and incapacity." ' *Id* (citation omitted).

FN4. Section Ten of the Contract, "Entire Agreement," states:
This agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this agreement shall not be binding upon either party except to the extent incorporated in this agreement.
Section Eleven of the Contract, "Modification of Agreement," states:
Any modification of this agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1653947 (Del.Super.)
**(Cite as: 2005 WL 1653947 (Del.Super.))**

Page 4

Here, the Plaintiff has presented no evidence that any exceptions to the rule should apply. The Contract is straightforward and clear. Nowhere in it, does the Contract state that Dr. Hobbs will be held personally liable for the obligations of the company under the Contract. [FN5] Furthermore, the Contract unambiguously states that it is between Tara Venture and Dr. Thomas. Dr. Thomas admitted that he contracted with an LLC, of which Hobbes was a member, and that the name was "Taraventure," "Taraventures," or something similar. Dr. Thomas and Dr. Hobbs were both sophisticated persons. In this context, the Court cannot find the Contract ambiguous, such that the parol evidence rule would permit the admission of extrinsic evidence as to Dr. Hobbs' alleged personal liability.

> FN5. The Defendant argues that Dr. Thomas' claim that Dr. Hobbs agreed to be personally responsible for the Contract must fail because he can provide no writing to support the claim, nor has he alleged any exceptions to the statute of frauds. *See* 6 *Del. C. §* 2714(a). Since the contract in this case was reduced to writing and fully integrated, the statute of frauds is inapplicable. The Contract itself requires any modification to be reduced to writing. Moreover, the Contract required the work to commence within ten days and to be completed within 120 days thereafter. If it had been necessary to consider the defense inherent in the statute of frauds, however, it would not have applied since the contract in this case was to be performed in less than a year and it did not fall into any of the other delineated categories of contracts that must be put in writing. *See id.*

*4 12) Considering the foregoing, the Court finds that Dr. Hobbs may not be held personally liable for the obligations and possible breach of contract of her limited liability company, Tara Venture. She is dismissed from this case. The case will proceed against Tara Venture, L.L.C. only in this Court. If the Plaintiff wishes to pierce the corporate veil, he must pursue such an action in the Chancery Court.

*IT IS SO ORDERED.*

Not Reported in A.2d, 2005 WL 1653947 (Del.Super.)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 15



January 1, 2001

Barron's Features

# E-gregious!

## 2000 SCOREBOARD

### ERIN E. ARVEDLUND

The year 2000 computer glitch caused barely a ripple in the stock market, but many another gloomy millennial prediction came true.

The dot.com revolution fizzled out, California began experiencing a devastating power crisis, big-name computer stocks and other blue chips sank and the economy slowed amid growing fears of a recession. Six hikes in the fed-funds rate since mid-1999 through the end of last year hit the stock market as well. During that period, the fed-funds rate rose from 4.75% to 6.50%.

The Dow Jones Industrials lost 6.18% in 2000, closing at 10,786.85. The S&P 500 declined 10.14%. After rising 85.59% in 1999, the Nasdaq Composite fell precipitously last year, down 39.29%.

The biggest losers were technology, communications and some cyclical consumer stocks. Onetime portfolio stalwarts turned into struggling stocks, including Lucent , AT&T , Computer Associates , Unisys , and Novell , which authorized a $500 million buyback program in August. Novell, which reached a 52-week high of $44.56 in February, ended the year at $5.22.

Most of last year's losers were linked to the egregious excesses of the Internet, amid growing concern that online advertising-the engine of financial results, if not earnings-was slowing dramatically.

Internet-content plays, incubators and service providers, including Yahoo , CMGI , eToys , Entrade , On2.com and Internet Capital Group were among the most steeply sold off. Priceline.com , the poster child for beaten-down 'Net stocks, said on the last trading day of 2000 that founder Jay Walker had stepped down from the company's board of directors. The company burned through $363 million in about one year, and the stock traded in a 52-week range of $104.25 down to $1.06. PlanetRx.com was notified it may be delisted by NASDAQ. The biggest gainers were the healthcare, financial, utility, energy and some capital-goods stocks. Banks and financials such as Metlife , Washington Mutual , AIG , Merrill Lynch and Freddie Mac posted smart gains amid rising interest rates and a series of mergers. Last year, conventional wisdom was that nimble 'Net start-ups would siphon customers and sales from mainline Wall Street firms, but in some cases, the reverse appears to have happened. Corporate America flourished while many pure Internet plays turned to dot-compost: Online brokerage firm E*Trade , for instance, fell to earth.

Soaring energy prices led to a fiery rush back into stocks such as Enron , Cross Timbers Oil and Magnum Hunter .

Florida smokers' verdicts against the tobacco industry prompted one of the biggest settlements in corporate history -- as well as a recovery in cigarette makers' stocks. British American Tobacco and

**Philip Morris** rebounded 50% or more.

Old Economy pillar **Xerox** , a leading maker of copiers, faced fierce competition and widespread problems collecting bills from customers. Retailers like Kmart coped with the slowing economy, and **Circuit City** , with remodeling costs and its decision to quit selling appliances.

As scientists completed the first map of the human genetic code, investors sought safety in drug stocks. Biotechnology, pharmaceutical and diagnostic-company share prices bounced, including giants **Merck** and **Pfizer** , generic-drug firm **Laboratory Corp. of America Corp.** , OSI Pharmaceuticals , Titan Pharmaceuticals , **Barr Laboratories** , and health-care concerns RehabCare Group , Quest Diagnostics and Inverness Medical . Retail drugstore chain Rite Aid , however, restated its financial results and halted an expansion plan.

And a few tech shares posted impressive gains, including optical networking equipment concern **Ciena** , Internet infrastructure plays such as BEA Systems and router maker **Juniper Networks** , and semiconductor-related stocks **Applied Micro Circuits** and **Rambus** . Ciena used that stock-market currency to buy Cyras Systems in a $2-billion, all-stock deal. **Brocade Communications** (see related story[1] ) and **Linear Technology** also both ended higher on the year.

---

E-mail comments to editors@barrons.com[2]

---

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB978138283939255261.djm

**Hyperlinks in this Article:**
(1) http://interactive.wsj.com/archive/retrieve.cgi?id=SB97813799333608177.djm
(2) mailto:editors@barrons.com

---

Copyright © 2002 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window